JUDGE FURMAN

12 CIV 7527

PREET BHARARA
United States Attorney for the
Southern District of New York
BY:    JEFFREY S. OESTERICHER
       SARAH J. NORTH
       REBECCA S. TINIO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone No. (212) 637-2800
Facsimile No. (212) 637-2730
Jeffrey.Oestericher@usdoj.gov
Sarah.North@usdoj.gov
Rebecca.Tinio@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



UNITED STATES OF AMERICA,

    Plaintiff,

        -against-

WELLS FARGO BANK, N.A.,

    Defendant.

12 Civ.    (  )

**COMPLAINT OF THE**
**UNITED STATES OF AMERICA**

**Jury Trial Demanded**

The United States of America (the "United States" or the "Government"), by its attorney,

Preet Bharara, United States Attorney for the Southern District of New York, brings this

complaint against Wells Fargo Bank, N.A. ("Wells Fargo"), alleging as follows:

## INTRODUCTION

1.    This is a civil fraud action by the United States to recover treble damages and

civil penalties under the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.*, civil penalties

under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"),

12 U.S.C. § 1833a, and common-law damages arising from fraud on the United States

Department of Housing and Urban Development ("HUD") in connection with Wells Fargo's residential mortgage lending business.

2.     As set forth more fully below, Wells Fargo, the largest HUD-approved Federal Housing Administration ("FHA") residential mortgage lender, engaged in a regular practice of reckless origination and underwriting of its retail FHA loans over the course of more than four years, from May 2001 through October 2005, all the while knowing that it would not be responsible when the materially deficient loans went into default.  Rather, as explained below, under FHA's Direct Endorsement program, HUD insured the loans that Wells Fargo was originating.  During this four and a half year period, Wells Fargo certified to HUD that over 100,000 retail FHA loans met HUD's requirements for proper origination and underwriting, and therefore were eligible for FHA insurance, when the bank knew that a very substantial percentage of those loans – nearly half of the loans in certain months – had not been properly underwritten, contained unacceptable risk, and were ineligible for FHA insurance.

3.     Moreover, the extremely poor quality of Wells Fargo's loans was a function of management's nearly singular focus on increasing the volume of FHA originations (and the bank's profits), rather than on the quality of the loans being originated.  Management's actions included hiring temporary staff to churn out and approve an ever-increasing quantity of FHA loans, failing to provide its inexperienced staff with proper training, paying improper bonuses to its underwriters to incentivize them to approve as many FHA loans as possible, and applying pressure on loan officers and underwriters to originate and approve more and more FHA loans as quickly as possible.  As a consequence of Wells Fargo's misconduct, FHA was required to pay hundreds of millions of dollars in insurance claims on defaulted loans that the bank had falsely

certified met HUD's requirements, and thousands of Americans lost their homes through mortgage foreclosures across the country.  Accordingly, the Government seeks recovery for its loss on these materially deficient mortgage loans that Wells Fargo recklessly underwrote and falsely certified were eligible for FHA insurance.

4.      To compound matters, from January 2002 through December 2010, Wells Fargo purposely violated HUD reporting requirements and kept its materially deficient loans a secret. Wells Fargo was well aware that HUD regulations required it to perform monthly reviews of its FHA loan portfolio and to self-report to HUD any loan that was affected by fraud or other serious violations.  This requirement permits HUD to investigate the bad loans and request reimbursement or indemnification, as appropriate.  But, although the bank generally performed the monthly loan reviews and internally identified over 6,000 materially deficient loans during this period, including over 3,000 loans that had gone into default within the first six months after origination (known as "Early Payment Defaults" or "EPDs"), it chose not to comply with its self-reporting obligation to HUD.

5.      Prior to October 2005, Wells Fargo, the largest originator of FHA loans in America, did not self-report a single bad loan to HUD.  Instead, the bank concealed its bad loans and shoddy underwriting to protect its enormous profits from the FHA program.  And when HUD inquired about Wells Fargo's self-reporting practices in 2005, the bank attempted to cover up its misdeeds by falsely suggesting to HUD that the bank had in fact been reporting bad loans. Thereafter, the bank's self-reporting was woefully and purposefully inadequate, all in an effort to avoid indemnification claims from HUD and pushback from wholesale brokers whose materially deficient loans would be reported to HUD.  All told, from January 1, 2002 through December 31,

3

2010, Wells Fargo internally identified 6,558 loans that it was required to self-report, including 3,142 Early Payment Defaults, but self-reported only 238 loans.  As a consequence of Wells Fargo's intentional failure to self-report these ineligible loans to HUD, FHA was required to pay hundreds of millions of dollars in insurance claims when the loans defaulted, with additional losses expected in the future.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. § 1331.

7.      Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1), (b)(3), and (c) because the defendant can be found and transacts business in this judicial district.

## PARTIES

8.      Plaintiff is the United States of America.

9.      Defendant Wells Fargo Bank, N.A. is a national bank with its principal place of business in California.  Wells Fargo Bank, N.A. is the parent company of Wells Fargo Home Mortgage, a mortgage lender headquartered in Des Moines, Iowa, with branches and offices in all 50 states.

## CIVIL STATUTES TO COMBAT MORTGAGE FRAUD

10.      The False Claims Act provides liability for any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B).  The False Claims Act further provides that any person who violates the Act: "is liable to the United States Government for a

civil penalty of not less than [$5,500] and not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person."   31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

11.    Congress enacted FIRREA in 1989 to reform the federal banking system.  Toward that end, FIRREA authorizes civil enforcement of enumerated criminal predicate offenses—as established by a preponderance of the evidence—that affect financial institutions and certain government agencies.  *See* 12 U.S.C. § 1833a(e).  Several of the predicate offenses that can form the basis of liability under FIRREA are relevant here:  First, 18 U.S.C. § 1006 prohibits any person, who is "connected in any capacity with [HUD]," from "mak[ing] any false entry in any book, report or statement of or to [HUD]" with the "intent to defraud [HUD] . . . or any other body politic . . . or to . . . deceive any officer, auditor, examiner, or agent of [HUD] or of [a] department or agency of the United States."  Second, 18 U.S.C. § 1014 prohibits any person from "knowingly mak[ing] any false statement or report, or willfully overvalu[ing] any land, property, or security, for the purpose of influencing in any way the action of [FHA]."  *Id.*  Third, 18 U.S.C. §§ 1341, 1343 prohibit using the mails or wires, respectively, for the purpose of executing a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  Fourth, 18 U.S.C. § 1001 prohibits any person from, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . mak[ing] any materially false, fictitious, or fraudulent statement or representation."

12.    FIRREA provides that the United States may recover civil penalties of up to $1 million per violation, or, for a continuing violation, up to $1 million per day or $5 million,

whichever is less.  12 U.S.C. § 1833a(b)(1)-(2).  The statute further provides that the penalty can exceed these limits to permit the United States to recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.  18 U.S.C. § 1833a(b)(3).

## FACTUAL BACKGROUND

### I.    THE FHA MORTGAGE INSURANCE PROGRAM

#### A.    Background

13.    FHA, a part of HUD, is the largest mortgage insurer in the world, insuring approximately one third of all new residential mortgages in the United States.  Pursuant to the National Housing Act of 1934, FHA offers various mortgage insurance programs.  Through these programs, FHA insures approved lenders ("mortgagees") against losses on mortgage loans made to buyers of single-family housing.  The programs help low-income and moderate-income families become homeowners by lowering some of the costs of their mortgage loans.  FHA mortgage insurance encourages lenders to make loans to creditworthy borrowers who nevertheless might not meet conventional underwriting requirements.

14.    Under HUD's mortgage insurance programs, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property.  HUD also incurs expenses in managing and marketing the foreclosed-upon property until it is resold.  By protecting lenders against defaults on mortgages, FHA mortgage insurance encourages lenders to make loans to millions of creditworthy Americans who might not otherwise satisfy conventional underwriting criteria.  FHA mortgage insurance also makes mortgage loans valuable in the

6

secondary markets, as FHA loans are expected to have met HUD requirements and because they are secured by the full faith and credit of the United States.

15.     In the event that a borrower defaults on an FHA-insured mortgage, the lender or other party holding the mortgage submits a claim to HUD for the costs associated with the defaulted mortgage and the sale of the property.  HUD then pays off the balance of the mortgage and other related costs and may assume ownership of the property.

16.     HUD's Direct Endorsement Lending program is one of the FHA-insured mortgage programs.  A Direct Endorsement Lender is authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA mortgage insurance without prior HUD review or approval.  To qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD requirements (*e.g.*, income, credit history, valuation of property, etc.).

17.     HUD relies on the expertise and knowledge of Direct Endorsement Lenders in providing FHA insurance and relies on their decisions.   A Direct Endorsement Lender is therefore obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in dealings with HUD.  The duty of good faith also requires a Direct Endorsement Lender to make full and fair disclosures to HUD of all material facts and to take on the affirmative duty of employing reasonable care to avoid misleading HUD in all circumstances.

**B.     Underwriting and Due Diligence Requirements**

18.     A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. The underwriter must "evaluate [each] mortgagor's credit characteristics, adequacy and stability of income to meet the

periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).   In addition, the underwriter must "have [each] property appraised in accordance with [the] standards and requirements" prescribed by HUD.  24 C.F.R. § 203.5(e).

19.    Mortgagees must employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud, in addition to the responsibility that underwriting decisions are performed with due diligence in a prudent manner.  HUD Handbook 4000.4 REV-1, ¶ 2-4(C)(5); *see also* HUD Handbook 4155.2 ¶ 2.A.4.b.  The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters.  HUD Handbook 4060.1 REV-2, ¶ 2-9(A).

20.    HUD relies on Direct Endorsement Lenders to conduct due diligence on Direct Endorsement loans.  The purposes of due diligence include (1) determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties, *see* 24 C.F.R. § 203.5(d), and (2) examining a property offered as security for the loan to determine if it provides sufficient collateral, *see* 24 C.F.R. § 203.5(e)(3).  Due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.  In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R. § 203.5(c).

21.    · HUD has set specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires Direct Endorsement Lenders to be familiar with, and to comply with, governing HUD Handbooks and Mortgagee Letters, which provide detailed processing instructions to Direct Endorsement Lenders.  These materials specify the minimum due diligence with which Direct Endorsement Lenders must comply.

22.    With respect to ensuring that borrowers have sufficient credit, a Direct Endorsement Lender must comply with governing HUD Handbooks, such as HUD Handbook 4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans), to evaluate a borrower's credit.  The rules set forth in HUD Handbook 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.  HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

23.    To properly evaluate a borrower's credit history, a Direct Endorsement Lender must, at a minimum, obtain and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or interested parties; inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts and recent credit inquiries; establish income stability and make income projections; obtain explanations for gaps in employment, when required; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and consider and document any compensating factors permitting deviations from those fixed ratios.

24.     With respect to appraising the mortgaged property (*i.e.*, collateral for the loan), a Direct Endorsement Lender must ensure that an appraisal and its related documentation satisfy the requirements in governing HUD Handbooks, such as HUD Handbook 4150.2 (Valuation Analysis for Single Family One- to Four-Unit Dwellings). The rules set forth in HUD Handbook 4150.2 exist to ensure that a Direct Endorsement Lender obtains an accurate appraisal that properly determines the value of the property for HUD's mortgage insurance purposes.

**C.      Quality Control Requirements and Wells Fargo Quality Control**

25.     Furthermore, to maintain HUD-FHA approval, a Direct Endorsement Lender must implement and maintain a quality control program. HUD requires the quality control department to be independent of mortgage origination and servicing functions. *See* HUD Handbook 4060.1 REV-1, ¶ 6-3(B); HUD Handbook 4060.1 REV-2, ¶ 7-3(B); HUD Handbook 4700.2 REV-1, ¶ 6-1(A). To comply with HUD's quality control requirements, a lender's quality control program must (among other things): (a) review a prescribed sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (b) conduct a full review of "all loans going into default within the first six payments," which HUD defines as "early payment defaults." HUD Handbook 4060.1 REV-1, ¶¶ 6-6(C), 6-6(D); HUD Handbook 4060.1 REV-2, ¶¶ 7-6(C), 7-6(D); HUD Handbook 4700.2 REV-1, ¶¶ 6-1(B), 6-1(D).

26.     In conducting a quality control review of a loan file, the lender must, among other things, review and confirm specific items of information. For instance, "[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written re-verification. Examples of items that must be reverified include, but are not limited to, the mortgagor's employment or other income, deposits, gift letters, alternate credit sources, and

10

other sources of funds." HUD Handbook 4060.1 REV-2, ¶ 7-6(E)(2). Further, "[a]ny discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed." *Id.*; *see also* HUD Handbook 4060.1 REV-1, ¶ 6-6(E)(2); HUD Handbook 4700.2 REV-1, ¶ 6-3(A)(2).

27.     The HUD Handbook lays out a rating system for the quality control reviews, in which the lender implements a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review. The system should enable a mortgagee to compare one month's sample to previous samples so the mortgagee may conduct trend analysis." HUD Handbook 4060.1 REV-2, ¶ 7-4; *see also* HUD Handbook 4060.1 REV-1, ¶ 6-4. The ratings provided, for this purpose, are "Low", *i.e.* no or minor violations, "Acceptable," *i.e.* issues identified were not material to insurability of the loan, "Moderate," *i.e.* significant unresolved questions or missing documentation created a moderate risk to the mortgagee and FHA, and "Material," *i.e.* issues identified were material violations of FHA or mortgagee requirements and represent an unacceptable level of risk, such that the loans must be reported to HUD. HUD Handbook 4060.1 REV-1, ¶ 6-4; HUD Handbook 4060.1 REV-2, ¶ 7-4.

28.     Specifically, the HUD Handbook defines "Material Risk" loans as follows:

The issues identified during the review were material violations of FHA or mortgagee requirements and represent an unacceptable level of risk. For example, a significant miscalculation of the insurable mortgage amount or the applicant[']s capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud. Mortgagees must report these loans, in writing, to the Quality Assurance Division in the FHA Home Ownership Center having jurisdiction.

HUD Handbook 4060.1 REV-2, ¶ 7-4(D); *see also* HUD Handbook 4060.1 REV-1, ¶ 6-4(D).

11

29.     Under HUD's rules, a lender must report to HUD (along with the supporting documentation) "[s]erious deficiencies, patterns of non-compliance, or fraud uncovered by mortgagees" during the "normal course of business and by quality control staff during reviews/audits of FHA loans" within 60 days of the initial discovery.  HUD Handbook 4060.1 REV-1, CHG-1, ¶¶ 6-13, 6-3(J); *see also* HUD Handbook 4060.1 REV-2, ¶ 7-3(J) (requiring DELs to "immediately" report findings of "fraud or other serious violations" affecting an FHA loan); HUD Handbook 4060.1 REV-2, ¶ 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.").[1]  Upon making such findings, the lender must also expand the scope of the quality control review both by increasing the number of files reviewed and conducting a more in-depth review of the selected files.

30.     Until 2005, HUD's rules instructed Direct Endorsement Lenders to make the required self-reports of loans with serious deficiencies, patterns of noncompliance, or fraud in writing to HUD through the Quality Assurance Division of the HUD Homeownership Centers ("HOCs") having jurisdiction.  In May 2005, HUD issued Mortgagee Letter 2005-26, which notified lenders that going forward they would have to participate in mandatory electronic reporting through HUD's online Neighborhood Watch system.  That new method became mandatory at the end of November 2005, and required mortgagees "to report serious deficiencies, patterns of noncompliance, or suspected fraud, to HUD in a uniform, automated fashion" and in lieu of written reports to the various individual HOCs.

---

[1] Prior to November 2003, lenders were required to self-report to HUD loans affected by "significant discrepancies," such as "any violation of law or regulation, false statements or program abuses by the mortgagee, its employees, or any other party to the transaction."  HUD Handbook 4060.1 REV-1, ¶ 6-1(H).

12

31.    In addition to reporting loans affected by fraud or other serious violations to HUD, the lender is required to take corrective action in response to its findings.  In particular, quality control review findings must "be reported to the mortgagee's senior management within one month of completion of the initial report" and "[m]anagement must take prompt action to deal appropriately with any material findings.  The final report or an addendum must identify the actions being taken, the timetable for their completion, and any planned follow-up activities." HUD Handbook 4060.1 REV-2, ¶ 7-3(I); *see also* HUD Handbook 4060.1 REV-1, ¶ 6-3(I); HUD Handbook 4700.2 REV-1, ¶ 6-1(F).   Appropriate action by management includes following up with underwriters responsible for material findings to ensure that they are properly trained and diligently reviewing each file before endorsing it for FHA mortgage insurance.

32.    Wells Fargo's home mortgage division's quality control function included both the Fraud Risk Management ("FRM") and Quality Assurance ("QA") departments.  The QA department's procedures included the following with respect to FHA-insured loans:  monthly reviews of a random sample of loans originated and sponsored within the prior 60 days, reviews of at least some portion of its EPDs, and preparation and circulation of internal reports of the reviews' findings.   The FRM department also reviewed loans referred to it as potentially involving fraud or misrepresentations.   The FRM department had several sources for these referrals, including the QA department, its branches, and the bank's fraud reporting hotline.

33.    In evaluating the loans it reviewed, Wells Fargo tracked HUD Handbook terminology, rating its findings regarding the risks of the loans as either "Material," "Moderate," or "Acceptable."   Wells Fargo's definition for the "Material" rating mirrored HUD's in substance, and made clear that a loan with that rating contained unacceptable risk and was

13

ineligible for FHA insurance.  Specifically, Wells Fargo's definition of the "Material" rating in

October 2002 was as follows:

> The loan contains significant deviations from the specific loan program
> parameters under which it was originated, making the loan ineligible for sale to
> the investor or resulting in potential repurchase or indemnification. [And/or] The
> loan contains significant risk factors affecting the underwriting decision and/or
> contains misrepresentation, which may render the loan non-investment quality.

34.     Wells Fargo's May 2004 Quality Control Plan for FHA loans, which was

provided to HUD, similarly defined "Material risk" rated loans as follows:

> The loan contains significant deviations from the specific loan program
> parameters under which it was originated or significant risk factors affecting the
> underwriting decision and/or contains misrepresentation, making the loan
> ineligible for sale to the investor or resulting in potential repurchase or
> indemnification.

That Plan also included examples drawn directly from the HUD Handbook's definition of

"Material risk" loans, stating:  "Examples of material risks include the applicant's capacity to

repay the mortgage, failure to underwrite an assumption or protect abandoned property from

damage, or fraud."

35.     Both the QA and FRM departments made monthly reports to senior management,

including the Wells Fargo Quality Control ("QC") Committee.  Wells Fargo's QA department

provided written reports, summarizing its findings resulting from QA's reviews of statistically

random monthly samples of loans, as well as loans that were categorized as EPDs.  Among other

information, those QA reports summarized the percentage of loans reviewed in various

categories and lines of business that contained "Material" risk ratings.

36.     Where FRM received a referral and conducted an initial review of a loan, if the

loan file indicated there may have been origination and underwriting violations, FRM performed

14

a "deep dive" review.  In this "deep dive," the FRM reviewers sought to verify the employment and income, whether "middle men" were being used for purchases, the validity of appraisals, and other items.  On the retail side of home mortgage, according to a former Wells Fargo FRM manager, these reviews exposed a "dirty underbelly of bad loan officers."

37.     The FRM reports to the QC Committee provided information regarding loans whose underwriting showed serious violations, including loans reviewed in its "deep dive." Loans reported by FRM to the QC Committee included loan files containing misrepresentations of assets, credit, and income, as well as appraisal fraud.  According to a former manager in the FRM department, FRM understood that the QC Committee then determined what information would be reported to HUD and that the QC Committee would make those reports.

**D.    Direct Endorsement Lender Certifications**

38.     Every Direct Endorsement Lender must make an annual certification of compliance with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan.   The annual certification states, in sum or substance:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies.  I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

Absent a truthful annual certification, a lender is not entitled to maintain its direct endorsement lender status and is not entitled to endorse loans for FHA insurance.

15

39.    In addition to the annual certification requirement, after each mortgage closing, the Direct Endorsement Lender must certify that the lender conducted due diligence and/or ensured data integrity such that the endorsed mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A. For each loan that was underwritten with an automated underwriting system approved by FHA, the lender must additionally certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id.* For each loan that required manual underwriting, the lender must additionally certify that the underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage. . . ." *Id.* HUD relies on each certification to endorse the loan and provide the lender with a mortgage insurance certificate.

## II.    WELLS FARGO SUBMITTED THOUSANDS OF FALSE INDIVIDUAL LOAN CERTIFICATIONS TO HUD IN CONNECTION WITH FHA LOANS THAT THE BANK ORIGINATED FROM MAY 2001 THROUGH OCTOBER 2005

40.    From May 2001 through October 2005, Wells Fargo engaged in a regular practice of reckless origination and underwriting of its retail FHA loans and falsely certified to HUD that tens of thousands of those loans were eligible for FHA insurance. During this time period, the quality of Wells Fargo's retail FHA loans was extremely poor. This was a function of the bank's concerted effort to vastly increase its FHA loan volume by hiring temporary staff to underwrite loans, failing to give the staff proper training, paying incentive bonuses to underwriters based on the number of loans that they approved, and pressuring loan officers and underwriters to

originate and approve as many FHA loans as possible as quickly as possible.  Not surprisingly, this increase in loan volume came at the expense of loan quality.

41.    From May 2001 through October 2005, Wells Fargo's management was aware that a substantial percentage of its retail FHA loan portfolio – nearly 50% in certain months – did not comply with HUD requirements, contained an unacceptable level of risk, and therefore was ineligible for HUD insurance.  But management failed to take effective action to address the seriously deficient loan originations and underwriting.  Instead, Wells Fargo reaped all the profits by certifying falsely that its entire portfolio of retail FHA loans met HUD requirements and was eligible for insurance.  And to avoid any indemnification claims from FHA, Wells Fargo concealed the fact that it was having very serious loan quality problems from HUD and failed to self-report, as required, any of the bad loans.  As a result of Wells Fargo's false loan certifications, FHA paid insurance claims on thousands of defaulted mortgage loans that Wells Fargo knew, or should have known, did not meet HUD's requirements and were ineligible for FHA insurance.

**A.    Wells Fargo's Widespread Loan Quality Problems, Reckless Underwriting, and False Loan Certifications:  May 2001 through January 2003**

42.    The underlying causes of Wells Fargo's very serious loan quality problems and reckless underwriting are multifold.  In or around the middle of 2000, Wells Fargo significantly increased its FHA loan originations.  From January 1, 2001 through December 31, 2002, Wells Fargo originated or sponsored approximately 225,000 FHA loans.  To facilitate this substantial increase in FHA originations, Wells Fargo expanded its staff, including hiring temporary underwriters to review FHA loans.  Many of these employees were not adequately trained with

respect to the requirements of the FHA program.  Indeed, Wells Fargo's senior management was aware that these employees had not received the in-depth training necessary to properly underwrite these loans and adhere to FHA's submission requirements.

43.     To compound matters, Wells Fargo paid its underwriters a bonus (in addition to their salaries) based on the number of loans approved, rather than the number of loans reviewed. This improper *de facto* commission incentivized the underwriters to approve as many FHA loans as possible, regardless of the risk of default or the loan's eligibility for FHA insurance.  Worse yet, the incentive was tied to the total number of loans approved at a particular underwriting site, thereby fostering a group dynamic whereby individual underwriters felt pressure from their peers at the site to approve loans.

44.     Apart from the incentive system, management applied heavy pressure on loan officers and underwriters to originate, approve, and close loans.  And management required underwriters to make decisions on loans on extremely short turnaround times and employed lax and inconsistent underwriting standards and controls.

45.     The extraordinarily heavy volume of FHA loans also overwhelmed Wells Fargo's FHA underwriters and further contributed to the extremely poor loan quality.  This heavy volume was particularly problematic given the underwriting staff's general lack of experience.

46.     As a result of this multitude of factors, the quality of the bank's retail FHA loans dropped precipitously beginning in the summer of 2000.  This huge decline in loan quality was detected contemporaneously by Wells Fargo's Quality Assurance division and was directly reported to senior management.  For example, QA's report for loans originated in December 2000 advised that 26% of the retail FHA loans that were randomly sampled contained a material

violation of HUD's requirements. In other words, based on Wells Fargo's sampling, greater than one out of every four retail FHA loan that the bank originated in December 2000 and certified to HUD for FHA insurance bore unacceptable risk and did not meet HUD's requirements. The report for December 2000 originations was consistent with prior monthly QA reports from the summer and fall of 2000 showing material violation rates in randomly sampled retail FHA loans of between about 15% to 20%.

47.     Despite these troubling findings, Wells Fargo's management failed to take action to address these issues. No written action plans were prepared for loans with material violations. Corrective action for such loans was not formally tracked. There was little to no follow-up on the material violations. And the bank failed to self-report any of these loans with serious deficiencies to HUD. Instead, Wells Fargo continued on the same path, originating tens of thousands of FHA loans with the same reckless underwriting, and certifying its entire portfolio of FHA loans for insurance.

48.     As a result of management's inaction, the material violation rate worsened significantly beginning in May 2001, and escalated tremendously throughout 2002. Based on Wells Fargo's own QA findings, during the 21 months from May 2001 through January 2003, the material violation rate for randomly reviewed FHA loans exceeded 25% in 18 of those months. That means that at least one out of every four retail FHA loan that Wells Fargo certified to HUD for FHA insurance during those months did not qualify, and the bank knew it.

49.     Even worse, during a seven-month stretch from April 2002 through October 2002, the material violation rate never dipped below 42%, and reached as high as 48%. That means that during those months nearly one out of every two retail FHA loan that Wells Fargo certified

to HUD did not qualify for insurance, and the bank knew it.  This was an extraordinary departure from Wells Fargo's internal benchmark for material violations, which was set at 5%.  And QA's material violation rate for FHA loans that went into early payment default was even higher, averaging 66% in 2002, and hitting an astronomical high of nearly 90% in one of those months.

50.     Wells Fargo QA's month-by-month findings, specific to the retail FHA business for this period, are as follows:[2]

| LOAN FUNDING MONTH | MATERIAL VIOLATION | MODERATE VIOLATION | TOTAL |
|---|---|---|---|
| May 2001 | 19.9% | N/A | N/A |
| June 2001 | 30.2% | N/A | N/A |
| July 2001 | 36.5% | N/A | N/A |
| August 2001 | 26.5% | N/A | N/A |
| September 2001 | NOT AVAILABLE | N/A | N/A |
| October 2001 | 30.5% | N/A | N/A |
| November 2001 | 28.9% | N/A | N/A |
| December 2001 | 21.8% | N/A | N/A |
| January 2002 | 30.5% | N/A | N/A |
| February 2002 | 21.6% | 24.4% | 46.0% |
| March 2002 | 35.7% | 29.1% | 64.8% |
| April 2002 | 48.0% | 28.6% | 76.6% |
| May 2002 | 46.2% | 28.8% | 75.0% |
| June 2002 | 46.6% | 36.2% | 82.8% |
| July 2002 | 42.6% | 40.3% | 82.9% |
| August 2002 | 43.6% | 32.6% | 76.2% |
| September 2002 | NO | TESTING | PERFORMED |
| October 2002 | NO | TESTING | PERFORMED |
| November 2002 | 28.5% | 38.9% | 67.4% |

---

[2] Information regarding Wells Fargo QA's review of September 2001 FHA originations is not available.  Information is not provided for September and October 2002, because Wells Fargo did not conduct random sample reviews of FHA loans in those months.

| LOAN FUNDING MONTH | MATERIAL VIOLATION | MODERATE VIOLATION | TOTAL |
|---|---|---|---|
| December 2002 | 27.5% | 47.1% | 74.6% |
| January 2003 | 27.5% | 49.0% | 76.5% |

51.     Month after month, Wells Fargo QA reported the extraordinarily severe and worsening loan quality problems to the bank's senior management, yet no effective action was taken.  Again, no written action plans were prepared to address loans with material violations.  There was little to no follow-up on the material violations.  Corrective action was not formally tracked.  And the bank did not self-report a single loan to HUD.

52.     The examples set forth below represent a tiny sample of the total number of mortgages for which Wells Fargo submitted false certifications in this period.

**1.     The Marsh Salt Property in Texas**

53.     FHA case number 492-6423217 relates to a property on Marsh Salt Court, in Springtown, TX (the "Marsh Salt Property").  Wells Fargo underwrote the mortgage for the Marsh Salt Property, reviewed and approved it for FHA insurance, and certified that a Direct Endorsement ("DE") underwriter had conducted the required due diligence on the loan application and that the loan was eligible for HUD mortgage insurance.  The mortgage closed on or about July 1, 2002.

54.     Contrary to Wells Fargo's certification, Wells Fargo did not comply with HUD rules in reviewing and approving this loan for FHA insurance, and did not exercise due diligence in underwriting the mortgage.  Instead, Wells Fargo violated multiple HUD rules, including HUD Handbook 4155.1 ¶¶ 2-10, 2-3, 3-1 and Mortgagee Letter 2001-01.

55.     Wells Fargo's violation of HUD Handbook 4155.1 ¶ 2-10 is illustrative of the multiple rules that Wells Fargo violated in approving the Marsh Salt Property.   HUD underwriting guidelines state that all funds for the borrower's investment in the property must be verified.   HUD Handbook 4155.1 ¶ 2-10.   Contrary to this clear requirement, Wells Fargo failed to verify and document the borrower's purported investment in the Marsh Salt Property; indeed, the documents in the Marsh Salt Property mortgage application reveal that the borrower had documented assets of thousands of dollars less than the amount the borrower was purportedly investing in the property.   In violating HUD Handbook 4155.1 ¶ 2-10, Wells Fargo endorsed the Marsh Salt Property for FHA insurance without proof of the borrower's contribution to the purported investment.

56.     Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

57.     Within three months after closing, this mortgage went into default.   As a result, HUD paid an FHA insurance claim of $120,751.83, including costs.

**2.  The Albert Drive Property in New Jersey**

58.     FHA case number 352-4722386 relates to a property on Albert Drive in Old Bridge Township, NJ (the "Albert Drive Property").   Wells Fargo underwrote the mortgage for the Albert Drive Property, reviewed and approved it for FHA insurance, and certified that a DE underwriter had conducted the required due diligence on the loan application and that the loan was eligible for HUD mortgage insurance.   The mortgage closed on or about September 27, 2002.

22

59.     Contrary to Wells Fargo's certification, Wells Fargo did not comply with HUD rules in reviewing and approving this loan for FHA insurance, and did not exercise due diligence in underwriting the mortgage.   Instead, Wells Fargo violated multiple HUD rules, including HUD Handbook 4155.1 ¶¶ 2-3, 2-12, and 2-13, HUD Handbook 4000.4 ¶ 2-4(c)(5), and Mortgagee Letter 1992-5.

60.     Wells Fargo's violation of HUD Handbook 4155.1 ¶¶ 2-12 and 2-13 is illustrative of the multiple rules that Wells Fargo violated in approving the Albert Drive Property.   HUD underwriting guidelines state that lenders cannot exceed HUD's established debt-to-income ratio benchmarks unless significant compensating factors are present.   At the time this loan closed, the total-fixed-payment-to-effective-income ratio ("TPI" ratio) limit was 41%.   HUD Handbook 4155.1 ¶¶ 2-12 and 2-13.   Contrary to this clear requirement, Wells Fargo failed to document adequate compensating factors even though the borrower's TPI ratio exceeded the 41% limit.   In violating HUD Handbook 4155.1 ¶¶ 2-12 and 2-13, Wells Fargo endorsed the Albert Drive Property for FHA insurance without sufficiently analyzing the borrower's ability to support the monthly mortgage payments.

61.     Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that borrower would make mortgage payments.

62.     Soon after closing, this mortgage went into default.   As a result, HUD paid an FHA insurance claim of $251,783.42, including costs.

23

### 3. The North Main Street Property in Indiana

63.     FHA case number 151-6793642 relates to a property on North Main Street in Laketon, IN (the "North Main Street Property").   Wells Fargo, using an FHA-approved Automated Underwriting System ("AUS"), underwrote the mortgage for the North Main Street Property, reviewed and approved it for FHA insurance, and certified to the integrity of the data supplied and that the mortgage qualified for HUD mortgage insurance.  The mortgage closed on or about August 9, 2002.

64.     Because the soundness of the AUS's evaluation is dependent on the accuracy and reliability of the data submitted by the mortgagee, a mortgagee may only enter into the AUS such income, asset, debt, and credit information that meets FHA's applicable eligibility rules and documentation requirements, including those set forth in HUD Handbook 4155.1, Mortgagee Letters, the FHA TOTAL Mortgage Scorecard User Guide, and the AUS certificate.

65.     Contrary to Wells Fargo's certification, the data Wells Fargo entered into the AUS lacked integrity and the mortgage loan failed to meet FHA's eligibility and documentation requirements.  Despite clear requirements, Wells Fargo entered income data variables into the AUS that overstated the borrower's income and lacked integrity.  In failing to enter accurate and verified information into AUS, Wells Fargo submitted a loan for FHA endorsement that was supported by data lacking integrity.

66.     Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

67.    Within seven months after closing, this mortgage went into default.  As a result, HUD paid an FHA insurance claim of $62,226.16, including costs.

### 4.  The Coriander Lane Property in Kentucky

68.    FHA case number 201-2966012 relates to a property on Coriander Lane in Lexington, KY (the "Coriander Lane Property").  Wells Fargo, using an FHA-approved AUS, underwrote the mortgage for the Coriander Lane Property, reviewed and approved it for FHA insurance, and certified to the integrity of the data supplied and that the mortgage qualified for HUD mortgage insurance.  The mortgage closed on or about May 31, 2001.

69.    Because the soundness of the AUS's evaluation is dependent on the accuracy and reliability of the data submitted by the mortgagee, a mortgagee may only enter into the AUS such income, asset, debt, and credit information that meets FHA's applicable eligibility rules and documentation requirements, including those set forth in HUD Handbook 4155.1, Mortgagee Letters, the FHA TOTAL Mortgage Scorecard User Guide, and the AUS certificate.

70.    Contrary to Wells Fargo's certification, the data Wells Fargo entered into the AUS lacked integrity and the mortgage loan failed to meet FHA's eligibility and documentation requirements.  Despite clear requirements, Wells Fargo entered credit and debt variables that were stale and lacked integrity.  In failing to enter timely and verified information into AUS, Wells Fargo submitted a loan for FHA endorsement that was supported by data lacking integrity.

71.    Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

25

72.     Soon after closing, this mortgage went into default.  As a result, HUD paid an FHA insurance claim of $111,879.30, including costs.

**5. The Courville Street Property in Michigan**

73.     FHA case number 261-8163025 relates to a property on Courville Street in Detroit, MI (the "Courville Street Property").  Wells Fargo underwrote the mortgage for the Courville Street Property, reviewed and approved it for FHA insurance, and certified that a DE underwriter had conducted the required due diligence on the loan application and that the loan was eligible for HUD mortgage insurance.  The mortgage closed on or about July 17, 2002.

74.     Contrary to Wells Fargo's certification, Wells Fargo did not comply with HUD rules in reviewing and approving this loan for FHA insurance, and did not exercise due diligence in underwriting the mortgage.  Instead, Wells Fargo violated multiple HUD rules, including HUD Handbook 4155.1 ¶¶ 2-3, 2-10, 2-12, 2-13, and 3-1, and Mortgagee Letter 2001-01.

75.     Wells Fargo's violation of HUD Handbook 4155.1 ¶¶ 2-12 and 2-13 is illustrative of the multiple rules that Wells Fargo violated in approving the Courville Street Property.  HUD underwriting guidelines state that lenders cannot exceed HUD's established debt-to-income ratio benchmarks unless significant compensating factors are present.  At the time this loan closed, the TPI ratio limit was 41%.  HUD Handbook 4155.1 ¶¶ 2-12 and 2-13.  Contrary to this clear requirement, Wells Fargo failed to document any compensating factors whatsoever even though the borrowers TPI ratio exceeded the 41% limit.  In violating HUD Handbook 4155.1 ¶¶ 2-12 and 2-13, Wells Fargo endorsed the Courville Street Property for FHA insurance without sufficiently analyzing the borrower's ability to support the monthly mortgage payments.

76.     Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

77.     Soon after closing, this mortgage went into default.  As a result, HUD paid an FHA insurance claim of $142,123.04, including costs.

*        *        *        *        *

78.     In short, from May 2001 through January 2003, Wells Fargo engaged in reckless loan origination and underwriting and falsely certified tens of thousands of retail FHA loans for FHA insurance when the bank knew, or should have known, that the loans contained unacceptable risk and did not qualify for insurance.  On information and belief, Wells Fargo sold most, or all, of its retail FHA loans to third parties knowing that the third parties would submit claims for FHA insurance in the event that the loans defaulted.  On information and belief, to the extent the retail FHA loans were not sold to third parties, Wells Fargo submitted claims for FHA insurance when the loans defaulted.

79.     As a result of Wells Fargo's false certifications, the United States has suffered hundreds of millions of dollars in damages for the insurance claims FHA has paid on defaulted mortgage loans that were not eligible for FHA insurance.

**B.      Wells Fargo's Widespread Loan Quality Problems, Reckless Underwriting, and False Loan Certifications:  February 2003 through October 2005**

80.     Although Wells Fargo purported to make some efforts to improve loan quality in 2002, management's focus remained on maintaining and even expanding loan volume, and the bank's reckless underwriting and serious loan quality problems remained from February 2003

through October 2005. During this period, Wells Fargo continued to certify its entire portfolio of retail FHA loans for insurance even though the bank knew that a substantial percentage of those loans did not meet HUD requirements. And, as before, Wells Fargo failed to self-report a single bad loan to HUD and did not otherwise inform HUD of the loan quality problems that it was experiencing.

81.     As shown by Wells Fargo's internal QA reports from February 2003 through October 2005, month after month QA reported to management about the significant problems it was finding with respect to the bank's retail FHA loans. Despite these reports, and QA's increasingly specific direction to management about the very serious underwriting problems, no effective action was taken. For example, in July 2003, QA candidly advised that one of the "overall root cause[s]" for the exceedingly high material violation rates in underwriting across all business lines was "[v]olume, pressure to approve loans, and the experience levels." QA was even more explicit in its August 2003 report on the same issue: "heavy volume, pressure to approve loans and meet acceptable turn times along with inexperienced staff are key contributing factors overall to the issues leading to material findings." But management did not want to change course.

82.     Instead of limiting its FHA originations or training an appropriate underwriting staff to match the volume of loans the bank was originating, Wells Fargo slashed the number of its FHA underwriters from 919 to 401. This smaller crew of underwriters remained inadequately trained, and the bank's improper bonus system for underwriters continued throughout this period.

83.     Consequently, Wells Fargo's QA reports show that the material violation rate for randomly sampled retail FHA loans remained very high, over 20% in many months. At the same

time, the moderate violation rate skyrocketed.  For a number of months during this period, the combined material and moderate violation rate exceeded 80% of the randomly sampled retail FHA loans, hitting a high of 87.2% in July 2003.  And for 18 consecutive months that combined rate hovered between 70% and 80% and never fell below 63%.  This astoundingly high violation rate – including the moderate violations – was a very serious problem because the "moderate" risk rating classification encompassed underwriting violations that actually were material to whether the loans met HUD's requirements and were eligible for FHA insurance.   Indeed, QA noted that "[i]n many instances the only difference between a moderate or material rating are the loan characteristics.  Therefore, attention should be given to all deficiencies if improved quality is to be achieved and maintained."

84.    The "moderate" rated loans in this and prior periods included loan files that lacked support for critical borrower income and asset information, including missing or incomplete verifications of employment, missing income, asset, and debt documentation, incorrect calculations of income, and social security number discrepancies.  For example, one QA report in this period identified "moderate" and "material" violations as follows:  "Critical documentation needed for either loan decisioning or program requirements are missing … Examples noted were employment gaps, discrepancies on pay-stubs for hours worked, ytd earnings that don't coincide with current earnings, etc."  Failure by the bank's underwriters to resolve any of these discrepancies evidences a lack of due diligence in underwriting the loan for FHA insurance.

85.    Wells Fargo QA's month-by-month findings for its distributed retail FHA business in this period are as follows:

| LOAN FUNDING MONTH | MATERIAL VIOLATION | MODERATE VIOLATION | TOTAL |
|---|---|---|---|
| February 2003 | 21.1% | N/A | N/A |
| March 2003 | 22.4% | N/A | N/A |
| April 2003 | 19.3% | N/A | N/A |
| May 2003 | 19.6% | N/A | N/A |
| June 2003 | 24.6% | 56.5% | 80.1% |
| July 2003 | 17.2% | 60.0% | 87.2% |
| August 2003 | 14.9% | 58.9% | 73.8% |
| September 2003 | 20.4% | 52.6% | 73.0% |
| October 2003 | 27.0% | 53.3% | 80.3% |
| November 2003 | 18.5% | 58.5% | 77.0% |
| December 2003 | 21.7% | 46.1% | 67.8% |
| January 2004 | 14.2% | 56.6% | 70.8% |
| February 2004 | 13.0% | 62.0% | 75.0% |
| March 2004 | 21.0% | 62.9% | 83.9% |
| April 2004 | 15.8% | 47.4% | 63.2% |
| May 2004 | 14.9% | 62.4% | 77.3% |
| June 2004 | 26.2% | 48.6% | 74.8% |
| July 2004 | 21.3% | 52.1% | 73.4% |
| August 2004 | 25.3% | 47.3% | 72.6% |
| September 2004 | 16.1% | 53.8% | 69.9% |
| October 2004 | 8.5% | 55.3% | 63.8% |
| November 2004 | 20.9% | 44.0% | 64.9% |
| December 2004 | 16.7% | 36.7% | 53.4% |
| January 2005 | 12.8% | 36.2% | 49.0% |
| February 2005 | 6.5% | 57.0% | 63.5% |
| March 2005 | 5.0% | 44.0% | 49.0% |
| April 2005 | 9.8% | 46.1% | 55.9% |
| May 2005 | 6.2% | 45.4% | 51.6% |
| June 2005 | 11.7% | 36.9% | 48.6% |
| July 2005 | 15.8% | 31.7% | 47.5% |
| August 2005 | 10.1% | 36.4% | 46.5% |
| September 2005 | 12.3% | 41.5% | 53.8% |
| October 2005 | 9.1% | 31.8% | 40.9% |