William F. Johnson
Douglas W. Baruch, *pro hac vice*
Jennifer M. Wollenberg, *pro hac vice*
FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
william.johnson@friedfrank.com
douglas.baruch@friedfrank.com
jennifer.wollenberg@friedfrank.com

Michael J. Missal, *pro hac vice*
Amy Pritchard Williams, *pro hac vice*
K&L GATES LLP
1601 K Street NW
Washington, DC 20006-1600
(202) 778-9000
michael.missal@klgates.com
amy.williams@klgates.com

Attorneys for Defendant
   Wells Fargo Bank, N.A.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>- against -<br><br>WELLS FARGO BANK, N.A.,<br><br>                  Defendant. | 12 Civ. 7527 (JMF)<br><br>ECF CASE<br><br>**DEFENDANT WELLS FARGO BANK, N.A.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

<u>**TABLE OF CONTENTS**</u>

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .............................................................................................................. 1

THE FHA PROGRAM AND LENDER CERTIFICATIONS ........................................... 5

I. Wells Fargo's Participation in the FHA Insurance Program ................................ 5

II. HUD and Wells Fargo Worked Together to Achieve HUD's Goals of Expanding Home Ownership and Minimizing Risk ............................................................... 5

III. FHA Insurance Program Regulations and Certifications .................................... 6

    A. Individual Loan-Level Certifications ...................................................... 7

    B. Annual Certifications ............................................................................ 8

ARGUMENT ..................................................................................................................... 9

I. THE U.S. RELEASE COVERS THE AC-1 CONDUCT ..................................... 9

    A. The U.S. Release Bars All Claims Alleged in the AC-1 ......................... 9

    B. Wells Fargo Is Seeking Relief in the D.C. Action ............................... 12

II. FCA CLAIMS PRIOR TO JUNE 25, 2006 ARE TIME-BARRED .................... 12

    A. Many of the FCA Claims Are Time-Barred ......................................... 13

    B. The United States' Knowledge of the Causes of Action Precludes Reliance on Any Extended Limitations Period ................................................... 14

III. THE AC-1 FAILS TO SATISFY RULE 9(b) ................................................... 17

    A. The AC-1 Does Not Plead Successor Liability ..................................... 18

    B. Vague and Non-Specific Allegations About Company-Wide Conduct Are Precluded by the U.S. Release and Do Not Satisfy Rule 9(b) ............... 19

    C. Conclusory Scienter Allegations Do Not Satisfy Rule 9(b) ................. 21

    D. Rule 9(b) Would Still Apply Even If the United States Alleged a Fraudulent Scheme .......................................................................... 22

IV. THE AC-1 FAILS TO STATE ANY FCA CLAIM ........................................... 24

PAGE

A.     The Alleged Misrepresentations Are Not Conditions of Payment and Therefore Do Not State a FCA Cause of Action ....................................................25

        1.     The Relevant Representations Are Merely Conditions of Participation .................................................................................27

        2.     Even If a Condition of Payment Were Alleged, the FCA Allegations Fail Because Such a Condition Is Not Express ....................29

B.     The AC-1 Fails to Adequately Plead Causation ....................................31

C.     The AC-1 Fails to Plead a Reverse False Claim (Fifth Claim)............................33

V.     THE AC-1 FAILS TO STATE A CLAIM UNDER FIRREA ..........................................35

A.     The AC-1 Fails to State a FIRREA Claim Based on 18 U.S.C. § 1005 ...............36

B.     The AC-1 Fails to State a FIRREA Claim Based on 18 U.S.C. § 1014 ...............37

C.     The AC-1 Fails to State a FIRREA Claim Based on 18 U.S.C. §§ 1001, 1341, and 1343 ....................................................................................38

        1.     Section 1833a(c)(2) Cannot Be Read to Impose Liability on Wells Fargo for "Affecting" Itself ....................................................39

        2.     The AC-1 Fails to Allege Any Predicate FIRREA Violations Affecting a Federally Insured Financial Institution ................................44

VI.     THE AC-1 FAILS TO STATE A COMMON LAW CLAIM..........................................46

A.     The Common Law Claims (Claims Seven Through Eleven) Fail for the Same Reasons the FCA Claims Fail ....................................................46

B.     The AC-1 Fails to State a Fiduciary Duty Claim (Seventh Claim) ......................47

C.     The AC-1 Fails to State a Claim for Unjust Enrichment (Tenth Claim) and Mistake of Fact (Eleventh Claim)........................................................48

CONCLUSION....................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**PAGE**

**CASES**

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995)...................................................................21

*Allison Engine Co. v. United States ex rel. Sanders*,
    553 U.S. 662 (2008)........................................................................26

*Amalgamated Sugar v. NL Indus., Inc.*,
    825 F.2d 634 (2d Cir. 1987)..............................................................12

*Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*,
    190 F.3d 729 (6th Cir. 1999) ......................................................34, 35

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................24, 25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).....................................................................24, 25

*Breza v. Thaldorf*,
    149 N.W.2d 276 (Minn. 1967)...........................................................49

*C&E Servs. v. Ashland, Inc.*,
    498 F. Supp. 2d 242 (D.D.C. 2007) ....................................................47

*Cagin v. McFarland Clinic, P.C.*,
    317 F. Supp. 2d 964 (S.D. Iowa 2004) ................................................48

*Chesbrough v. VPA. P.C.*,
    655 F.3d 461 (6th Cir. 2011) .............................................................26

*Cohen v. Avande*,
    874 F. Supp. 2d 315 (S.D.N.Y. 2012)..............................................21, 22

*Decker v. Massey-Ferguson, Ltd.*,
    681 F.2d 111 (2d Cir. 1982)..............................................................21

*Denny v. Barber*,
    576 F.2d 465 (2d Cir. 1978)..............................................................22

*Dolan v. U.S. Postal Serv.*,
    546 U.S. 481 (2006)........................................................................39

*EAD Control Systems, LLC v. Besser Co. USA*,
      No. C 11–4029, 2012 WL 2357572 (N.D. Iowa Jun. 19, 2012)........................................49

*FCC v. Am. Broad. Co.*,
      347 U.S. 284 (1954).........................................................................................................40

*Fiebelkorn v. IKON Office Solutions, Inc.*,
      668 F. Supp. 2d 1178 (D. Minn. 2009)............................................................................49

*FSP, Inc. v. Societe Generale*,
      No. 02 CV 4786, 2003 WL 124515 (S.D.N.Y. Jan. 14, 2003) ........................................47

*Galiano v. Fid. Nat'l Title Ins. Co.*,
      684 F.3d 309 (2d Cir. 2012).............................................................................................24

*Glidepath Holding B.V. v. Spherion Corp.*,
      590 F. Supp. 2d 435 (S.D.N.Y. 2007)........................................................................17, 21

*Griep v. Yamaha Motor Corp. U.S.A., Inc.*,
      120 F. Supp. 2d 1196 (D. Minn. 2000)............................................................................49

*Hayden Capital USA, LLC v. Northstar Agri Indus., LLC*,
      No. 11 Civ. 594 (DAB), 2012 WL 1449257 (S.D.N.Y. Apr. 23, 2012)...........................18

*Hopper v. Anton*,
      91 F.3d 1261 (9th Cir. 1996) ..........................................................................................26

*In re Crude Oil Commodity Litig.*,
      No. 06-CV-6677, 2007 U.S. Dist. LEXIS 47902 (S.D.N.Y. June 28, 2007) ...................18

*Kramer v. Time Warner, Inc.*,
      937 F.2d 767 (2d Cir. 1991)..........................................................................................9, 14

*Maalouf v. Salomon Smith Barney, Inc.*,
      No. 02 Civ. 4770, 2003 WL 1858153 (S.D.N.Y. Apr. 10, 2003)....................................48

*Meisel v. Grunberg*,
      651 F. Supp. 2d 98 (S.D.N.Y. 2009)..........................................................................47, 48

*Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*,
      261 F.R.D. 13 (S.D.N.Y. 2009) .......................................................................................21

*Nat'l Minority Supplier Dev. Council Bus. Consortium Fund, Inc. v.
      Hessian & McKasy, P.A.*,
      No. 04-1670, 2005 WL 3526587 (D. Minn. Dec. 15, 2005) .....................................47, 48

*Pentagen Techs. Int'l v. CACI Int'l*,
    Nos. 93 Civ. 8512, 94 Civ. 0441, 94 Civ. 8164,
    1996 WL 435157 (S.D.N.Y. Aug. 2, 1996) ..................................................................12

*Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*,
    893 F. Supp. 285 (S.D.N.Y. 1995) ............................................................................48

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ......................................................................................17

*Schlenger v. Fid. Emp'r Servs. Co., LLC*,
    785 F. Supp. 2d 317 (S.D.N.Y. 2011) .........................................................................21

*Spagnola v. Chubb Corp.*,
    574 F.3d 64 (2d Cir. 2009) ........................................................................................49

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................................21

*Top of Iowa Co-op. v. Schewe*,
    149 F. Supp. 2d 709 (N.D. Iowa 2001) .....................................................................47

*United States v. Barel*,
    939 F.2d 26 (3d Cir. 1991) ........................................................................................36

*United States v. Bouyea*,
    152 F.3d 192 (2d Cir. 1998) ...........................................................................40, 45, 46

*United States v. Edwards*,
    566 F. Supp. 1219 (D. Conn. 1983) ...........................................................................36

*United States v. EER Sys. Corp.*,
    No. Civ. AW-96-1014, 1996 WL 751496 (D. Md. Nov. 20, 1996) .............................49

*United States v. First Nat'l Bank of Cicero*,
    957 F.2d 1362 (7th Cir. 1992) ...................................................................................32

*United States v. Hibbs*,
    568 F.2d 347 (3d Cir. 1977) .................................................................................31, 32

*United States v. Hydroaire, Inc.*,
    No. 94-C-4414, 1995 WL 86733 (N.D. Ill. Feb. 27, 1995) ........................................49

*United States v. Island Park*,
    791 F. Supp. 354 (E.D.N.Y. 1992) .............................................................................16

*United States v. Kensington Hosp.*,
    No. 90-5430, 1993 WL 21446 (E.D. Pa. Jan. 14, 1993) .............................................16

PAGE

*United States v. Ohle,*
 678 F. Supp. 2d 215 (S.D.N.Y. 2010)..................................................................40

*United States v. Ortiz,*
 906 F. Supp. 140 (E.D.N.Y. 1995) ......................................................................36

*United States v. Q Int'l Courier, Inc.,*
 131 F.3d 770 (8th Cir. 1997) ................................................................................35

*United States v. Rapoport,*
 514 F. Supp. 519 (S.D.N.Y. 1981) ......................................................................32

*United States v. Reinhardt Coll.,*
 597 F. Supp. 522 (N.D. Ga. 1983)........................................................................16

*United States v. Rubin/Chambers, Dunhill Ins. Serv.,*
 831 F. Supp. 2d 779 (S.D.N.Y. 2011)..............................................................45, 46

*United States v. Rubin/Chambers, Dunhill Ins. Serv.,*
 798 F. Supp. 2d 517 (S.D.N.Y. 2011)..............................................................36, 37

*United States v. Serpico,*
 320 F.3d 691 (7th Cir. 2003) ................................................................................40

*United States v. The Baylor Univ. Med. Ctr.,*
 469 F.3d 263 (2d. Cir. 2006)................................................................................13

*United States ex rel. Bain v. Georgia Gulf Corp.,*
 386 F.3d 648 (5th Cir. 2004) ................................................................................35

*United States ex rel. Bauchwitz v. Holloman,*
 671 F. Supp. 2d 674 (E.D. Pa. 2009) ....................................................................16

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
 501 F.3d 493 (6th Cir. 2007) ................................................................................23

*United States ex rel. Blundell v. Dialysis Clinic, Inc.,*
 No. 5:09-CV-00710, 2011 WL 167246 (N.D.N.Y Jan. 19, 2011) ......................26, 27-28

*United States ex rel. Cericola v. Fed. Nat'l Mortg. Assoc.,*
 529 F. Supp. 2d 1139 (C.D. Cal. 2007) ............................................................23, 24

*United States ex rel. Chapman v. Office of Children & Family Servs. of New York,*
 No. 1:04-CV-1505, 2010 WL 610730 (N.D.N.Y. Feb. 16, 2010)....................................23

*United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.,*
 543 F.3d 1211 (10th Cir. 2008) ........................................................................26, 27, 28

*United States ex rel. Doe v. Dow Chem. Co.*,
   343 F.35 325 (5th Cir. 2003) ..................................................................17

*United States ex rel. Fago v. M & T Mortg. Corp.*,
   518 F. Supp. 2d 108 (D.D.C. 2007)........................................................32

*United States ex rel. Feldman v. City of New York*,
   808 F. Supp. 2d 641 (S.D.N.Y. 2011)....................................................49

*United States ex rel. Feldman v. van Gorp*,
   697 F.3d 78 (2d Cir. 2012).....................................................................31

*United States ex rel. Frascella v. Oracle*,
   751 F. Supp. 2d 842 (E.D. Va. 2010) .....................................................16

*United States ex rel. Gross v. AIDS Research Alliance-Chi.*,
   415 F.3d 601 (7th Cir. 2005) ..................................................................26

*United States ex rel. Hendow v. Univ. of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) ................................................................26

*United States ex rel. Kirk v. Schindler Elevator Corp.*,
   601 F.3d 94 (2d Cir. 2010)......................................................................26

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
   777 F. Supp. 195 (N.D.N.Y. 1991) .........................................................16

*United States ex rel. Lemmon v. Envirocare of Utah*,
   614 F.3d 1163 (10th Cir. 2010) ..............................................................26

*United States ex rel. Mikes v. Straus*,
   274 F.3d 687 (2d Cir. 2001)................................................13, 25, 26, 27, 29

*United States ex rel. Miller v. Bill Harbert Int'l Const.*,
   505 F. Supp. 2d 1 (D.D.C. 2007) ............................................................16

*United States ex rel. Pervez v. Beth Israel Med. Ctr.*,
   736 F. Supp. 2d 804 (S.D.N.Y. 2010).....................................................23

*United States ex rel. Rafizadeh v. Cont'l Common, Inc.*,
   553 F.3d 869 (5th Cir. 2008) ..................................................................17

*United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc.*,
   No. 99-3105, 2000 WL 1595976 (10th Cir. Oct. 26, 2000) ........................22-23

*United States ex rel. Steury v. Cardinal Health, Inc.*,
   625 F.3d 262 (5th Cir. 2010) ..................................................................25

**PAGE**

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
    125 F.3d 899 (5th Cir.1998) ....................................................23

*United States ex rel. Vigil v. Nelnet, Inc.*,
    639 F.3d 791 (8th Cir. 2011) ...............................................26, 27

*United States ex rel. Williams v. Renal Care Group, Inc.*,
    696 F.3d 518 (6th Cir. 2012) .............................20, 22, 25, 26, 29

*Watson v. United States*,
    552 U.S. 74, 80 (2007)........................................................39

*Whitney v. Citibank. N.A.*,
    782 F.2d 1106 (2d Cir. 1986)................................................47

*Wood v. Applied Research Assocs., Inc.*,
    328 Fed. Appx. 744 (2d Cir. 2009)........................................34

*Zeleznik v. United States*,
    770 F.2d 20 (3d Cir. 1985)..................................................16

**STATUTES**

5 U.S.C. App. 3 § 4 ....................................................................15

5 U.S.C. App. 3 § 5 ....................................................................14

12 U.S.C. § 1708(c)(1)................................................................29

12 U.S.C. § 1811 ........................................................................39

12 U.S.C. § 1818(i)(2) (1988).......................................................44

12 U.S.C. § 1818(i)(2)(A)............................................................44

12 U.S.C. § 1818(i)(2)(A)(i)........................................................41

12 U.S.C. § 1833a..................................................................35, 41

12 U.S.C. § 1833a(c)...................................................................33

12 U.S.C. § 1833a(c)(2)........................................................*passim*

15 U.S.C. § 645(a)......................................................................39

18 U.S.C. § 215..........................................................................39

18 U.S.C. § 287..........................................................................39

18 U.S.C. § 656 ..............................................................................................................39

18 U.S.C. § 657 ..............................................................................................................39

18 U.S.C. § 1001 ...............................................................................................36, 38, 39

18 U.S.C. §1005 ................................................................................................36, 37, 39

18 U.S.C. § 1006 ............................................................................................................39

18 U.S.C. § 1007 ............................................................................................................39

18 U.S.C. § 1014 .......................................................................................36, 37, 38, 39

18 U.S.C. § 1032 ............................................................................................................39

18 U.S.C. § 1341 ...............................................................................................36, 38, 39

18 U.S.C. § 1343 ...............................................................................................36, 38, 39

18 U.S.C. § 1344 ...................................................................................................39, 43

18 U.S.C. § 3293(2) .......................................................................................................40

28 U.S.C. § 2415(a) .......................................................................................................46

28 U.S.C. § 2415(b) .......................................................................................................46

28 U.S.C. § 2416(c) .......................................................................................................16

31 U.S.C § 3729(a)(1) ....................................................................................................31

31 U.S.C. § 3729(a)(1)(G) .............................................................................................34

31 U.S.C. § 3729(a)(7) ...................................................................................................34

31 U.S.C. § 3729(b)(1) ...................................................................................................10

31 U.S.C. § 3731(b)(1) ....................................................................................3, 13, 16

31 U.S.C. § 3731(b)(2) ..................................................................................14, 15, 16

Fraud Enforcement & Recovery Act of 2009,
     Pub. L. No. 111-21, § 4(f)(1), 123 Stat. 1617 (2009) ......................................34

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
     Pub. L. No. 101-73, § 101(10), 103 Stat. 187 (1989) ......................................39

**REGULATIONS**

24 C.F.R. § 25.2(b) ...................................................................29

24 C.F.R. § 25.5(a) ...................................................................29

24 C.F.R. § 202.5 ......................................................................28

24 C.F.R. § 203.5(a) ..................................................................48

24 C.F.R. § 203.5(d) ...................................................................7

24 C.F.R. § 203.5(e) ...................................................................7

24 C.F.R. § 203.255 ...................................................................48

**RULES**

Federal Rule of Civil Procedure 9(b) .................................... *passim*

Federal Rule of Civil Procedure 12(b)(6) ............................. *passim*

Federal Rule of Evidence 201(c)(2) ........................................9

**OTHER AUTHORITIES**

101 Cong. Rec. H2,725 (daily ed. June 15, 1989) ....................41

132 Cong. Rec. S11,244 (daily ed. Aug. 11, 1986) ...................16

151 Cong. Rec. 656 (2005) ........................................................14

*Financial Institutions Reform, Recovery, and Enforcement Act of 1989—(H.R. 1278): Hearing Before the Subcomm. on Fin. Inst. Supervision, Regulation and Ins. of the H. Comm. on Banking, Finance, and Urban Affairs,* 101st Cong. (1989) ................................................................42

H.R. Rep. No. 101-54 (1989) ........................................37, 41, 43

U.S. Dep't of Hous. & Urban Dev., Office of Inspector Gen., Audit Report 2004-KC-1003: Wells Fargo Home Mortgage Non-Supervised Direct Endorsement Lender Des Moines, IA (July 16, 2004), *available at* http://archives.hud.gov/offices/oig/ reports/files/ig471003.pdf ....14

U.S. Dep't of Hous. & Urban Dev., Office of Inspector Gen., Semiannual Report to Congress: April 1, 2004, through September 30, 2004 (HUD-2004-10-OIG), *available at* http://www.hud.gov/offices/oig/sar52.pdf ......14

HUD Handbook 4000.2, rev. 3 (2004) .......................................49

PAGE

HUD Handbook 4000.4, rev. 1, chg. 2 (1994)..................................................................6

HUD Handbook 4060.1, rev. 2 (2006) ..............................................................28, 29

*Problems of the Federal Savings and Loan Insurance Corporation [FSLIC]:*
    *Hearing Before the Sen. Comm. on Banking, Housing and Urban Affairs,*
    101st Cong. (1989).....................................................................................41, 42

*Prosecuting Fraud in the Thrift Industry: Hearing before the Subcomm. On*
    *Criminal Justice of the H. Comm. on the Judiciary,* 101st Cong. (1989).............41, 42, 43

S. Rep. No. 101-19 (1989) ..............................................................................41

*Wells Fargo Rapped by HUD,*
    28 Nat'l Mortg. News 44 (Aug. 2, 2004).......................................................14

Wells Fargo Bank, N.A. ("Wells Fargo"), by and through its attorneys, respectfully submits this memorandum of law in support of its motion to dismiss the First Amended Complaint of the United States of America (the "AC-1").  The AC-1 represents the United States' second attempt to craft viable claims against Wells Fargo.  However, the AC-1 does not cure the deficiencies detailed in Wells Fargo's original Motion to Dismiss (Dkt. 14).  While the United States has sprinkled the AC-1 with some new conclusory assertions, and has replaced one defective FIRREA theory with another, the AC-1 still must be dismissed because the claims are barred by a prior release of liability, are time-barred, lack the pleading particulars required by Rule 9(b), and otherwise fail to state claims for relief.

## INTRODUCTION

For more than two decades, Wells Fargo, through itself and a predecessor, has supported the United States Department of Housing and Urban Development's ("HUD") efforts to expand home ownership by extending federally-backed mortgage loans, under a Federal Housing Administration ("FHA") program, to borrowers who do not qualify for conventional mortgages. For much of this time, Wells Fargo has been the largest lender in the FHA Direct Endorsement Lender ("DEL") program, and Wells Fargo's performance consistently has outpaced the industry, achieving FHA mortgage loan default rates that are well below the industry average. Throughout this period, Wells Fargo has maintained a strong working relationship with HUD, with extensive communication and feedback to achieve HUD's goals.  The AC-1 is an affront to this history.

The AC-1 seeks to capitalize on an uninformed and often prevailing post-Financial Crisis era assumption that a financial industry culprit is to blame for every negative economic event. Here, faced with thousands of FHA-insured mortgage loan defaults resulting from the financial crisis and the recent housing market collapse, the United States is trying to escape having to

honor HUD's insurance commitments by falsely asserting that Wells Fargo is to blame. This AC-1 story-line does not work because the allegations are not true. Wells Fargo is not to blame for these mortgage loan defaults, and it is grossly unfair and improper for the Justice Department – years after the fact – to contend that Wells Fargo not only should have handled these mortgage loans in a different manner but that it also intentionally deceived the government, especially when HUD knew of and accepted Wells Fargo's practices at the time.

To make matters worse, the United States is pursuing causes of action based on conduct and claims that the United States released in April 2012 in a separate lawsuit before the United States District Court for the District of Columbia (the "D.C. Action"). In that case, Wells Fargo committed over $5 billion in a settlement and, in exchange, obtained a heavily negotiated written release from the United States (the "U.S. Release") that absolves Wells Fargo from any further liability for the claims that the United States is now pursuing in the AC-1.

Of course, this Motion is not the time to debate the merits of the underlying factual allegations, and Wells Fargo does not do so. Instead, Wells Fargo focuses on the numerous AC-1 deficiencies that the Court can resolve now and seeks dismissal on six principal grounds:

*First,* as a threshold matter, the causes of action as pleaded in the AC-1 are barred by the U.S. Release in the D.C. Action. By a motion filed November 1, 2012 in the D.C. Action, Wells Fargo is seeking enforcement of the U.S. Release terms. As set forth in that Motion, now fully briefed and pending before the Honorable Rosemary Collyer, Wells Fargo bargained for, paid for, and received a promise by the United States that Wells Fargo would not have to defend these types of claims. The enforceability and applicability of the U.S. Release to the claims now asserted by the United States in the AC-1 are threshold matters that will determine whether, and, if so, to what extent, the AC-1 claims are viable.

*Second*, the six-year False Claims Act ("FCA") statute of limitations, 31 U.S.C. § 3731(b)(1), bars action on a substantial number of the loans at issue in the AC-1, including thousands of loans originated from 2001 through 2005 that are the subject of the First and Second Claims.   After Wells Fargo filed its initial Motion to Dismiss, the United States attempted to salvage these stale claims by amending the complaint.   In particular, the United States now asserts that the "Department of Justice" did not have actual knowledge of the conduct until 2011, thereby seeking to resurrect these claims under the FCA's ten-year statute of repose. But this new approach fails as well because (a) under the express language of the FCA, the United States' actual knowledge is not relevant where, as here, the United States reasonably "should have known" of the conduct years earlier, and (b) whether or not the Justice Department had the requisite knowledge, it is a matter of public record that "the official of the United States charged with responsibility to act in the circumstances" – the HUD Inspector General – had actual knowledge years earlier.   As a result, the limitations period under the FCA is six years, meaning that claims accrued prior to June 2006 are time barred.[1]   The Court should act now to substantially streamline the scope of the United States' complaint by dismissing untimely claims.[2]

*Third*, the AC-1 allegations do not satisfy Fed. R. Civ. P. 9(b).   This Rule has particular significance in this case because, due to the U.S. Release, the only way the United States can attempt to impose liability on Wells Fargo for FHA insurance payouts on defaulted mortgage

---

[1]   Further, the AC-1 inexplicably fails to account for the fact that the "loan origination" and "self-reporting" conduct at issue in the 2001 through May 2004 time period was undertaken by at least one separate legal entity, Wells Fargo Home Mortgage, Inc.  This would be of little consequence if the pre-2006 claims are time-barred, but if any remain, the AC-1 makes no assertion of successor liability by Wells Fargo.  The references to "Wells Fargo" throughout this Motion to Dismiss are for convenience only and are not concessions that successor liability exists or that particular conduct is attributable to Wells Fargo rather than to any predecessor.

[2]   If the Court determines that there is a factual dispute concerning the United States' knowledge, discovery should be targeted at resolving that issue now.

loans is at the individual loan level.  In particular, the United States must prove that individual Wells Fargo underwriters acted with the requisite scienter in falsely certifying mortgage loans, each with unique circumstances, as eligible for FHA insurance at the time of loan origination. However, even after Wells Fargo detailed these deficiencies in its initial Motion to Dismiss, the AC-1 suffers from the same fatal defects as the original complaint, including that it (1) never identifies a single Wells Fargo underwriter, (2) never specifies an unreleased "material violation" of HUD/FHA requirements that the underwriter knew or should have known about at the time of certification, and (3) never ties any such "material violation" to the later default or demonstrates how the resulting insurance claim was false.

*Fourth*, the First through Fifth claims, alleging violations of the FCA, fail to state claims for relief under Fed. R. Civ. P. 12(b)(6).  The FCA causes of action rely on implied certifications that are not actionable and describe conduct that does not satisfy the requisite "condition of payment" standard for FCA liability in the Second Circuit.

*Fifth,* the AC-1 alleges violations of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") in the Sixth Claim, but it only compounds the deficiencies identified by Wells Fargo in its initial Motion to Dismiss by staking out theories that no court has ever accepted – for instance, that Wells Fargo is liable under FIRREA for engaging in conduct that "affected" Wells Fargo.  This misguided attempt to manufacture new types of liability should be halted.

*Finally*, the Seventh through Eleventh claims, alleging common law violations, must be dismissed for several reasons, including the fact that they depend in one or more respects on the shortcomings that require dismissal of the First through Sixth Claims.

## THE FHA PROGRAM AND LENDER CERTIFICATIONS

I.      **Wells Fargo's Participation in the FHA Insurance Program**

Congress created the FHA to encourage mortgage lenders to expand home ownership opportunities to a greater percentage of the population.  AC-1 ¶ 13.[3]  Through the FHA program, lenders work with HUD to provide mortgage loans for borrowers who do not qualify for conventional loans.  In turn, the FHA-administered insurance fund provides some protection with respect to any of these loans that default.

HUD created the Direct Endorsement Lender ("DEL") status in 1983, allowing certain lenders to underwrite mortgage loans for the FHA program, subject to post-closing/pre-insurance review of the relevant loan documentation by HUD.  Wells Fargo became a DEL in the mid-1980s.

Throughout its participation in the FHA program, Wells Fargo has engaged thousands of underwriters who have helped to originate hundreds of thousands of FHA-insured mortgage loans.  Wells Fargo's underwriting performance has been highly effective, as documented by the fact that its FHA mortgage loan default rate consistently has been substantially lower than the industry average.

II.     **HUD and Wells Fargo Worked Together to Achieve HUD's Goals of Expanding Home Ownership and Minimizing Risk**

The AC-1 portrays Wells Fargo as having operated in a world where underwriters and management ran amok – in terms of the quality of the mortgage loans originated – while HUD stood by helplessly and at Wells Fargo's mercy, with no idea what was going on.  This story line is pure fiction.  In fact, HUD's Post-Endorsement Technical Review ("PETR") teams monitored

---

[3]     A copy of the AC-1 is attached as Exhibit A to the January 16, 2013 Declaration of Douglas W. Baruch ("Baruch Decl.").  Well-pleaded AC-1 factual allegations are presumed true solely for purposes of this Motion.

the underwriting performance of Wells Fargo.  *See, e.g.*, HUD Handbook 4000.4, rev. 1, chg. 2, § 5-2 (1994) (establishing HUD authority to "review[] cases during post-endorsement technical reviews, analyz[e] quality control reports … and shar[e] information with other field offices, HUD's monitoring division, the Mortgagee Review Board, and the Housing Civil Penalties Panel").  The PETR teams reviewed thousands of Wells Fargo loan files each year.  In addition, HUD's Office of Inspector General ("OIG") conducted and published a report of an audit of Wells Fargo Home Mortgage, Inc. ("WFHM Inc.") in July 2004 (the "2004 HUD-OIG Audit"), AC-1 ¶ 123, which covered two years of WFHM Inc.'s monthly quality control review reports, including many of the mortgage loan quality statistics cited in the AC-1, *e.g.*, AC-1 ¶¶ 45, 53-54. In other words, much of the activity now characterized in the AC-1 as concealed evidence of Wells Fargo's misconduct has been in HUD's possession since at least July 2004.

Notwithstanding this HUD knowledge, including of conduct described in the 2004 HUD-OIG Audit, HUD did not revoke Wells Fargo's DEL status or impose heightened oversight over Wells Fargo's underwriting or quality practices.  Indeed, far from the AC-1's *post hoc* characterizations, the reality is that the issues HUD identified in the 2004 HUD-OIG Audit were dealt with as routine administrative matters by the federal agency with subject-matter expertise and responsibility for overseeing and enforcing compliance with FHA mortgage loan guidelines, rules, and regulations.  In short, conduct – which, at the time, was known, discussed, and addressed by the federal agency overseer (HUD) – is now spun years later as "fraudulent" in a lawsuit filed by the Justice Department.  This Monday-morning quarterbacking by an agency lacking HUD's experience and mortgage-industry knowledge is unfair and improper.

III.   **FHA Insurance Program Regulations and Certifications**

The AC-1 references two types of certifications provided to HUD: (1) individual loan-level certifications made at the time of loan origination as to the eligibility of specific

mortgage loans for FHA insurance; and (2) annual certifications by lenders as to overall compliance with FHA program requirements.  AC-1 ¶¶ 37-39.  However, the AC-1 never explains the very different nature of these certifications and how each relates to HUD regulations/guidance and the U.S. Release.

### A.   Individual Loan-Level Certifications

HUD regulations set forth guidelines specific to the underwriting and origination of individual mortgage loans, such as underwriting due diligence, property appraisals in certain circumstances, and evaluations of borrower income and credit characteristics.   24 C.F.R. §§ 203.5(d)-(e); AC-1 ¶¶ 17, 19.  At the time of origination of an FHA-insured mortgage loan, Wells Fargo, or a predecessor, submitted to HUD a document – HUD Form 92900-A – that contained three certifications specific to that individual loan.[4]  One of those Form 92900-A certifications is relevant to the AC-1 allegations.  In particular, a Wells Fargo underwriter certified that – in his/her subjective belief – the specific mortgage loan referenced on that form met FHA eligibility standards.[5]  Form 92900-A is a HUD document, and it obviously reflects the exact verbiage HUD wanted the underwriter to provide.  Yet, the form did not request, and the underwriter did not provide, any representation or certification beyond the specific mortgage loan referenced on the form.  Consequently, the individual underwriter's loan-level certification did not express or imply anything about Wells Fargo's compliance with its quality control plan or other FHA program responsibilities.  Further, this individual loan-level certification pertaining to a single mortgage loan said nothing about Wells Fargo's compliance with HUD handbook

---

[4]   A copy of Form HUD-92900-A is attached as Exhibit B to the Baruch Declaration.

[5]   Or, in the case of a mortgage loan "approved" through FHA's automated underwriting scorecard, the Wells Fargo underwriter certified "to the integrity of the data" used in the scorecard and, on the basis of the scorecard "approval," that the specific mortgage loan referenced on the form was "eligible for HUD mortgage insurance."

instructions concerning the "self-reporting" of other FHA mortgage loans that already had been originated and closed, but which later were identified as having some deficiency.

### B. <u>Annual Certifications</u>

Wholly separate from the individual loan-level certification, HUD requested FHA lenders to provide HUD with an annual certification focused on overall Wells Fargo compliance with HUD/FHA standards. Unlike the individual loan-level certifications provided by underwriters who attested only to the circumstances of an individual mortgage loan, the annual certifications were signed by different Wells Fargo personnel and related to Wells Fargo's overall compliance with HUD/FHA requirements. Using language dictated by HUD, the pre-2009 annual certification, with slight variations over the years, was: "I know, or am in the position to know, whether the operations of [Wells Fargo] conform to HUD regulations and guidelines. I certify that to the best of my knowledge, [Wells Fargo] conforms to all HUD regulations necessary to maintain its HUD/FHA approval."[6] This annual certification was the only means by which HUD asked Wells Fargo to affirm its compliance with HUD regulations and HUD handbooks dealing with Wells Fargo's quality control plan, quality control audits, self-reporting criteria, employee supervision and training, and employee compensation.

\* \* \*

The distinction between the individual loan-level certifications and the annual certifications is critically important for this case and this Motion to Dismiss because the AC-1 allegations are based on alleged Wells Fargo conduct covered by the annual certifications. For example, three separate AC-1 Claims (Third, Fourth, and Fifth) are styled as "Self-Reporting" causes of action under the FCA – a specific activity that is covered only by the annual

---

[6]   A sample pre-2009 HUD annual certification form is attached as Exhibit C to the Baruch Declaration. The post-2009 annual certification form is substantially similar.

certifications.  As a result, those (and similar) claims are barred by the U.S. Release in the D.C. Action and must be dismissed for this reason alone.

Moreover, perhaps because the AC-1 allegations focus on conduct that has been released, and do not fall within the limited individual loan-level conduct that was carved out of the U.S. Release, the AC-1 is woefully deficient in meeting the pleading standards under Rule 9(b). Indeed, the only path left to the United States to attempt to impose liability on Wells Fargo following the U.S. Release is to establish that specific Wells Fargo underwriters "knowingly" falsified individual loan-level certifications, made at the time of origination, that the specific mortgage loan was eligible for FHA insurance.  The AC-1 never makes this type of allegation (or specifies any corresponding claim for payment), let alone with the particulars required under Rule 9(b).

## ARGUMENT

### I.     THE U.S. RELEASE COVERS THE AC-1 CONDUCT

#### A.     The U.S. Release Bars All Claims Alleged in the AC-1

In early 2012, in exchange for a $5 billion settlement by Wells Fargo, the United States released Wells Fargo from civil liability – including under the FCA and FIRREA – with respect to the company's adherence to FHA program responsibilities that fell within the scope of Wells Fargo's annual certifications.   The U.S. Release is enforceable through a Consent Judgment entered by the United States District Court for the District of Columbia on April 4, 2012 in *United States v. Bank of America Corp.*, No. 1:12-cv-00361-RMC.[7]  By its express terms, the U.S. Release precludes the United States from seeking to impose liability for conduct within the

---

[7]     A copy of the U.S. Release is attached as Exhibit D to the Baruch Declaration and is properly before this Court on this Motion.  *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ("[When considering a motion to dismiss, a district court may] consider matters of which judicial notice may be taken under Fed. R. Evid. 201."); Fed. R. Evid. 201(c)(2) ("The court must take judicial notice [of an adjudicative fact] if a party requests it and the court is supplied with the necessary information.").

scope of Wells Fargo's annual certifications to HUD, including any shortcomings in its quality

program and any failures to meet its "self-reporting" obligations to HUD:

> [T]he United States fully and finally releases [Wells Fargo] … from any
> civil or administrative claims it has or may have and from any civil or
> administrative remedies or penalties (expressly including punitive or
> exemplary damages) it may seek to impose under FIRREA, the False
> Claims Act, and the Program Fraud Civil Remedies Act where the sole
> basis for such claim or claims is that [Wells Fargo] submitted to
> HUD-FHA … a false or fraudulent annual certification that the mortgagee
> had "conform[ed] to all HUD-FHA regulations necessary to maintain its
> HUD-FHA approval" (including, but not limited to, the requirement that
> the mortgagee implement and maintain a quality control program that
> conforms to HUD-FHA requirements), or "complied with and agree[d] to
> continue to comply with HUD-FHA regulations, handbooks, Mortgagee
> Letters, Title I Letters, policies, and terms of any agreements entered into
> with the Department under HUD's Direct Endorsement Program."

Baruch Decl., Exh. D, at F-16–F-17.  To avoid any ambiguity, the U.S. Release specifies further:

> **For avoidance of doubt, this Paragraph means that the United States
> is barred from asserting**
>
> [1] **that a false annual certification** renders [Wells Fargo] liable under
> the False Claims Act and the other laws cited above for loans endorsed by
> [Wells Fargo] for FHA insurance during the period of time applicable to
> the annual certification without regard to whether any such loans contain
> material violations of HUD-FHA requirements, or
>
> [2] **that a false individual loan certification** that "this mortgage is
> eligible for HUD mortgage insurance under the Direct Endorsement
> program" renders [Wells Fargo] liable under the False Claims Act for any
> individual loan that does not contain a material violation of HUD-FHA
> requirements.

*Id.* at F-17–F-18 (emphasis added).  The only exception to this full release is equally clear:  The

United States retained the ability to seek to impose liability on Wells Fargo if it could establish

that specific, individual Wells Fargo underwriters who executed the individual loan-level

certifications did so "knowing"[8] that particular mortgage loans were not eligible for FHA

---

[8]    Under the FCA, the terms "knowing" and "knowingly" mean that a person has actual knowledge of information
or acts in deliberate ignorance or reckless disregard of the truth or falsity of that information.  31 U.S.C.
§ 3729(b)(1).

insurance because of "material violations of any applicable HUD-FHA requirements with respect to [that] individual loan or loans."  Baruch Decl., Exh. D, at F-18.

Now, within a year of that agreement, through the AC-1, the United States is attempting to recover from Wells Fargo again for the same conduct that it already released.  But Wells Fargo has no further exposure for these FHA program-wide compliance allegations.  No matter how creatively the United States tries to wordsmith around the plain language and clear consequences of the U.S. Release, it cannot escape that the activity alleged in the AC-1 is conduct that the United States has released.

There is no plausible argument that the AC-1 operates within the carve-out of the U.S. Release.  Mere mention of individual loan-level certifications cannot mask the essence of the claims.  Indeed, any fair reading of the AC-1 reveals that it is not about alleged individual Wells Fargo underwriter misconduct in falsely certifying mortgage loans as eligible for FHA insurance knowing that the mortgage loans contained "material violation[s] of applicable HUD-FHA requirements."  Baruch Decl., Exh. D, at F-18.  Not a single instance of such activity is alleged in the AC-1.

Instead, the AC-1 pleads programmatic deficiencies by Wells Fargo and seeks to impose liability on the theory that Wells Fargo either (a) "knowingly" falsely certified that the mortgage loans met FHA eligibility requirements at the time of origination because Wells Fargo management allegedly knew – due to systemic problems such as the hiring of temporary staff, inadequate training, an incentive bonus system, and a culture that valued quantity and quick turnarounds – that a high percentage of these mortgage loans could contain "material violation[s] of applicable HUD-FHA requirements," or (b) discovered (post-origination) through its quality assurance system – but failed to report to HUD – "material violation[s] of applicable HUD-FHA

11

requirements" in these mortgage loans.  *See* AC-1 ¶¶ 2-5.  These systemic allegations, and the causes of action they purport to substantiate, are expressly barred by the U.S. Release because they are only certified to in the annual certification.  *See* Baruch Decl., Exh. C ("I certify that to the best of my knowledge, the mortgagee conforms to all HUD regulations necessary to maintain its HUD/FHA approval.").

### B.  Wells Fargo Is Seeking Relief in the D.C. Action

Because the United States has breached its obligations under the D.C. Action Consent Judgment to release any further claims against Wells Fargo arising out of the FHA mortgage loan portfolio, except in the narrow individual loan-level instances described above, Wells Fargo filed a Motion to Enforce the Consent Judgment in that court (the "D.C. Motion").[9]  As set forth in the D.C. Motion, the AC-1 claims are barred by *res judicata* and must be dismissed with prejudice.[10]

## II.  FCA CLAIMS PRIOR TO JUNE 25, 2006 ARE TIME-BARRED

The AC-1 centers on FHA mortgage loans originated between 2001 through 2005 (Claims One-Two) as well as alleged "self-reporting" violations beginning in 2002 (Claims Three-Five).  The latest closing date of the ten mortgage loans described in the AC-1 is in 2004, and the United States contends that each one defaulted within a few months or "soon after closing."  *See, e.g.*, AC-1 ¶¶ 95, 110.  However, FCA actions generally "may not be brought ...

---

[9]   The U.S. Release contains an exclusive jurisdiction provision, vesting the United States District Court for the District of Columbia with continuing jurisdiction.  *See* Baruch Decl., Exh. D, at F-43.  Consequently, Wells Fargo filed its D.C. Motion with that court on November 1, 2012.  Copies of Wells Fargo's supporting memorandum, the United States' opposition, and Wells Fargo's reply in support of the D.C. Motion are attached as Exhibits E-1, E-2, and E-3 to the Baruch Declaration.

[10]   *Res judicata* is an affirmative defense and is properly raised in a motion to dismiss.  *See, e.g.*, *Pentagen Techs. Int'l v. CACI Int'l*, Nos. 93 Civ. 8512, 94 Civ. 0441, 94 Civ. 8164, 1996 WL 435157, at *8 (S.D.N.Y. Aug. 2, 1996) (granting motion to dismiss and holding that "[f]ederal law provides that a consent judgment qualifies as a final judgment on the merits entitled to *res judicata* effect in a subsequent litigation between the parties to the consent decree over the same cause of action"); *see also Amalgamated Sugar v. NL Indus., Inc.*, 825 F.2d 634, 639 (2d Cir. 1987) ("The general rule is that a final consent decree is entitled to *res judicata* effect.").

more than 6 years after the date on which the violation ... is committed." 31 U.S.C. § 3731(b)(1). Since the FCA statute of limitations is six years, any alleged FCA violation that arose prior to June 25, 2006[11] is time-barred and should be dismissed.

### A.   Many of the FCA Claims Are Time-Barred

There can be no FCA violation without a claim for payment. *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001). Here, although the AC-1 never specifies a single claim for payment (and is defective for that reason as discussed in Section III below), the theory appears to be that the alleged false claim for payment occurred – and, therefore, an FCA violation arose – each time Wells Fargo made a claim for an FHA-insurance payment on defaulted mortgage loans that the United States alleges were originated in violation of applicable requirements. *See* AC-1 ¶¶ 141-43.

Despite seeking to impose FCA liability on Wells Fargo for thousands of defaulted mortgage loans, the United States has made it difficult to determine which FCA claims are timely and which are not because the AC-1 improperly fails to specify the date of a single Wells Fargo claim for payment. Even so, this pleading deficiency presents no obstacle to this Court determining the appropriate limitations period and ordering the dismissal of all time-barred claims. *See United States v. The Baylor Univ. Med. Ctr.*, 469 F.3d 263, 268 (2d. Cir. 2006) (remanding for dismissal of the government's complaint as untimely because "the six-year statute of limitations in 31 U.S.C. § 3731(b)(1) had expired"). The Court should rule that the FCA causes of action are limited to those based solely on claims made on or after June 25, 2006.

---

[11]   The United States and Wells Fargo executed a tolling agreement effective June 25, 2012.

**B.**     **The United States' Knowledge of the Causes of Action Precludes Reliance on Any Extended Limitations Period**

Through its AC-1 amendments (*e.g.*, AC-1 ¶¶ 118, 136), the United States seeks refuge in the FCA's ten-year statute of repose, which can apply if the United States files suit within "3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances." 31 U.S.C. § 3731(b)(2). For several reasons, including public records referenced in the AC-1 and an Eastern District of New York case involving a similar FHA scenario that is directly on point, the United States' attempt to plead around the statute of limitations bar must be rejected.

First, the AC-1 references the July 2004 HUD-OIG Audit of WFHM Inc.'s FHA mortgage loan origination practices.[12]   AC-1 ¶ 123. This HUD-OIG Audit was widely disseminated throughout HUD, reported by the media at the time, posted on HUD's website (where it can still be accessed today),[13] and featured prominently in an October 2004 report presented by HUD-OIG to the head of HUD and to the United States Congress (the "Report to Congress").[14]

---

[12]    A copy of the 2004 HUD-OIG Audit report is attached as Exhibit F to the Baruch Declaration for purposes of this statute of limitations argument only.

[13]    *See, e.g.*, *Wells Fargo Rapped by HUD*, 28 Nat'l Mortg. News 44, at 1 (Aug. 2, 2004); *see also* http://archives.hud.gov/offices/oig/reports/files/ig471003.pdf.

[14]    A copy of the Report to Congress is attached as Exhibit G to the Baruch Declaration and is submitted to the Court at this time solely for purposes of addressing the statute of limitations grounds for dismissal. The Report to Congress is properly before this Court as a public record. *See Kramer*, 937 F.2d at 774 (approving "[t]he practice of taking judicial notice of public documents," and specifically holding that a court may consider "public disclosure documents required by law to be filed, and actually filed, with the SEC" in deciding a motion to dismiss). The Report to Congress is mandated by law and was actually filed with Congress. *See* 5 U.S.C. App. 3 § 5 (requiring semiannual reports to Congress by each inspector general, requiring that these reports be provided to the head of the department, and requiring that these reports be made public); 151 Cong. Rec. 656 (2005) (indicating receipt of this particular semiannual report by the Senate oversight committee on January 25, 2005). The Report to Congress also is available on HUD's website at http://www.hud.gov/offices/oig/sar52.pdf.

Authored by the HUD Inspector General – certainly the official with responsibility to act[15] – this Report to Congress expressly states on the first page of the "Inspector General's Message" that WFHM Inc. "did not follow HUD requirements and prudent lending practices." Baruch Decl., Exh. G, at iii.  This official report, delivered to Congress, further states that the majority of defaulted loans examined in the 2004 HUD-OIG Audit contained origination deficiencies and concluded that "Wells Fargo did not have adequate controls to ensure its employees followed HUD's requirements" in certain respects and that this "significantly increased the risk to the FHA insurance fund."  Baruch Decl., Exh. G, at 11.

Under § 3731(b)(2), it is enough that the "official of the United States charged with responsibility to act" on the information either knew or *reasonably should have known* of the information contained in the HUD-OIG Audit to trigger the three-year period in which suit has to be brought.  Yet, in the AC-1, the United States ignores this standard and instead merely adds the allegation that the "United States Department of Justice learned the facts material to its claims ... no earlier than 2011."  AC-1 ¶¶ 118, 136.  This carefully worded statement cures nothing.

The ten-year statute does not apply if *either* the United States "knows" of the information more than three years before suit *or* the United States reasonably should have known of the information.  The United States' conclusory amendment addresses (at most) only one prong and therefore remains deficient.  Here, the Report to Congress and the 2004 HUD-OIG Audit were both widely disseminated and publicized in 2004, and each "reasonably should have been

---

[15]   The HUD Inspector General is personally charged "to keep the head of [HUD] and the Congress fully and currently informed ... concerning fraud and other serious problems, abuses, and deficiencies."  5 U.S.C. App. 3 § 4.

known" to the Justice Department.[16]   On this ground alone, the ten-year repose period does not apply.

Second, the AC-1 addresses only the alleged personal knowledge of unspecified persons within the Justice Department.   Whether this assertion can withstand discovery, the fact remains that, under applicable law, the knowledge of senior HUD/HUD-OIG officials is attributed to the Justice Department.   This was the holding in *United States v. Island Park*, where the court was confronted with a HUD-OIG report and denied a government attempt to resuscitate FCA claims that were otherwise barred by the six-year provision of § 3731(b)(1).   791 F. Supp. 354, 363 (E.D.N.Y. 1992) ("To hold that the common knowledge of the Island Park affair at all levels of the federal government cannot reasonably be attributed to the Department of Justice is to ignore the basic fact that HUD and DOJ are both subdivisions of the same branch of the same government.").[17]   The same reasoning applies here.   Any attempt by the United States to rely on § 3731(b)(2) must be rejected.   All FCA claims prior to June 25, 2006 must be dismissed.

---

[16]     *See United States ex rel. Frascella v. Oracle*, 751 F. Supp. 2d 842, 852 (E.D. Va. 2010) (holding that publication of a GSA audit report, even though the report was preliminary and the results were qualified, began the limitations period under § 3731(b)(2)); *United States ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, 695 (E.D. Pa. 2009) ("Actual knowledge of the material facts ... is not necessary to trigger the running of the § 3731(b)(2) three-year period.   Rather, the start date is when the plaintiff possesses enough knowledge that would lead a reasonable person to investigate whether a false claim was made." (citing *Zeleznik v. United States*, 770 F.2d 20, 24 (3d Cir. 1985))); *United States ex rel. Miller v. Bill Harbert Int'l. Const.*, 505 F. Supp. 2d 1, 7 (D.D.C. 2007); *United States v. Kensington Hosp.*, No. 90-5430, 1993 WL 21446, at *13 (E.D. Pa. Jan. 14, 1993).

[17]     Another district court in this Circuit expressly has held that a senior agency official in similar circumstances is "an official of the United States" for purposes of this provision.   *See United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 777 F. Supp. 195, 204 (N.D.N.Y. 1991) (holding that the period under 31 U.S.C. § 3731(b)(2) began to run when "senior Army officials responsible for the Black Hawk program were aware" of an engineering change, and rejecting an "argument that the contracting officer is the only official charged with responsibility to act in the circumstances").   The legislative history of the 1986 FCA amendments supports this interpretation as one of the chief sponsors of the bill explained during the floor debate, "The committee has added a tolling provision[] to the False Claims Act which is adopted directly from 28 U.S.C. 2416(c) … care should be taken to assure that the information has reached an official in a position both to recognize the existence of a possible violation of this act and to take steps to address it."   132 Cong. Rec. S11,244–45 (daily ed. Aug. 11, 1986) (statement of Sen. Charles Grassley).   Section 2416(c) – which uses the same phrase "an official of the United States" – has been consistently interpreted to include government employees and agents beyond Justice Department officials.   *See, e.g.*, *United States v. Reinhardt Coll.*, 597 F. Supp. 522, 526 (N.D. Ga. 1983) (finding Veterans Administration auditors were

## III.   **THE AC-1 FAILS TO SATISFY RULE 9(b)**

The claims against Wells Fargo sound in fraud, *see, e.g.*, AC-1 ¶ 1, and the United States' allegations must satisfy the pleading requirements of Fed. R. Civ. P. 9(b) by "(1) specify[ing] the statements that the plaintiff contends were fraudulent, (2) identify[ing] the speaker, (3) stat[ing] where and when the statements were made, and (4) explain[ing] why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).   Indeed, courts have emphasized that "[b]ecause the linchpin of an FCA claim is a false claim, 'the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b).'"   *United States ex rel. Rafizadeh v. Cont'l Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008) (quoting *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003)).[18]

Rule 9(b) has significance beyond the important purpose of giving Wells Fargo "clear notice" of the claims and protecting Wells Fargo "from undue harm to its reputation."   *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 451 (S.D.N.Y. 2007).   For instance, the lack of particulars regarding the Wells Fargo underwriters who allegedly falsified individual loan-level certifications and where this conduct occurred is critically important to determining

---

"officials of the United States" sufficient to trigger the running of the statute of limitations under 28 U.S.C. § 2416(c).

[18]   Likewise, to plead FIRREA liability, the AC-1 must plead facts that tie particular individual loan-level certifications to violations of the predicate statutes upon which the FIRREA claims depend, but the AC-1 lumps together all five predicate statutes, barely mentioning their elements.   *See* AC-1 ¶¶ 11, 169.   And rather than pleading each alleged FIRREA "violation" – for which it seeks "$1 million per violation," AC-1 ¶ 174 – with particularity, the AC-1 inappropriately refers to four "including, but not limited to" examples, only two of which involve specific conduct.   *See* AC-1 ¶ 169.   The AC-1 provides virtually no other particulars of the underlying predicate offense violations of supposed wire fraud, mail fraud, and other actionable offenses, and, as such, the FIRREA claims cannot withstand this Rule 9(b) challenge.

the most appropriate venue for the United States' claims.[19]   Moreover, the lack of particulars in

the AC-1 highlights that the United States is pursuing claims that are barred by the U.S. Release.

If it were otherwise, the AC-1 would identify particular Wells Fargo underwriters who

"knowingly" certified individual mortgage loans as eligible for FHA insurance notwithstanding

"material violation[s] of applicable HUD/FHA requirements."   Instead, the AC-1 focuses on

alleged programmatic deficiencies by Wells Fargo – albeit also without providing the requisite

Rule 9(b) particulars – which is the precise conduct covered by the U.S. Release.

### A.   The AC-1 Does Not Plead Successor Liability

Notwithstanding its pre-suit investigation of the conduct at issue, and the fact that the

AC-1 identifies ten supposedly exemplar loans that purport to establish Wells Fargo liability, the

AC-1 inexplicably ignores and fails to account for the fact that for several of the years at issue,

the FHA mortgage loan business was conducted by WFHM Inc., a separate and distinct legal

entity and not a federally insured financial institution.   The AC-1 contains no allegations of

successor liability by Wells Fargo for the conduct of WFHM Inc. and therefore fails to state a

claim against Wells Fargo for WFHM Inc. conduct.   *See Hayden Capital USA, LLC v. Northstar*

*Agri Indus., LLC*, No. 11 Civ. 594 (DAB), 2012 WL 1449257, at *8-9 (S.D.N.Y. Apr. 23, 2012)

(granting motion to dismiss under Rule 12(b)(6) for plaintiff's failure to plead adequately a claim

for successor liability).   Furthermore, "'lumping' all [actors] together fails to satisfy the

particularity requirement" of Rule 9(b).   *In re Crude Oil Commodity Litig.*, No. 06-CV-6677,

2007 U.S. Dist. LEXIS 47902, at *19 (S.D.N.Y. June 28, 2007).

---

[19]   Wells Fargo reserves its right to move to transfer venue once the requisite specificity is provided.

**B.      Vague and Non-Specific Allegations About Company-Wide Conduct Are Precluded by the U.S. Release and Do Not Satisfy Rule 9(b)**

The AC-1's sweeping allegations of "deficiencies" in mortgage loan originations – in *unspecified mortgage loans*[20] originated in *multiple unspecified locations* over *multiple years* by *numerous unspecified underwriters* and certified to in *multiple unidentified* loan-level certifications by *numerous unspecified* Wells Fargo personnel and with no description of the "material violation" – do not satisfy the Rule 9(b) requirements.  In fact, no actual claims for payment are even pleaded, much less their details.  As much as the United States may want to simplify its claims, it cannot avoid the fact that any liability must be alleged, and proven, at the individual mortgage loan level because (1) the U.S. Release precludes claims arising out of the annual certifications, and (2) the only claims for payment submitted by Wells Fargo, or a predecessor, are at the individual mortgage loan level.  Wells Fargo cannot be required to guess which mortgage loans are allegedly deficient and who was allegedly involved.

Thus, to establish FCA liability, the United States must show, with respect to each mortgage loan that resulted in a false claim for payment, that (a) the mortgage loan contained a "material violation[] of applicable HUD-FHA requirements," (b) a specifically identified Wells Fargo employee "knowingly" falsely certified that the mortgage loan met all of the HUD eligibility requirements, (c) the mortgage loan default was caused by the "material violation," and (d) an actual claim was filed.  This is a fact intensive inquiry with numerous variables from mortgage loan to mortgage loan, including: the type of violation, the type of certification, the underwriters and other personnel who made the certifications, the differing definitions of

---

[20]     According to the United States, Attachments A through C to the AC-1 are only relevant to the Third through Fifth Claims for alleged "self-reporting" misconduct and, in any event, "do not constitute the universe of bad loans" on which the claims are based.  AC-1 ¶ 133.

deficiencies and violations over the years,[21] and the more than nine years of conduct that the AC-1 places at issue.  The need for specificity is all the more important here because it is well established that FCA liability does not extend to innocent or even negligent errors, nor is the FCA a vehicle to police technical compliance with complex regulations, which these were.  *See United States ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 532 (6th Cir. 2012).

The AC-1 repeatedly alleges that "senior management" or even "management" did or knew various things, but it does not identify those managers.  *See* AC-1 ¶¶ 3, 34, 45, 46, 48, 50-52, 55, 84-85, 116, 123, 140.  Likewise, the United States in passing mentions only Wells Fargo's branch in "Baton Rouge, Louisiana," while alleging that unidentified "Wells Fargo management knew, or should have known, that certain of its branches and underwriters were originating and approving loans of astoundingly poor quality."  AC-1 ¶ 116.  However, the United States merely alleges overall statistics about default rates at that one branch without alleging what was done wrong at that branch, by whom, on what mortgage loans and certifications, and with what knowledge, much less the "certain" other branches involved. Moreover, nowhere else does the United States identify particular Wells Fargo offices, much less particular underwriters or other personnel, who allegedly provided false loan-level certifications regarding FHA mortgage loan eligibility.  Even with respect to the ten specific mortgage loans listed, AC-1 ¶¶ 56-81, 90-115, the United States provides no information regarding the identity of a Wells Fargo employee who knowingly submitted a false certification, what was a "material

---

[21]    The AC-1 fails to even define the term "material violation."  The phrase "material violation" referenced in the U.S. Release and various HUD handbooks is not defined and is not necessarily coextensive with the Wells Fargo quality control finding of certain mortgage loans as "material" during reviews.  The exact alleged "violations" at issue – which the United States does nothing to identify – are critically important to the question of whether a claim has even been stated because some "material" findings result from post-origination activity and thus cannot be the basis for a false certification or causally connected to underwriter error.  For instance, a check can bounce or a document can be misplaced post-closing and give rise to a quality control "material" finding even though the underwriter did everything required to properly verify the loan at the time of the individual loan-level certification.

violation[] of applicable HUD-FHA requirements," the Wells Fargo office or branch involved with the mortgage loan origination, or the crux of an FCA action – the claim for payment.

As convenient as it may be, the United States cannot make general characterizations without specifying *who* did *what*, *where*, and *when*.  As this Court has held, "such failures are fatal" under Rule 9(b).  *Cohen v. Avande*, 874 F. Supp. 2d 315, 324 (S.D.N.Y. 2012) (citing *Schlenger v. Fid. Emp'r Servs. Co., LLC*, 785 F. Supp. 2d 317, 352 (S.D.N.Y. 2011) (rejecting a complaint that alleged "IBM representatives" or "representatives of IBM" made statements "during the 'hiring process,'" because "Plaintiff's failure to name individuals, identify detailed statements, or identify particular dates makes clear that as pleaded this claim lacks the specificity required by Rule 9")).  The Justice Department gets no free ride on 9(b) compliance.  Its failure to provide the "who did what, where, and when" warrants dismissal.

## C.   Conclusory Scienter Allegations Do Not Satisfy Rule 9(b)

Moreover, the AC-1 must also "allege facts that give rise to a strong inference of fraudulent intent."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).  This means that "conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough."  *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir. 1982).[22]  Yet, the AC-1 is riddled with such conclusory allegations of mental state.  For example, the AC-1 recites twenty-two times the United States' mantra that Wells Fargo was "reckless" but offers no explanation for how particular underwriting analyses and the individual loan-level certifications that followed them were "knowingly" false, rather than simply the result of subjective judgments or innocent

---

[22]   *See also Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 19 (S.D.N.Y. 2009).  A strong inference requires a basis for inferring mental state that "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations."  *Glidepath*, 590 F. Supp. 2d at 451 (applying, to Rule 9(b), other precedent on the meaning of "strong inference" (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (internal quotation marks omitted))).  "A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*

errors.  Certainly, it is not enough for the United States to identify a defaulted mortgage loan and then declare that the default must have been the product of fraud.  This type of "fraud by hindsight" pleading is improper.  *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) ("For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones.  While greater clairvoyance [in the past] might have led to a realization that [certain investments] would run into serious trouble … failure to make such perceptions does not constitute fraud.").[23]  Likewise, allegations of facts suggesting knowledge of falsity *after* an alleged false statement, combined with conclusory allegations of knowledge at the time of the statement, do not suffice under Rule 9(b).  *See Cohen*, 874 F. Supp. 2d at 323-24.

The United States has not alleged that any Wells Fargo employee who made an individual loan-level certification later admitted to doing so "knowingly."  Each mortgage loan origination certification must be shown to have been signed by an identified person who *knew that it was false* at the time of certification.  The AC-1 sheds no light on why this would be so for each of the thousands of specific individual loan-level certifications signed by different employees in a host of locations over many years.

### D.   Rule 9(b) Would Still Apply Even If the United States Alleged a Fraudulent Scheme

Even if it were to plead a fraudulent scheme – which the AC-1 does not – the United States still could not bypass Rule 9(b) since scheme allegations "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations."  *United States ex rel.*

---

[23]    Allegations of regulatory noncompliance, married with conclusory allegations of intent, do not suffice to plead a strong inference of mental state.  Indeed, where a defendant has "consistently sought clarification," has "followed industry practice in trying to sort through ambiguous regulations," and has supplied information to the government regarding its conduct, deeming such conduct reckless would "impose[] a burden on government contractors far higher than what Congress intended."  *Williams*, 696 F.3d at 531.

*Schwartz v. Coastal Healthcare Grp., Inc.*, No. 99-3105, 2000 WL 1595976, at *3 (10th Cir. Oct. 26, 2000) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1998)); *see United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510-14 (6th Cir. 2007) (holding that a false or fraudulent scheme only supports "more generalized allegations of fraud" where the examples are not only representative of the broader class but also detailed enough to satisfy Rule 9(b) particularity requirements).[24]   The United States cannot hide behind the "relaxed" pleading standard courts sometimes apply to *qui tam* relators who rely on inferences rather than facts.  By virtue of its power to investigate FCA and FIRREA claims prior to bringing suit – which the United States took full advantage of, including through the issuance of four FIRREA subpoenas to Wells Fargo seeking documents spanning the past decade – the United States cannot plausibly contend that it must await discovery before providing the requisite particulars.

Notably, a district court in California dismissed a FCA case on Rule 9(b) grounds where the complaint alleged that the defendant "caused the submission of claims for HUD insurance on loans it knew were ineligible" because "approximately 70% of the loans originated in the 1995-98 period were ineligible" as a result of "improper underwriting, servicing, and other problems."  *See United States ex rel. Cericola v. Fed. Nat'l Mortg. Assoc.*, 529 F. Supp. 2d 1139, 1145 (C.D. Cal. 2007).  The court found the complaint's allegation of a fraudulent scheme, supposedly typified by eighty-one previously settled – and thus inactionable – loans, failed to satisfy the pleading requirements of Rule 9(b).  Putting aside these precluded examples, the court

---

[24]   *See also United States ex rel. Chapman v. Office of Children & Family Servs. of New York*, No. 1:04-CV-1505, 2010 WL 610730, at *4 (N.D.N.Y. Feb. 16, 2010) (dismissing, on Rule 9(b) grounds, complaint that alleged a fraudulent scheme while "summarily conclud[ing] that the defendants submitted false claims to the government for reimbursement"), *aff'd*, No. 10-0967CV, 2011 WL 2163997 (2d Cir. June 3, 2011); *United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 810 (S.D.N.Y. 2010).

held that "[w]ithout having any factual support as to the types of loans, the relevant time period, employees involved, and the like, [the defendant] does not have adequate notice of the particular misconduct it is alleged to have committed." *Id.* at 1146. In making this ruling, the court appreciated the import of the scale of the alleged fraud and defendant's operations, noting that "***thousands of other loans***" allegedly were involved and that the defendant, with broad geographic reach, "was a large player in the ... market." *Id.* (emphasis in original).

Here, the United States only attempts to provide detail for "a tiny sample of the total number of mortgages," AC-1 ¶¶ 56, 90, many of which, despite the failure to plead a claim date, are outside the applicable statute of limitations and so cannot be considered as examples of any actionable fraudulent scheme. These allegations are even less adequately pleaded than in *Cericola*. The United States not only alleges that "tens of thousands" of mortgage loans nationwide are at issue, AC-1 ¶ 44, but also that the wrongdoing took place over a ten-year period (versus the three-year period in *Cericola*). AC-1 ¶¶ 2, 4 (alleging conduct from May 2001 through December 2010). The large number of mortgage loans the United States is trying to attack does not excuse the lack of particularized pleading.

The AC-1 must be dismissed for failure to comply with Rule 9(b).

## IV.    THE AC-1 FAILS TO STATE ANY FCA CLAIM

Should any FCA claims survive all of the barriers outlined in Sections I through III above, those claims must be dismissed under Fed. R. Civ. P. 12(b)(6) because the AC-1 fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 313 (2d Cir. 2012) ("The plausibility standard … asks for more than a sheer possibility that a defendant has acted unlawfully." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))). While at the motion to dismiss stage the plaintiff's well-pleaded allegations must be accepted as true, "a

formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Similarly, in *Iqbal*, the Supreme Court emphasized that adequate pleading "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and that "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  556 U.S. at 678.

Although the AC-1 purports to allege some Wells Fargo failure to comply with its FHA program responsibilities, pleading facts to support some elements of a claim, but not others, is not permissible.  In *Twombly*, the Supreme Court addressed exactly this sort of failure to plead facts supporting each element of a cause of action.  550 U.S. at 557.  The Court emphasized that because the statute at issue "does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy," a complaint may not simply plead facts that suggest an unreasonable restraint of trade and then allege in conclusory terms an antitrust conspiracy.  *Id.* at 553 (internal quotations omitted).  Rather, a complaint must plead facts "plausibly suggesting (not merely consistent with)" conspiracy.  *Id.* at 557.  Here, as in *Twombly*, the United States pleads threadbare allegations concerning essential elements of its FCA claims.  As such, the AC-1 does not plead facts sufficient to "nudge[] their claims across the line from conceivable to plausible."  *Id.* at 570.

A.   **The Alleged Misrepresentations Are Not Conditions of Payment and Therefore Do Not State a FCA Cause of Action**

This Circuit has held that a legally false certification is actionable under the FCA only where the regulatory or statutory provision violated is a condition of payment.  *Mikes*, 274 F.3d at 697; *Williams*, 696 F.3d at 532 ("[The violation of] conditions of participation … do not lead to False Claims Act liability."); *see also United States ex rel. Steury v. Cardinal Health, Inc.,* 625 F.3d 262, 269 (5th Cir. 2010) (citing the Second Circuit's *Mikes* decision with approval and

finding that the certification, even if "material"[25] to the government's decision to pay, is "not 'false' within the meaning of the FCA if the contractor is not required to certify compliance in order to receive payment").[26]   Courts draw clear distinctions between mere conditions of *participation* and true conditions of *payment* in order to prevent the government from improperly using the FCA as a "blunt instrument to enforce compliance with all [program regulations]." *Mikes*, 274 F.3d at 699.   This Circuit and other courts have applied this reasoning in FCA cases arising across the spectrum of federal regulations and programs.[27]

Further, the Second Circuit has imposed an additional requirement where an alleged *implied* false certification serves as the basis for the alleged false claim.   In those circumstances, a cause of action exists *only* where an underlying regulation or statute has "expressly" made

---

[25]   Materiality also is an independent prerequisite of any FCA claim.   *See Mikes*, 274 F.3d at 697 (noting that materiality is a "related concept" and that the FCA "does not encompass those instances of regulatory non-compliance that are irrelevant to the government's disbursement decisions"); *see also Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 665 (2008) (explaining that to be actionable a false statement must be "material to the Government's decision to pay or approve the false claim").

[26]   *See also United States ex rel. Blundell v. Dialysis Clinic, Inc.*, No. 5:09-CV-00710, 2011 WL 167246, at *13 (N.D.N.Y Jan. 19, 2011) ("The Second Circuit follows the majority view and has held that a claim is only legally false when the party certifies compliance [whether expressly or impliedly] with a statute that is a condition to governmental payment.").

[27]   *See, e.g., Williams*, 696 F.3d at 532 ("The False Claims Act is not a vehicle to police technical compliance with complex federal regulations."); *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113-15 (2d Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 1885 (2011) (applying *Mikes* to find allegedly false Vietnam Era Veterans Readjustment Assistance Act certification statements actionable); *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 796-99 (8th Cir. 2011) (applying a condition of payment analysis to dismiss Federal Family Education Loan Program allegations); *Chesbrough v. VPA. P.C.*, 655 F.3d 461, 467-69 (6th Cir. 2011) (applying *Mikes* to dismiss FCA claims based on Medicare/Medicaid requirements and HIPPA confidentiality regulations); *United States ex rel. Lemmon v. Envirocare of Utah*, 614 F.3d 1163, 1169-70 (10th Cir. 2010) (involving radioactive waste disposal regulations); *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008) ("Where a contractor participates in a certain government program … courts are careful to distinguish between conditions of program participation and conditions of payment."); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1176 (9th Cir. 2006) (involving Title IV funding); *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005) ("An FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements … requires that the certification of compliance be a condition of or prerequisite to government payment."); *Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) (finding inaccurate certification of Individuals with Disabilities Education Act compliance did not result in actionable false claims).

compliance a condition of payment.  *Mikes*, 274 F.3d at 699-700 ("[T]o construe the impliedly false certification in an expansive fashion would improperly broaden the Act's reach.").

Once again, the United States failed to cure this deficiency, only adding a conclusory assertion that "[a] truthful individual loan certification for FHA endorsement is a condition of payment of FHA insurance on that loan."  AC-1 ¶¶ 143, 148, 155, 161, 166.  But this added language does not change the fact that the allegations in the AC-1 pertain to programmatic matters that are "conditions of participation" rather than "conditions of payment," and, as such, they cannot support a FCA claim.  Nor are the allegations actionable under an implied certification theory since the AC-1 fails to identify any underlying regulation or statute that "expressly" makes the programmatic matters conditions of payment – and indeed there is none.

## 1.        The Relevant Representations Are Merely Conditions of Participation

Regardless whether the certifications regarding self-reporting or quality control are express or implied, they relate to "conditions of participation," not "conditions of payment," and thus are not actionable.  For FCA purposes, Wells Fargo only makes claims for payment to HUD when a mortgage loan defaults.  Therefore, the United States must show – but cannot – that Wells Fargo's compliance with self-reporting or quality control standards were conditions of payment by HUD at the time of claim submission because the relevant regulations make clear that these standards are no more than conditions of participation.  *See Conner*, 543 F.3d at 1218 ("[W]e must look to the underlying statutes to surmise if they make the certification a condition of payment."); *Mikes*, 275 F.3d at 701-02 (making clear that where there are separate repercussions for violations of a regulatory regime, compliance with such regulations is not a condition of payment).[28]

---

[28]     *See also Vigil*, 639 F.3d at 798-99 (finding it "significant" in dismissing an alleged false certification that the applicable regulations provided detailed remedies for non-compliance); *Blundell*, 2011 WL 167246, at *15

27

In fact, the applicable regulation, 24 C.F.R. § 202.5, reads:

> To be approved for *participation* in [FHA] programs, and to maintain approval, a lender or mortgagee shall meet and continue to meet the general requirements of paragraphs (a) through (n) of this section. [emphasis added]

This section references paragraph (m) concerning the submission of an annual certification and paragraph (h) concerning the implementation of a quality control plan; and self-reporting is made a part of the quality control plan through a HUD handbook.  HUD Handbook 4060.1, rev. 2, § 7-3(J) (2006) ("A mortgagee's Quality Control Program must ensure that findings discovered by employees during the normal course of business and by quality control staff during reviews/audits of FHA loans are reported to HUD within 60 days of the initial discovery.").[29]

Notably, the United States admits that the annual certification, quality control plan, and self-reporting responsibilities are merely conditions of participation:

> [T]o maintain HUD-FHA *approval*, a Direct Endorsement Lender must implement and maintain a quality control program. … Absent a truthful annual certification, a lender is not *entitled to maintain* its direct endorsement lender status and is not entitled to endorse loans for FHA insurance. … This [self-reporting] requirement provided HUD with an opportunity to investigate the loans and *request* reimbursement or indemnification, *as appropriate*.

AC-1 ¶¶ 24, 37, 120 (emphasis added).  The plain words of the regulations are fully consistent with the entire regulatory framework that enables HUD to impose certain remedies in response to quality system insufficiencies but makes no mention of allowing HUD to deny insurance claims

---

("Conditions of participation, as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program." (quoting *Conner,* 543 F.3d at 1220)).

[29]   Excerpts from the HUD handbooks cited in this Motion are attached as Exhibit H to the Baruch Declaration.

on defaulted mortgage loans.[30]  In the absence of any statute or regulation that conditions HUD's payment on Wells Fargo's compliance with quality system standards, there can be no FCA cause of action based on an alleged violation of those standards or provisions.  *See Williams*, 696 F.3d at 531 (finding certification in application for billing privileges that company "meets and will continue to meet" certain standards was a condition of participation and not actionable under the FCA).

Because the AC-1 does not allege (nor is it dictated by the relevant statutes and regulations) that compliance with the annual certification quality control system and self-reporting standards is a condition of payment, the FCA claims fail under Rule 12(b)(6) and should be dismissed.

### 2. Even If a Condition of Payment Were Alleged, the FCA Allegations Fail Because Such a Condition Is Not Express

Even if the United States could plead that compliance with quality control system and self-reporting standards was a condition of payment, it cannot overcome the additional hurdle – applicable to implied certifications – that the condition must be *expressly* tied to payment in the applicable regulation.  *See Mikes*, 274 F.3d at 699-700.  As described above, Wells Fargo underwriters executed an individual loan-level certification for each individual FHA mortgage loan they processed.  That certification stated that, in the underwriter's judgment, or based on FHA's automated underwriting scorecard "approval," that specific mortgage loan was eligible for FHA insurance.  The United States contends that this certification was required before HUD would accept the mortgage loan into the program.  AC-1 ¶ 40.

---

[30]   For instance, HUD can issue letters of reprimand, impose civil monetary penalties, enforce probation or suspension, or withdraw program approval.  *See* HUD Handbook 4060.1, rev. 2, § 8-4 (2006); *see also* 12 U.S.C. § 1708(c)(1); 24 C.F.R. § 25.2(b); 24 C.F.R. § 25.5(a).

More important for present purposes, however, is what the certifications did not say or even imply.  The underwriter never certified anything about Wells Fargo's overall compliance with HUD quality control standards, and the underwriter never certified that Wells Fargo was meeting its "self-reporting" obligations with respect to other mortgage loans already accepted into the program.  Instead, the individual loan-level certification was limited to the specific mortgage loan package, the documentation supporting it, and the underwriter's assessment of whether the mortgage loan was eligible for FHA insurance.

Wells Fargo did, in fact, make representations about quality and self-reporting, but those appeared only in entity-wide annual certifications to HUD.  The United States must recognize this distinction between the scope of the individual loan-level certifications and the annual certifications, and the potentially fatal consequence of this reality to its theories in this case given the U.S. Release.  Presumably, that reality prompts the *implied* certification theories the United States is advancing.  But given the express annual certifications, it defies logic and the regulatory scheme for the United States to contend that identical program-wide certifications are *implied* in the underwriters' individual loan-level certifications.  Had HUD intended this result, it would have included the sweeping language of the annual certifications in the individual loan-level certifications.  HUD never did so.  The United States cannot now "imply" such a certification as the AC-1 attempts to do.

For instance, the AC-1 alleges that Wells Fargo's individual loan-level certifications by individual underwriters were "knowingly" false because Wells Fargo – the company – lacked the proper quality control and supervision to certify that the mortgage loans actually met FHA-program eligibility requirements.  AC-1 ¶¶ 45-51, 84.  In other words, the United States is contending that those individual loan-level certifications by underwriters are also *implied*

certifications about Wells Fargo's company-wide compliance, even though that company-wide compliance is expressly within the scope of the annual certifications.  The individual loan-level certifications say nothing about these issues, nor logically should they because company-wide compliance is beyond the scope of knowledge of the underwriters making loan-level certifications about the contents of an individual loan file.  Similarly, the AC-1 alleges that Wells Fargo made implied certifications regarding mortgage loan eligibility when it reported some, but not all, mortgage loans with identified "material deficiencies."  AC-1 ¶¶ 152-53.  But in making those reports, Wells Fargo made no representation – express or implied – that these were the only mortgage loans with deficiencies.  Again, the only representations by Wells Fargo regarding the self-reporting of mortgage loans with "material violation[s] of applicable HUD-FHA requirements" fall within the scope of the annual certifications, which have been released.

By implication, the United States improperly is trying to import annual certification conduct into the individual loan-level certifications.  This type of implied certification theory cannot succeed because the AC-1 does not identify a statue or regulation that *expressly* conditions payment on compliance with the quality control and self-reporting requirements.

### B.    The AC-1 Fails to Adequately Plead Causation

The FCA requires causation between an alleged false claim for payment and the government's loss.  *See* 31 U.S.C. § 3729(a)(1) (creating liability for damages "which the Government sustains *because* of the act of that person" (emphasis added)).  Here, the AC-1 broadly alleges that *but for* the alleged misrepresentations (express or implied), HUD would not have paid the insurance.  AC-1 ¶¶ 83, 137.  Such generalized "but for" causation allegations are insufficient under the FCA.  *See United States v. Hibbs*, 568 F.2d 347, 349 (3d Cir. 1977) (finding that "a broad 'but for' test is not in compliance with the statute"); *see also United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 89 (2d Cir. 2012) (acknowledging the *Hibbs* approach

as appropriate for determining causation in the mortgage loan insurance context and distinguishing it from the damages causation approach appropriate for fraud-in-the-inducement cases).   Instead, the FCA requires proximate causation, *i.e.*, a causal connection between the actual loss and fraudulent conduct, in these circumstances.  *Hibbs*, 568 F.2d at 349.[31]

Notwithstanding that Wells Fargo identified this deficiency in its initial Motion to Dismiss, the United States still does not attempt to plead (1) that the default of any of the mortgage loans (and resulting claim) is causally linked to a "material violation[] of applicable HUD-FHA requirements," as specified in the U.S. Release, or (2) how that violation was the cause.   Nor does the AC-1 connect any specific mortgage loan default with the alleged inadequacies in Wells Fargo's quality control procedures, including self-reporting practices.[32] *See United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 122 (D.D.C. 2007) ("[I]f the subject matter of the alleged misrepresentation is unrelated to the ultimate reason for the borrower's default (and the claim against HUD that flows from that default) Plaintiff cannot recover any damages.").

Of course, with the FHA insurance program – as is true in any insurance program – a certain amount of losses are to be expected.   If there is no risk of loss, there is no need for insurance.   Underwriting involves judgment and discretion, and the mortgage loans at issue here

---

[31]   *See also United States v. Rapoport*, 514 F. Supp. 519, 525 (S.D.N.Y. 1981) ("To inquire merely whether the government incurred damage because it honored its loan guarantee strips the statutory [causation] restriction of any real significance.").  Another line of cases follows the "but for" causation test rejected in *Hibbs*.  *See United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992) (holding that "a demonstration that the government would not have guaranteed the loan 'but for' the false statement is sufficient to establish the causal relationship between the false claim and the government's damages necessary to permit recovery").  The Second Circuit has not adopted nor affirmed the *Cicero* standard.

[32]   The 204-paragraph AC-1 only describes alleged deficiencies in ten specific mortgage loans.  However, even for these mortgage loans, the AC-1 does not connect the alleged conduct with the loss, stating only that "Wells Fargo's false certification … bore upon … the **likelihood** that the borrower would make mortgage payments."  AC-1 ¶¶ 60, 65, 70, 75, 80, 94, 99, 104, 109, 114 (emphasis added).   The AC-1 does not claim that the specific misrepresentations or deficiencies caused the later mortgage loan default or resulting claim.

are in many ways at greater risk of default than other mortgage loans since the very nature of the FHA program is to expand homeownership to borrowers who may be unable to qualify for conventional mortgage loans. But the mere existence of an underwriting deficiency does not mean that the mortgage loan will later default. Nor does it follow that any later default was necessarily caused by the deficiency[33] or that HUD would not have paid the insurance claim after being made aware of the deficiency.[34] Defaults can occur months or even years after the loans have been underwritten – when borrowers are faced with changed circumstances, such as job layoffs, divorces, or health factors. Borrowers may also default due to unfortunate economic conditions, including drastic reductions in property value that make it difficult or impractical for them to meet their mortgage loan obligations or sell the property. None of these defaults are caused by faulty underwriting. The United States seeks to sweep these realities to the side by adopting a "but for" causation theory that has no application here. The AC-1 never alleges that the default resulting in the claim for payment was caused by mortgage loan underwriting in "material violation[] of applicable HUD-FHA requirements." As such, it fails to state a claim.[35]

### C.      The AC-1 Fails to Plead a Reverse False Claim (Fifth Claim)

The United States' "reverse false claims" theory is yet another strained attempt to manufacture a FCA cause of action that is not barred by the U.S. Release. The United States never articulates the specifics of the so-called "reverse false claim," relying instead on

---

[33]   For instance, if an underwriter fails to verify the borrower's income, that does not mean that the borrower did not have that income. And if the borrower had the requisite income, notwithstanding the underwriter's failure to verify it, that underwriting criterion could not have been the cause of a later default.

[34]   Even a mortgage loan with a self-reported deficiency does not necessarily have its insurance revoked by HUD. *See also supra* note 21.

[35]   Even if the "but for" standard applied, the United States cannot show that "but for" the alleged quality control non-compliance, the United States would not have suffered losses. Indeed, the United States admits that HUD was aware of the alleged quality control non-compliance and still insured mortgage loans, AC-1 ¶ 128, showing that the alleged non-compliance did not cause the extension of insurance or the ultimate insurance payout.

conclusory language that fails to distinguish the conduct it is relying on to make such a claim.[36] Thus, the AC-1 fails to plead the fundamental elements of a reverse false claim, which require a showing that a party "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(7);[37] *see Wood v. Applied Research Assocs., Inc.*, 328 Fed. Appx. 744, 748 (2d Cir. 2009) (affirming dismissal of reverse false claims action because complaint "makes no mention of any financial obligation that the Contractor Defendants owed to the government, and moreover, does not specifically reference any false records or statements used to decrease such an obligation").

First, the AC-1 does not sufficiently plead that there was any "obligation" – contractual, statutory, or regulatory – existing at the time of the alleged misrepresentation.  *See Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 734-35 (6th Cir. 1999) ("[A] plaintiff may not state a reverse false claim unless the pertinent obligation attached ***before*** the defendant made or used the false record or statement ... the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used." (emphasis in original)).  Moreover, to the extent that the United States is trying to advance a reverse false claims theory on the notion that Wells Fargo made

---

[36]    In 2011, the United States asserted a "reverse false claims" count against Deutsche Bank and MortgageIT, Inc. based on alleged misrepresentations to HUD regarding their FHA mortgage loan practices without making any showing of the necessary elements of the claim.  When the defendants in that case filed a motion to dismiss questioning the appropriateness of that claim, the United States abandoned that argument.  Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 28 n.4, *United States v. Deutsche Bank AG*, No. 11-CV-2976 (S.D.N.Y. Nov. 1, 2011), ECF No. 29.

[37]    In 2009, Congress amended 31 U.S.C. § 3729.  *See* Fraud Enforcement & Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, § 4(f)(1), 123 Stat. 1617, 1625 (2009).  The amended reverse false claims act provision, 31 U.S.C. § 3729(a)(1)(G), applies to conduct after the May 20, 2009 enactment date.  *Id.*  Because the AC-1 does not give details about when the alleged misconduct occurred, it is impossible to know to what extent, if any, the post-FERA version of the FCA is applicable.  However, based on the general facts pleaded in the AC-1, the 2009 amendments are not applicable for most – and possibly all – of the claims.

false statements in order to avoid the prospect of having to indemnify HUD against the possibility of a loan default, this approach is misguided.  Indemnification in these circumstances is the government's avoidance of providing funds *to Wells Fargo* when an insured mortgage loan defaults, while the hallmark of a reverse false claim action is improper reductions in a defendant's liability *to the government*.

Second, the AC-1 fails to plead that the so-called "obligation" was for a specific and fixed amount as required for any reverse false claims allegations related to activity that occurred prior to the 2009 FCA Amendments.  *See United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 774 (8th Cir. 1997) ("An obligation, for FCA purposes, must be for a fixed sum that is immediately due." (internal quotations omitted)); *see also United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004) ("[T]he reverse false claims act does not extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed (and as to which no formal proceedings to do so have been instituted)."); *The Limited, Inc.*, 190 F.3d at 734-35.

Third, the AC-1 fails to allege a single false record or statement Wells Fargo made to avoid or reduce an obligation.  Instead, it merely lists various communications or submissions made to HUD, without the requisite showing that the statements are related to any obligation to pay or transmit money to the government.  *See* AC-1 ¶ 165.

As a result, the Fifth Claim should be dismissed because it does not plead any of the required elements of a reverse false claim.

## V.    THE AC-1 FAILS TO STATE A CLAIM UNDER FIRREA

The United States amended its Sixth Claim, purporting to state a cause of action under FIRREA, 12 U.S.C. § 1833a, in response to Wells Fargo's initial Motion to Dismiss, which showed that none of the underlying predicate Title 18 offenses were actionable.  In the re-

pleaded Sixth Claim, the United States again seeks massive recovery for alleged violations of FIRREA.  AC-1 ¶¶ 168-74.  Yet, the new FIRREA theories fare no better than the original.  As shown below, one of the five predicate offenses[38] does not apply, another is inadequately pleaded, and the remaining three rely on the United States' untested theory that Wells Fargo is the financial institution that was "affected" by Wells Fargo's own alleged misconduct.  This "affect yourself" theory has never been accepted by any court and is undermined by the language of the statute and its legislative history.  In addition, the Rule 9(b) and U.S. Release arguments also bar the FIRREA claim.  As such, the Sixth Claim must be dismissed.

## A.    The AC-1 Fails to State a FIRREA Claim Based on 18 U.S.C. § 1005

The United States contends that Wells Fargo faces FIRREA liability based on violations of the fourth paragraph of § 1005, which holds liable:

> Whoever with intent to defraud the United States or any agency thereof, or any financial institution referred to in this section, participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution.

*See* AC-1 ¶ 169 & n.3.  But courts have held – as this Court should as well – that this paragraph of § 1005 only applies to bank insiders (*i.e.*, individuals).  *See United States v. Rubin/Chambers, Dunhill Ins. Serv.,* 798 F. Supp. 2d 517, 525-27 (S.D.N.Y. 2011) (granting non-insiders' motion to dismiss and citing *United States v. Barel*, 939 F.2d 26 (3d Cir. 1991), *United States v. Ortiz*, 906 F. Supp. 140 (E.D.N.Y. 1995), and *United States v. Edwards*, 566 F. Supp. 1219 (D. Conn. 1983)).[39]  The *Rubin* court examined the legislative history and found that "Paragraph Four" was intended to address insider abuse and should not be applied more widely.  *Id.* at 526-27 & n.2

---

[38]    The AC-1 alleges that Wells Fargo violated 18 U.S.C. §§ 1001, 1005, 1014, 1341, and 1343.

[39]    The court found "*Barel*'s, *Edwards*'s and *Ortiz*'s importation of Paragraph One's bank insider restriction into Paragraphs Two and Three to be persuasive and based on a sound application of traditional principles of statutory construction."  *Rubin,* 798 F. Supp. 2d at 526.

("[T]here is ample support in FIRREA's legislative history to find that Congress was concerned with regulating the conduct of bank insiders.  There is no more ground to warrant a finding that Congress intended Paragraph Four as a generalized federal bank fraud statute than there is to find that Paragraphs Two and Three were intended to be 'bad check' statutes, or means to prosecute tax evasion, or social security fraud.").[40]  The *Rubin* decision is thorough and well-reasoned and should be followed.  The United States cannot predicate a FIRREA claim against Wells Fargo based on "Paragraph Four" of § 1005.

### B.    The AC-1 Fails to State a FIRREA Claim Based on 18 U.S.C. § 1014

The United States next alleges that Wells Fargo violated § 1014, which penalizes "[w]hoever makes any false statement or report … for the purpose of influencing in any way the action of the Federal Housing Administration …."  In its initial Motion to Dismiss, Wells Fargo pointed out two defects in the United States' § 1014 claim:  (1) the statute only applies to alleged false statements made after July 30, 2008; and (2) the United States failed to plead any such statements.  But even though it was on notice of these defects, the United States did virtually nothing to attempt to address them.  Instead, the United States merely acknowledged that it now seeks recovery only "for false statements or reports that Wells Fargo made after July 30, 2008, to influence the actions of FHA."  AC-1 ¶ 11.

In violation of Rule 9(b), the AC-1 never identifies any alleged false statement or report made by Wells Fargo after July 30, 2008, allegedly for the purpose of influencing any FHA action, or describes how FHA was improperly influenced by such a statement.  To the contrary, the AC-1 identifies ten loans, all supposedly fraudulently underwritten years prior to 2008, but

---

[40]    The court cited to House Report No. 101-54, which states that one of the "primary purposes" of FIRREA was "to protect against fraud, waste and **insider abuse**."  *Rubin*, 798 F. Supp. 2d at 526-27 (emphasis added).  That Report further states that the FIRREA amendments would provide the Justice Department with enhanced authority "for the purpose of pursuing the prosecution of **individuals** who have acted illegally against financial institutions."  H.R. Rep. No. 101-54, pt. 1, at 311 (1989) (emphasis added).

never makes any allegation that Wells Fargo made any communication about them to FHA after July 30, 2008.  AC-1 ¶¶ 57-81, 91-115.  Similarly, the United States asserts that "Wells Fargo's electronic submission of self-reported loans to HUD from October 2005 through December 2010 … knowingly omitted at least 6,320 seriously deficient loans …."  AC-1 ¶ 169.  But this claim does not identify any post-July 30, 2008 false statement or report to FHA either.  Indeed, Wells Fargo's "electronic submission of self-reported loans" made no reference to loans that were omitted for any reason, and the AC-1 does not allege otherwise.  Further, any Wells Fargo representation as to general self-reporting compliance was contained in its annual certification, and any claim based on that certification has been released.

Finally, the AC-1 alleges that "Wells Fargo's electronic submission of claims for payment, from 2002 through the present, on loans it knew were ineligible for FHA insurance," also supports a § 1014 claim.  AC-1 ¶ 169.  Here again, the AC-1 does not identify even one such claim post-dating July 30, 2008.  The AC-1's failure to comply with Rule 9(b) with respect to its § 1014 claim is fatal.

### C.   The AC-1 Fails to State a FIRREA Claim Based on 18 U.S.C. §§ 1001, 1341, and 1343

The AC-1 also seeks to impose FIRREA liability predicated on alleged violations of 18 U.S.C. §§ 1001 (false statements to the government), 1341 (mail fraud), and 1343 (wire fraud).  But these predicate offenses are expressly limited "to a violation[] of, or a conspiracy to violate" these sections "*affecting a federally insured financial institution* …."  12 U.S.C. § 1833a(c)(2) (emphasis added).  The AC-1 fails to allege a viable cause of action consistent with this limitation.  The original complaint did not identify a federally insured financial institution affected by the alleged Wells Fargo violations.  The United States has now tried to cure this defect by alleging that Wells Fargo is the "federally insured financial institution" that was

"affect[ed]" by Wells Fargo's own alleged violations.  AC-1 ¶¶ 171-72.  No court has accepted this "affect yourself" theory of liability, and it is wrong.

1.    **Section 1833a(c)(2) Cannot Be Read to Impose Liability on Wells Fargo for "Affecting" Itself**

The natural reading of § 1833a(c)(2) does not authorize a claim that Wells Fargo engaged in fraud that affected itself by exposing itself to potential litigation and other harm.  *See Watson v. United States,* 552 U.S. 74, 80 (2007) (explaining that the ordinary statutory reading is preferred to a literal but unnatural reading of the language).  Section 1833a(c)(2) provides for liability for "a violation ... affecting a federally insured financial institution."  A primary purpose of FIRREA was "[t]o strengthen the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors."[41]  Consistent with this purpose, paragraphs (c)(1) and (c)(3) list predicate offenses that identify the financial institution or other entities in danger of being harmed and which are to be protected.[42]  In contrast, the (c)(2) predicate offenses, standing alone, are general in application, without a banking or financial institution focus.[43]

Consequently, the "affecting a federally insured financial institution" limitation language in (c)(2) matches the scope of the predicate statutes in (c)(1) and (c)(3).  None of the (c)(1) or (c)(3) statutes have been construed to have the perpetrator also be the victim, nor should this

---

[41]    Pub. L. No. 101-73, § 101(10), 103 Stat. 187 (1989), codified at 12 U.S.C. § 1811.

[42]    18 U.S.C. §§ 215 (bribery involving a financial institution); 656 (theft, etc., by bank officer); 657 (theft, etc., by officers of lending, credit, and insurance institutions); 1005 (fraud against the United States or a financial institution by an individual); 1006 (fraud against the United States or a financial institution by an individual insider); 1007 (FDIC); 1014 (FHA); 1344 (bank fraud); 15 U.S.C § 645(a) (fraud against the Small Business Administration).

[43]    18 U.S.C. §§ 287 (false claims to the government); 1001 (false statements to the government); 1032 (concealment of assets from the FDIC); 1341 (mail fraud); 1343 (wire fraud).

Court construe (c)(2) in such a manner.[44]  It is an accepted rule of statutory interpretation that "a word is known by the company it keeps."  *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).  The "affecting" language in (c)(2), therefore, should not be interpreted as posited by the United States, but, rather, in the context of the limits on the statutes in (c)(1) and (c)(3).   Under these circumstances, if Congress intended for § 1833a(c)(2) to be used to pursue claims *against* a financial institution for allegedly harming *itself*, it would have said so directly.

Notably, as the United States has acknowledged, § 1833a(c)(2) has never been applied by a court in the manner advocated in the AC-1.[45]  There are cases that deal with another statute, construing the statute of limitations under 18 U.S.C. § 3293(2), which provides for a longer limitations period and greater punishment for wire and mail frauds "if the offense affects a financial institution …."  *E.g.*, *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998); *United States v. Ohle*, 678 F. Supp. 2d 215, 228-29 (S.D.N.Y. 2010); *see also United States v. Serpico*, 320 F.3d 691, 694 (7th Cir. 2003).   However, none of these cases required the court to address whether the "affect yourself" theory is valid under § 1833a(c)(2).

Further, the § 3293 cases stand for the proposition that a *third party* can be penalized for fraud that affects a financial institution, even when the institution was a participant in the fraud.  *See Serpico*, 320 F.3d at 694 ("[T]he whole purpose of [the statute] is to protect financial institutions.").   This is consistent with the Congressional purpose, discussed below, that focused

---

[44]   *See, e.g.*, *FCC v. Am. Broad. Co.*, 347 U.S. 284, 296 (1954) ("[P]enal statutes are to be construed strictly," even when applied in non-criminal contexts).

[45]   Even though, in its 23 years of existence, no court has determined that (c)(2) could be applied in such a manner, the Justice Department suddenly has begun to advance this manufactured theory.  In *United States v. The Bank of New York Mellon*, No. 11 Civ. 6969 (LAK) (S.D.N.Y.), the Government makes the same claim – that the Bank of New York Mellon may be both the perpetrator of the fraud and the victim under § 1833a(c)(2).  This issue is briefed and pending before the Honorable Lewis Kaplan.  Interpretation of the (c)(2) "affecting" language is also at issue in *United States ex rel. O'Donnell v. Bank of America Corp.*, 12 Civ. 1422 (JSR) (S.D.N.Y.), where the amended complaint alleges that Bank of America, as a successor to Countrywide Financial, affected itself and other federally insured financial institutions.

on protecting financial institutions from harm by corporate insiders and others.  These cases do not support an argument that Congress intended to penalize an institution for affecting itself, particularly given that the authority for regulation of financial institutions is squarely placed on the bank regulatory agencies.  *See, e.g.*, 12 U.S.C. § 1818(i)(2)(A)(i) (expanding power under FIRREA for bank regulatory agencies to seek civil monetary penalties against financial institutions for violation of "any law or regulation").

Nor does the legislative history support the United States' theory.  During consideration of FIRREA, Congress assumed that the Justice Department would use its authority to pursue civil claims against individuals, primarily insiders, whose actions harmed financial institutions,[46] not to impose extraordinary sanctions on a financial institution for affecting itself.  Indeed, Wells Fargo has identified no FIRREA legislative history that supports a claim that a bank can be *both* the violator *and* the affected financial institution.

The Justice Department, with the Treasury Department, drafted the civil penalty enhancements in the version of FIRREA proposed to Congress.[47]  Justice officials testified that the civil penalty provisions would facilitate the prosecution of "those who jeopardize the safety

---

[46]   *See, e.g.*, 101 Cong. Rec. H2,725 (daily ed. June 15, 1989) (statement of Rep. Annunzio) (explaining that § 1833a targets "crooks, wearing tailor-made suits and wily smiles, [who] have pilfered the industry of billings of dollars in cash," is "part of a strong web of enforcement provisions which vastly increased the power of these regulators to combat fraud and insider abuse in the bank and thrift industries," and will "only apply to the 'bad guys' within the industry"); *id.* at H2,728 (statement of Rep. Barnard) ("[§ 1833a will] send a strong message to those that have defrauded banks, committed fraud in banks, and brought down banks and savings and loans.  We serve notice that those individuals are going to pay. ... [W]e wanted to send a message to those that are out there who have flagrantly, and cavalierly breaking banks, creating riches for themselves."); *id.* at H2,729 (statement of Rep. Annunzio) ("[§ 1833a is to be] tougher on the crooked bankers, [catch the crooks] who were going to take this money, [and] put a fine of $1 million a day on these crooks.").  Committees in both the House and the Senate confirmed that fraud and insider abuse were among the main causes of the savings and loan crisis and that combating fraud and insider abuse was one of the key purposes of FIRREA.  H.R. Rep. No. 101-54, pt. 1, at 294, 300-01, 307-08 (1989); S. Rep. No. 101-19, at 9-10 (1989); *Prosecuting Fraud in the Thrift Industry: Hearing before the Subcomm. on Criminal Justice of the H. Comm. on the Judiciary*, 101st Cong. (1989).

[47]   *Problems of the Federal Savings and Loan Insurance Corporation [FSLIC]: Hearing Before the Sen. Comm. on Banking, Housing and Urban Affairs*, 101st Cong., pt. I, at 319, 324 (1989) (comments by Atty. Gen. Thornburgh).  The original FIRREA proposal was introduced in Congress as H.R. 1278, 101st Cong. (1989) (as introduced Mar. 6, 1989) and S. 413, 101st Cong. (1989) (as introduced Feb. 22, 1989).

or soundness of insured financial institutions, either from the inside or from without,"[48] and would "address[] fraud and insider abuse in savings and loans and other financial institutions where these problems exist."[49]  This clearly speaks to targeting individuals and not institutions. Indeed, given the Justice Department's active participation in drafting the civil liability provisions in FIRREA, the absence of any "affect yourself" liability language in § 1833a undermines the Justice Department's current interpretation.

Section 1833a(c)(2) was added at the request of Representative Doug Barnard, Chairman of the House Subcommittee on Commerce, Consumer, and Monetary Affairs.[50]  Representative Barnard explained:

> [W]e need to amend several sections to include the mail and fraud statutes—that is 12 U.S.C. 1341 and 1343.  Financial institution fraud cases are often investigated and prosecuted as probable violations of the mail fraud statute, since much financial institution fraud either involves the mail or interstate phone calls, and thus can be proven most readily under these statutes.
>
> Unfortunately, the legislation omits mail and wire fraud, while it does list nine other Federal statutes applying to criminal offenses often arising within financial institutions.  The bill should be amended to include mail and wire fraud.  Our subcommittee found in its October 1988 study that the U.S. postal inspectors are playing a greater role in working with the FBI agents in investigating bank and S&L fraud cases, because of the mail fraud connection.  So, I say, why eliminate this resource?  Without this amendment, there will be a strong disincentive for the Postal Inspection Service to further cooperate.  There are plenty of good cases to go around, and experienced postal inspectors have an important role to play.  Absent

---

[48]   *Financial Institutions Reform, Recovery, and Enforcement Act of 1989—(H.R. 1278): Hearing Before the Subcomm. on Fin. Inst. Supervision, Regulation and Ins. of the H. Comm. on Banking, Finance, and Urban Affairs*, 101st Cong., pt. 2, at 664 (1989) (comments by Acting Assoc. Atty. Gen. Whitley).

[49]   *Problems of the Federal Savings and Loan Insurance Corporation [FSLIC]: Hearing Before the Sen. Comm. on Banking, Housing and Urban Affairs*, 101st Cong., pt. I, at 297, 302 (1989) (comments by Atty. Gen. Thornburgh).

[50]   *Prosecuting Fraud in the Thrift Industry: Hearing Before the Subcomm. on Criminal Justice of the H. Comm. on the Judiciary*, 101st Cong. 201, 210-11 (1989) (statement of Rep. Barnard).

this amendment, civil cases, where the violations of the mail or wire fraud statutes are the most probable offense, will not go forward.[51]

The amendment was not prompted by an intent to change the focus from targeting insiders to targeting the financial institution itself.  Indeed, an exchange between Representative Charles Schumer, Chairman of the Subcommittee on Criminal Justice of the House Committee on the Judiciary, and Mr. Stephen McSpadden, counsel to Representative Barnard's subcommittee, confirms that the "affecting" language was designed to limit the scope of (c)(2) to match the scope of the bank fraud statute.[52]  The bank fraud statute, 18 U.S.C. § 1344, by its express terms, is designed to combat fraud *against* financial institutions.  Members of Congress who sought to model the (c)(2) additions on § 1344 had the same intent – to protect institutions from fraud and not to authorize their prosecution both as perpetrators and victims.

After accepting the changes requested by Representative Barnard, the House Banking Committee advanced FIRREA to the full House, summarizing the proposed law as follows:

> The Committee adopted provisions which expand, enhance and clarify enforcement powers of the financial institution regulatory agencies.  The legislation increases civil and criminal penalties for crimes ***involving financial institutions*** and improves methods to detect misconduct in financial dealings.

> The Department of Justice is directed to establish new regional offices within its Criminal Division to enhance its ability to prosecute incidents of misconduct *involving* financial institutions.  The Justice Department is authorized to spend an additional seventy-five million dollars for the purpose of pursuing the prosecution of ***individuals who have acted illegally against financial institutions***.[53]

---

[51]   *Id.* at 201-02, 210-11 (statement of Rep. Barnard).

[52]   *Id.* at 219.

[53]   H.R. Rep. No. 101-54, pt. 1, at 311 (1989) (emphasis added).  The House Judiciary Committee summarized the new authority similarly and made no reference to targeting financial institutions as perpetrators of predicate acts.  *See* H.R. Rep. No. 101-54, pt. 5, at 5 (1989).

Thus, the Banking Committee articulated a statutory purpose of protecting financial institutions from the conduct of others rather than targeting them.

The overriding theme of this legislative history was to protect federally insured financial institutions from fraud perpetrated upon them by others, especially insiders, so that the financial institutions could continue to be in a position to provide needed credit to borrowers.  There is no indication in the legislative history that § 1833a(c)(2) was intended to pursue claims *against* a financial institution for allegedly harming itself.

On this record, the United States' attempt to use § 1833a(c)(2) as a vehicle to punish Wells Fargo for engaging in fraud that supposedly affected Wells Fargo is misguided, lacks legislative support, and is unnecessary, since the bank regulatory agencies via FIRREA gained extensive powers to regulate federally insured financial institutions when those agencies determine that their actions might put the institutions in danger.  *See, e.g.*, 12 U.S.C. § 1818(i)(2)(A).[54]  The § 1833a(c)(2) claims should be dismissed.[55]

2. **The AC-1 Fails to Allege Any Predicate FIRREA Violations Affecting a Federally Insured Financial Institution**

Even if the "affect yourself" theory were valid, this aspect of the FIRREA claim must be dismissed because the AC-1 does not allege facts that would support such a finding.

First, the AC-1 suggests that Wells Fargo "affected itself" under § 1833(c)(2) because "Wells Fargo has been required to indemnify HUD for specific loans that the bank falsely certified were eligible for FHA insurance …."  AC-1 ¶ 171.  But this allegation is insufficient. The AC-1 never specifies a single indemnification, let alone does it allege that the

---

[54]   Prior to FIRREA, bank regulatory agencies could assess civil money penalties against a depository institution only when the institution violated a final cease and desist order.  12 U.S.C. § 1818(i)(2) (1988).

[55]   Given that the AC-1 relies on the exact same alleged conduct to support both the FCA and FIRREA claims, there is no compelling reason for the Court to accept the United States' "affect yourself" FIRREA theory in this case.

indemnification was associated with some mail or wire fraud.  Nor is there any basis for a suggestion that a particular indemnification by Wells Fargo for a particular loan in fact "affected" or even could have affected Wells Fargo.[56]  Thus, this indemnification allegation cannot pass Rule 9(b) scrutiny and cannot constitute evidence of a violation that has affected a financial institution.  *See, e.g., United States v. Rubin/Chambers, Dunhill Ins. Serv.*, 831 F. Supp. 2d 779, 784-85 (S.D.N.Y. 2011).  Further, the AC-1 never alleges that indemnifications are a "sufficiently direct" result of a predicate statute violation, a Second Circuit requirement.  *See Bouyea,* 152 F.3d at 195.[57]

Second, in a strange and strained attempt to allege that Wells Fargo "affected itself" for FIRREA purposes, the United States contends that its own complaint in this very lawsuit is evidence of that effect.  AC-1 ¶ 171 (claiming that Wells Fargo affected itself by "exposing itself to substantial civil liability").  This "affecting" claim also makes no sense.  To conclude otherwise would enable the United States to manufacture the "effect" – and therefore the FIRREA violation – simply by bringing suit against a federally insured financial institution under the FCA or otherwise.  FIRREA liability under (c)(2) depends on a violation of a predicate

---

[56]   Indemnifications are a matter of routine between lenders and HUD in this FHA program, and they do not represent any admission of fraud or other wrongdoing by the lender.  The United States does not allege, nor could it plausibly do so, that an indemnification of HUD by Wells Fargo, in the event that a particular mortgage loan were to default and be foreclosed, would have any "effect" on an institution the size of Wells Fargo, such that its federally insured deposits are even remotely placed at risk.  Certainly, the AC-1's conclusory assertion that "Wells Fargo's poor underwriting and loan administration practices, including quality control, risked the safety and security of federally insured bank deposits," AC-1 ¶ 171, does not tie the alleged risk to indemnifications and cannot otherwise suffice for pleading purposes.

[57]   It is worth highlighting here the incongruity in the United States' theories.  On the one hand, in the context of its FCA claims, the United States claims that Wells Fargo actually benefited by avoiding indemnifications.  *See* AC-1 ¶ 165.  Similarly, the AC-1 alleges elsewhere that, for FCA purposes, "Wells Fargo actually received hundreds of millions of dollars in FHA payments on those false claims."  AC-1 ¶ 3.  But, on the other hand, in advocating its "affect yourself" theory under FIRREA, the United States contends that, through the same conduct, Wells Fargo "expos[ed] it[self] to actual … [and] substantial losses."  AC-1 ¶ 171.  These conflicting theories are not pleaded as alternative causes of action in the AC-1.  As such, they suggest an effort by the United States to use FIRREA – and its ten-year statute of limitations – to reach conduct that is clearly barred under the six-year FCA statute of limitations (*see supra* Section II).  Whatever the United States' rationale, the FIRREA claim is not viable.

statute that has affected a federally insured financial institution.  A pending lawsuit with unproven allegations and unproven effects cannot plausibly provide the "affecting" nexus required by FIRREA.

Third, the AC-1 alleges that a private 2011 civil litigation settlement, not involving FHA loans, is further evidence that Wells Fargo's alleged fraudulent conduct has affected itself.  AC-1 ¶ 172.  But the United States has not – and cannot – allege that Wells Fargo admitted any liability in that settlement nor does it allege any connection between that lawsuit and FHA loans.[58]  Therefore, the United States' reliance on the settlement referenced in the AC-1 is insufficient to plead that a federally insured financial institution has been directly affected by any Wells Fargo violation of a § 1833a(c)(2) statute.  *Rubin,* 831 F. Supp. 2d at 784-85; *see also Bouyea,* 152 F.3d at 195 (requiring a "sufficiently direct" connection between the alleged violation and the effect on the financial institution).

## VI.   THE AC-1 FAILS TO STATE A COMMON LAW CLAIM

### A.   The Common Law Claims (Claims Seven Through Eleven) Fail for the Same Reasons the FCA Claims Fail

While the FCA causes of action are the gravamen of the AC-1, the United States has tacked on common law claims, which purportedly arise out of the same facts and circumstances that are pleaded in support of the FCA claims.  Many of the common law claims suffer from the same deficiencies that warrant dismissal of the FCA claims.  For instance, many of the claims are limited in whole or in part by the statute of limitations,[59] are subject to dismissal under Fed. R.

---

[58]   Surely, it is not enough for pleading purposes or otherwise for the United States to quote from never proven allegations, in an amended complaint drafted by a plaintiff's lawyer in a separate private litigation, as evidence that Wells Fargo's conduct in this FHA litigation "affected itself."  Moreover, the securitized trusts that were the subject of the cited lawsuit, AC-1 ¶ 172, did not contain any FHA loans.

[59]   With respect to the common law causes of action in the AC-1, a three-year statute of limitations applies to the tort claims (breach of fiduciary duty, negligence), 28 U.S.C. § 2415(b), and a six-year statute of limitations applies to the contract claims (unjust enrichment, mistake of fact).  28 U.S.C. § 2415(a).  The AC-1 does not specify when

Civ. P. 9(b),[60] or fail to adequately plead causation under Fed. R. Civ. P. 12(b)(6).[61]   In addition,

the AC-1's claim for "future losses" amounts to no more than an impermissible attempt to seek

future indemnification.[62]   Moreover, the AC-1 fails to adequately plead the elements of the

specific common law claims, as further discussed below.   For all these reasons, the common law

claims (Claims Seven through Eleven) must be dismissed.

### B.   The AC-1 Fails to State a Fiduciary Duty Claim (Seventh Claim)

To state a breach of fiduciary duty claim, the United States must allege that: (1) a

fiduciary duty existed between the United States and Wells Fargo, (2) Wells Fargo breached that

duty, and (3) damages resulted.   *See Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y.

2009) (citing *Whitney v. Citibank. N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986)); *cf. Nat'l Minority

Supplier Dev. Council Bus. Consortium Fund, Inc. v. Hessian & McKasy, P.A.*, No. 04-1670,

2005 WL 3526587, at *6 (D. Minn. Dec. 15, 2005); *Top of Iowa Co-op. v. Schewe*, 149

F. Supp. 2d 709, 717 (N.D. Iowa 2001).[63]   The Seventh Claim cannot overcome the first hurdle.

While the United States asserts the existence of such a duty, AC-1 ¶ 176, conclusory claims carry

no weight, especially where the referenced HUD DEL regulations expressly do not create a

---

the alleged common law causes of action arose, but this Court should enter an order dismissing as time-barred any such claims that arose prior to June 25, 2009 (breach of fiduciary duty, negligence) and June 25, 2006 (unjust enrichment, mistake of fact).

[60]   For example, the AC-1's fiduciary duty claim, which sounds in fraud, has not been pleaded with the requisite specificity under Rule 9(b).   *See Meisel v. Grunberg*, 651 F. Supp. 2d 98, 108 (S.D.N.Y. 2009) ("[T]o the extent that the breach of fiduciary duty claims are based on fraud, allegations concerning the predicate acts of fraud must meet the particularity requirements of Federal Rule of Civil Procedure 9(b).").

[61]   For example, the AC-1's negligence claims require that proximate causation be adequately pleaded.

[62]   *See C&E Servs. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 267 (D.D.C. 2007); *FSP, Inc. v. Societe Generale*, No. 02 CV 4786, 2003 WL 124515, at *4 (S.D.N.Y. Jan. 14, 2003) ("The subject action is not justiciable to the extent it seeks a declaration regarding defendant's obligation to defend and indemnify plaintiff with regard to potential, unfiled claims, and seeks reimbursement for losses arising from … future, anticipated claims.").

[63]   Wells Fargo Home Mortgage's headquarters are located in Des Moines, Iowa, and it is has significant operations in Minnesota.

fiduciary relationship between Wells Fargo and HUD.  Rather than "[t]he Direct Endorsement Lender program empower[ing] Wells Fargo to obligate HUD to insure mortgages it issued without any independent HUD review," AC-1 ¶ 176, HUD maintains extensive review and oversight over each DEL's FHA program lending activities.  *See, e.g.*, 24 C.F.R. § 203.5(a).  Nor can a DEL "obligate" HUD to insure mortgage loans since DELs only submit "applications" for insurance, which must be approved by HUD.  *See, e.g.*, 24 C.F.R. § 203.255.  For example, HUD would have reviewed the relevant loan documentation for each of the ten mortgage loans described in the AC-1 prior to approving those loans for FHA insurance.[64]  Thus, the FHA program's statutes and regulations do not impose a fiduciary duty on DELs, and there is no basis for finding an implied fiduciary duty.[65]  The breach of fiduciary duty claims must be dismissed. *Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4770, 2003 WL 1858153, at *4-5 (S.D.N.Y. Apr. 10, 2003).

### C.    The AC-1 Fails to State a Claim for Unjust Enrichment (Tenth Claim) and Mistake of Fact (Eleventh Claim)

Since all of the FHA-insured mortgage loans at issue are governed by a Mortgage Insurance Certificate issued by HUD under the applicable DEL regulations, there can be no

---

[64]    The AC-1 alleges breach of fiduciary duty based on origination conduct.  *See* AC-1 ¶¶ 176-79 (alleging duties with respect to the "insurance" and "endorsement" of mortgage loans).  For all of the 2001 through 2005 period tied to the origination allegations in the AC-1, HUD would have reviewed the relevant loan documentation from DEL Wells Fargo prior to HUD approving loans for FHA insurance.

[65]    *See Meisel*, 651 F. Supp. 2d at 114 (explaining that, absent contractual language to the contrary or extraordinary circumstances such as a prolonged prior course of dealing, a fiduciary relationship does not exist between parties dealing at arm's length); *Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995) ("[A] fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another." (internal citations and quotations omitted)); *see also Nat'l Minority Supplier Dev. Council Bus. Consortium Fund, Inc.*, 2005 WL 3526587, at *6 ("A fiduciary relationship does not arise … when the parties negotiating a contract are dealing at arm's length."); *Cagin v. McFarland Clinic, P.C.*, 317 F. Supp. 2d 964, 969-70 (S.D. Iowa 2004) (dismissing a fiduciary duty claim for failure to state a claim where an alleged fiduciary duty "stemm[ed] directly" from an "arms-length" contract).  In light of the extensive regulations providing for HUD review and monitoring of DELs, Wells Fargo enjoyed no "superiority of influence" over HUD.

quasi-contract common law claim for unjust enrichment or mistake of fact.  *See* HUD Handbook 4000.2, rev. 3, § 1-5 (2004) ("FHA's endorsement of the mortgage and issuance of an electronic Mortgage Insurance Certificate (MIC) **creates a contract** of mortgage insurance subject to the regulations in effect at that time." (emphasis added)).[66]  In addition, recovery for a voluntary payment cannot be had where the payment was "made with full knowledge of the facts" or where "the party's ignorance of its contractual rights and obligations resulted from a 'lack of diligence.'"  *United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 657 (S.D.N.Y. 2011) (quoting *Spagnola v. Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2009)).[67]  HUD's extensive knowledge of Wells Fargo's and its predecessor's origination and self-reporting practices, through the 2004 HUD-OIG Audit and the various letters referenced in the AC-1, *see, e.g.*, AC-1 ¶¶ 123, 126, precludes the United States' claims.

---

[66]   *See EAD Control Systems, LLC v. Besser Co. USA*, No. C 11-4029, 2012 WL 2357572, at *3 (N.D. Iowa June 19, 2012) (holding that where "an express contract exists between the parties as to the subject matter at issue in the unjust enrichment claim, the unjust enrichment claim fails as a matter of law because an express and implied contract may not coexist as to the same subject matter"); *Griep v. Yamaha Motor Corp. U.S.A., Inc.*, 120 F. Supp. 2d 1196, 1201 (D. Minn. 2000) (holding that the existence of a written agreement "defeats [plaintiff's] quasi-contractual claim" (citing *Breza v. Thaldorf*, 149 N.W.2d 276, 279 (Minn. 1967))); *United States v. EER Sys. Corp.*, 950 F. Supp. 130, 134 (D. Md. 1996) (dismissing claims for negligent misrepresentation, mistake of fact, and unjust enrichment due to express contract between the parties); *United States v. Hydroaire, Inc.*, No. 94-C-4414, 1995 WL 86733, at *6 (N.D. Ill. Feb. 27, 1995) (dismissing claims for unjust enrichment and mistake of fact where FCA and contract actions were "adequate remed[ies] at law").

[67]   *See also Fiebelkorn v. IKON Office Solutions, Inc.*, 668 F. Supp. 2d 1178, 1191 (D. Minn. 2009) (explaining that voluntary payment can preclude a claim for mistake of fact where a plaintiff has "access to all of the information necessary to" avoid making a mistake so long as the plaintiff does not "unconsciously ignore[] (or forg[e]t) part of that information").

## **CONCLUSION**

For all the foregoing reasons, Wells Fargo requests that the Court grant its Motion to Dismiss in its entirety.

Dated:    New York, New York
          January 16, 2013

By:    _/s/ William F. Johnson_
William F. Johnson
Douglas W. Baruch, *pro hac vice*
Jennifer M. Wollenberg, *pro hac vice*
FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
william.johnson@friedfrank.com
douglas.baruch@friedfrank.com
jennifer.wollenberg@friedfrank.com

Michael J. Missal, *pro hac vice*
Amy Pritchard Williams, *pro hac vice*
K&L GATES LLP
1601 K Street NW
Washington, DC 20006-1600
(202) 778-9000
michael.missal@klgates.com
amy.williams@klgates.com

Attorneys for Defendant
    Wells Fargo Bank, N.A.