**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      Plaintiff,

          -against-

WELLS FARGO BANK, N.A.,

      Defendant.

12 Civ. 7527 (JMF)(JCF)

**MEMORANDUM OF LAW OF THE UNITED STATES IN OPPOSITION TO**
**WELLS FARGO BANK, N.A.'S MOTION TO DISMISS**
**THE FIRST AMENDED COMPLAINT**

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-2698/2639/2774
Facsimile:  (212) 637-2750
Email:  Jeffrey.Oestericher@usdoj.gov
         Sarah.North@usdoj.gov
         Rebecca.Tinio@usdoj.gov

JEFFREY S. OESTERICHER
SARAH J. NORTH
REBECCA S. TINIO
Assistant United States Attorneys
– Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ..............................................................................3

I.   HUD'S FHA DIRECT ENDORSEMENT LENDING PROGRAM ....................................3

     A.   Underwriting and Due Diligence Requirements.....................................4

     B.   Quality Control and Reporting Requirements .....................................5

     C.   Submission and Payment of FHA Claims, and Indemnification of HUD ..............7

II.  WELLS FARGO'S QUALITY CONTROL PROCESS................................................7

III. WELLS FARGO'S FRAUD ON THE FHA INSURANCE PROGRAM ...........................9

     A.   Wells Fargo Submitted Thousands of False Individual Loan Certifications
          for FHA Loans That the Bank Originated Between May 2001 and
          October 2005 ...............................................................9

     B.   Wells Fargo's Knowing Failure to Report 6,320 Materially Deficient
          Loans to HUD ..............................................................12

ARGUMENT ..............................................................................15

POINT I.    THE GOVERNMENT'S CLAIMS ARE NOT BARRED BY RELEASE .............15

POINT II.   THE AMENDED COMPLAINT PLEADS WELLS FARGO'S FRAUD
            WITH SUFFICIENT PARTICULARITY .....................................18

POINT III.  THE AMENDED COMPLAINT STATES A CLAIM FOR VIOLATIONS
            OF THE FALSE CLAIMS ACT...........................................25

     A.   The Government Adequately Pled That Wells Fargo Knowingly
          Submitted and Caused to Be Submitted False Claims to HUD, and
          Knowingly Made or Caused to Be Made False Statements to HUD
          Material to Those Claims...................................................26

          1.   Well Fargo's Condition of Payment Argument Is Wrong.................27

          2.   Wells Fargo's Causation Argument Is Wrong..........................33

     B.   The Government Properly Alleges Reverse False Claims......................36

i

      C.     The FCA Claims That Arose Prior to June 25, 2006 Are Not Time Barred..........39

POINT IV.   THE AMENDED COMPLAINT STATES CLAIMS UNDER FIRREA ...............48

      A.     The FIRREA Statute ........................................................................48

      B.     The Amended Complaint States a FIRREA Claim Based Upon Wells Fargo's Violations of 18 U.S.C. § 1005.....................................................................51

      C.     The Amended Complaint States a FIRREA Claim Based Upon Wells Fargo's Violations of 18 U.S.C. § 1014 .................................................................54

      D.     The Amended Complaint States a FIRREA Claims Based Upon Wells Fargo's Violations of 18 U.S.C. §§ 1001, 1341, and 1343...................................55

            1.     Wells Fargo Can Violate FIRREA Through Misconduct That Affects Its Own Federally Insured Deposits..........................................................55

            2.     Wells Fargo Was Affected by Its Fraud Because It Incurred Actual Losses and Has Been Exposed to Risks of Losses...................................61

POINT V.   THE GOVERNMENT'S COMMON LAW CLAIMS ARE PROPERLY PLED ....................................................................................64

CONCLUSION............................................................................................68

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)......................................66

*Ali v. Mukasey*, 529 F.3d 478 (2d Cir. 2008)..................................................16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).............................................................25

*Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*,
    No. 11 Civ. 2375 (JSR), 2013 WL 440114 (S.D.N.Y. Feb. 5, 2013)....................23, 36

*BP America Prod. Co. v. Burton*, 549 U.S. 84 (2006)......................................39

*Badaracco v. Commissioner*, 464 U.S. 386 (1984) ......................................39, 40

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)......................................25

*Capozzi v. United States*, 980 F.2d 872 (2d Cir. 1992) ....................................39

*In re Cardiac Devices Qui Tam Litigation*, 221 F.R.D. 318 (D. Conn. 2004) .................22

*Del. Insurance Guaranty Association v. Christiana Care Health Services*,
    892 A.2d 1073 (Del. 2006) .........................................................................25

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).............................................58

*In re Drexel Burnham Lambert Group*, 995 F.2d 1138 (2d Cir. 1993) ...........................67

*In re Enterprise Mortgage Acceptance Co., LLC, Securities Litigation*,
    391 F.3d 401 (2d Cir. 2004)........................................................................47

*In the Matter of Flagship Mortgage Services*,
    HUDALJ 90-154-MR, 1991 WL 11668525 (H.U.D.A.L.J. Jan. 16, 1991) ...............66

*Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005)...........................................................65

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999)................30

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996)..........................................18

*Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*,
    665 F. Supp. 2d 239 (S.D.N.Y. 2009)...........................................................65

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)................................................58

*International Motor Sports Group, v. Gordon*,
   No. 98 Civ. 5611 (MBM), 1999 WL 619633 (S.D.N.Y. Aug 16, 1999)..............18, 23

*In re Iraq and Afghanistan Detainees Lit.*,
   479 F. Supp. 2d 85 (D.D.C. 2007), *aff'd sub nom. Ali v. Rumsfeld*,
   649 F.3d 762 (D.C. Cir. 2011) ...................................................................................48

*Jana, Inc. v. United States*, 34 Fed. Cl. 447 (Fed. Cl. 1995) .........................................42

*Jimenez v. Quarterman*, 555 U.S. 113 (2009) .................................................................51

*Katt v. City of New York*, 151 F. Supp. 2d 313 (S.D.N.Y. 2001) ....................................40

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)...........................................41

*In re Leslie Fay Companies, Inc. Sec. Litig.*,
   No. 92 Civ. 8036 (WCC), 1993 WL 438927 (S.D.N.Y. Oct. 27, 1993).....................23

*Martin J. Simko Construction, Inc. v. United States*,
   852 F.2d 540 (Fed. Cir. 1988) ...................................................................................43

*Melton v. Carolina Power & Light Co.*,
   No. 4:11-cv-00270-RBH, 2012 WL 2401635 (D.S.C. June 25, 2012)......................67

*Orr v. United States*, 174 F.2d 577 (2d Cir. 1949) .........................................................47

*Ortiz v. Cornetta*, 867 F.2d 146 (2d Cir. 1989) ..............................................................40

*Qualls v. Rumsfeld*, 357 F. Supp. 2d 274 (D.D.C. 2005)  .................................................48

*In re Samuel T. Isaac & Assoc., Inc.*,
   HUDBCA No. 80-452-M2, 1983 WL 13321 (Nov. 10, 1983)..................................66

*Taberna Capital Management, LLC v. Dunmore*,
   No. 08 Civ. 1817 (JSR), 2009 WL 2850685 (S.D.N.Y. Sept. 2, 2009).....................67

*U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189 (10th Cir. 2006) ..........................38

*U.S. ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648 (5th Cir. 2004)...........................38

*U.S. ex rel. Bledsoe v. Community Health System*, 501 F.3d 493 (6th Cir. 2007).......22, 23

*U.S. ex rel. Cantekin v. University of Pittsburgh*, 192 F.3d 402 (3d Cir. 1999)...............34

iv

*U.S. ex rel. Cericola v. Federal   National Mortg. Associate*,
    529 F. Supp. 2d 1139 (C.D. Cal. 2007) ....................................................24

*U.S. ex rel. Condie v. Board of Regents of the University of California*,
    No. C89-3550-FMS, 1993 WL 740185 (N.D. Cal. Sept. 7, 1993) .................43, 44, 46

*U.S. ex rel. Conner v. Salina Regional Health Ctr.*,
    543 F.3d 1211 (10th Cir. 2008) ..............................................................31

*U.S. ex rel. Fago v. M&T Mortg. Corp.*, 518 F. Supp. 2d 108 (D.D.C. 2007) ................35

*U.S. ex rel. Feldman v. City of New York*,
    808 F. Supp. 2d 641 (S.D.N.Y. 2011)..................................................26, 27, 28, 30, 31

*U.S. ex rel. Feldman v. Van Gorp*,
    No. 03 Civ. 8135 (WHP), 2010 WL 5094402 (S.D.N.Y. Dec. 9, 2010) ....................33

*U.S. ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39 (D. Mass. 2001) ...............22, 23

*U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009) ..............................18, 19

*U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006)................30

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
    601 F.3d 94 (2d Cir. 2010), *rev'd on other grounds*,
    131 S. Ct. 1885 (2011) ....................................................26, 27, 28, 29, 33

*U.S. ex rel. Kreindler & Kreindler v. United Technology Corp.*,
    777 F. Supp. 195 (N.D.N.Y. 1991), *aff'd on other grounds*,
    985 F.2d 1148 (2d Cir. 1993)...........................................................43

*U.S. ex rel. Kreindler & Kreindler v. United Technology Corp*,
    985 F.2d 1148 (2d Cir. 1993)..........................................................39, 43

*U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163 (10th Cir. 2010)..........33

*U.S. ex rel. Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001) ....................................28, 29, 31

*U.S. ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69 (D.D.C. 2003) ...........................41

*U.S. ex rel. Wyke v. American International Inc.*,
    No. 01-60109, 2005 WL 1529669 (E.D. Mich. June 20, 2005) .................................41

*United States v. A&P Trucking Co.*, 358 U.S. 121 (1958) ...............................................52

*United States v. BNP Paribas SA*,
    __ F. Supp. 2d __, 2012 WL 3234233 (S.D. Tex. Aug. 3, 2012) ................41, 46, 47

*United States v. Bank of America et al.*,
    No. 12-361 (RMC), __ F. Supp. 2d __, 2013 WL 504156
    (D.D.C. Feb. 12, 2013) ......................................................................................16

*United States v. Bennett*, 161 F.3d 171 (3d Cir. 1998) ....................................................64

*United States v. Bornstein*, 423 U.S. 303 (1976) ............................................................28

*United States v. Bouyea*, 152 F.3d 192 (2d Cir. 1998) .............................................56, 63

*United States v. Carell*, 681 F. Supp. 2d 874 (M.D. Tenn. 2009) .............................40, 41

*United States v. Caremark, Inc.*, 634 F.3d 808 (5th Cir. 2011)........................................37

*United States v. Christensen*, 344 F. Supp. 2d 1294 (D. Utah 2004) ..............................54

*United States v. Collins*, 361 F.3d 343 (7th Cir. 2004)....................................................58

*United States v. Daugerdas*,
    No. 09 Cr. 581 (WHP), 2011 WL 6020113 (S.D.N.Y. Apr. 5, 2011) ..................57, 59

*United States v. Education Management Corp*,
    871 F. Supp. 2d 433 (W.D. Pa. 2012).......................................................................31

*United States v. Eghbal*, 548 F.3d 1281 (9th Cir. 2008)......................................29, 33, 35

*United States v. Entin*, 750 F. Supp. 512 (S.D. Fla. 1990) ..............................................36

*United States v. First National Bank of Cicero*, 957 F.2d 1362 (7th Cir. 1992) ..............34

*United States v. Ghavami*,
    No. 10 Cr. 1217 (KMW), 2012 WL 2878126 (S.D.N.Y. July 13, 2012) ..56, 57, 61, 64

*United States v. Grass*, 274 F. Supp. 2d 648 (M.D. Pa. 2003) ........................................58

*United States v. Hartz*, 296 F.3d 595 (7th Cir. 2002) ......................................................64

*United States v. Hess*, 194 F.3d 1164 (10th Cir. 1999) ....................................................41

*United States v. Hibbs*, 568 F.2d 347 (3d Cir. 1977)...........................................33, 34, 35

*United States v. Hoffecker*, 530 F.3d 137 (3d Cir. 2008)................................................58

*United States v. Huron Consulting Group, Inc.*,
   No. 09 Civ. 1800 (JSR), 2011 WL 253259 (S.D.N.Y. Jan. 24, 2011).................19, 23

*United States v. Island Park*, 791 F. Supp. 354 (E.D.N.Y. 1992) ..............................42, 46

*United States v. Johnson*, 130 F.3d 1352 (9th Cir. 1997)...................................64

*United States v. Kensington Hospital*, 760 F. Supp. 1120 (E.D. Pa. 1991).....................19

*United States v. Kolsky*, 137 F. Supp. 359 (E.D. Pa. 1955)...............................47

*United States v. Lahey Clinic Hospital, Inc.*, 399 F.3d 1 (1st Cir. 2005) ........................23

*United States v. Macomb Contracting Corp.*,
   763 F. Supp. 272 (M.D. Tenn. 1990)...................................................42, 46

*United States v. Martinez*, No. 98-1438, 1999 WL 38842 (2d Cir. Jan. 27, 1999) ..........56

*United States v. Mavashev*,
   No. 08-CR-902 (DLI) *(MDG)*, 2009 WL 4746301 (E.D.N.Y. Dec. 7, 2009) ............63

*United States v. Miller*, 645 F.2d 473 (5th Cir. 1981) ......................................35

*United States v. Mullins*, 613 F.3d 1273 (10th Cir. 2010)................................61

*United States v. Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010) ...................................57, 63

*United States v. Pelullo*, 964 F.2d 193 (3d Cir. 1992)......................................63

*United States v. Pfluger*, 685 F.3d 481 (5th Cir. 2012) ....................................48

*United States v. Prosperi*, 573 F. Supp. 2d 436 (D. Mass. 2008)....................................47

*United States v. Q International Courier, Inc.*, 131 F.3d 770 (8th Cir. 1997) ................38

*United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436 (S.D.N.Y. 1999) ..........37

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008)......................................23

*United States v. Rubin/Chambers, Dunhill Insurance Servs.*,
   798 F. Supp. 2d 517 (S.D.N.Y. 2011)...................................................52, 53

*United States v. Rubin/Chambers, Dunhill Insurance Servs.*,
   831 F. Supp. 2d 779 (S.D.N.Y. 2011)................................................57, 58, 59, 63, 64

*United States v. Schinnell*, 80 F.3d 1064 (5th Cir. 1996) .................................64

*United States v. Serpico*, 320 F.3d 691 (7th Cir. 2003) .................................56, 57, 61, 62

*United States v. Slaey*, No. 06-4930, 2007 WL 2142361 (E.D. Pa. July 24, 2007) ..........41

*United States v. Spicer*, 57 F.3d 1152 (D.C. Cir. 1995) ...................................................35

*United States v. Technology Refrigeration*,
    143 F. Supp. 2d 1006 (N.D. Ill. 2001) ................................................42, 43, 44, 46, 65

*United States v. Van Brocklin*, 115 F.3d 587 (8th Cir. 1997) ..........................................53

*United States v. Wiant*, 314 F.3d 826 (6th Cir. 2003) ......................................................63

*In re U.S. Foodservice Inc. Pricing Litigation*,
    No. 3:07 MD 1894 (CFD), 2009 WL 5064468 (D. Conn. Dec. 15, 2009) .................19

*Vance v. Rumsfeld*, 653 F.3d 591 (7th Cir. 2011) .............................................................48

*Vernon v. Cassadaga Valley Central Sch. District*, 49 F.3d 886 (2d Cir. 1995) ..............47

*In re Wells Fargo Mortgage-Backed Certificates Litigation*,
    712 F. Supp. 2d 958 (N.D. Cal. 2010) .......................................................................64

**Statutes**

1 U.S.C. § 1 ........................................................................................................................51

12 U.S.C. § 1708(c)(3)(E)(v) .........................................................................................31, 38

12 U.S.C. § 1717z-21(c)(1) (2006) .................................................................................31, 38

12 U.S.C. § 1833a ....................................................................................................... *passim*

15 U.S.C. § 645(a) ..............................................................................................................60

18 U.S.C. § 1001 ...........................................................................................................50, 55

18 U.S.C. § 1005 ...............................................................................................50, 51, 52, 53

18 U.S.C. § 1007 ...........................................................................................................53, 60

18 U.S.C. § 1014 ...............................................................................................50, 54, 55, 60

18 U.S.C. § 1341 ...............................................................................................50, 53, 55

viii

18 U.S.C. § 1343 ..................................................................................50, 53, 55

18 U.S.C. § 1344 ........................................................................................53, 61

18 U.S.C. § 3287 ........................................................................................46, 47

18 U.S.C. § 3293 ....................................................................53, 56, 57, 59, 61

28 U.S.C. § 2415 ................................................................................................65

28 U.S.C. § 2416 ................................................................................................65

31 U.S.C. § 3729(a)(1) (2006) ...................................................................25, 26

31 U.S.C. § 3729(a)(1)(A) ..........................................................................25, 26

31 U.S.C. § 3729(a)(1)(B) ..........................................................................25, 26

31 U.S.C. § 3729(a)(1)(G) ..........................................................................25, 36

31 U.S.C. § 3729(a)(2) (2006) ...........................................................................25

31 U.S.C. § 3729(a)(7) (2006) ..............................................................25, 36, 38

31 U.S.C. § 3730 ..............................................................................................43

31 U.S.C. § 3731 ..................................................................................40, 42, 43

Financial Institutions Recovery and Reinvestment Act of 1989,
    Pub. L. No. 101-73, 103 Stat. 183 (1989) .................................48, 50, 53, 59

Fraud Enforcement and Recovery Act of 2009,
    S. Rep. 111-10, 111th Cong., 1st Sess. 2009, 2009 U.S.C.C.A.N. 430, 441 ...............38

Joint Resolution to Authorize Use of Military Force, Pub. L. 107-40, 115 Stat.
    224 (2001) .........................................................................................47

Joint Resolution to Authorize Use of Military Force, Pub. L. 107-243, 116 Stat.
    1498 (2002) ........................................................................................47

## Rules & Regulations

12 C.F.R. § 5.33(g)(4)(v) ..................................................................................25

24 C.F.R. § 203.5 ....................................................................................4, 30, 31

24 C.F.R. § 203.255(g) .................................................................................31, 38

28 C.F.R. § 0.45(d) ...........................................................................................42

Fed. R. Civ. P. 9(b) ...................................................................................*passim*

Fed. R. Civ. P. 12(b)(6)............................................................................*passim*

Fed. R. Civ. P. 15................................................................................................25

**Other Authority**

H.R. Rep. No. 101-54(I) (1989), 1989 U.S.C.C.A.N. 86 ...........................49, 59

H.R. Rep. 101-54(V) (1989), 1989 U.S.C.C.A.N. 397...............................59, 60

Plaintiff the United States of America (the "Government") respectfully submits this memorandum of law in opposition to the motion by defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "the bank") to dismiss the First Amended Complaint ("Amended Complaint" or "FAC").

## PRELIMINARY STATEMENT

Through its motion to dismiss, Wells Fargo seeks to paint itself as a victim.  In the bank's version, Wells Fargo is HUD's partner, a benevolent provider of mortgage loans that is now being unfairly blamed for loan defaults that are the product of the recent housing market collapse.  The reality is much different.  Wells Fargo was the beneficiary of a federal mortgage insurance program that allowed it to originate hundreds of billions of dollars in home mortgages without fear of loss.  And after being reposed with the Government's trust to originate loans guaranteed in full by the United States of America, Wells Fargo breached that trust by falsely certifying thousands of bad loans for insurance, concealing its misconduct, and defrauding the Government out of hundreds of millions of dollars.  Nothing in Wells Fargo's motion provides it an escape from liability for the years of misconduct detailed in the Amended Complaint.

Wells Fargo's misconduct played out in two related fraudulent schemes in connection with its origination and underwriting of home mortgage loans under the Federal Housing Administration ("FHA") Direct Endorsement Lender program – loans that are insured in full against default by the Government.  Specifically, from May 2001 through October 2005, Wells Fargo engaged in a regular practice of reckless origination and inadequate underwriting of its retail FHA loans.  During this period, Wells Fargo certified to the United States Department of Housing and Urban Development ("HUD") that tens of thousands of the bank's retail FHA loans met HUD's requirements for proper origination and underwriting and therefore were eligible for

FHA insurance, when the bank knew that a very substantial percentage of these loans – nearly 50% in certain months – had not been properly underwritten, contained unacceptable risk, and were ineligible for FHA insurance.  When these bad loans defaulted, Wells Fargo submitted false claims for FHA insurance payments and caused third parties to whom Wells Fargo sold these bad loans to submit false claims, causing HUD to suffer hundreds of millions of dollars in losses.

To compound matters, from January 2002 through December 2010, Wells Fargo flouted HUD's self-reporting requirement to conceal its bad loans from the Government.   Under the Direct Endorsement program, Wells Fargo was required to perform quality control reviews of the FHA loans that it was originating and promptly report to HUD loans that contained material violations of HUD's requirements.  This self-reporting requirement allows HUD the opportunity to investigate the reported loans and request reimbursement or indemnification, as appropriate. However, despite internally identifying thousands of materially deficient loans that the bank had falsely certified to HUD were eligible for FHA insurance, Wells Fargo decided to keep its bad loans a secret.  Prior to October 2005, the bank did not self-report a single loan to HUD. Thereafter, Wells Fargo made a token effort at self-reporting, informing HUD in total of less than 4% of the 6,558 bad loans that the bank had internally identified.  Defaults from just the loans that Wells Fargo failed to self-report, as required, have cost HUD nearly $190 million.

Wells Fargo offers a slew of technical defenses in its motion which the bank asserts relieves it of being held to account for this misconduct, but none has merit.  First, Wells Fargo contends that the Government's claims were released as part of a settlement of a separate action in the District of Columbia.  That argument now is precluded, as on February 12, 2013, the district court in the District of Columbia rejected Wells Fargo's interpretation of the release.

2

Second, Wells Fargo insists that the Government's False Claims Act claims are time barred because as part of a routine audit in 2004, HUD identified a small number of FHA loans that Wells Fargo had not properly underwritten.  This fact-based argument is inappropriate on a motion dismiss and, in any event, wholly lacks merit.  Third, Wells Fargo asserts that the Amended Complaint is insufficiently pled under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  But the detailed allegations in the Amended Complaint debunk the bank's Rule 9(b) argument, and the Amended Complaint states well-pled claims under the False Claims Act ("FCA"), the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), and the common law.  Accordingly, Wells Fargo's motion should be denied.

## STATEMENT OF FACTS

### I.    HUD'S FHA DIRECT ENDORSEMENT LENDING PROGRAM

The Federal Housing Administration ("FHA"), a part of HUD, is the largest mortgage insurer in the world, insuring approximately one third of all new residential mortgages in the United States.  FAC ¶ 13.  FHA encourages lenders to make loans to millions of creditworthy Americans who might not otherwise satisfy conventional underwriting criteria, by promising to pay the mortgage holder the balance of the loan and take on foreclosure and other costs if a loan in the program defaults.  *Id.* ¶ 14.  HUD's Direct Endorsement Lending program is one of the FHA-insured mortgage programs.  *Id.* ¶ 15.  When a Direct Endorsement Lender ("DEL") is authorized by HUD to participate in the program, HUD relies on the DEL to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA mortgage insurance without prior HUD review or approval.  *Id.* ¶¶ 15-16.  Wells Fargo is the most prolific DEL in the FHA mortgage insurance program.  *Id.* ¶ 2.

3

### A. Underwriting and Due Diligence Requirements

A DEL is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the FHA mortgage. FAC ¶ 17. The underwriter must "evaluate [each] mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d); *see also* FAC ¶ 17. In addition, the underwriter must "have [each] property appraised in accordance with [the] standards and requirements" prescribed by HUD. 24 C.F.R. § 203.5(e); *see also* FAC ¶ 17. To qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD-FHA requirements (*e.g.*, income, credit history, valuation of property, etc.). FAC ¶ 15.

Mortgagees must employ underwriters who can detect warning signs that may indicate irregularities or fraud, and must ensure that underwriting decisions are performed with due diligence in a prudent manner. HUD Handbook 4000.4 REV-1, ¶ 2-4(C)(5); *see also* HUD Handbook 4155.2 ¶ 2.A.4.b; FAC ¶ 18.[1] The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters. HUD Handbook 4060.1 REV-2, ¶ 2-9(A); FAC ¶ 18.

In addition, in order for a loan to be insured by FHA, the DEL must complete an individual loan certification, which, among other things, certifies that the lender conducted due diligence and/or ensured data integrity such that the endorsed mortgage complies with HUD

---

[1] All of the current HUD Handbooks are publicly available at http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh (last visited Feb. 6, 2013). For the Court's convenience, we also attach the relevant portions of the current and historical HUD Handbooks as an appendix.

rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." FAC ¶ 38; *see* Declaration of Douglas Baruch dated January 16, 2013 ("Baruch Decl."), Ex. B. Additional certifications are required depending upon whether a loan is approved through automated or manual underwriting, but in either case, the lender also must certify: "I, the undersigned, as authorized representative of mortgagee at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4." *Id.* ¶ 39; *see* Baruch Decl. Ex. B at 3, 4. HUD relies on each individual loan certification to endorse the loan for insurance and provide the lender with an FHA mortgage insurance certificate. *Id.* ¶ 40.

### B. Quality Control and Reporting Requirements

Pursuant to HUD rules, every DEL must make an annual certification of compliance with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan. *Id.* ¶ 37. The annual certification states:

> I know, or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

*Id.* Absent a truthful annual certification, a lender is not entitled to maintain its DEL status and is not entitled to certify loans for FHA insurance. *Id.*

To truthfully affirm HUD's required annual certification and thus maintain HUD-FHA approval, a DEL must implement and maintain an independent quality control program. *Id.* ¶ 24. HUD's quality control requirements mandate that a lender must (among other things): (a) review

5

a prescribed sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (b) conduct a full review of "all loans going into default within the first six payments," which HUD defines as "early payment defaults." *Id.* In conducting a quality control review of a loan file, the lender must, among other things, review and re-verify specific items of information that track the HUD underwriting and due diligence requirements for certifying FHA loans for endorsement. *See id.* ¶ 25. The HUD Handbook provides a four-level rating system for quality control reviews, to rate the severity of the violations found: those ratings range from "Low", *i.e.*, no or minor violations, up to the top tier of "Material," *i.e.*, issues identified were material violations of FHA or mortgagee requirements and represent an unacceptable level of risk, and have to be reported to HUD. *Id.* ¶ 26. Specifically, the HUD Handbook defines "Material Risk" loans as follows:

> The issues identified during the review were material violations of FHA or mortgagee requirements and represent an unacceptable level of risk. For example, a significant miscalculation of the insurable mortgage amount or the applicant[']s capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud. Mortgagees must report these loans, in writing, to the Quality Assurance Division in the FHA Home Ownership Center having jurisdiction.

*Id.* ¶ 27 (emphasis added).

Under HUD's rules, a lender must report to HUD (along with the supporting documentation) "[s]erious deficiencies, patterns of non-compliance, or fraud uncovered by mortgagees" during the "normal course of business and by quality control staff during reviews/audits of FHA loans" within 60 days of the initial discovery. *Id.* ¶ 28.[2]   In addition to

---

[2] Before November 2003, lenders were required to report to HUD loans affected by "significant discrepancies," such as "any violation of law or regulation, false statements or program abuses by the mortgagee, its employees, or any other party to the transaction."   FAC ¶ 28.

reporting those loans to HUD, the lender is required to take corrective action in response to its findings. *Id.* ¶ 30. In particular, quality control review findings must "be reported to the mortgagee's senior management within one month of completion of the initial report" and "[m]anagement must take prompt action to deal appropriately with any material findings." *Id.* The final report or an addendum "must identify the actions being taken, the timetable for their completion, and any planned follow-up activities." *Id.* Appropriate action by management includes following up with underwriters responsible for material violations to ensure that they are properly trained and diligently reviewing each file before endorsing it for FHA insurance. *Id.*

## C. Submission and Payment of FHA Claims, and Indemnification of HUD

Once a loan is certified for FHA insurance by a DEL, HUD endorses the loan and assigns it a unique FHA case number. *Id.* ¶ 40. Whenever an FHA loan defaults and an insurance claim is submitted, HUD's electronic system will conduct a series of checks and if there are no impediments to paying the claim, a disbursement request is sent to the United States Treasury to issue the funds to the holder of record. *Id.* ¶ 42. In the event that HUD discovers that a loan was endorsed despite being ineligible for the FHA program, HUD may seek indemnification from the DEL that certified the loan via an indemnification agreement whereby the lender agrees to indemnify HUD should claims for FHA insurance be submitted on that loan. *Id.* ¶ 40.

## II.    WELLS FARGO'S QUALITY CONTROL PROCESS

Wells Fargo's quality control program includes both the Fraud Risk Management ("FRM") and Quality Assurance ("QA") departments. FAC ¶ 31. The QA department's procedures included the following with respect to FHA-insured loans: monthly reviews of a random sample of loans originated and sponsored within the prior 60 days, reviews of at least

some portion of its early payment defaults ("EPDs"), and preparation and circulation of internal reports of the reviews' findings. *Id.* The FRM department also reviewed loans referred to it as potentially involving fraud or misrepresentation. *Id.*

In evaluating the loans it reviewed, Wells Fargo tracked HUD Handbook terminology, rating its findings regarding the risks associated with the loans as either "Material," "Moderate," or "Acceptable." *Id.* ¶ 32. Wells Fargo's definition of the "Material" rating mirrored HUD's in substance, and made clear that a loan with that rating contained unacceptable risk and was ineligible for FHA insurance. *Id.* For example, Wells Fargo's May 2004 Quality Control Plan for FHA loans, which was provided to HUD, defined "Material risk" rated loans as follows:

> The loan contains significant deviations from the specific loan program parameters under which it was originated or significant risk factors affecting the underwriting decision and/or contains misrepresentation, making the loan ineligible for sale to the investor or resulting in potential repurchase or indemnification.

*Id.* ¶ 33. That Plan also drew examples directly from HUD's "Material risk" definition, stating: "Examples of material risks include the applicant's capacity to repay the mortgage, failure to underwrite an assumption or protect abandoned property from damage, or fraud." *Id.*

Both the QA and FRM departments made monthly reports to senior management, including the Wells Fargo Quality Control ("QC") Committee. *Id.* ¶ 34. Wells Fargo's QA department provided written reports summarizing the findings from its reviews of statistically random monthly samples of loans, as well as loans that were categorized as EPDs. *Id.* Among other information, those QA reports set forth the percentage of loans reviewed in various categories and lines of business that contained "Material" risk ratings. *Id.* Loans reported by

FRM to the QC Committee included those containing misrepresentations of assets, credit, and income, as well as appraisal fraud.  *Id.* ¶ 35.

### III.   WELLS FARGO'S FRAUD ON THE FHA INSURANCE PROGRAM

#### A.  Wells Fargo Submitted Thousands of False Individual Loan Certifications for FHA Loans That the Bank Originated Between May 2001 and October 2005

Between May 2001 and October 2005, Wells Fargo engaged in a regular practice of reckless origination and inadequate underwriting of its retail FHA loans.  FAC ¶ 44.  Wells Fargo's underwriters routinely failed to perform basic due diligence, including failing to verify information in the loan file that bore directly on the borrower's ability to make payments on the mortgage.  *Id.* ¶¶ 44-55.  Consequently, the bank experienced very serious loan quality problems. *Id.* ¶¶ 44-55, 84-89.  During that period, Wells Fargo's management knew that a substantial percentage of its retail FHA loan portfolio – nearly 50% in certain months – did not meet critical HUD requirements, contained an unacceptable level of risk, and therefore was ineligible for FHA insurance.  *Id.* ¶ 45.  But management failed to take effective action to address these serious deficiencies.  *Id.*  Instead, Wells Fargo falsely certified that thousands of the bank's retail FHA loans had been properly underwritten, met HUD's requirements, and therefore were eligible for FHA insurance, when they were not.  *Id.*  And when these loans defaulted, the bank submitted, and caused third parties to whom Wells Fargo sold these loans to submit, false claims for FHA insurance payments causing HUD to incur hundreds of millions of dollars in losses.  *Id.*

Wells Fargo's severe loan quality problems began in or around the middle of 2000, when the bank significantly increased its FHA loan originations.  FAC ¶ 46.  To facilitate this substantial increase in loan originations, Wells Fargo expanded its staff, including hiring temporary underwriters to review FHA loans, many of whom were not adequately trained with

respect to the requirements of the FHA program.  *Id.*  Wells Fargo's senior management was aware that these employees had not received the in-depth training necessary to underwrite FHA loans in accordance with HUD requirements.  *Id.* ¶¶ 31, 34, 46.  Nonetheless, management pressured underwriters to make decisions on loans on extremely short turnaround times, employed lax and inconsistent underwriting standards and controls, and took on an extraordinarily heavy volume of FHA loans.  *Id.* ¶¶ 48-49.  To compound matters, Wells Fargo paid its underwriters a bonus (in addition to their salaries) based on the number of loans approved, rather than the number of loans reviewed.  *Id.* ¶ 47.  This improper *de facto* commission incentivized underwriters to approve as many FHA loans as possible, regardless of the risk of default or the loan's eligibility for FHA insurance.  *Id.*

As a result, the quality of the bank's retail FHA loans dropped precipitously, which decline was detected contemporaneously by Wells Fargo's QA department and reported to senior management.  *Id.* ¶ 50.  For example, QA's report for loans originated in December 2000 advised senior management that 26% of the retail FHA loans that were randomly sampled contained a material violation of HUD's requirements.  *Id.*  In other words, more than one out of every four retail FHA loan that Wells Fargo certified to HUD for FHA insurance was not eligible.  *Id.* Despite these troubling findings, Wells Fargo's management failed to take action.  *Id.* ¶ 51.

Consequently, the material violation rate worsened significantly beginning in May 2001, and escalated tremendously throughout 2002.  *Id.* ¶ 52.  During the 21 months from May 2001 through January 2003, the material violation rate for randomly reviewed retail FHA loans, as found by Wells Fargo QA, exceeded 25% in 18 of those months.  *Id.*  Worse still, during the seven months from April 2002 to October 2002, the material violation rate never dipped below

10

42%, and reached as high as 48%.  *Id.*   ¶ 53.  This was an extraordinary departure from Wells

Fargo's internal material violations benchmark, set at 5%.  *Id.*  And QA's material violation rate

for FHA loans that went into early payment default was even higher, averaging 66% in 2002, and

hitting an astronomical high of nearly 90% in one of those months.  *Id.*[3]

Wells Fargo's reckless underwriting and serious loan quality problems continued from

February 2003 through October 2005, yet Wells Fargo continued to certify its entire portfolio of

retail FHA loans for insurance even though the bank knew that a substantial percentage of those

loans did not meet HUD requirements.   FAC ¶ 84.   Month after month QA reported to

management about the significant problems it was finding in the bank's retail FHA loans.  *Id.* ¶

85.  For example, in July 2003, QA candidly advised that one of the "overall root cause[s]" for

the exceedingly high underwriting material violation rates across all business lines was

"[v]olume, pressure to approve loans, and the experience levels."  *Id.*  QA was even more

explicit in August 2003: "heavy volume, pressure to approve loans and meet acceptable turn

times along with inexperienced staff are key contributing factors overall to the issues leading to

material findings."  *Id.*

Despite these reports, and QA's increasingly specific admonitions to management

concerning the very serious underwriting problems, no effective action was taken.  *Id.*  On the

contrary, Wells Fargo slashed the number of its FHA underwriters from 919 to 401.  *Id.* ¶ 86.

These underwriters remained inadequately trained and improperly incentivized with the *de facto*

commission.  *Id.*  As a result, the material violation rate for randomly sampled retail FHA loans

remained very high, over 20% in many months.  *Id.* ¶ 87.  At the same time, the moderate

---

[3] The Amended Complaint charts in detail QA's month-by-month findings for retail FHA loans
funded between May 2001 and October 2005.  *Id.* ¶¶ 54, 89.

violation rate – the rating just below "material" – skyrocketed. *Id.* For a number of months during this period, the combined material and moderate violation rate exceeded 80% of the randomly sampled retail FHA loans. *Id.* And for 18 consecutive months that combined rate hovered between 70% and 80% and never fell below 63%. *Id.* This high combined violation rate was a particularly serious problem because the "moderate" risk rating classification in this period encompassed underwriting violations that actually were material to whether the loans met HUD's requirements and were eligible for FHA insurance. *Id.* ¶¶ 87-88.[4]

All told, from May 2001 through October 2005, Wells Fargo falsely certified thousands of loans for insurance and caused HUD to pay hundreds of millions of dollars in insurance claims for loans that were not eligible for the FHA program. *Id.* ¶ 119.

**B. Wells Fargo's Knowing Failure to Report 6,320 Materially Deficient Loans to HUD**

During this same period and continuing through December 2010, Wells Fargo also purposely flouted its obligation to self-report materially deficient FHA loans to HUD. As discussed above, HUD requires DELs, like Wells Fargo, to perform post-closing reviews of the FHA loans they originate and report to HUD loans that have an unacceptable risk. FAC ¶¶ 24-30, 120. This requirement provides HUD with an opportunity to investigate the loans that are reported and request reimbursement or indemnification, as appropriate. *Id.* ¶¶ 40, 43, 120. Wells Fargo, however, decided unilaterally not to comply with this requirement. *Id.* ¶ 120. Prior to October 2005, Wells Fargo – the largest originator of FHA insured loans in the country – failed to report a single bad loan. *Id.* ¶¶ 5, 118, 127. And until the Government began the instant

---

[4] The Amended Complaint provides ten examples of mortgages falsely certified for FHA insurance by Wells Fargo, including the details regarding how those mortgages materially failed to meet FHA requirements, and the amount ultimately paid by the FHA program to Wells Fargo as holder of the mortgages. *Id.* ¶¶ 56-81, 90-115.

investigation in 2011, the bank reported only a very small number of loans:  238 between

October 2005 and December 2010.  *Id.* ¶¶ 131-32.  This despite the bank's serious loan quality

problems and identification of 6,558 loans between January 2002 and December 2010 that

contained serious violations of HUD's requirements such that they were required to be self-

reported.  *Id.* ¶ 132.

Wells Fargo's internal memoranda reveal that the bank was aware of HUD's requirement

to promptly report, in writing, loans affected by fraud and other serious violations.  *Id.* ¶ 122.

Behind closed doors, however, Wells Fargo decided to disregard the self-reporting requirement.

*Id.* ¶ 123. It did so by simply ignoring its self-reporting obligations prior to 2004, and then

redefining the reporting requirement so narrowly as to all but obliterate it.  *Id.*

Specifically, in the spring of 2004, Wells Fargo began to concern itself with the topic of

reporting bad loans to HUD *for the very first time*.  *Id.*  An April 8, 2004 memorandum states

that the Vice President of Quality Management (the "VP of Quality Control") "will organize a

working group to address reporting to HUD.  Some of the items in the scope of this group are:

fraud, significant credit risks, significant servicing risks, EPD issues, non-owner occupied issues,

fair lending issues."  *Id.*  But no reporting occurred.  *Id.*

In August 2004, the working group decided not to report material risk-rated loans as

mandated by HUD regulations.  *Id.* ¶ 124.  Accordingly, no loans were reported to HUD.  *Id.*

Then, in 2005, after HUD began questioning whether Wells Fargo was complying with its self-

reporting obligations, the bank lied to HUD.  *Id.* ¶ 126.  In a January 18, 2006 letter responding

to HUD's inquiry, the Division Presidents of Wells Fargo Home Mortgage acknowledged that

"HUD requires that 'serious deficiencies, patterns of non-compliance, or fraud uncovered by

mortgagees must be report[ed] in writing,'" and then represented falsely that "[p]rocedures are, and have been, in place to report appropriate items to the HUD Homeownership Centers." *Id.* Wells Fargo's Division Presidents then described these procedures, which supposedly included "obtaining input from various groups including Quality Assurance, Fraud Risk management, Legal Servicing, etc.," and assured HUD that "[r]egular meetings are held to discuss what files should be reported." *Id.* They explained the bank's prior self-reporting policy as follows: "[h]istorically Wells Fargo interpreted HUD's [self-reporting] requirement . . . to mean that reporting was required on incidents that involve several files or patterns of fraud or non compliance . . . ." *Id.* Based on this interpretation, "Wells Fargo did not report *every* incident of fraud or non compliance that involved a single instance or file, but rather focused on reporting larger global fraud issues which involved numerous parties and files." *Id.* (emphasis added). Wells Fargo then assured HUD that it had now "broadened its reporting requirements to meet the guidance provided" in HUD's May 27, 2005 Mortgagee Letter. *Id.*

Following HUD's inquiry, Wells Fargo began to report bad loans, but even then the bank failed to adhere to its own self-reporting policy and, more importantly, knowingly failed to comply with HUD's regulations. *Id.* ¶ 128. Indeed, from October 2005 through December 2010, the bank's reporting was cursory at best, totaling only 238 loans. *Id.* ¶¶ 128, 132.

Wells Fargo's woefully inadequate reporting was the product of regular monthly meetings of the Wells Fargo QC working group. *Id.* ¶ 129. Those meetings began in October 2005 and were attended by numerous high-level employees, who conducted only bare reviews of a handful of loans and, accordingly, reported to HUD only a tiny number of loans. *Id.* Amongst the loans discussed and not reported at these QC working group meetings were loans for which

14

Suspicious Activity Reports were filed by Wells Fargo with the United States Department of the Treasury.  *Id.*  Wells Fargo's motive for not reporting loans to HUD is revealed in internal documents, which show that the bank believed that reporting would negatively affect profits by (i) requiring indemnification of HUD for these bad loans, and (ii) jeopardizing the bank's relationship with its wholesale FHA brokers.  *Id.* ¶ 130.

Wells Fargo's self-reporting stands in stark contrast to the findings of Wells Fargo's QA reviews.  *Id.* ¶ 132.  From January 2002 through December 2010, Wells Fargo QA identified 6,558 loans as having a "material" risk rating, such that they needed to be reported to HUD, including 3,142 early payment defaults.  *Id.* ¶¶ 26-27, 32-33, 132.  Yet, Wells Fargo failed to report 6,320 of these "material" risk-rated loans to HUD, over 96%.  *Id.* ¶ 132.  Claims from those loans alone resulted in FHA's payment of nearly $190 million in FHA benefits on defaulted mortgage loans.  *Id.* ¶¶ 132, 135 & Exs. A-C.

## ARGUMENT

### I.   THE GOVERNMENT'S CLAIMS ARE NOT BARRED BY THE RELEASE

Wells Fargo is now estopped from arguing that the release contained in a Consent Judgment from a separate litigation in the District Court for the District of Columbia (the "Release"), *United States v. Bank of America et al.*, 12-cv-00361-RMC (the "D.C. Action"), bars the United States for suing the bank "for conduct within the scope of Wells Fargo's annual certification to HUD."  *See* Defendant Wells Fargo Bank N.A.'s Memorandum of Law in Support of Its Motion to Dismiss the First Amended Complaint ("WF Mem.") at 9-10.[5]  2, 9-12.

---

[5] On April 4, 2012, the District Court for the District of Columbia entered a Consent Judgment among the United States, forty-nine states, the District of Columbia, and Wells Fargo.  The Release was attached as Exhibit F to the Consent Judgment.  *See* Baruch Decl. Ex. D.

In the D.C. Action, Wells Fargo moved to enjoin the Government from pursuing this case, arguing – just as it has here – that the Release in the D.C. action was broad and encompasses the claims asserted in the Amended Complaint.  On February 12, 2013, the district court rejected the bank's argument and denied the motion.  *See United States v. Bank of America et al.*, No. 12-361 (RMC), __ F. Supp. 2d __, 2013 WL 504156 (D.D.C. Feb. 12, 2013).

In addressing the merits of the parties' arguments, the district court found that the "Release is clear and unambiguous, as evidenced by its plain language." *Id.* at *7.  As such, the court ruled that the "plain language of the Release governs, and it does not have the meaning ascribed to it by Wells Fargo." *Id.*  Rather, the court held, consistent with the Government's position, that the Release only relieved Wells Fargo of liability for:

(1) Claims under FIRREA, FCA, and the Civil Program Remedies Act where the "sole basis" for such claims is that Wells Fargo submitted a false or fraudulent annual certification – without regard to whether any such loan contains a material violation of HUD-FHA requirements.

(2) Claims under FCA based on a false individual loan certification where the individual loan did not contain a material violation of HUD-FHA requirements.

*Id.* at *6.  Having "construed the release as described in the opinion," the court left "the interpretation of the SDNY Amended Complaint" to this Court.  *Id.* at *7.

Wells Fargo is barred by collateral estoppel from relitigating the scope of the Release. *See Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008) ("Collateral estoppel applies when:  (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was 'actually litigated and actually decided,' (3) there was a 'full and fair opportunity for litigation in the prior proceeding,' and (4) the issues previously litigated were 'necessary to support a valid and final judgment on the merits.'") (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir.

16

1986)).  Moreover, Wells Fargo does not, and cannot, argue that the allegations of the Amended Complaint fall within the scope of the Release as interpreted by the district court in the D.C. Action, because the Government is not asserting claims based solely on a false annual certification without regard to whether any such loan contains a material violation of HUD-FHA requirements or based on a false individual loan certification for loans that do not contain a material violation of HUD-FHA requirements.

In particular, in Counts 1 and 2 of the Amended Complaint, the Government alleges, *inter alia*, that between May 2001 and October 2005, Wells Fargo violated HUD's underwriting and due diligence requirements with respect to thousands of retail FHA loans that contained material violations of HUD's requirements, submitted false individual loan certifications to HUD for those loans, and submitted and caused the submission of false claims for FHA insurance payments when those loans defaulted.  FAC ¶¶ 44-54, 82-90, 132-148.  Likewise, in Counts 3 and 4 of the SDNY Complaint, the Government alleges, *inter alia*, that Wells Fargo internally identified 6,558 FHA loans that contained material violations of HUD-FHA requirements and therefore were ineligible for FHA insurance, failed to self-report 6,320 of these deficient loans to HUD as required, and submitted, or caused a third party to submit, a false claim to HUD for FHA insurance payments when these loans defaulted.  FAC ¶¶ 116-131, 150-162 and Ex. A.[6]

Accordingly, Wells Fargo's motion to dismiss based on the Release should be denied.

---

[6] The claims in the remainder of the Amended Complaint are based on the same facts and similar legal theories.  *See id.* ¶¶ 163-204.

## II.   THE AMENDED COMPLAINT PLEADS WELLS FARGO'S FRAUD WITH SUFFICIENT PARTICULARITY

Wells Fargo's argument that the Amended Complaint fails to satisfy the pleading requirements of Fed. R. Civ. P. 9(b) is inconsistent with the governing law and should be rejected.  *See* WF Mem. at 17-24.  Rule 9(b) requires that the "circumstances constituting fraud" be "state[d] with particularity"; however, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  To plead fraud with sufficient particularity, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996).  Notwithstanding this standard, it is "well established that there is no bright line rule for deciding whether a complaint has satisfied Rule 9(b)."  *Int'l Motor Sports Group, Inc. v. Gordon*, No. 98 Civ. 5611 (MBM), 1999 WL 619633, at *3 (S.D.N.Y. Aug. 16, 1999) (citation omitted).  Indeed, "in analyzing the sufficiency of a pleading under Rule 9(b), a district court must balance the rule with both Fed. R. Civ. P. 8(a), which requires only a 'short and plain statement of the claims for relief,' and [former] Fed. R. Civ. P. 8(f), which provides that 'all pleadings shall be so construed as to do substantial justice.'"  *Id.*; *see U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186, 189 (5th Cir. 2009) (Rule 9(b) "requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud,' which after *Twombly* must make relief plausible, not merely conceivable, when taken as true.").

Moreover, "courts have relaxed Rule 9(b)'s heightened pleading requirements in cases involving complex fraudulent schemes or those occurring over a lengthy period of time and

involving thousands of billing documents." *In re U.S. Foodservice Inc. Pricing Litigation*, No. 3:07 MD 1894 (CFD), 2009 WL 5064468, at *18 (D. Conn. Dec. 15, 2009) (citation omitted); *see also United States v. Huron Consulting Group, Inc.*, No. 09 Civ. 1800 (JSR), 2011 WL 253259, at *2 (S.D.N.Y. Jan. 24, 2011) (citation omitted).  And for FCA claims, "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b).  Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim[s] Act." *Kannegani*, 565 F.3d at 190 (citation omitted); *see also Int'l Motor Sports Group*, 1999 WL 619633, at *4 ("Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map") (citation omitted); *United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1125-26 (E.D. Pa. 1991) (Rule 9(b) only requires that defendants receive "fair notice of the charges against them").

The Amended Complaint plainly provides "fair notice" of the claims against Wells Fargo.  The Government has pled Wells Fargo's FCA violations through a detailed exposition of two different but related schemes that resulted in hundreds of millions of dollars in damages to the Government: Wells Fargo's reckless underwriting and certification of loans for FHA insurance from May 2001 through October 2005, and the bank's knowing failure to report to HUD as required FHA loans with material underwriting violations from 2002 through 2010.  With respect to the first scheme, the Amended Complaint lays out in great detail Wells Fargo's reckless underwriting and false certification of individual loans for FHA insurance from May 2001 through October 2005.

Specifically, the Amended Complaint identifies the requirements for the individual loan certifications that DELs are required to submit to HUD, including requirements relating to

underwriting due diligence and ensuring data integrity, *id.* ¶¶ 38-39; HUD's reliance on the individual loan certifications to endorse the loans for insurance, *id.* ¶ 40; the origins of Wells Fargo's severe loan quality problems, *id.* ¶¶ 44-50; senior management's awareness of the loan quality problems, including QA's findings that in certain months nearly half of the bank's retail FHA loans had material underwriting violations, contained unacceptable risk, and were ineligible for FHA insurance, *id.* ¶¶ 44-50; Wells Fargo's failure to take action to address the serious loan quality problems and failure to notify HUD of those problems, *id.* ¶¶ 44-47, 51; management's actions that exacerbated the loan quality problems, including hiring temporary underwriters to review FHA loans, failing to provide proper training, pressuring loan officers and underwriters to originate, approve, and close large quantities of loans on very short turnaround times, paying improper incentive bonuses to underwriters to further incentivize them to approve FHA loans, and employing lax and inconsistent underwriting standards and controls, *id.* ¶¶ 44, 46-49, 85, 86; the significant worsening of the loan quality problems, including a month-by-month breakdown of the material and moderate violation rate found by QA for retail FHA loans from May 2001 through January 2003, *id.* ¶¶ 52-54; a discussion of five examples of loans for which Wells Fargo submitted a false individual loan certification and a false claim for FHA insurance during the period May 2001 through January 2003, *id.* ¶¶ 57-81; the continuation of the severe loan quality problems from February 2003 through October 2005, including a month-by-month breakdown of the material and moderate violation rate, *id.* ¶¶ 84-85, 87-89; Wells Fargo management's continued awareness of the problems, continued failure to take effective action to address the issues, and continued failure to report the loan quality problems to HUD; *id.* ¶¶ 84-89; a month-by-month breakdown of the material and moderate violation rate for retail FHA

loans from February 2003 through October 2005, *id.* ¶ 89; a discussion of five examples of loans for which Wells Fargo submitted a false individual loan certification and a false claim for FHA insurance during the period February 2003 through October 2005, *id.* ¶¶ 90-115; and the bank's motive for engaging in reckless origination and underwriting practices, failing to remedy or report its loan quality problems, and  submitting thousands of false individual loan certifications and false claims to HUD for FHA insurance, *id.* ¶¶ 2-5, 44-45, 82, 117.

Similarly, with respect to the second scheme, the Government has laid out its claim in detail, including specifying the quality control and self-reporting requirements at issue, FAC ¶¶ 24-30; Wells Fargo's QC practices, *id.* ¶¶ 31-36; the bank's reporting of its QC findings to senior management, *id.* ¶¶ 34, 36; management's knowledge of the self-reporting requirement and failure to self-report any loans prior to October 2005 and woefully inadequate reporting thereafter, *id.* ¶¶ 51, 55, 84, 122-23; Wells Fargo's false representations to HUD that it would comply, and had been complying, with the self-reporting requirement, *id.* ¶¶ 122, 126; Wells Fargo management's decisions, behind closed doors, to establish a working group to address self-reporting and then to construe the requirement so narrowly as to virtually eliminate it, *id.* ¶¶ 123-35; Wells Fargo's motive for failing to self-report its bad loans to HUD and for submitting false claims to HUD for FHA insurance payments when those bad loans defaulted, *id.* ¶¶ 45, 130-35; and a list of each bad loan that Wells Fargo failed to self-report, including separate lists of the loans for which the bank submitted and caused to be submitted a false claim to HUD, *id.* Exs. A-C.

Accordingly, the Amended Complaint plainly sets forth the details of the alleged fraud with sufficient particularity.  Indeed, courts have specifically sanctioned what the Government

has done here – pled "a complex and far-reaching fraudulent scheme with particularity, and provide[d] examples of specific false claims submitted to the government pursuant to that scheme[.]" *U.S. ex rel. Bledsoe v. Cmty. Health Sys.,* 501 F.3d 493, 510 (6th Cir. 2007); *see also U.S. ex rel. Franklin v. Parke-Davis,* 147 F. Supp. 2d 39, 49 (D. Mass. 2001) (where allegations are "complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible"); *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004) (same).

Wells Fargo's arguments to the contrary focus almost exclusively on the first of the fraudulent schemes alleged by the Government – the bank's reckless certification of ineligible loans between May 2001 and October 2005 – and rest upon a confounding refusal to accept the allegations in the Amended Complaint.  First, Wells Fargo amazingly (and mistakenly) states that "no actual claims for payment are even pleaded" by the Government.  WF Mem. 19.  To the contrary, the Amended Complaint lists by loan number the 1,443 materially deficient FHA loans that Wells Fargo failed to self-report as required and for which a false claim for FHA insurance was submitted to HUD.  FAC ¶ 135, Exhs. B & C.  In addition, the FAC provides ten examples of mortgage loans originated by Wells Fargo's retail business – identified by street name, city, and FHA case number – and the precise ways in which the bank's underwriting for those loans materially failed to meet HUD requirements.  *Id.* ¶¶ 57-81, 91-115.  Wells Fargo's assertion that the Government must plead the details of each of the thousands of loans for which a false claim

22

was submitted, WF Mem. at 19, is simply not the law.  *See, e.g.*, *Franklin*, 147 F. Supp. 2d at 49; *Int'l Motor Sports Group*, 1999 WL 619633, at *4.[7]

Second, Wells Fargo redrafts the allegations as if the bank's individual underwriters were the defendants, so that it can argue that the Government has failed to identify each individual underwriter and allege that each "knew" the individual loan certification "was false at the time of certification."  WF Mem. at 22.  But the bank's premise is incorrect.  Where, as here, plaintiff "has alleged that the corporation has committed the fraudulent acts, it is the identity of the corporation, not the identity of the natural person, that the relator must necessarily plead with particularity."  *Bledsoe*, 501 F.3d at 506.  Indeed, in a case cited by Wells Fargo, the Sixth Circuit rejected the contention that the relator had to "plead the identity of the specific individual employees within the defendant corporation who submitted false claims to the government" because it was "not required by the FCA or Rule 9(b)."  *Id.*; *see also Huron*, 2011 WL 253259, at *2-*3 & n.3 (denying motion to dismiss even though complaint only alleged, *inter alia*, that the false statements were "authored by Huron Corporation") (citing *Bledsoe*); *In re Leslie Fay Companies, Inc. Sec. Litig.*, No. 92 Civ. 8036 (WCC), 1993 WL 438927, at *3 (S.D.N.Y. Oct. 27, 1993).  The focus of the FAC is on the bank itself:  the Government alleges that Wells Fargo knowingly allowed its underwriters to falsely certify that loans were underwritten in accordance

---

[7] Courts even decline to require the details of each and every false claim in the ultimate proof, much less pleading, of fraud, stating that "sampling of similar claims and extrapolation from the sample is a recognized method of proof."  *United States v. Lahey Clinic Hospital, Inc.*, 399 F.3d 1, 18 n.19 (1st Cir. 2005) (citing the 9th and D.C. Circuits); *see also United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008); *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, No. 11 Civ. 2375 (JSR), 2013 WL 440114, at *36  (S.D.N.Y. Feb. 5, 2013) (reaffirming the use of sampling to prove liability and damages in a contract case regarding the underwriting of mortgage loans in a loan pool).

with HUD rules and eligible for FHA insurance, when they were not, and submitted or caused the submission of false claims when the loans defaulted.

Third, Wells Fargo's reliance on the court's dismissal of the *qui tam* complaint in *U.S. ex rel. Cericola v. Fed. Nat'l Mortg. Assoc.*, 529 F. Supp. 2d 1139 (C.D. Cal. 2007), to support its 9(b) argument is misplaced.  WF Mem. at 23-24.  Rather than supporting the bank's position, *Cericola* makes clear that the complaint therein failed because it lacked the detail found here. *Cericola*, 529 F. Supp. 2d at 1145-46.  In particular, the "general" allegations in *Cericola* made "no mention of any actual loans, or any specific description of types of loans, allegedly submitted to the government . . . [and] amount[ed] to an assertion that, because Fannie Mae participated in the relevant market and the pertinent governmental program, it must have been engaged in fraudulent activity." *Id.* at 1146.  Indeed, "the only specific allegation [wa]s that, *based upon Plaintiff's experience with Title I loans*, approximately 70% of the loans originated in the 1995-98 period were ineligible for Title I insurance, and Fannie Mae purchased approximately 28,000 Title I loans during that period." *Id.* at 1145 (emphasis added).   That is not the situation here, as the Amended Complaint details Wells Fargo's reckless loan origination and underwriting on a month-to-month basis based on the bank's own QA findings and identifies the precise loans that Wells Fargo failed to self-report and for which a false claim was submitted.

Finally, Wells Fargo argues in passing that the Government has failed to plead successor liability with respect to the conduct of Wells Fargo Home Mortgage Inc. ("WFHM"), yet attaches no documents or affidavits supporting its factual claim that WFHM was the entity that submitted some of the false claims at issue.  WF Mem. at 18.  Online research indicates that there may have been a legal merger between WFHM and Wells Fargo Bank, N.A., in 2004.

24

Regardless, the defendant national bank is liable for WFHM's misconduct as a matter of law (which the bank did not dispute). *See* 12 C.F.R. § 5.33(g)(4)(v); *see also Del. Ins. Guar. Ass'n v. Christiana Care Health Servs.*, 892 A.2d 1073 (Del. 2006) (successor by merger takes on the liability of the predecessors). However, since this argument did not appear in the bank's motion to dismiss the original complaint, and the Amended Complaint identifies WFHM as a current subsidiary of defendant Wells Fargo, FAC ¶ 9, if the Court credits this passing argument, the Government respectfully requests leave to amend its complaint to allege successor liability. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").

### III.   THE AMENDED COMPLAINT STATES A CLAIM FOR VIOLATIONS OF THE FALSE CLAIMS ACT

Under Rule 12(b)(6), a complaint should survive if it has "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Amended Complaint alleges that Wells Fargo violated three prongs of the FCA: former 31 U.S.C. § 3729(a)(1) (2006) (and, as amended, 31 U.S.C. § 3729(a)(1)(A)), for submitting and causing false claims to be submitted; former 31 U.S.C. § 3729(a)(2) (2006) (and, as amended, 31 U.S.C. § 3729(a)(1)(B)), for using false statements in support of false claims; and former 31 U.S.C. § 3729(a)(7) (2006) (and, as amended, 31 U.S.C. § 3729(a)(1)(G)), for using false statements to avoid an obligation to repay the Government. FAC ¶¶ 138-167. In its

25

motion, Wells Fargo argues that the Government did not allege causes of action under the first two prongs above because (i) the alleged false statements purportedly are not a condition of payment, and (ii) the FCA requires proximate causation of damages, which supposedly has not been alleged.  Wells Fargo further argues that the elements of a cause of action under the third prong, for reverse false claims, have not been pled, and that all of the Government's FCA claims arising prior to June 25, 2006 are time barred.  These arguments are meritless for the reasons discussed below.

### A. The Government Adequately Pled That Wells Fargo Knowingly Submitted and Caused to Be Submitted False Claims to HUD, and Knowingly Made or Caused to Be Made False Statements to HUD Material to Those Claims

To plead a cause of action under former § 3729(a)(1), the Government must allege that Wells Fargo (1) made, or caused to be made, a claim, (2) to the Government, (3) that was false or fraudulent, (4) knowing of its falsity.  *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 1885 (2011).[8]  To allege a claim under 31 U.S.C. § 3729(a)(1)(B), the Government must allege that Wells Fargo (1) made, used, or caused to be made or used, a statement, (2) to the Government, (3) that was knowingly false or fraudulent, (4) and was material to a payment decision by the Government.  *See U.S. ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 655-56 (S.D.N.Y. 2011).  The allegations in the Amended Complaint easily satisfy these elements.

Specifically, with regard to its self-reporting claim, the Government has alleged that Wells Fargo identified through its QC process, after closing, 6,558 loans that had not been properly underwritten, contained unacceptable risk, and did not qualify for FHA insurance.

---

[8] These elements are also sufficient to plead a cause of action under the current § 3729(a)(1)(A).

Nonetheless, Wells Fargo failed to notify HUD as required of 6,320 of these materially deficient loans; failed to correct the individual loan certifications for these loans, even though the bank knew that the loan certifications were false, knew that HUD had relied on those certifications in endorsing the loans for insurance, and knew that HUD would rely on those certifications in paying a claim for FHA insurance in the event the loans defaulted; and submitted false claims, and caused third parties to submit false claims, to HUD for FHA benefits when these loans defaulted.   FAC ¶¶ 150-162.   These factual averments suffice to allege that Wells Fargo knowingly submitted and caused to be submitted false claims to the Government and knowingly made or used a false statement that was material to the Government's decision to make a payment.  *See, e.g., Kirk*, 601 F.3d at 113; *City of New York*, 808 F. Supp. 2d at 655-56.

Similarly, with respect to its reckless underwriting claim, the Government alleges that Wells Fargo engaged in a general practice of reckless loan origination and inadequate underwriting that was fueled by the bank's own policies and practices; that the bank's management was aware of its very serious loan quality problems – including in certain months that nearly half of the retail FHA loans that the bank certified for FHA insurance were ineligible – but took no effective action to address the problems; that Wells Fargo concealed its serious loan quality problems from HUD and continued to certify its entire portfolio of retail FHA loans for insurance, including thousands of loans that contained unacceptable risk and were ineligible for FHA insurance; that a truthful individual loan certification is a condition of payment of FHA insurance; and that Wells Fargo submitted false claims, and caused third parties to submit false claims, to HUD for FHA benefits for loans that were ineligible for the FHA program.  *Id.* ¶¶ 138-

27

149.  These allegations also plainly satisfy the elements of the reckless underwriting FCA claims. *See, e.g., Kirk*, 601 F.3d at 113; *City of New York*, 808 F. Supp. 2d at 655-56.

       1.    <u>Wells Fargo's Condition of Payment Argument Is Wrong</u>

In response, Wells Fargo employs an argument utterly divorced from the Government's allegations, arguing that its false statements about the quality of its loans and false claims for FHA insurance payments somehow are non-actionable, false implied certifications.  WF Mem. at 25-31.  That is not a correct statement of the facts alleged in the Amended Complaint or the law.

As a threshold matter, the FCA reaches both factually and legally false claims.  *U.S. ex rel. Mikes v. Straus*, 274 F.3d 687, 696-97 (2d Cir. 2001).  Here, contrary to Wells Fargo's characterization of the FAC as attempting to allege claims for legally false implied certifications, the Government has alleged that Wells Fargo's individual loan certifications and claims for FHA insurance payments were factually false.  Specifically, by falsely certifying that loans met HUD's strict underwriting requirements, Wells Fargo caused HUD to guaranty thousands of loans that had not been properly underwritten, contained unacceptable risk, and were ineligible for FHA insurance.  And when these bad loans defaulted, Wells Fargo submitted false claims for the insurance proceeds.  As these claims were factually false, s*ee United States v. Bornstein*, 423 U.S. 303, 307 (1976) (claims were factually false where goods were provided and marked as if they met certain quality specifications, when they did not), the Court need not analyze whether they are also "legally false," *see Kirk*, 601 F.3d at 114 (where claims are "[factually false], application of the FCA is fairly straightforward).

Regardless, the Amended Complaint also states causes of action for legally false claims. The FCA reaches two types of "legally false" claims: "express false certification" and "implied

false certification" claims.   A claim is expressly false where a claimant expressly, but falsely, certifies compliance with a statutory, regulatory, or contractual term, where compliance is not "irrelevant to the Government's disbursement decisions."  *Mikes*, 274 F.3d at 697.  A claim is impliedly false where a claimant, through the demand for payment, impliedly but falsely represents compliance with prerequisites for payment.  *See id.* at 699-700.  While the Amended Complaint's allegations support Wells Fargo's liability under both legally false claims theories, the individual loan certifications and the false claims for FHA insurance payments that the bank submitted and caused to be submitted were expressly false and highly relevant to the FHA's decision to insure and pay claims on the loans.  *Kirk*, 601 F.3d at 114-115; *United States v. Eghbal*, 548 F.3d 1281, 1283-84 (9th Cir. 2008) (false statements to induce Government to provide a loan guarantee constitute a false claim).   Accordingly, the Government has stated an express false certification claim and the Court need go no further because the requirement upon which Wells Fargo relies – that a false certification must be a condition of payment – applies only to *impliedly* false, not expressly false, certifications.  *See Mikes*, 274 F.3d at 700.

In any event, Wells Fargo assertion that the Amended Complaint fails to state a claim because "the certifications regarding self-reporting or quality control . . . relate to 'conditions of participation,' not 'conditions of payment,'" is mistaken.  WF Mem. at 27; *see also id.* at 29.  This argument is based on a complete misreading of the Amended Complaint.  The false claims that form the basis of Counts 1 (reckless underwriting) and 3 (self-reporting) are not, as Wells Fargo suggests, the annual certifications (which certify among other things the bank's compliance with quality control, including self-reporting), but rather the individual loan certifications for FHA insurance and the claims for FHA insurance payments, both of which are

conditions of payment.  FAC ¶¶ 138-144, 150-56.[9]  Likewise, while the annual certifications do constitute false statements that the bank submitted material to its false claims in Counts 2 and 4, there are numerous other false statements listed, *see id.* ¶ 160, including most importantly the false individual loan certifications which the Government has alleged (and the Court must accept as true for purposes of this motion) were "a condition of payment of FHA insurance."  *Id.* ¶¶ 148, 155.  Accordingly, Wells Fargo's arguments as to the annual certifications are irrelevant.

Regardless, the annual certification is both a condition of participation *and* a condition of payment.  *See, e.g.*, *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1176 (9th Cir. 2006) ("The University argues that the ban is merely a condition of *participation*, not a condition of *payment*.  But in this case, that is a distinction without a difference. . . .  These conditions are also 'prerequisites' and the '*sine qua non*' of federal funding, for one basic reason:  if the University had not agreed to comply with them, it would not have gotten paid.") (emphasis in original); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786 (4th Cir. 1999) (same).  The annual certification, states, *inter alia*, that "the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval . . ."  FAC ¶ 37.  There are only a handful of applicable requirements that are "necessary to maintain" Wells Fargo's DEL approval, and one is the implementation of a proper quality control program.  *Id.*  Given that a failure to meet quality control requirements is a basis for revoking DEL status, s*ee* Mortgagee Letter 89-32, 1989 WL 1128166, at *1 (HUDML Dec. 26, 1989), a false annual

---

[9] The individual loan certifications are implied false certifications because "the [DEL] determines that the proposed mortgage is eligible for insurance under the applicable program regulations[,]" 24 CFR § 203.5(a), and, once the loan is endorsed, if no flags are raised and the FHA case number is valid, the claim is processed and paid automatically, FAC ¶¶ 40-43.  Thus, implicit in the submission of claims is that they are for loans eligible for FHA insurance under the applicable rules and regulations, which they were not.  *City of New York*, 808 F. Supp. 2d at 652.

certification is a condition of payment because if a lender is not eligible to participate in the FHA program, then it would not be entitled to insurance payments for the loans that it originated. *See Harrison*, 176 F.3d at 786; *United States v. Education Management Corp*, 871 F. Supp. 2d 433, 457 (W.D. Pa. 2012) (compliance with incentive compensation ban was condition of participation and payment) (collecting cases).[10]  Furthermore, since "[c]onditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment[,]" *U.S. ex rel. Conner v. Salina Regional Health Ctr.*, 543 F.3d 1211, 1220 (10th Cir. 2008), the fact that HUD may seek indemnification for "mortgages originated in violation of [FHA] requirements," 12 U.S.C. § 1708(c)(3)(E)(v), supports the conclusion that annual certifications are conditions of both eligibility and payment.[11]

Wells Fargo also mistakenly suggests that the Government is claiming that the "program-wide certifications" in the annual certification "are *implied* in the underwriters' individual loan

---

[10] Wells Fargo's inapposite case citations do not support dismissal.  Indeed, all three cases that Wells Fargo cites for the argument that the representations here are conditions of participation, not payment, arise in the health care context and involve certifications alleged to be false because of the medical provider's or supplier's failure to meet standards of care, or some technical defect such as the manner in which inventory should be filled.  *See* WF Mem. at 27-29.  Further, Wells Fargo misstates the law after *Mikes*, arguing that, to base an FCA claim upon implied falsity (not the Government's primary theory here), the underlying regulation must expressly say that the requirement is a condition for payment.  However, the Second Circuit in *Mikes* confined the added requirement to cases based on impliedly false claims by medical providers, to avoid "the federalization of medical malpractice[.]"  274 F.3d at 700.  Indeed, the court in *City of New York* distinguished *Mikes* on that basis.  808 F. Supp. 2d at 653 ("[T]he Second Circuit restricted its holding to FCA claims brought against 'a medical provider.' . . . It is clear, therefore, that *Mikes* does not directly control this case[.]" (quoting *Mikes*, 274 F.3d at 700)).

[11] *See also* 12 U.S.C. § 1717z-21(c)(1) (2006) ("If the Secretary determines that a mortgage insured by a mortgagee pursuant to delegation of authority under this section was not originated in accordance with the requirements established by the Secretary, and the Secretary pays an insurance claim …, the Secretary may require the mortgagee … to indemnify the Secretary for the loss."); 24 CFR § 203.255(g) ("Indemnification" requirements and procedures); 24 CFR § 203.5(d)(4) ("Mortgagee sanctions" includes catch-all).

certifications." WF Mem. at 30 (emphasis in original). Again, not so. The Government is not alleging that the individual loan certifications are false because of inadequate loan review by Wells Fargo's QA department. Rather, they are expressly false because Wells Fargo's underwriters routinely did not perform the due diligence necessary to ensure that the loans qualified for FHA insurance and falsely certified that the loans met program requirements.

Moreover, contrary to Wells Fargo's suggestion (WF Mem. at 29), the individual loan certifications do not merely certify the underwriter's subjective belief that the specific mortgage was eligible for FHA insurance. Rather, they contain a series of specific certifications by the "lender" to "induce [HUD] to issue a firm commitment for mortgage insurance or a Mortgage Insurance Certificate under the National Housing Act." Baruch Decl. Ex. B at 1. Among those certifications are (1) that the information contained in the loan application was obtained directly from the borrower and is true to the best of the lender's knowledge and belief, (2) that verification of employment and deposits were requested and received, (3) that the proposed loan meets the income and credit requirements of the governing law, (4) that for manually underwritten mortgages, the underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and [] used due diligence in underwriting this mortgage," and (5) that for automated underwritten loans, the underwriter "certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id.* at 1-3. Also, the underwriter must state that "this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement Program," and "make all certifications required for this mortgage

as set forth in HUD Handbook 4000.4." *Id.* at 3.[12]  Wells Fargo does not dispute that a truthful individual loan certification is a condition of payment, nor could it.  *See* FAC ¶¶ 143, 148; *see Eghbal*, 548 F.3d at 1283-84.[13]  Thus, the bank's implied certification argument is erroneous.

> 2.    Wells Fargo's Causation Argument Is Wrong

Second, Wells Fargo mistakenly argues that the Government must plead proximate causation, which the bank insists means the Government must state "how th[e material violation of applicable HUD-FHA requirements] was the cause" of the loan's default and that it has failed to do so.  WF Mem. at 32.  Not only is the law unsettled as to whether "but for" or "proximate" causation is the appropriate test in FCA cases, but where courts have applied proximate causation, they have not required the pleading formulation advanced by the bank.  Here, the Government has met both the "but for" standard, which should be applied, and the proximate cause standard as described in the very cases Wells Fargo cites.

In arguing that "'but for' causation allegations are insufficient under the FCA," Wells Fargo relies on *United States v. Hibbs*, 568 F.2d 347, 349 (3d Cir. 1977), for the proposition that "the FCA requires proximate causation, *i.e.*, a causal connection between the actual loss and fraudulent conduct, in these circumstances."  WF Mem. at 31-32.  *Hibbs*, however, is far from

---

[12]  HUD Handbook 4000.4 contains similar certifications regarding the underwriters' due diligence, including with respect to the mortgagor's use of the property as a primary residence, income, ability to pay the mortgage, and credit.

[13]  Wells Fargo also does not contest that false individual loan certifications are both false claims and false statements material to payment of false claims.  A false statement is material if it has a "natural tendency to influence, or is capable of influencing," HUD's payment decision.  *See U.S. ex rel. Feldman v. Van Gorp*, No. 03 Civ. 8135 (WHP), 2010 WL 5094402, at *2 (S.D.N.Y. Dec. 9, 2010) (internal quotations omitted).  Accordingly, the Government need only show that HUD "may not have paid."  *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1170 (10th Cir. 2010); *see also Kirk*, 601 F.3d at 116.

settled law and should not be followed here.  Indeed, the Seventh Circuit explicitly rejected the

*Hibbs* standard, holding that "a demonstration that the government would not have guaranteed

the loan 'but for' the false statement is sufficient to establish the causal relationship between the

false claim and the government's damages necessary to permit recovery under the False Claims

Act." *United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992).  In

rejecting *Hibbs*, the court explained:

> If the government would not have made a financial commitment absent the
> claimant's false statement, and the government is nevertheless required to pay a
> mortgage insurance claim or a loan guaranty, the government has suffered
> damage "because of" the false statement, as required by the [FCA].  We disagree
> with the statement in *Hibbs* that "the same loss would have been suffered by the
> government had the certifications been accurate and truthful."

*Id.* (quoting *Hibbs*, 568 F.2d at 351, and ruling in an FCA case that even though a fire caused the

car dealership to default on the loan, the Government had sufficiently demonstrated that the

bank's misrepresentations about the loan had caused the Government's damages).

Moreover, in a Third Circuit decision subsequent to *Hibbs*, the court found that the more

restrictive causation requirement in *Hibbs* can be satisfied by showing either that a government

grant "might not have been approved but for [the] false statements" or that the falsely omitted

information "could have made the difference in whether [the] grant was approved or not." *U.S.

ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 417 (3d Cir. 1999).  That standard has been

met here.  *See* FAC ¶¶ 37, 40-43.  The Amended Complaint alleges that Wells Fargo's failure to

underwrite FHA loans in compliance with HUD requirements bore directly upon the likelihood

that borrowers would meet their mortgage obligations and increased the risk of default, FAC ¶¶

46-119; and that absent the false loan certification, the loan would not have been insured and no

claim would have been paid, i*d.* ¶¶ 37, 40-43.  Nothing more is required.

Wells Fargo's citation to *U.S. ex rel. Fago v. M&T Mortg. Corp.*, 518 F. Supp. 2d 108, 122 (D.D.C. 2007), is misguided. WF Mem. at 32. There, proximate causation was lacking because the alleged falsity was "non-genuine signatures on various documents in the loan binders" such as termite infestation reports, which had no nexus to a mortgage's default. *Id.* at 121. Moreover, *Fago* quotes favorably from *United States v. Spicer*, 57 F.3d 1152 (D.C. Cir. 1995), whose ruling supports causation here. *See Fago*, 518 F. Supp. 2d at 121 (following *Spicer*). In *Spicer*, the defendant misrepresented certain facts on applications for mortgages to HUD. 57 F.3d at 1155. In reasoning directly applicable here, the D.C. Circuit held that plaintiffs had shown proximate causation because:

> Spicer's misrepresentations were material to HUD's determination that the mortgage applicants met the financial requirements to qualify for FHA-insured mortgages and had a sufficient personal financial stake in the properties to have the proper incentives to avoid default. The misrepresentations were thus more than a "but for" cause; they proximately caused HUD's losses when the buyers to whom HUD improvidently granted FHA-insured mortgages on the basis of Spicer's misrepresentations of their financial qualifications defaulted. . . . It is undoubtedly true that in each case other factors also "caused" the buyer's default, but that is of no moment, for as long as Spicer's misrepresentations were a material and proximate cause, they need not have been the sole factor causing HUD's losses.

*Id.* at 1159.

Similarly, other courts have found causation in FCA actions where "'the false information furnished to the government bore upon the likelihood of the [borrowers] meeting mortgage payments.'" *See, e.g., Eghbal*, 548 F.3d at 1248 (quoting *Hibbs*, 568 F.2d at 352); *see also United States v. Miller*, 645 F.2d 473, 475-76 (5th Cir. 1981) (holding that "the government has clearly alleged the necessary causation" in an FCA action alleging false statements in FHA loan applications "as to the credit worthiness and net worth of such home buyers" because those

35

statements "regarding the ability of purchasers to afford housing *could very well be* the major factor for subsequent defaults") (emphasis added); *United States v. Entin*, 750 F. Supp. 512, 519 (S.D. Fla. 1990) (false statements in connection with a Government loan application that "bear directly on credit worthiness" establish "an adequate causal relationship between the defendants' conduct, the disbursement of funds and the eventual loss") (distinguishing *Hibbs*).  And just last week, in rendering judgment for plaintiff in a case regarding the quality of underwriting of loans in an investment pool, Judge Rakoff held that causation was met where the breaches "caused plaintiff to incur an increased risk of loss," regardless of what actually caused the loans to default.  *Assured Guaranty Municipal Corp*, 2013 WL 440114, at *35 ("it is irrelevant to the Court's determination of material breach what Flagstar believes ultimately caused the loans to default, whether it is a life event or if the underwriting defects could be deemed 'immaterial' based on twelve months of payment.  Risk of loss can be realized or not; it is the fact that Assured faced a greater risk than was warranted that is at issue for the question of breach.") (internal quotation marks omitted).  Accordingly, the FAC adequately alleges causation.

## B.  The Government Properly Alleges Reverse False Claims

Wells Fargo's assertion that the Amended Complaint does not plead a cause of action for reverse false claims also fails as a matter of law.  *See* WF Mem. at 33-35.  The FCA renders liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government[.]"  31 U.S.C. § 3729(a)(7).[14]  "This is known as a reverse false claim because the

---

[14] Because a greater portion of the Government's claims fall within former § 3729(a)(7), its argument focuses on that section, but for the same reasons the Government also has pled claims under current § 3729(a)(1)(G).

effect of the defendant's knowingly false statement is a failure to pay the Government when payment is required." *United States v. Caremark, Inc.*, 634 F.3d 808, 815 (5th Cir. 2011); *see also United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 444-45 (S.D.N.Y. 1999). Consistent with § 3729(a)(7), the Government alleges that Wells Fargo made numerous false statements to avoid its obligation to reimburse or indemnify HUD with respect to the 6,320 bad loans that the bank knew it had falsely certified for FHA insurance.  FAC ¶¶ 120, 130, 163-67.

Wells Fargo's arguments to the contrary are threefold.  First, Wells Fargo asserts that the Amended Complaint fails to plead that the bank had an "obligation" to reimburse or indemnify HUD for these materially deficient loans.  WF Mem. at 34.  On the contrary, the Government specifically pleads that one of Wells Fargo's motives for not self-reporting its materially deficient loans was to avoid having to indemnify HUD.  FAC ¶ 130 (describing August 4, 2005 memo which cautioned that, "[b]y self reporting all significant audit results and suspected fraud to HUD on FHA originations, [Wells Fargo Home Mortgage] has potentially given HUD a list of loans which could result in indemnification from HUD."); *see also id.* ¶ 40 (describing indemnification procedure); Baruch Decl. Ex. F at 53 (Wells Fargo's offer to "work with HUD on indemnification parameters on 49 loans" ineligible for FHA insurance).

Second, Wells Fargo contends that the false records and statements that the Government relies upon are not "related to any obligation to pay or transmit money to the government."  WF Mem. at 35.  This flies in the face of the allegations in the Amended Complaint, which must be accepted as true on this motion.  *See* FAC ¶¶ 120-35, 165-67.

Third, Wells Fargo cites several cases for the proposition that no obligation for a specific and fixed amount is alleged.  WF Mem. at 35.  In contrast, however, with the cases upon which

37

Wells Fargo relies, the obligation here is not a potential fine,[15] but instead a specific obligation arising out of the relationship between HUD and Wells Fargo through which the bank was to indemnify HUD for loans that were discovered to be ineligible for insurance, the amount of which is specifically fixed to the amount of the FHA insurance claim.[16]   Moreover, Wells Fargo's cited cases incorrectly interpreted the "obligation" element.   In endeavoring to "address[] current confusion" in the very reverse false claim cases Wells Fargo cites, the U.S. Senate Judiciary Committee's 2009 Report on the FCA amendments rejects their narrow interpretation of former § 3729(a)(7), pointing out that the section "speaks of an 'obligation,' not a 'fixed obligation.'"   *See* Fraud Enforcement and Recovery Act of 2009, S. Rep. 111-10, 111th Cong., 1st Sess. 2009, 2009 U.S.C.C.A.N. 430, 441.   The Report further states that expressly "including contingent obligations such as 'implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship,' . . . reflect[] the Committee's view, held since the passage of the 1986 Amendments, that an 'obligation arises . . . where there is a relationship between the Government and a person that 'results in a duty to pay the Government money, whether or not the amount owed is yet fixed.'"   *Id.* (internal citations omitted); *see also U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1202 (10th Cir. 2006) (finding it

---

[15] *See* WF Mem. at 34 (citing *Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 739 (6th Cir. 1999) (alleged obligation was the potential "imposition of a fine, payment of liquidated damages, imposition of a tax, or forfeiture of property."); *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 774 (8th Cir. 1997) (stating belief that Congress did not consider an "obligation" under the former § 3729(a)(7) to include a "potential fine" and noting that the sanction for avoiding a postal fee is a "fine . . . not necessarily related to the amount of postage avoided or evaded"); *U.S. ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004) (potential fines or penalties for false emissions reports were not an obligation for reverse false claim liability).

[16] 12 U.S.C. § 1708(c)(3)(E)(v); 12 U.S.C. § 1717z-21(c)(1) (2006); 24 CFR § 203.255(g).

"significant that § 3729(a)(7) refers to 'an obligation' and not 'a fixed obligation,' "and agreeing" that there are instances in which a party is required to pay money to the government, but, at the time the obligation arises, the sum has not been precisely determined").

Accordingly, the Government has pled reverse false claims.

## C.  The FCA Claims That Arose Prior to June 25, 2006 Are Not Time Barred

Wells Fargo's argument that "any alleged FCA violation that arose prior to June 25, 2006 is time-barred" by operation of the FCA's statute of limitations, WF Mem. at 13, is mistaken.[17] As a threshold matter, the application of statutes of limitations to bar claims by the United States is especially disfavored.  *See Badaracco v. Comm'r*, 464 U.S. 386, 391 (1984).  Indeed, the Supreme Court recently reaffirmed the longstanding "rule that statutes of limitations are construed narrowly against the government."  *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 95 (2006) (citing *E.I. Dupont de Nemours & Co. v. Davis*, 264 U.S. 456 (1924)).  "This canon is rooted in the traditional rule *quod nullum tempus occurrit regi* – time does not run against the King. . .  A corollary of this rule is that when the sovereign elects to subject itself to a statute of limitations, the sovereign is given the benefit of the doubt if the scope of the statute is ambiguous."  *BP America*, 549 U.S. at 96 (citation omitted).  Accordingly, "precedent clearly h[olds] that no statute of limitations will block federal government actions unless Congress clearly and specifically says so."  *Capozzi v. United States*, 980 F.2d 872, 875 (2d Cir. 1992); *see*

---

[17]  Wells Fargo incorrectly suggests that the FCA statute of limitations for each of the Government's claims started to run on the date when the "claim for an FHA-insurance payment" on a defaulted mortgage loan was submitted to HUD.  WF Mem. at 13.  The Second Circuit has made clear that the limitations period for FCA claims commences on the date that the claim actually was paid.  *See U.S. ex rel. Kreindler & Kreindler v. United Tech. Corp*, 985 F.2d 1148, 1157 (2d Cir. 1993) (stating that the limitations period "'begins to run on the date the claim is made, or, if the claim is paid, on the date of payment.'") (quoting *Blusal Meats, Inc. v. United States*, 638 F. Supp. 824, 829 (S.D.N.Y. 1986), *aff'd*, 817 F.2d 1007 (2d Cir. 1987)).

*also Badaracco*, 464 U.S. at 391 ("Statutes of limitation sought to be applied to bar rights of the Government must receive a strict construction in favor of the Government.").  Moreover, as the party asserting a statute of limitations defense, Wells Fargo bears the burden of proving it.  *See, e.g.*, *Katt v. City of New York*, 151 F. Supp. 2d 313, 348-49 (S.D.N.Y. 2001) (subsequent history omitted); *United States v. Carell*, 681 F. Supp. 2d 874, 883 (M.D. Tenn. 2009).

Here, Wells Fargo cannot meet its burden to show that the Government is confined to a six year limitations period, instead of the alternative ten year limitations period provided in the FCA under § 3731(b)(2).[18]  Under the latter provision, the Government may bring suit within up to ten years of a false claim violation provided that the suit was commenced within three years of the date that "the official of the United States charged with responsibility to act in the circumstances" knew or reasonably should have known of the facts material to the right of action.  Wells Fargo contends that HUD-OIG's 2004 audit report conclusively establishes that the official with responsibility to act knew the facts material to the Government's causes of action in the Amended Complaint more than three years before the complaint was filed.  *See* WF Mem. at 14-16.  That assertion is wrong for a host of reasons.

First, Wells Fargo's argument is premature.  A "motion to dismiss based on the statute of limitations should be denied if any issues of fact are involved."  *Carell*, 681 F. Supp. 2d at 883; *see also Ortiz v. Cornetta*, 867 F.2d 146, 149 (2d Cir. 1989) (motion to dismiss based on statute of limitations should not be granted unless it appears beyond doubt that claim is time barred;

---

[18] Section 3731(b) of the FCA provides: A civil action under section 3730 may not be brought– (1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.  31 U.S.C. § 3731(b).

disputed issues of fact preclude dismissal). In this context, "courts have repeatedly recognized that the question of when the responsible government official 'should have known' facts material to the FCA or equity claims is generally 'a complex factual determination.'" *Carell*, 681 F. Supp. 2d at 884 (quoting *U.S. ex rel. Wyke v. American Int'l Inc.*, No. 01-60109, 2005 WL 1529669, at *3 (E.D. Mich. June 20, 2005) and citing *U.S. ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 78 (D.D.C. 2003) and *United States v. Hess*, 194 F.3d 1164, 1175 (10th Cir. 1999)); *see also United States v. BNP Paribas SA*, __ F. Supp. 2d __, 2012 WL 3234233, at *7-8 (S.D. Tex. Aug. 3, 2012). Because Wells Fargo's motion to dismiss on statute of limitations grounds raises numerous factual issues, it should be denied. *See, e.g.*, *BNP Paribas*, 2012 WL 3234233, at *7 (ruling that the "allegations contained in the United States' Complaint make clear that the question of whether this action was filed" more than 3 years after a DOJ official knew or reasonably should have known of facts material to the right of action "is a question of fact that cannot be answered based solely on the pleadings before discovery has begun"); *Carell*, 681 F. Supp. 2d at 884 (same); *United States v. Slaey*, No. 06-4930, 2007 WL 2142361, at *3 (E.D. Pa. July 24, 2007) ("[T]he applicability of the [FCA] tolling provision is a partly fact-driven inquiry that cannot be decided at the pleadings stage.").

Specifically, the Government alleges in the First Amended Complaint that the United States Department of Justice ("DOJ") learned the facts material to its claims against Wells Fargo "no earlier than 2011, the year in which the United States Attorney's Office for the Southern District of New York [] commenced its investigation resulting in this action." FAC ¶¶ 118, 136. That fact must be presumed true on a motion to dismiss. *See, e.g.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 165 (2d Cir. 2005). Moreover, there is nothing in the Amended Complaint

41

which establishes that any DOJ official knew or reasonably should have known that Wells Fargo was committing fraud by falsely certifying retail FHA loans for insurance during the period May 2001 through October 2005, and failing to self-report thousands of materially deficient FHA loans to HUD during 2002 through 2010.

In response, Wells Fargo asserts that DOJ's knowledge is not the relevant inquiry for purposes of determining the timeliness of the Government's complaint under § 3731(b)(2); rather, the bank posits that HUD's knowledge was sufficient because the "HUD Inspector General . . . [was] certainly the official with responsibility to act" under the False Claims Act. WF Mem. at 15; *see also id.* at 3. That contention is meritless. In interpreting the FCA's tolling provision, courts have repeatedly held that the "official of the United States charged with responsibility to act in the circumstances" is an official within DOJ. *See, e.g.*, *United States v. Island Park*, 791 F. Supp. 354, 363 (E.D.N.Y. 1992); *United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1009 (N.D. Ill. 2001); *Jana, Inc. v. United States*, 34 Fed. Cl. 447, 451 n. 6 (Fed. Cl. 1995) ("the discovery that triggers 31 U.S.C. § 3731(b)(2) is not knowledge of the fraud by *any* government official, but knowledge of the fraud by an official having the authority to initiate litigation under the Act, generally considered to be an official at the Civil Division of the Department of Justice, which has exclusive litigating authority under the False Claims Act"); *United States v. Macomb Contracting Corp.*, 763 F. Supp. 272, 274 (M.D. Tenn. 1990) (same). That makes sense given that DOJ's Civil Division, including the United States Attorney's offices, is specifically charged with responsibility for FCA litigation. *See* 28 C.F.R. § 0.45(d). It is also consistent with the plain language and structure of the FCA, which provides that FCA actions may be filed only by the Attorney General or a private person in the name of the United

States.  *See* 31 U.S.C. § 3730(a), (b); *Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 547 (Fed. Cir. 1988) ("Regardless of who initiates the suit, the Attorney General is *specifically* authorized to administer [FCA] claims for the government.  No other agency is empowered to act under the statute.") (emphasis in original).[19]

Alternatively, Wells Fargo asserts that HUD's knowledge can be "attributed to the Justice Department" because the 2004 HUD-OIG audit report was "widely disseminated throughout HUD, reported by the media at the time, posted on HUD's website . . ., and featured prominently in an October 2004 [HUD-OIG report to Congress]."  WF Mem. at 14.  This assertion cannot withstand analysis.  First, Wells Fargo fails to provide any citation for its claim that the audit report was "widely disseminated throughout HUD," and there is nothing in the Amended Complaint to substantiate that claim, which clearly raises an issue of fact.  Further, the "report[] by the media" to which Wells Fargo cites is a National Mortgage News article which contains a single sentence reporting that underwriting deficiencies were found in a small number of loans.  *See* WF Mem. at 14 n.13.  That passing reference in a publication of this nature plainly does not support the attribution of HUD's knowledge to DOJ.  Likewise, the fact that the audit report allegedly was posted on HUD's website and cited in a report to Congress does not establish as a matter of law that DOJ knew or should have known of its contents.  *See also infra* at n. 20.

---

[19] Wells Fargo's reliance on *U.S. ex rel. Kreindler & Kreindler v. United Tech Corp.*, 777 F. Supp. 195 (N.D.N.Y. 1991), *aff'd on other grounds*, 985 F.2d 1148 (2d Cir. 1993), to support its argument that HUD-OIG was the responsible official under § 3731(b)(2) is unavailing.  *See* WF Mem. at 16 n. 17.  Wells Fargo fails to mention that on appeal, the Second Circuit determined that the *Kreindler* district court should not have reached the statute of limitations issue. *Kreindler*, 985 F.2d at 1155.  Accordingly, courts have recognized that the district court decision is of "limited precedential value."  *Tech Refrigeration*, 143 F. Supp. 2d at 1010 n. 3; *U.S. ex rel. Condie v. Board of Regents of the University of California*, No. C89-3550-FMS, 1993 WL 740185, at *2 (N.D. Cal. Sept. 7, 1993).

Second, in any event, even if DOJ had been aware of the 2004 HUD-OIG audit report, the findings in the audit were not sufficient to trigger the statute of limitations.  In keeping with the FCA's legislative history, courts have recognized that the "'should have known' provision should be applied sparingly, and defendants are protected against inordinate delay by the ten-year outside limit contained in the statute." *Tech Refrigeration*, 143 F. Supp. 2d at 1010; *see also Condie*, 1993 WL 740185, at *2 (same).  As indicated in the Congressional record, "'courts should be leery of finding that the Government had knowledge of the existence of a possible cause of action based merely upon the discovery of irregularities that fall short of a concrete suspicion that fraud has occurred.'"  *Condie*, 1993 WL 740185, at *2 (quoting 132 Cong. Rec. S11244-45 (daily ed. Aug. 11, 1986)).  Here, a review of the contents of the 2004 HUD-OIG audit report demonstrates that its findings were not sufficient to show as a matter of law that DOJ knew or should have known of the fraud alleged in the Amended Complaint.

Indeed, HUD-OIG's findings with respect to Wells Fargo's inadequate underwriting were not even the lead finding in the 2004 audit report.  Rather, the lead finding – and the one that garnered the very limited media attention – was that "Wells Fargo improperly submitted 2,325 [FHA] loans, totaling $265,381,849, for late endorsement."  *See* Baruch Decl. Ex. F at p. i.; WF Mem. at 14 n. 13.  This conduct does not relate to the Government's claims alleged in the Amended Complaint.[20]  With respect to underwriting, the audit report states that HUD-OIG

---

[20] Wells Fargo's assertion (WF Mem. at 14-15) that HUD-OIG's findings with respect to the bank's underwriting deficiencies were "featured prominently" in the agency's semiannual report to Congress and were the subject of a caution that the conduct "significantly increased the risk to the FHA insurance fund," is wrong.  The latter statement was made in connection with the audit's lead finding concerning Wells Fargo's improper submission of $265 million of FHA loans for late endorsement, not with respect to the bank's underwriting deficiencies, *see* Baruch

sampled only 74 defaulted FHA loans originated between January 1, 2001 and December 31, 2002, and concluded that "Wells Fargo did not originate 61 loans, totaling $6,664,470, in accordance with HUD's requirements." Baruch Decl. Ex. F at p. i. Tellingly, the report does not use the word "fraud" or "reckless" or even "improper" in describing this finding. Moreover, in responding to Wells Fargo's comments concerning this finding, HUD-OIG wrote that, "[b]ased on the initiatives Wells Fargo described to us during the audit and in its formal response," it understood the bank was improving its origination and underwriting processes for FHA loans. *Id.* at 27. HUD-OIG went on to recommend that HUD, through its administrative process, require Wells Fargo to indemnify or reimburse the agency with respect to 50 of the 74 defaulted loans and verify that the bank has implemented an effective control environment to prevent the submission of loans that do not meet HUD requirements. *Id.* at 28.

This finding plainly did not put DOJ on notice of the false claims alleged in the Amended Complaint. As Wells Fargo candidly admits, "the issues HUD identified in the 2004 HUD-OIG Audit were dealt with as routine administrative matters by the federal agency." WF Mem. at 6. There was no finding of fraud or even intentional misconduct. Moreover, the underwriting portion of the audit only dealt with a small sample of *defaulted* loans, and HUD-OIG reported that Wells Fargo was "making great strides in improving its origination and underwriting processes for FHA loans." Baruch Decl. Ex. F at 27. That is certainly not a basis for ruling, as a matter of law, that DOJ was on notice of misconduct meriting a False Claims Act investigation. And, moreover, the 2004 audit report does not address at all the Government's separate FCA claims with respect to Wells Fargo's failure to self-report materially deficient loans.

---

Decl. Ex. G at 11, and the entire discussion of the 2004 audit in the report to Congress takes up half a page of the 133-page document, *id.*

Wells Fargo's heavy reliance on the decision in *United States v. Island Park*, 791 F. Supp. 354 (E.D.N.Y. 1992), is misplaced.  WF Mem. at 14, 16.  First, *Island Park* was decided on summary judgment, not, as here, in the context of a motion to dismiss where there is no factual record.  791 F. Supp. at 357; *see BNP Paribas*, 2012 WL 3234233, at *7 (distinguishing *Island Park* in denying Rule 12(b)(6) statute of limitations motion).  Second, the record in *Island Park* showed that HUD-OIG "conducted an extensive internal investigation into allegations of misconduct," *Island Park*, 791 F. Supp. at 358, concluded that the "government had legally actionable claims," *id.*, and detailed the "extensive wrongdoing" by Island Park officials and residents, *id.* at 363.  In addition, the HUD-OIG report had been "widely disseminated throughout the United States government" such that its contents were "common knowledge . . . at all levels of the federal government," *id.*  None of these factors is present on the record here with respect to the 2004 audit of Wells Fargo.  Accordingly, the bank's Rule 12(b)(6) motion to dismiss based on statute of limitations should be denied.  *See Tech Refrigeration*, 143 F. Supp. 2d at 1010 (denying statute of limitations motion, finding that the "record in this case is nowhere near as clear cut as it was in *Island Park*"); *see also, e.g.*, *BNP Paribas*, 2012 WL 3234233, at *8 (denying motion to dismiss because the "Complaint's allegations do not affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and do raise some basis for tolling"); *Macomb*, 763 F. Supp. 2d at 274; *Condie*, 1993 WL 740185, at *2.

Finally, even if the United States' claims did not fall within the tolling provision of the FCA, they all are timely brought by operation of the Wartime Suspension of Limitations Act ("WSLA"), 18 U.S.C. § 3287.  The WSLA provides:

> When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers

46

> Resolution (50 U.S.C. § 1544(b)), the running of any statute of limitations
> applicable to any offense (1) involving fraud or attempted fraud against the
> United States or any agency thereof in any manner, whether by conspiracy or not,
> . . . shall be suspended until 5 years after the termination of hostilities as
> proclaimed by a Presidential proclamation, with notice to Congress, or by a
> concurrent resolution of Congress.  For purposes of applying such definitions in
> this section, the term "war" includes a specific authorization for the use of the
> Armed Forces, as described in section 5(b) of the War Powers Resolution (50
> U.S.C. § 1544(b)).

18 U.S.C. § 3287 (2011).[21]  The WSLA applies to civil fraud claims brought pursuant to the

FCA.  *See, e.g.*, *BNP Paribas*, 2012 WL 3234233, at \*\*12-13 (citing cases); *United States v.*

*Kolsky*, 137 F. Supp. 359, 362 (E.D. Pa. 1955).

Here, the WSLA was triggered by two specific Congressional authorizations for the use

of the Armed Forces:  (1) the Authorized Use of Military Force issued on September 18, 2001,

pursuant to which the President ordered United States' armed forces to Afghanistan, *see* Pub. L.

107-40, 115 Stat. 224 (2001), Senate Joint Resolution 23, Section 2(a); and (2) the Authorized

Use of Military Force Against Iraq issued on October 16, 2002, pursuant to which the President

ordered United States' armed forces to Iraq, *see* Pub. L. 107-243, 116 Stat. 1498 (2002).  *See,*

*e.g.*, *United States v. Prosperi,* 573 F. Supp. 2d 436, 442-54 (D. Mass. 2008) (holding, under

prior version of statute, that Iraq and Afghanistan conflicts triggered WSLA).  Moreover,

numerous courts have recognized that as of June 2007 – five years before the parties' tolling

---

[21]  The WSLA was amended by the Wartime Enforcement of Fraud Act of 2008 ("WEFA"),
effective October 14, 2008.  *BNP Paribas*, 2012 WL 3234233, at \*9.  WEFA extended the
suspension period from three years to five years, and made clear that the suspension period
applies whenever "the United States is at war or Congress has enacted a specific authorization
for the use of Armed Forces. . ."  18 U.S.C. § 3287.  The WEFA Amendments are applicable
here because amendments to statute of limitations periods are given effect if the limitations
period on the underlying claim has not run at the time of the enactment.  *See In re Enterprise
Mortgage Acceptance Co., LLC, Securities Litigation*, 391 F.3d 401, 408-09 (2d Cir. 2004);
*Vernon v. Cassadaga Valley Cent. Sch. Dist.*, 49 F.3d 886, 890-91 (2d Cir. 1995); *Orr v. United
States*, 174 F.2d 577, 580 (2d Cir. 1949).

agreement – there had been no "termination of hostilities" under the WSLA with respect to the Iraq and Afghanistan conflicts, and thus the relevant statutes of limitation continued to be tolled. *See United States v. Pfluger*, 685 F.3d 481, 485 (5th Cir. 2012) (no termination of hostilities as of 2012); *Vance v. Rumsfeld*, 653 F.3d 591, 626 (7th Cir. 2011) (recognizing that in 2006, the United States was "in the midst of a Congressionally-authorized war in Iraq") (subsequent history omitted); *In re Iraq and Afghanistan Detainees Lit.*, 479 F. Supp. 2d 85, 102 (D.D.C. 2007) (recognizing same for 2007), *aff'd sub nom. Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011); *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 283 (D.D.C. 2005) (same for 2005). Accordingly, the FCA claims are timely. *BNP Paribas*, 2012 WL 3234233, at *14-15.

## IV.    THE AMENDED COMPLAINT STATES CLAIMS UNDER FIRREA

Wells Fargo's primary tactic with regard to the Government's FIRREA claims is to attempt to narrow the statute's reach by selectively citing its legislative history. *E.g.*, WF Mem. at 39-44. The bank, however, fails to identify any valid basis for dismissing these claims.

### A.  The FIRREA Statute

Congress enacted FIRREA in 1989, in the wake of the savings and loan crisis. *See* FIRREA, Pub. L. No. 101-73, 103 Stat. 183 (1989). The sweeping enactment includes, among other provisions, enhanced civil and criminal penalties for bank fraud. *Id.* §§ 951-961, 103 Stat. at 498-501. Wells Fargo self-servingly characterizes the Act as little more than a bodyguard for victimized financial institutions. *E.g.*, WF Mem. at 44. The statute itself makes clear, however, that its fundamental purposes are much broader:  to protect the public *fisc*, including the security of the depositors' federally insured funds, and to do so in part by regulating financial institutions' own practices. *See* Pub. L. No. 101-73, §§ 101(3), (5), (9), (10), 103 Stat. at 187 (purposes of

the Act include to "curtail investments and other activities of savings associations that pose unacceptable risks to the Federal deposit insurance funds"; "put the Federal deposit insurance funds on a sound financial footing"; "strengthen the enforcement powers of Federal regulators of depository institutions"; and "strengthen the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors").

Indeed, FIRREA's legislative history is replete with references to fraud and abuse by financial institutions and the resulting detriment to the public. *See, e.g.*, H.R. Rep. No. 101-54(I), at 301 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 97 (noting that "[w]ithout adequate supervision, thrifts were free to engage in fraudulent and risky activities, often at the expense of the FSLIC"); *see also Failure of Independent CPA's to Identify Fraud, Waste and Mismanagement and Assure Accurate Financial Position of Troubled S&L's: Hearings Before the H. Comm. on Banking, Finance and Urban Affairs*, 101st Cong. 5 (1989), at 13 ("In January of this year, we testified before this committee that financial institutional failures have often been associated with management-related problems such as serious internal control weaknesses, insider abuse and fraud, unresponsiveness to regulators and disregard for the safety and soundness of financial operations.") (statement of Frederick D. Wolf, Assistant Comptroller General, General Accounting Office).  Moreover, Congress explicitly recognized that poor loan underwriting and loan administration – the very conduct targeted by the Amended Complaint – could seriously threaten a financial institution's stability.  *See, e.g.*, H.R. Rep. No. 101-54(I), at 299, 1989 U.S.C.C.A.N. at 95 ("Failed institutions have a number of similar traits including . . . poor underwriting and loan administration standards"); H.R. Rep. No. 101-54(I), at 300, 1989 U.S.C.C.A.N. at 96 ("Poor loan underwriting and administration standards have proved

49

particularly detrimental to thrift institutions.  Thrift regulators have reported weaknesses related to poor loan documentation and inadequate credit analysis . . . In addition, many appraisals were found to be inaccurate or insufficiently documented.").

In order to protect the public from the consequences of fraud involving financial institutions, Congress created in FIRREA new civil penalties recoverable via actions instituted by the Attorney General for violations of certain criminal statutes.  Pub. L. No. 101-73, § 951, 103 Stat. at 498-99.[22]  FIRREA defines the potential targets of this new civil enforcement authority as broadly as possible, stating that "*[w]hoever* violates any provision of law to which this section is made applicable . . . shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section."  12 U.S.C. § 1833a(a) (emphasis added).

The predicate offenses for which FIRREA creates civil penalties include the following, which are relevant to the Government's claims:  18 U.S.C. § 1005 (relating, in relevant part, to receiving money or profit from the United States through a fraudulent transaction by a financial institution); *id.* § 1014 (false statements on loan or credit applications to certain federal agencies and federally insured financial institutions, including the FHA); *id.* § 1001 (false statements to the Government); and *id.* §§ 1341 and 1343 (mail and wire fraud).  *See* 12 U.S.C. § 1833a(c). With regard to Sections 1001, 1341, and 1343, FIRREA adds the requirement of some nexus to a federally insured financial institution, stating that to trigger civil penalties, violations of these predicates must "affect[] a federally insured financial institution."  12 U.S.C. § 1833a(c)(2).

---

[22] FIRREA also amended several predicate criminal provisions, added new financial offenses, and increased the penalties for existing offenses.  Pub. L. No. 101-73, § 961, 103 Stat. at 499-501.

**B. The Amended Complaint States a FIRREA Claim Based Upon Wells Fargo's Violations of 18 U.S.C. § 1005**

18 U.S.C. § 1005, in relevant part, imposes civil liability on:

> Whoever with intent to defraud the United States or any agency thereof, or any financial institution referred to in this section, participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution.

*Id.* [23]   As set forth in the Amended Complaint, Wells Fargo violated this provision by defrauding HUD in connection with false claims that were submitted for FHA insurance payments.  *See* FAC ¶¶ 169-70.  Wells Fargo's only challenge to this claim is to assert that "whoever" in § 1005 purportedly "only applies to bank insiders (*i.e.*, individuals)," and therefore cannot apply to the conduct of a financial institution.  WF Mem. at 36.  This argument fails for three reasons:  (1) the plain language of the fourth paragraph of § 1005 contains no limitation to individuals; (2) the cases upon which Wells Fargo relies do not address whether entities fall within the scope of "whoever" in the fourth paragraph, nor do they exclude, as Wells Fargo contends, entities as potential violators; and (3) the legislative history of the fourth paragraph demonstrates that no limitation to individuals should be imported from elsewhere in the statute.

First, "[a]s with any question of statutory interpretation, our analysis begins with the plain language of the statute."  *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009).  Here, the fourth paragraph of § 1005 identifies potential violators of the statute using the word "whoever," which is defined in the U.S. Code to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  1 U.S.C. § 1.  The

---

[23] Section 1005 contains four substantive paragraphs, each setting forth a different violation, as well as paragraphs setting forth penalties and definitions.  The Government's Section 1005 claim arises only from Wells Fargo's violations of the fourth paragraph.  FAC ¶ 169 n .3.

Supreme Court has explained that "whoever" must be "liberally interpreted," particularly in connection with the Criminal Code. *See United States v. A&P Trucking Co.*, 358 U.S. 121, 123 n. 2 (1958). Had Congress wished to limit the application of the provision to entities, it could have done so, but it did not. Wells Fargo offers no reason to depart from the statute's plain language and the traditionally broad definition of "whoever," which expressly includes entities.

Second, there is no precedent for dismissing a FIRREA claim based on paragraph four of § 1005 on the ground that "whoever" does not include entities. In urging dismissal on this basis, Wells Fargo relies on criminal cases that do not even address, much less support, the contention that "whoever" in the fourth paragraph of § 1005 excludes financial institutions. WF Mem. at 36-37. For example, in *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 798 F. Supp. 2d 517 (S.D.N.Y. 2011), the United States criminally charged three individuals with offenses under the fourth paragraph of § 1005 in connection with an alleged scheme to manipulate the market for municipal derivatives. *Id.* at 520. The defendants argued for dismissal of the indictment on the ground that § 1005 applied only to bank insiders, which they were not alleged to be. *Id.* at 524. Concerned that more widespread application of § 1005 might result in a "federal bad check" statute, the court held that paragraph four only applied to bank insiders. *Id.* at 527-28. This holding does not undercut the Government's § 1005 claim in this case, as the court in *Rubin/Chambers* did not consider the question of whether the fourth paragraph applies to entities.[24] Further, Wells Fargo does not, and cannot, argue that the bank (and its management, through which it has committed civil violations) is not an insider to its own fraudulent scheme.

---

[24] The other three cases cited by Wells Fargo, *United States v. Edwards*, *United States v. Barel*, and *United States v. Ortiz*, are likewise irrelevant because they similarly do not address the issue

Moreover, *Rubin/Chambers* was incorrect in importing the "insider" requirement from the first paragraph of § 1005 to the fourth. Paragraph four has a vastly different legislative history from, and essentially no substantive relationship to, the rest of § 1005. The first three paragraphs of § 1005 date back to 1948 and were originally contained in a single paragraph with the limiting language that is now included only in the first paragraph of § 1005 ("Whoever, being an officer, director, agent, or employee of . . ."). *Rubin/Chambers*, 798 F. Supp. 2d at 525. Paragraph four was added to § 1005 over forty years later, as part of FIRREA's new civil and criminal enforcement scheme. *See* Pub. L. 101-73, § 961(d)(3), 103 Stat. at 499. Notably, every new or amended predicate offense added by FIRREA uses the general term "whoever" (or the equally broad "person") to define the potential targets of enforcement actions. *See* 12 U.S.C. § 1833a.[25] Accordingly, in interpreting the legislative history of paragraph four of § 1005, the Eighth Circuit held that the "insider" limitation of the first three paragraphs should not apply. *United States v. Van Brocklin*, 115 F.3d 587, 597 (8th Cir. 1997) (finding that "[p]aragraph four is not by its terms restricted to bank insiders" and that "FIRREA was intended, in part, to strengthen the enforcement powers of Federal regulators of depository institutions [and to] strengthen the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors[,]" such that "[t]he legislative history of the other

_____

of whether an entity can be civilly prosecuted under FIRREA for a violation of Section 1005. WF Mem. at 36. Moreover, none of these cases even addresses paragraph four of § 1005.

[25] *See* 18 U.S.C. § 1005 (fourth paragraph added by FIRREA, referring to "[w]hoever with intent to defraud the United States or any agency thereof"); *id.* § 1007 ("[w]hoever, for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation"); *id.* §§ 1341, 1343 ("[i]f the violation affects a financial institution, such person shall be fined"); *id.* § 1344 ("[w]hoever knowingly executes, or attempts to execute, a scheme or artifice"); *id.* § 3293 (statute of limitations provision, referring to "[n]o person").

provisions . . . is simply not applicable to paragraph four.") (citations and internal quotation marks omitted); *see also United States v. Christensen*, 344 F. Supp. 2d 1294, 1296-97 (D. Utah 2004) (following *Van Brocklin*).

It is not surprising that no criminal cases have opined on whether "whoever" in paragraph four applies to an entity, since criminal charges are infrequently brought against corporations. In contrast, through FIRREA, Congress gave the Government new *civil* remedies – which are commonly directed at entities – to combat financial fraud. While Wells Fargo takes umbrage at the fact that the Department of Justice is using FIRREA to combat the bank's mortgage fraud, that is not a basis upon which to dismiss the Government's claims under the Act.

### C.  The Amended Complaint States a FIRREA Claim Based Upon Wells Fargo's Violations of 18 U.S.C. § 1014

Section 1014 prohibits making any false statements or reports for the purpose of influencing the action of, *inter alia*, the FHA.  18 U.S.C. § 1014.  Because Section 1014 only applies to alleged false statements made after July 30, 2008, the Amended Complaint expressly limits this claim to false statements and records made after that date.  FAC ¶ 169 n. 4.

Wells Fargo's lone argument for dismissal of the Government's Section 1014 claims is that, in supposed contravention of Rule 9(b), the Amended Complaint "never identifies any alleged false statement or report made by Wells Fargo after July 30, 2008, allegedly for the purpose of influencing any FHA action, or describes how FHA was improperly influenced by such a statement."  WF Mem. at 37.  This argument, however, ignores the fact that the Amended Complaint specifically identifies a number of such false statements, including Wells Fargo's post-July 30, 2008 false self-reporting (particularly, under-reporting) of its materially deficient loans, the bank's submission of false claims for FHA insurance payments after those bad loans

54

defaulted, and its submission of false annual certifications for the years 2009 and 2010 to the

FHA.  FAC ¶¶ 160, 165.  These false reports, claims, and certifications were made to influence

the FHA, namely to "get false or fraudulent claims for FHA insurance paid by HUD."  *Id.* ¶ 160.

Accordingly, the Section 1014 claim is pled with more than sufficient particularity.

### D. The Amended Complaint States FIRREA Claims Based Upon Wells Fargo's Violations of 18 U.S.C. §§ 1001, 1341, and 1343

FIRREA levies civil penalties for violations of 18 U.S.C. §§ 1001, 1341, and 1343 –

prohibiting, respectively, making false statements to the Government, mail fraud, and wire fraud

– where the misconduct "affect[s] a federally insured financial institution."  12 U.S.C. §

1833a(c)(2).  As an initial matter, Wells Fargo does not dispute, nor could it, that the bank falls

within the scope of the word "whoever" in each of these statutes.  Wells Fargo challenges only

the "affecting" element of these claims, asserting that:  (1) a financial institution may not be

prosecuted under Section 1833a(c)(2) for conduct affecting itself (WF Mem. at 39-44); and (2)

the Amended Complaint does not allege sufficient effects on Wells Fargo (WF Mem. at 44-46).

Both of these arguments fail.

1. Wells Fargo Can Violate FIRREA Through Misconduct That Affects Its Own Federally Insured Deposits

Wells Fargo first asserts that it is essentially immune from civil prosecution under

FIRREA for conduct harming its federally insured deposits, because "self-affecting" misconduct

is purportedly not within the meaning of "affecting" in 12 U.S.C. 1833a(c)(2).  WF Mem. at 39-

44.  In seeking to manufacture restrictions on the broad, general language of Section 1833a(c)(2),

Wells Fargo again attempts to escape the simple text and far reach of FIRREA's enforcement

provisions, and insists instead that legislators sought to spare banks from liability for their own

misconduct.  Such an approach turns the principles of statutory construction on their head and undermines the stated purposes of FIRREA.  *See supra.* Section IV.A.

FIRREA does not expressly define what it means to "affect[]" a federally insured financial institution, and no court has yet interpreted that word specifically in the context of Section 1833a(c)(2), but many courts have interpreted virtually identical language in another provision of FIRREA and consistently rejected the same argument that Wells Fargo advances here.  In Section 961(*l*) of FIRREA, Congress extended the statute of limitations for mail and wire fraud from five to ten years where the offense "affects a financial institution."  *See* 18 U.S.C. § 3293(2).  In interpreting that provision, courts have held that "affect" is a broad and unambiguous term meaning to "produce an effect on" or to materially or detrimentally "influence."  *See, e.g.*, *United States v. Ghavami*, No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *5 (S.D.N.Y. July 13, 2012) (finding that the "most common meaning of the verb 'affect' is 'to produce an effect upon,'" and that the term is "secondarily defined as 'to produce a material influence upon or alteration in' and tertiarily defined as 'to have a detrimental influence on'") (citation omitted).  Furthermore, courts interpreting Section 3293(2) have repeatedly rejected the argument that a financial institution cannot be "affect[ed]" by a fraud that it has perpetrated, and indeed have held that "affects" applies both to perpetrators and victims of fraud.[26]

---

[26]  *See United States v. Serpico*, 320 F.3d 691, 695 (7th Cir. 2003) (holding bank was affected by its own fraudulent scheme); *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) ("[The defendant's] argument would have more force if the statute provided for an extended limitations period where the financial institution is the object of the fraud.  Clearly, however, Congress chose to extend the statute of limitations to a broader class of crimes.") (citation omitted); *United States v. Martinez*, No. 98-1438, 1999 WL 38842, at *2 (2d Cir. Jan. 27, 1999) ("The word 'affect[],' in the statute is not the same as 'defraud'"); *see also Ghavami*, 2012 WL 2878126, at *5 (the term "affects" "is not limited to circumstances in which a financial institution is the object or victim of a scheme to defraud" but rather includes active participants); *United States v.*

For example, in *United States v. Serpico*, the criminal defendants contested the district court's application of 18 U.S.C. § 3293(2), arguing that their mail fraud did not "affect" the financial institutions who were "willing participants" and "active perpetrator[s]" of the fraudulent scheme. *Id.*, 320 F.3d at 693-95. The Seventh Circuit rejected this argument, holding that "the mere fact that participation in a scheme is in a bank's best interest does not necessarily mean that it is not exposed to additional risks and is not 'affected.'" *Id.* at 695. The court observed that the banks' involvement in the fraud did expose them to risks, primarily having risky loans on their books. *Id.* As to one of the financial institutions that pled guilty to conspiracy, the Court found "it hard to understand how a bank that was put out of business as a direct result of the scheme was not 'affected,' even if it played an active part in the scheme." *Id.*

Likewise, in *Ghavami*, a number of indicted co-conspirator financial institutions had entered into civil settlements with the SEC and other regulators, as well as non-prosecution agreements with DOJ, in connection with a municipal investment bid-rigging scheme. 2012 WL 2878126, at *1, *7. When the financial institutions' employees were subsequently prosecuted, they sought to exclude evidence relating to these agreements, which the Government intended to offer to prove that the co-conspirator financial institutions had been "affect[ed]" by their own crimes. *Id.* at *7. Relying on *Bouyea*, *Serpico*, *Ohle* and *Daugerdas*, the court observed that a financial institution may be "affect[ed]" by a fraudulent scheme, even if it was an active participant, which these financial institutions were, and allowed the introduction of evidence

---

*Daugerdas*, No. 09 Cr. 581 (WHP), 2011 WL 6020113, at *1-2 (S.D.N.Y. Apr. 5, 2011) ("affects" applies to financial institutions that "participated in a fraud" because "[n]othing in the statute's language precludes its application to a financial institution that participated in a fraud"); *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 831 F. Supp. 2d 779, 783 (S.D.N.Y. 2011) (same); *United States v. Ohle*, 678 F. Supp. 2d 215, 229 (S.D.N.Y. 2010) (same).

concerning non-prosecution agreements, as well as settlement agreements with the SEC and others, to demonstrate that the co-conspirator financial institutions were "affect[ed] financial institutions." 2012 WL 2878126, at \*5-\*10; *see also Rubin/Chambers*, 831 F. Supp. 2d at 781-85 (allowing evidence of non-prosecution agreements with co-conspirator financial institutions based on holding that financial institutions that participate in fraud may be "affect[ed]" by it).[27]

Wells Fargo attempts to skirt the on-point interpretation of "affects a financial institution" in the above cases (WF Mem. at 40-41), but there is no reason to ascribe any different meaning to the word "affecting" in Section 1833a(c)(2). On the contrary, it is "logical to assume" that where the same term is used in different parts of the same Act, the term "would carry the same meaning with respect to both provisions." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003). Even where the same term is used in different pieces of legislation, the Supreme Court credits Congress with "knowing the interpretation federal courts had given the words earlier Congresses had used first" in other laws, and since "[i]t used the same words . . . we can only assume it intended them to have the same meaning that courts had already given them." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). Indeed, "[w]hether a fraud does or does not 'affect a financial institution' is a recurring consideration in federal criminal jurisprudence," and cases interpreting that phrase in one context are generally applied to others. *United States v. Grass*, 274 F. Supp. 2d 648, 654 n. 5 (M.D. Pa. 2003).

---

[27] Further, courts have similarly broadly interpreted a prior version of the Sentencing Guidelines promulgated following FIRREA, which enhanced punishment for offenses that "affected a financial institution." *See United States v. Hoffecker*, 530 F.3d 137, 200 (3d Cir. 2008) (finding sentence enhancement should apply when "a fraud affects a financial institution that acted as the vehicle for the fraud"); *see also United States v. Collins*, 361 F.3d 343, 348 (7th Cir. 2004).

Wells Fargo's attempt to narrow the meaning of "affecting" by cherry-picking FIRREA's legislative history (WF Mem. at 41-44) is unavailing, as the word "affecting" is unambiguous and its plain meaning governs. *See, e.g.*, *Daugerdas*, 2011 WL 6020113, at *1 ("The legislative history and authorities cited by Defendants do not exhort imposing a limitation absent from the plain language of the statute.  It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms.") (citation and internal quotation marks omitted).  In any event, there is ample evidence in FIRREA's legislative history that Congress did not take as cramped a view of the term "affecting" as Wells Fargo does here, but rather one in line with the broad interpretation that courts have applied to the "affects a financial institution" language in 18 U.S.C. § 3293(2).

Nothing in Section 1833a(c) requires that the "affect[ed]" federally insured financial institution be "the victim."    Rather, the civil enforcement provisions subtitle of FIRREA imposes "Civil Penalties For Violations *Involving* Financial Institutions," not violations defrauding or victimizing them.  Pub. L. No. 101-73, § 951, 103 Stat. at 498 (emphasis added).[28] Wells Fargo also wrongly contends that the "affecting a federally insured financial institution" language in Section 1833a(c)(2) must "match[] the scope of the predicate statutes in (c)(1) and

---

[28] *See also* H. R. Rep. 101-54(I), at 311, 1989 U.S.C.C.A.N. at 107 (FIRREA "increases civil and criminal penalties for crimes *involving* financial institutions and improves methods to detect misconduct in *financial dealings*") (emphases added); H.R. Rep. 101-54(I), at 472, 1989 U.S.C.C.A.N. at 268 (Section 951 "authorizes the Attorney General to recover a civil penalty for conduct violating specified provisions of title 18, United States Code, *involving* financial institutions . . . most of the cases likely to be brought under this section will involve allegations of fraud") (emphasis added); H.R. Rep. 101-54(V), at 5, 1989 U.S.C.C.A.N. 397, at 398 ("Subtitle E of Title IX contains proposed new civil penalties for certain violations *involving* financial institutions.  As reported by the Committee on Banking, Finance and Urban Affairs, violations and conspiracies to violate eight sections of title 18 which *relate to* financial institutions are made the basis of civil penalties.") (emphases added).

(c)(3)," which it argues have not been "construed to have the perpetrator also be the victim[.]" *See* WF Mem. at 39-40.  However, many of the offenses in Sections 1833a(c)(1) and (3) do not require that a financial institution be a victim at all.[29]

Finally, Wells Fargo's argument that it is "unnecessary" to use Section 1833a(c)(2) "as a vehicle to punish Wells Fargo for engaging in fraud that supposedly affected Wells Fargo," because FIRREA also granted new powers to bank regulatory agencies to regulate federally insured financial institutions, provides no basis for dismissal.  WF Mem. at 44.  Indeed, the legislative history of FIRREA makes clear that the new civil penalties were intended to impose a *third* penalty for misconduct, which could certainly be cumulative to penalties imposed by regulatory agencies.  *See* H.R. Rep. 101-54(V), at 5, 1989 U.S.C.C.A.N. at 398 ("In fact, the Administration states that the penalties can also be cumulative to other civil penalties, which also may be up to $1,000,000, which may be imposed by bank regulatory agencies under other provisions of this bill."); *see also* H.R. Rep. 101-54(V), at 6, 1989 U.S.C.C.A.N. at 399 ("Subtitle E is therefore intended to be used to impose a third monetary penalty, each of which may be up to $1 million per incident, for the same violation.").  Holding banks responsible for conduct that puts their own federally insured deposits at risk is consistent with and furthers the legislative purpose of FIRREA, and the Court should reject Wells Fargo's effort to redraft FIRREA arbitrarily to exclude liability for the bank's own misconduct.

---

[29]  For example, 18 U.S.C. §§ 1007 and 1014 and 15 U.S.C. § 645(a) make it a crime for any person or entity to submit false statements to, *inter alia*, the FDIC, the FHA and the Small Business Administration.

2.  <u>Wells Fargo Was Affected by Its Fraud Because It Incurred Actual Losses and Has Been Exposed to Risks of Losses</u>

Finally, Wells Fargo is wrong in contending that the Amended Complaint does not adequately allege effects of Wells Fargo's fraudulent conduct on itself.  WF Mem. at 44-46. Courts in this jurisdiction and elsewhere, interpreting similar language in section 961(*l*) of FIRREA, have held that a financial institution is "affect[ed]" by a fraud whenever it is "exposed to a new or increased risk of loss."  *See Ghavami*, 2012 WL 2878126, at *6 ("for purposes of 18 U.S.C. § 3293(2), a wire fraud may be deemed to 'affect[] a financial institution' where it exposes such institution to a new or increased risk of loss, even if there is no actual or net loss"); *United States v. Mullins*, 613 F.3d 1273, 1278-79 (10th Cir. 2010); *Serpico*, 320 F.3d at 694-95 (financial institution is "affect[ed]" for purposes of Section 961(*l*) of FIRREA if it was "exposed . . . to a new or increased risk of loss").  A "new or increased risk of loss," as the courts have reasoned, "is plainly a material, detrimental effect on a financial institution and falls squarely within the proper scope of the statute."  *Mullins*, 613 F.3d at 1278-79; *see also Ghavami*, 2012 WL 2878126, at *5.[30]

Here, Wells Fargo's reckless underwriting practices and failure to comply with quality control requirements certainly increased its risk of loss, and even resulted in actual losses, because:  (1) Wells Fargo has had to indemnify HUD for hundreds of specific loans it originated between May 2001 and October 2005; (2) the bank's poor underwriting and loan administration practices risked the safety and security of federally insured bank deposits, exposing the bank to substantial losses; and (3) Wells has exposed itself to substantial civil liability, including

---

[30]  Further, since a mere risk of loss is enough to defraud a financial institution under 18 U.S.C. § 1344, "a lesser standard . . . and in any event certainly not a greater one" must suffice to "affect" a financial institution.  *Mullins*, 613 F.3d at 1279; *Ghavami*, 2012 WL 2878126, at *5 n. 6.

settlement of one aspect of its false annual certification liability in the D.C. Action, and possible treble damages and civil penalties under the False Claims Act.  FAC ¶ 171.  Wells Fargo's meritless arguments cannot erase those pleaded effects.

First, Wells Fargo argues that since the Government has not identified specific loans that have been indemnified by the bank, it has not pled an effect.  The Government, however,  has clearly alleged that, as a matter of course, when the Government discovers an ineligible loan, it has a practice of seeking indemnification from Wells Fargo (and other banks), and that when a claim is made on an indemnified loan, if Wells Fargo is not the holder of record, the bank is billed.  FAC ¶¶ 40-43; *see also* Baruch Decl. Ex. F at 53.  As such, the bank suffers an increased risk of loss when it has made faulty loans which, by their nature, can and do result in indemnification.  *See, e.g.*, *Serpico*, 320 F.3d at 695 (fraudulent scheme "affected" banks, even though banks expected to make money on the deals; bank made risky loans at low interest rates that it never would have made absent the scheme).

Wells Fargo also argues that the Government has not alleged a sufficiently direct link between the alleged fraud and the effect.  WF Mem. at 45.  It is difficult to see, however, how a pattern and practice of reckless underwriting and false certifications to HUD to fraudulently secure FHA insurance would not lead to substantial losses to the bank after the loans defaulted, through indemnifications and civil enforcement by HUD and DOJ.  Indeed, in fraudulently deciding not to report materially defective loans to HUD, as required, Wells Fargo expressly acknowledged that doing so would negatively impact the bank through indemnifications and harm to broker relationships.  FAC ¶ 130.  In addition, the link was directly made in the D.C.

Action where Wells Fargo paid monies to resolve one aspect of its false annual certification liability for its FHA lending practices. *See* Baruch Decl. Ex. D.

Moreover, the Government has easily met the standard set forth in the very case Wells Fargo cites – that it show "some impact" from the fraud that is "sufficiently direct" and not "unreasonably remote." *See Bouyea*, 152 F.3d at 195; *see also United States v. Pelullo*, 964 F.2d 193, 215-16 (3d Cir. 1992); *United States v. Mavashev*, No. 08-CR-902 (DLI) (MDG), 2009 WL 4746301, at *4 (E.D.N.Y. Dec. 7, 2009); *Rubin/Chambers*, 831 F. Supp. 2d at 782; *Ohle*, 678 F. Supp. 2d at 229.   In this case, the link between the submission of individual false loan certifications to HUD and Wells Fargo's increased risk of loss on tens of thousands of risky, ineligible loans is certainly direct enough to meet this standard.[31]

Second, Wells Fargo complains that it "makes no sense" that the conduct giving rise to this lawsuit could "affect" the bank, because the United States is simply "manfactur[ing] the effect" by initiating litigation.  WF Mem. at 45.  What Wells Fargo fails to appreciate is that the risk or "effect" here was created by Wells Fargo's own misconduct, not by subsequent lawsuits brought to remedy it.

Third, Wells Fargo argues that the $125 million settlement of *In re Wells Fargo Mortgage Backed Certificates Litig.*, 09 Civ. 1376 (SI) (N.D. Cal.) ("MBC Litigation"), cannot demonstrate an effect on the bank because Wells Fargo did not "admit[] any liability in that

---

[31] Wells Fargo also contends that it is not plausible that the alleged hundreds of indemnifications that the bank has been required to enter into affected "or even could have affected Wells Fargo," because the Government could not possibly claim that "an indemnification of HUD by Wells Fargo . . . . would have any 'effect' on an institution the size of Wells Fargo."  WF Mem. at 45 and n.56.  This factual argument is inappropriate at the motion to dismiss stage and, in any event, is incorrect.  *See United States v. Wiant*, 314 F.3d 826, 830 (6th Cir. 2003) ("Nowhere does the term ["effect"] imply any *de minimis* limitation; on the contrary, the breadth of the definition indicates that the guideline is intended to encompass even minimal impacts.").

settlement." WF Mem. at 46. But courts have held that civil settlements may constitute "effects" regardless of whether the financial institution admitted liability. *Ghavami*, 2012 WL 2878126, at *8.[32] Further, the loss of reputation and customer goodwill from discovery of Wells Fargo's reckless practices is also an "effect" within the meaning of Section 1833a.[33]

Nor does the fact that the MBC Litigation allegedly did not specifically involve FHA loans alter the analysis (WF Mem. at 46), as the misconduct alleged therein – systematically failing to adhere to underwriting guidelines, disregarding credit risk and quality control, and focusing on the income generated for the bank instead of the quality of the loans – is very similar to the conduct alleged here. *See In re Wells Fargo Mortgage–Backed Certificates Litig.*, 712 F. Supp. 2d 958, 971-72 (N.D. Cal. 2010). For these reasons, the Amended Complaint adequately states claims under FIRREA.

## V.   THE GOVERNMENT'S COMMON LAW CLAIMS ARE PROPERLY PLED

Wells Fargo's arguments for dismissal of the Government's common law claims fare no better.[34] First, Wells Fargo incorrectly insists that the Government's breach of fiduciary duty

---

[32] *See generally United States v. Schinnell*, 80 F.3d 1064, 1070 (5th Cir. 1996) (fraud against bank customer affected the institution where it was "realistically exposed to substantial potential liability as the result of [defendant's] fraud"); *United States v. Bennett*, 161 F.3d 171, 193 (3d Cir. 1998) (same for $18 million settlement); *Ghavami*, 2012 WL 2878126, at *5 (financial institution may be affected by settlements of criminal or civil liability); *Rubin/Chambers*, 831 F. Supp. 2d 779 (same); *United States v. Hartz,* 296 F.3d 595, 600 (7th Cir. 2002) (same).

[33] *See United States v. Johnson*, 130 F.3d 1352, 1355 (9th Cir. 1997) (bank can be affected by harm to the bank's "employee morale and customer relationship," "reputation" and "immediate and long-term operations and policies"); *United States v. Bennett*, 161 F.3d171, 193 (3d Cir. 1998) (crime affected financial institution that paid $18 million to settle a lawsuit and was exposed to "negative publicity that harmed its reputation").

[34] In a footnote, Wells Fargo mistakenly suggests that most of the Government's common law claims should be dismissed as time barred. *See* WF Mem. at 46 & n. 59. Although the bank correctly states that the common law claims are governed by the limitations periods in 28 U.S.C.

claim fails because the Government has not sufficiently alleged that a fiduciary duty existed between the United States and Wells Fargo.  WF Mem. at 47-48.  A fiduciary duty arises "when one has reposed trust or confidence in the integrity or fidelity o[f] another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another."  *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 413-14 (S.D.N.Y. 2005) (citation omitted).  "[B]ecause the existence of a fiduciary relationship normally depends on the facts of a particular relationship, a claim alleging such a relationship is generally not dismissed for failure to state a claim."  *Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 258 (S.D.N.Y. 2009) (citing *World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*, 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007), *aff'd*, 328 Fed App'x 695 (2d Cir. 2009)).

Here, the Government has alleged more than sufficient facts to state a *prima facie* fiduciary duty.  HUD and Wells Fargo had a special relationship of trust and confidence by virtue of the bank's participation in the DEL program.  *See* FAC ¶¶ 15-30, 37-43, 176-81.  Specifically, the DEL program empowered Wells Fargo to obligate HUD to insure mortgages it issued without any independent HUD review.  Thus, HUD reposed great trust and confidence in

§ 2415, *see* WF Mem. at 46 n. 59*,* Wells Fargo neglects to mention that these time limits are subject to the tolling provision in 28 U.S.C. § 2416(c), which provides that "[f]or purpose of computing the limitations periods in section 2415, there shall be excluded all periods during which – . . . (c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances."  Accordingly, for the same reasons set forth with respect to the FCA claims, the common law claims are not subject to dismissal as untimely.  *See, e.g.*, *Tech Refrigeration*, 143 F. Supp. 2d at 1011 (denying statute of limitations motion with respect to common law claims "for the same reasons noted . . . with regard to the FCA claims").  Likewise, Wells Fargo's conclusory assertions that the common law claims "are subject to dismissal under Fed. R. Civ. P. 9(b), or fail to adequately plead causation under Fed. R. Civ. P. 12(b)(6)," WF Mem. at 46-47, fail for the reasons explained above with respect to the Government's FCA claims.

Wells Fargo, which was in a position of advantage or superiority in relation to HUD, and which therefore was required to act with the utmost good faith in ensuring that the mortgages it certified in fact complied with HUD's requirements and were eligible for FHA insurance. *See, e.g.*, *id.* ¶¶ 15-30, 37-43, 176-81. Indeed, HUD has made this clear in administrative cases. *See, e.g.*, *In re Samuel T. Isaac & Assoc., Inc.*, HUDBCA No. 80-452-M2, 1983 WL 13321, at \*18-\*19 (Nov. 10, 1983) (FHA mortgagee breached fiduciary duties by, *inter alia*, making false statements); *In the Matter of Flagship Mortgage Servs.*, HUDALJ 90-154-MR, 1991 WL 11668525 (H.U.D.A.L.J. Jan. 16, 1991) (same). Thus, the Amended Complaint states a breach of fiduciary duty claim.

Second, Wells Fargo mistakenly suggests that the Amended Complaint's "claim for 'future losses' amounts to no more than an impermissible attempt to seek future indemnification." WF Mem. at 47. The ripeness doctrine, on which the bank apparently is relying, is based upon concerns regarding advisory opinions, and is aimed at "prevent[ing] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Here, there is no abstract disagreement. Accordingly, delayed adjudication would not further judicial economy. To the contrary, the parties' dispute about whether defaulted FHA loans were fraudulently, negligently, or otherwise wrongfully originated and certified by Wells Fargo arises from the same conduct regardless of whether HUD already has paid insurance claims on the loans. Further, the Government will present evidence at trial demonstrating the future damages that HUD will incur in the form of insurance payments and other costs relating to FHA loans that Wells Fargo wrongfully

66

originated and certified for insurance.  This is a real injury or threat of injury to HUD, the precise amount of which will be determined during fact and expert discovery.  *See, e.g.*, *In re Drexel Burnham Lambert Group*, 995 F.2d 1138, 1146 (2d Cir. 1993) (ripeness doctrine "turns on whether there are nebulous future events so contingent in nature that there is no certainty they will ever occur").

Lastly, Wells Fargo contends that the Court should dismiss the Government's claims for unjust enrichment and payment under mistake of fact because HUD purportedly was aware of Wells Fargo's misconduct when it paid the bank's insurance claims on defaulted FHA loans. WF Mem. at 49.  As discussed above, this argument fails because the 2004 HUD-OIG audit on which Wells Fargo relies did not put the agency on notice of the misconduct alleged in the Amended Complaint.  Wells Fargo's alternative argument that those common law claims are barred because the FHA loans at issue are governed by an express contract (the Mortgage Insurance Certificate) also lacks force.  *See id.* at 48-49.  Tellingly, Wells Fargo has not put the Mortgage Insurance Certificate before the Court.  That is because the Certificate does not govern the parties' rights and remedies with respect to loans that were falsely certified for FHA insurance.  As such, the Government's claims for unjust enrichment and payment under mistake of fact are not precluded.  *See Taberna Capital Management, LLC v. Dunmore*, No. 08 Civ. 1817 (JSR), 2009 WL 2850685, at *3 (S.D.N.Y. Sept. 2, 2009) (express contract bars unjust enrichment claim only where its terms govern the subject matter of the dispute); *Melton v. Carolina Power & Light Co.*, No. 4:11-cv-00270-RBH, 2012 WL 2401635 (D.S.C. June 25, 2012), at *2 (unjust enrichment claim may proceed "on a point not covered by an express contract") (internal quotation marks and citation omitted).

67

## <u>CONCLUSION</u>

For the foregoing reasons, Wells Fargo's motion to dismiss should be denied.

Dated:  New York, New York
        February 13, 2013

                                      Respectfully submitted,

                                       PREET BHARARA
                                       United States Attorney for the
                                       Southern District of New York

By: _____/s/_____
                                       JEFFREY S. OESTERICHER
                                       SARAH J. NORTH
                                       REBECCA S. TINIO
                                       Assistant United States Attorneys
                                       86 Chambers Street, Third Floor
                                       New York, New York 10007
                                       Telephone No. (212) 637-2800
                                       Facsimile No. (212) 637-2730
                                       Jeffrey.Oestericher@usdoj.gov
                                       Sarah.North@usdoj.gov
                                       Rebecca.Tinio@usdoj.gov