William F. Johnson
Douglas W. Baruch, *pro hac vice*
Jennifer M. Wollenberg, *pro hac vice*
FRIED, FRANK, HARRIS, SHRIVER
 & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
william.johnson@friedfrank.com
douglas.baruch@friedfrank.com
jennifer.wollenberg@friedfrank.com

Michael J. Missal, *pro hac vice*
Amy Pritchard Williams, *pro hac vice*
K&L GATES LLP
1601 K Street NW
Washington, DC 20006-1600
(202) 778-9000
michael.missal@klgates.com
amy.williams@klgates.com

Attorneys for Defendant
 Wells Fargo Bank, N.A.


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> - against - <br><br> WELLS FARGO BANK, N.A., <br><br> Defendant. | 12 Civ. 7527 (JMF) (JCF) <br><br> ECF CASE <br><br> **DEFENDANT WELLS FARGO BANK, N.A.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION .................................................................................................1

I.     THE U.S. RELEASE BARS AC-1 CLAIMS..................................................1

    A.     The D.C. Opinion Interprets the U.S. Release but Does Not Apply It to the AC-1 Allegations ................................................................................2

    B.     The AC-1 Claims Arise Solely Out of Annual Certifications ................................3

II.    THE STATUTE OF LIMITATIONS BARS FCA CLAIMS ........................................6

    A.     The AC-1 Does Not Properly Invoke the Ten-Year Statute of Repose .................7

    B.     The Wartime Suspension of Limitations Act Does Not Apply .............................8

III.   THE AC-1 FAILS TO MEET THE REQUIREMENTS OF RULE 9(b).........................10

IV.    THE AC-1 FAILS TO STATE ANY FCA CLAIM..............................................12

    A.     The AC-1 Only Alleges Implied False Certifications That Are Not Actionable ................................................................................12

    B.     The AC-1 Does Not State a Reverse False Claim ................................13

    C.     The AC-1 Has Not Pleaded the Requisite Causation Under the FCA .................15

V.     THE AC-1 FAILS TO STATE ANY FIRREA CLAIM .........................................16

    A.     The FIRREA Claim Based on 18 U.S.C. § 1005 Fails .............................16

    B.     The FIRREA Claim Based on 18 U.S.C. § 1014 Fails .............................17

    C.     The AC-1's "Affect Yourself" FIRREA Theory Fails ............................18

VI.    THE AC-1 FAILS TO STATE ANY COMMON LAW CLAIMS..................................19

CONCLUSION...................................................................................................20

# TABLE OF AUTHORITIES

PAGE

**CASES**

*Adams v. Deutsche Bank AG*,
    No. 11 Civ. 1893, 2012 U.S. Dist. LEXIS 143332 (S.D.N.Y. Sept. 24, 2012) ......8, App. 1

*Am. Home Mortg. Servicing, Inc. v. Donovan*,
    No. 3:10-CV-1936-M, 2011 WL 2923978 (N.D. Tex. July 20, 2011) ............................20

*Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*,
    190 F.3d 729 (6th Cir. 1999) .......................................................................................14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .....................................................................................................13

*Assured Guaranty Mun. Corp. v. Flagstar Bank*,
    No. 11 Civ. 2375 (JSR), 2013 WL 440114 (S.D.N.Y. Feb. 6, 2013) ...............................16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .....................................................................................................19

*City of New York v. Joseph L. Balkan, Inc.*,
    656 F. Supp 536 (E.D.N.Y. 1987) ................................................................................10

*Comm'r v. Lundy*,
    516 U. S. 235 (1996) ....................................................................................................17

*In re Cardiac Devices Qui Tam Litig.*,
    221 F.R.D. 318 (D. Conn. 2004) ..................................................................................10

*In re U.S. Foodservice Inc. Pricing Litig.*,
    No. 3:07 MD 1894 (CFD), 2009 WL 5064468 (D. Conn. Dec. 15, 2009) ......................10

*Jones v. Overton*,
    549 U.S. 199 (2007) .......................................................................................................7

*Sinclair v. Donovan*,
    Nos. 1:11–CV–00010, 1:11–CV–00079, 2011 WL 5326093 (S.D. Ohio 2011) ...............19

*Sullivan v. Stroop*,
    496 U.S. 478 (1990) .....................................................................................................17

*Thompson v. Bellevue Hosp.*,
    No. 9:09-CV-01038, 2011 WL 4369132 (N.D.N.Y Aug. 29, 2011) .................................7

PAGE

*United States v. Barel,*
    939 F.2d 26 (3d Cir. 1991)............................................................................16

*United States v. BNP Paribas SA,*
    No. 11-3718, 2012 WL 3234233 (S.D. Tex. Aug. 3, 2012) ................................9

*United States v. Bollinger Shipyards, Inc.,*
    No. 12–920, 2013 WL 393037 (E.D. La. Jan. 30, 2013)......................8, 10, 11

*United States v. Bornstein,*
    423 U.S. 303 (1976).....................................................................................12

*United States v. Edwards,*
    566 F. Supp. 1219 (D. Conn. 1983)...............................................................16

*United States v. Ghavami,*
    No. 10 Cr. 1217 (KMW), 2012 WL 2878126 (S.D.N.Y. July 13, 2012) .........19

*United States v. Huron Consulting Grp., Inc.,*
    No. 09 Civ. 1800 (JSR), 2011 WL 253259 (S.D.N.Y. Jan. 24, 2011).............10

*United States v. Island Park,*
    791 F. Supp. 354 (E.D.N.Y. 1992) ..................................................................8

*United States v. Miller,*
    645 F.2d 473 (5th Cir. 1981) ........................................................................15

*United States v. Najjar,*
    No. 6:10-cv-414-Orl-31DAB, 2012 WL 177412 (M.D. Fla. Jan. 23, 2012).....6

*United States v. Ortiz,*
    906 F. Supp. 140 (E.D.N.Y. 1995) .................................................................16

*United States v. Rubin/Chambers, Dunhill Ins. Servs.,*
    831 F. Supp. 2d 779 (S.D.N.Y. 2011).............................................................19

*United States v. Rubin/Chambers, Dunhill Ins. Servs.,*
    798 F. Supp. 2d 517 (S.D.N.Y. 2011).............................................................17

*United States v. Science Applications Int'l Corp.,*
    626 F.3d 1257 (D.C. Cir. 2010)......................................................................11

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
    501 F.3d 493 (6th Cir. 2007) .........................................................................11

*United States ex rel. Cantekin v. Univ. of Pittsburgh,*
    192 F.3d 402 (3d Cir. 1999)...........................................................................16

PAGE

*United States ex rel. Carter v. Halliburton Co.*,
    No. 1:11CV602 (JCC/JFA), 2011 WL 6178878 (E.D. Va. Dec. 12, 2011) ...................9

*United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*,
    543 F.3d 1211 (10th Cir. 2008) ...................12

*United States ex rel. Feldman v. City of New York*,
    808 F. Supp. 2d 641 (S.D.N.Y. 2011) ...................12

*United States ex rel. Kirk v. Schindler Elevator Corp.*,
    601 F.3d 94 (2d Cir. 2010) ...................12

*United States ex rel. Mikes v. Straus*,
    274 F.3d 687 (2d Cir. 2001) ...................12

*United States ex rel. Ramadoss v. Caremark Inc.*,
    586 F. Supp. 2d 668 (W.D. Tex. 2008) ...................6


**STATUTES**

12 U.S.C. § 1833a ...................18

18 U.S.C. § 1001 ...................18

18 U.S.C. § 1005 ...................16–17

18 U.S.C. § 1014 ...................17–18

18 U.S.C. § 1341 ...................18

18 U.S.C. § 1343 ...................18

18 U.S.C. § 1344 ...................18

18 U.S.C. § 3287 ...................8

31 U.S.C. § 3729(a)(1)(G) ...................14

31 U.S.C. § 3729(a)(7) ...................13

31 U.S.C. § 3729(b)(3) ...................14

31 U.S.C. § 3731(b)(1) ...................7

31 U.S.C. § 3731(b)(2) ...................7, 8

## REGULATIONS

24 C.F.R. § 203.255(g)(3)..................................................................14

24 C.F.R. § 203.255(g)(5)..................................................................13

24 C.F.R. § 203.257.........................................................................20

## RULES

Fed. R. Civ. P. 9(b) ...................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)................................................................. *passim*

## OTHER AUTHORITIES

77 Fed. Reg. 3598 (Jan. 25, 2012) ..................................................14

Black's Law Dictionary (9th ed. 2009)......................................9, 10, 17

H.R. Rep. No. 101-54 (1989)..........................................................18

S. Rep. No. 110-431 (2008) ...........................................................9

**INTRODUCTION**

Wells Fargo Bank, N.A. ("Wells Fargo"), by and through its attorneys, respectfully submits this Reply in support of its Motion to Dismiss the First Amended Complaint of the United States of America ("Motion" (Dkt. 26)). For the reasons set forth below and in its Memorandum of Law in support of its Motion ("Memo" (Dkt. 27)), Wells Fargo requests that its Motion be granted.

Sixty-eight pages of briefing cannot mask the reality that the First Amended Complaint ("AC-1") is riddled with pleading and legal deficiencies that warrant its dismissal. This Court should not credit the United States' various excuses in response to Wells Fargo's release, statute of limitations, Rule 9(b), and Rule 12(b)(6) arguments. The United States' novel theories of liability, re-characterization of the AC-1 allegations, and citation to AC-1 detail that has no bearing on the sufficiency of its pleading should be rejected.

**ARGUMENT**

**I.   THE U.S. RELEASE BARS AC-1 CLAIMS**

The United States is wrong to treat Wells Fargo's "release" argument dismissively and to suggest that this ground for dismissal has been conclusively resolved by the February 12, 2013 decision by the Hon. Rosemary Collyer ("D.C. Opinion") in *United States v. Bank of America Corp.*, No. 1:12-cv-00361-RMC, 2013 WL 504156 (the "D.C. Action").[1]   Judge Collyer interpreted the scope of the U.S. Release, but she did not apply that interpretation to the AC-1 allegations, expressly reserving that task for this Court.   D.C. Opinion at 8 n.6, 14 ("The interpretation of the SDNY Amended Complaint is a matter properly addressed by the New York

---

[1]   This is contrary to the United States' earlier argument to the D.C. Court that it lacked jurisdiction to even hear the issue, an argument that Judge Collyer found to be based on the United States' "strained and disingenuous reading of the Release." *See* D.C. Opinion at 4.   Wells Fargo reserves all rights with respect to the D.C. Opinion.

district court ... [T]he Court leaves the interpretation of the SDNY Amended Complaint to the court that has jurisdiction over it ....").

So, far from being resolved, this threshold ground for dismissal is now ripe for decision. Nothing in the United States' Memorandum of Law in Opposition ("Opposition" or "Opp." (Dkt. 30)) even begins to challenge, let alone effectively rebut, Wells Fargo's substantial showing that the False Claims Act ("FCA") and Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") claims in the AC-1 are based on alleged quality control shortcomings by Wells Fargo – including failing to "self-report" various alleged deficiencies identified in quality audits and failing to properly train, supervise, and compensate underwriting staff – that are actionable (if at all) only because of Wells Fargo's annual certifications.  Applying the D.C. Opinion, this Court must dismiss the United States' AC-1 claims.

A.    **The D.C. Opinion Interprets the U.S. Release but Does Not Apply It to the AC-1 Allegations**

Judge Collyer made clear that she was construing the full scope of the pertinent U.S. Release provisions, rather than focusing on the specific scenarios Wells Fargo had laid out concerning the AC-1 allegations.[2]  For instance, Judge Collyer considered scenarios where the conduct at issue arguably could be considered annual certification conduct as well as Covered Servicing Conduct, Covered Origination Conduct, and/or Covered Bankruptcy Conduct.  D.C. Opinion at 12.  Accordingly, Judge Collyer declined to adopt a broad interpretation of the U.S. Release that would equate the Paragraph 3(b) annual certification release provision with a release

---

[2]    *See* D.C Opinion at 5 ("[I]t makes logical sense for this Court to address the scope of the Release, as future disputes might arise with regard to the Consent Judgment and Release concerning other parties to this case who are not part of the New York Suit.").  Judge Collyer contemplated situations – albeit ones not present in the AC-1 allegations – in which a claim may be based on the annual certification, but not *only* based on the annual certification, or in which a claim may be based solely on the annual certification, but brought under a statute other than the FCA, FIRREA, or Program Fraud Civil Remedies Act.  *See id*. at 12–13 ("Presumably, a false annual certification could jeopardize each application for FHA insurance during that year and potentially expose Wells Fargo to hundreds, if not thousands of claims under the FCA and other statutes.").

of all possible liability for any claims or conduct that could in any way fall within the scope of the annual certifications. But Wells Fargo does not need such a ruling in order to prevail on its "release" defense. Instead, Wells Fargo merely needs to show, as it does in this Motion, that the AC-1 FCA and FIRREA claims arise out of alleged conduct that can *only* be the subject of those claims *because of* the annual certifications submitted by Wells Fargo. D.C. Opinion at 11–13. Nothing in the D.C. Opinion forecloses Wells Fargo's arguments. Indeed, the D.C. Opinion confirms that "the Government … did not reserve the right to bring claims based only on false annual certifications," and that "Paragraph 3(b) releases liability to the federal government on all claims where the sole basis for the claim is a false *annual* certification …." *Id.* at 10, 11. This Court must now determine whether the *actual* AC-1 claims – as opposed to the whole range of disputes that could possibly arise between the United States and Wells Fargo (or any of the other banks subject to the Consent Judgment) – are barred by the U.S. Release.

**B.      The AC-1 Claims Arise Solely Out of Annual Certifications**

It is now more evident than ever that the United States seeks to impose liability on Wells Fargo based on alleged company-wide shortcomings with respect to FHA loan practices that are certified to only through the annual certifications. In its Opposition, the United States tries to cast this conduct as two Wells Fargo "schemes" that fostered (1) "reckless underwriting" through company policies that allegedly violated HUD requirements and (2) "self-reporting" practices by "senior management" that hid these alleged quality shortcomings from HUD. (*See, e.g.*, Opp. at 1–2.) Wells Fargo's "annual certifications deal with company-wide compliance with HUD-FHA requirements," D.C. Opinion at 10, and the AC-1 claims arise solely from the annual certifications. There can be no legitimate argument (and the United States makes none) that these AC-1 claims also arise out of the individual loan-level certifications – such that they would not be precluded under the U.S. Release. Indeed, the AC-1 allegations about company-wide

3

conduct have nothing to do with the individual loan-level certifications, each of which is unique to an individual loan and says nothing about quality programs, training, supervision, or self-reporting.  D.C. Opinion at 10 ("An individual loan certification contains the underwriter's pledge that a particular loan qualifies for FHA insurance in light of the appraisal and the borrower's assets and credit rating.").[3]  As Wells Fargo has detailed, every one of the AC-1 claims arises solely out of the company's alleged false annual certification that it was maintaining quality control in conformity with HUD-FHA requirements.

By way of example, the Third through Fifth Claims in the AC-1 are expressly styled as "Self-Reporting" claims.  Self-reporting is a requirement that arises solely from the annual certification and not from any loan-level certification.[4]  Other examples are specified in the chart Wells Fargo provided with its Motion, which illustrates the identity between the AC-1 claims and the annual certifications.[5]  Paragraph 3(b) of the U.S. Release clearly bars any FCA and FIRREA claims that are based solely on claims arising out of annual certification representations, including that Wells Fargo had:

> "conform[ed] to all HUD-FHA regulations necessary to maintain its HUD-FHA approval" (*including but not limited to the requirement that [Wells Fargo] implement and maintain a quality control program that conforms to HUD-FHA requirements*), "or complied with and agree[d] to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with the Department under HUD's Direct Endorsement Program."

---

[3]   The AC-1 fails to identify a single false underwriter pledge.  (*See* Memo at 19–22.)  Nowhere does the AC-1 allege underwriter "knowledge" of falsity relating to a particular appraisal, a borrower's assets, or a borrower's credit rating at the time an individual loan-level certification was signed.

[4]   The United States' description of the Fourth and Fifth Claims for "self-reporting" expressly relies on the annual certifications but also purports to rely on a Wells Fargo's Quality Control Plan and a letter related to that Plan. (AC-1 ¶¶ 160, 165.)  But the Plan and letter clearly fall within the scope of Paragraph 3(b) of the U.S. Release.  And even if they were considered separately, they are isolated statements (one in 2004 and one in 2006) which obviously could not (and do not purport to) establish FCA or FIRREA liability for all of the AC-1 "self-reporting" claims between 2002 and 2010.

[5]   *See* January 16, 2013 Declaration of Douglas W. Baruch ("Baruch Decl." (Dkt. 28)), Exh. E-1, at 14–16.  For ease of reference, this chart is also provided as Exhibit 1 to the February 22, 2013 Declaration of William Johnson.

Baruch Decl., Exh. D, at ¶ 3(b) (emphasis added).   Even the United States is compelled to acknowledge that the annual certifications "certify among other things the bank's compliance with quality control, including self-reporting."   (Opp. at 29.)

The only remaining question, therefore, is whether these AC-1 claims arise solely under the annual certifications, or whether they *also* arise under some other Wells Fargo certification or statement.   Faced with Wells Fargo's Motion, the United States had the burden of showing that these AC-1 claims are also based on some other certification or representation, but it utterly failed to do so.   The only other certification mentioned in the AC-1 is the individual loan-level certification, but as Wells Fargo has shown, and as Judge Collyer confirmed, these certifications are unique to each loan.   Moreover, as noted below, the AC-1 makes no allegation that the individual underwriters who made these loan-level certifications had personal knowledge about company-wide compliance with quality program standards or made any representations about company-wide conduct.

Wells Fargo does not contend that the U.S. Release is a general release for all claims relating to FHA loans.   To the contrary, as Wells Fargo has made clear all along, certain types of conduct and claims *are* reserved, including claims based on allegations that particular Wells Fargo underwriters knowingly falsified individual loan-level certifications concerning loan eligibility.   The problem for the United States, however, is that the AC-1 does not plead any of these reserved claims and, in fact, the United States expressly denies making them.[6]   The FCA

---

[6]    (Opp. at 23 ("Wells Fargo redrafts the allegations as if the bank's individual underwriters were the defendants …. But the bank's premise is incorrect. … The focus of the [AC-1] is on the bank itself.").)   Given this clear government representation, the AC-1's conclusory allegation that "Wells Fargo's underwriters knew, or should have known" that certain loans "did not meet FHA loan program parameters" (AC-1 ¶ 140) does not accurately portray the theory behind the AC-1 claims.  Far from making allegations about individual loan-level certifications, the actual theory is that "***Wells Fargo*** certified its ***entire portfolio*** …."  *Id.* (emphasis added).

and FIRREA claims in the AC-1 are claims based only on annual certifications of "company-wide compliance with HUD-FHA requirements," D.C. Opinion at 10, and they are barred.

## II.    THE STATUTE OF LIMITATIONS BARS FCA CLAIMS

The AC-1 seeks to impose FCA liability on Wells Fargo for conduct beginning as early as 2001. The supposed "reckless underwriting scheme," as those claims are now framed by the United States, *occurred entirely within the time period 2001–2005*. (Opp. at 1.) However, the FCA statute of limitations is six years, and, as detailed in Wells Fargo's Motion, all FCA violations prior to June 25, 2006, are therefore time-barred and must be dismissed. (Memo at 12–13.) While the precise number of FCA claims subject to dismissal on this ground cannot be determined – principally because the AC-1 does not particularize a single "false claim for payment" in violation of Rule 9(b) – it is clear from the "example" loans referenced in the AC-1 that the number is likely to be substantial. Indeed, each of the ten loans characterized as a "tiny sample" by the United States *closed in 2004 or earlier*, and the AC-1 alleges that default occurred, and that an insurance claim was paid, within months or "soon after closing," *i.e.*, well prior to June 25, 2006. (AC-1 ¶¶ 57–81, 91–115.)[7]

In response, the United States invokes creative theories in an attempt to avoid application of the time bar. The United States claims that: (1) the issue is premature; (2) as the sovereign "King," the statute of limitations should be construed in its favor;[8] (3) the Justice Department

---

[7]    The United States' argument that the statute of limitations is triggered by the payment, not the claim for payment (Opp. at 39 n.17), has no bearing here because: (1) while the AC-1 fails to provide either date with respect to any of the supposed false claims, there is no reason to believe that the claim and payment dates are not in close proximity; and (2) the argument is wrong with respect to the "reverse false claim" cause of action (Fifth Claim) because the limitations period for that alleged FCA violation is triggered by the alleged false statement (since there is no claim for payment under this theory). *See United States v. Najjar*, No. 6:10-cv-414-Orl-31DAB, 2012 WL 177412, at *4 (M.D. Fla. Jan. 23, 2012).

[8]    The United States' attempt to benefit from a more lenient limitations analysis (Opp. at 39) has no merit since the argument depends on inapposite cases where the statute in question – unlike here – has no specified limitations period. *See United States ex rel. Ramadoss v. Caremark Inc.*, 586 F. Supp. 2d 668, 701 (W.D. Tex. 2008).

only recently learned of the alleged fraud; and (4) incredibly, civil Justice Department lawyers should get extra time because the U.S. military has been fighting in Afghanistan since 2002. (Opp. at 39–48.)  None of these arguments changes the fact that many of the FCA claims are time-barred and must be dismissed.[9]

### A.   The AC-1 Does Not Properly Invoke the Ten-Year Statute of Repose

After Wells Fargo moved to dismiss the original FCA claims under 31 U.S.C. § 3731(b)(1), the United States tried to salvage the stale claims under § 3731(b)(2), the FCA's ten-year statute of repose, with the following language: the "Department of Justice learned the facts material to its claims … no earlier than 2011" (AC-1 ¶¶ 118, 136).  Now, with this brief amendment, the United States contends that it has cured the problem.  (Opp. at 41–42.)  Not so.

This AC-1 amendment is legally insufficient to invoke § 3731(b)(2).  The statute of repose applies only where the case is brought within three years after the date when the facts material to the right of action are known *or reasonably should have been known* to the requisite government official.  The amendment does nothing to cure the statute of limitations deficiency in the AC-1 because it is limited to an assertion based solely on the *wrong* official's *actual* knowledge.[10]  This pleading omission is no oversight.  The United States knows what the statute requires, but it nevertheless limited the amendment to "actual knowledge" by the Justice Department.  As Wells Fargo has shown, the 2004 HUD-OIG Audit, which is separately referenced in the AC-1 as evidence of Wells Fargo's misconduct (*e.g.*, AC-1 ¶ 123), was

---

[9]   *See Jones v. Overton*, 549 U.S. 199, 215 (2007) (explaining that 12(b)(6) dismissal is appropriate where all that is necessary to show the statute of limitations bar appears on the face of the complaint).  Because application of the statute of limitations has the potential to sharply curtail, if not eliminate, years of conduct in this matter, it should be applied now to streamline any remaining issues.  If the Court determines that there is a factual dispute as to the appropriate limitations period, the Court should limit initial discovery to that issue in order to promote efficient administration of the case.

[10]   *See Thompson v. Bellevue Hosp.*, No. 9:09-CV-01038, 2011 WL 4369132, at *8 (N.D.N.Y Aug. 29, 2011) (granting motion to dismiss on statute of limitations grounds where complaint insufficiently alleged the continuing violation doctrine by pleading general facts in support but omitting key aspects).

sufficient to trigger the "should have known" standard for purposes of § 3731(b)(2) (Memo at 14–16).  In fact, given that the AC-1 specifically relies on the very Wells Fargo monthly quality assurance reports that were examined in the HUD-OIG Audit (*e.g.*, AC-1 ¶¶ 54, 89)[11] to claim that *Wells Fargo* "knew, or should have known, that the loans contained unacceptable risk" (AC-1 ¶ 82), the United States cannot plausibly claim that *it should not have known* these same material facts.  *See Adams v. Deutsche Bank AG*, No. 11 Civ. 1893, 2012 U.S. Dist. LEXIS 143332 (S.D.N.Y. Sept. 24, 2012) (dismissing complaint under Rule 12(b)(6) on statute of limitations grounds where Senate Report placed plaintiffs on inquiry notice).

Separately, the AC-1 amendment does not properly invoke § 3731(b)(2) because it focuses solely on the general knowledge of the "Department of Justice" (AC-1 ¶¶ 118, 136).  In order to accept this allegation, this Court would have to find as a matter of law that the term "official" in this FCA provision actually means "Department of Justice official."  The FCA itself does not add this qualifier, and, as set forth in Wells Fargo's Motion, other courts, in similar circumstances, have held that an agency inspector general or equivalent is "the official" under § 3731(b)(2).[12]  Here, of course, the HUD-OIG not only "should have known" of the material facts, but had actual knowledge of them since they are detailed in the 2004 report.

## B.    The Wartime Suspension of Limitations Act Does Not Apply

This Court also should reject the United States' attempt to resurrect the FCA claims by invoking the Wartime Suspension of Limitations Act ("WSLA"), 18 U.S.C. § 3287.  The WSLA

---

[11]    Baruch Decl., Exh. F at 3 ("We reviewed two years of monthly quality control review reports ….").

[12]    (*See* Memo at 16.)  *See also United States v. Bollinger Shipyards, Inc.*, No. 12–920, 2013 WL 393037, at *16 (E.D. La. Jan. 30, 2013) (citing "the general proposition that the responsible official is the official who is also responsible for the activity [*i.e.*, the specific federal contract or program] out of which the action arose").  The legislative history of § 3731(b)(2) and analogous cases (*see* Memo at 16 n.17) support the holding in *United States v. Island Park*, which recognized "the basic fact that HUD and DOJ are both subdivisions of the same branch of the same government" in refusing to apply the FCA's ten-year statute of repose in the face of a similar HUD-OIG report, 791 F. Supp. 354, 363 (E.D.N.Y. 1992).

– a Title 18 Criminal Code statute – applies to "offenses" involving "fraud" against the United States. Not surprisingly, the Southern District of Texas decision cited by the United States is the only opinion by a federal court in the last fifty years to apply the WSLA in the civil context.[13] That decision, which was issued in an ongoing case and has not yet been appealed, relies on 1950s-era cases analyzing legislative history from the 1940s and does not address the legislative history to the 2008 amendment of the WSLA.[14] The more recent legislative history, combined with the plain language of the WSLA referencing an "offense"[15] and its placement in the criminal code (Title 18), establish that the WSLA applies only in the criminal context.

Moreover, even if the WSLA were to apply to the civil context and to the FCA, this Court would have to determine whether (1) it should apply to matters involving domestic mortgage loan practices, having nothing to do with wartime contracting, and (2) it applies to the AC-1 allegations, which repeatedly characterize Wells Fargo's conduct as "reckless," as opposed to "fraud" on the United States within the meaning of Title 18.[16]

---

[13]   *United States v. BNP Paribas SA*, No. 11-3718, 2012 WL 3234233 (S.D. Tex. Aug. 3, 2012).

[14]   The legislative history from 2008 emphasizes the WSLA's *criminal* enforcement objective. *See* S. Rep. No. 110-431, at 2 (2008) ("This legislation will protect American taxpayers from criminal contractor fraud."); *id.* at 4 (noting that the amendments were intended to make the WSLA "consistent with the general statute of limitations for criminal offenses"). Notably, the legislative history to the 2008 amendment of the WSLA makes no reference to the statute's limited application in the civil context over 50 years earlier. Moreover, the FCA, which has its own explicit statute of limitations, nowhere references the WSLA even though the FCA was amended twice in the two years following the 2008 WSLA amendment.

[15]   The term "offense" – which is never used in the civil FCA – is defined as "[a] violation of the law; a crime." Black's Law Dictionary (9th ed. 2009) (noting that "[t]he terms 'crime,' 'offense,' and 'criminal offense' are all said to be synonymous, and ordinarily used interchangeably"). "Thus, it is by no means clear from the statutory language that the term 'offense' as used in the WSLA necessarily includes civil offenses." *United States ex rel. Carter v. Halliburton Co.*, No. 1:11CV602 (JCC/JFA), 2011 WL 6178878, at *9 (E.D. Va. Dec. 12, 2011) (finding the WSLA inapplicable to a FCA action brought by a *qui tam* relator). Nor does the WSLA concept of "attempted fraud" have any meaning in FCA cases.

[16]   In addition, it is by no means clear that the 2008 WSLA amendments can be applied retroactively as the United States suggests. Since the United States has failed to particularize when any of the alleged claims were made or paid, application of the retroactivity analysis here is uncertain.

## III.   THE AC-1 FAILS TO MEET THE REQUIREMENTS OF RULE 9(b)

Faced with Wells Fargo's Rule 9(b) challenge, the United States now re-casts the AC-1 allegations as two separate "schemes" and argues that it need not provide the particulars of those schemes.  (Opp. at 18–19.)[17]  These tactics do not work.

To begin with, the United States' claim that Wells Fargo was engaged in a "reckless" origination and underwriting scheme makes no sense.  Schemes are intentional, not reckless.[18]  And, the variables at issue here – myriad alleged deficiencies surrounding tens of thousands of loans and quality practices over a ten-year period and involving untold (and unidentified) numbers of Wells Fargo staff and management – debunk the notion that the AC-1 allegations are "schemes."[19]  Moreover, any relaxed pleading standard does not apply to the United States,[20] which had the ability to investigate and ascertain the particulars of the alleged fraud prior to bringing suit.  (*See* Memo at 22–23.)[21]

---

[17]     The AC-1 uses the term "scheme" only with respect to the FIRREA claim (Sixth Claim).  The AC-1's FCA claims (First–Fifth Claims) do not incorporate the FIRREA allegations.

[18]     A scheme is defined as "[a] systemic plan; a connected or orderly arrangement, esp[ecially] of related concepts" and "[a]n artful plot or plan, usu[ally] to deceive others."  Black's Law Dictionary (9th ed. 2009).

[19]     *Cf. In re Cardiac Devices Qui Tam Litig.,* 221 F.R.D. 318, 323, 337 (D. Conn. 2004) (alleging a scheme where "[t]he alleged fraudulent activity with respect to each claim was ***the same***" (emphasis added)); *City of New York v. Joseph L. Balkan, Inc.*, 656 F. Supp 536, 545 (E.D.N.Y. 1987) (alleging specific mail fraud "schemes" involving "***standardized*** documents containing ***identical*** false representations" (emphasis added)).  The cases cited by the United States for its "schemes" theory make the same point.  *See, e.g., United States v. Huron Consulting Grp., Inc.*, No. 09 Civ. 1800 (JSR), 2011 WL 253259, at *3 (S.D.N.Y. Jan. 24, 2011) (involving a single, hospital-wide "cost-to-charge ratio"); *In re U.S. Foodservice Inc. Pricing Litig.*, No. 3:07 MD 1894 (CFD), 2009 WL 5064468, at *4 (D. Conn. Dec. 15, 2009) (involving "systematic" invoice inflations).

[20]     The "complex fraudulent scheme" cases cited by the United States (Opp. at 18–19) are inapposite since they involve allegations by private parties with no pre-filing governmental investigative powers.  Here, considering its issuance of four FIRREA subpoenas to Wells Fargo pre-suit, the United States had no such impediment, nor is this a case where "the pleading requirements of Rule 9(b) may be ***slightly*** relaxed" because "facts about the fraud are peculiarly within the perpetrator's knowledge."  *Bollinger Shipyards, Inc.*, 2013 WL 393037, at *7 (emphasis added; internal quotations omitted).  Of course, even where relaxed pleading is available, it "must not be mistaken for [a] license to base claims of fraud on speculation and conclusory allegations."  *Id.* (internal quotations omitted).

[21]     The United States tries to gloss over the fact that the AC-1 does not name Wells Fargo Home Mortgage, Inc. ("WFHM Inc.") as a defendant or plead successor liability.  But there is no excuse for this omission because the Form 92900-As for at least six of the ten loans listed in the AC-1 show that the loans were originated by WFHM Inc., not Wells Fargo.  The United States' lack of due diligence does not warrant a relaxed pleading standard, and the United States offers no adequate justification for why it should be able to maintain a deficient pleading.

The United States confuses volume with particulars.  Wells Fargo does not contend that the AC-1 lacks "great detail" (Opp. at 19) but, instead, that it lacks the particulars of the alleged fraud.  If this is a case about Wells Fargo management affirmatively deciding not to "self-report" thousands of materially deficient loans to HUD over a nine year period (2002–2010), surely the AC-1 must identify the management and describe the scheme, but, apart from references to one 2006 letter, no Wells Fargo management are identified anywhere in the AC-1.  If this is a case about reckless loan origination certifications by Wells Fargo underwriters over a five-year period (2001–2005), surely the AC-1 must identify at least some underwriters who acted recklessly, and how so, when certifying that specified loans met HUD-FHA eligibility requirements.  But the AC-1 does not identify a single underwriter who acted recklessly in any manner.  The United States never disputes these AC-1 shortcomings, nor does it claim to be able to identify management or underwriters who engaged in this alleged misconduct.  Instead, the United States cites to case law stating that it is not necessary to identify the individual who submitted the false claim for payment.  (Opp. at 23.)  Even assuming that is true, Wells Fargo's Motion does not turn on that question.  Wells Fargo has instead argued it is entitled to the particulars of the alleged fraud, including the identities of the individuals who acted with the requisite scienter.[22]

---

[22]  *See Bollinger Shipyards, Inc.*, 2013 WL 393037, at *10 (finding letters expressing an after-the-fact awareness insufficient to allege "that [the defendant] knew of any false … calculations, intended for the company to conduct false calculations in the future, or instructed anyone to do so").  Even where an institution is the defendant, the particulars showing who within the institution had the requisite intent must be pleaded.  Moreover, collective knowledge is not a viable theory under the FCA.  *See United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1275–76 (D.C. Cir. 2010).  While two of the AC-1 appendices purport to list loans "for which a false claim … was submitted" (Opp. at 22), Wells Fargo was not "mistaken" in saying that these appendices, which only list loan numbers, do not specify any false statements, who made them, or any false claim for payment associated with them.  Neither the ten so-called sample loans nor the appendices rise to the level of being "representative of the broader class" and "detailed enough to satisfy Rule 9(b) particularity requirements."  *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510–14 (6th Cir. 2007).

## IV.   THE AC-1 FAILS TO STATE ANY FCA CLAIM

### A.   The AC-1 Only Alleges Implied False Certifications That Are Not Actionable

The claims as pleaded in the AC-1 are, at most, implied false certifications that are not actionable under the FCA in this jurisdiction.  (*See* Memo at 25–31.)  In response, the United States makes the contradictory assertions that the AC-1 alleges (1) factually false, (2) express legally false, and (3) implied legally false certifications.[23]

To the extent that the United States wants to rely on the individual underwriter's loan-level certification regarding a specific loan's eligibility for FHA insurance, that certification says nothing about Wells Fargo's compliance with quality control, training, supervision, and self-reporting obligations that are central to the AC-1 allegations.   As such, these loan-level certifications are, at most, impliedly false and are actionable "only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid."  *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001) (emphasis in original).[24]  While the AC-1 makes a conclusory assertion that the certifications are conditions of payment (*see, e.g.*, AC-1 ¶ 143), that is not enough, even in the 12(b)(6) context, because "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare

---

[23]   (*See* Opp. at 28–29, 30 n.9.)  These are separate and distinct classifications.  *See United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113–14 (2d Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 1885 (2011); *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008).  The United States has not explained how the same statements can at the same time be all three – clearly they cannot.  Moreover, the Opposition merely proclaims that these certifications are factually false and expressly false, without any analysis or actual support.  The cases cited by the United States are not on point.  (*See* Opp. at 28–29).  For example, *United States v. Bornstein*, 423 U.S. 303 (1976), does not even make the factual versus legal analysis whereas the Second Circuit has clearly defined "legal" falsity as involving compliance with underlying contracts, statutes, or regulations – exactly the situation alleged here.

[24]   The United States is wrong to argue (Opp. at 31 n.10) that *Mikes* is limited to healthcare cases.  Wells Fargo's Motion cites decisions, arising in myriad non-healthcare contexts, applying the condition of payment analysis.  (*See* Memo at 26 n.27.)   Indeed, the Second Circuit applied the *Mikes* analysis in a non-healthcare context.  *See Schindler*, 601 F.3d at 114.  Moreover, *United States ex rel. Feldman v. City of New York*, on which the United States relies, (1) is not controlling precedent, (2) failed to address the Second Circuit's decision in *Schindler*, and (3) found that the implied certifications at issue were actionable even under the *Mikes* analysis.  808 F. Supp. 2d 641, 654 (S.D.N.Y. 2011).

recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[25]  As Wells Fargo explained in its Motion, FHA regulations do not condition payment, much less *expressly* condition payment, on compliance with quality control and self-reporting requirements.  (*See* Memo at 27–31.)

### B.   The AC-1 Does Not State a Reverse False Claim

The United States' "reverse false claims" theory (Fifth Claim) rests on the mistaken assumption that HUD would have obtained indemnification from Wells Fargo for every self-reported loan with a material finding and that by failing to report these "deficient" loans to HUD, Wells Fargo avoided an obligation to indemnify HUD.  (Opp. at 37.)  Putting aside for the moment the fact that indemnification is not an "obligation to pay or transmit money or property ***to*** the government"[26] – which alone is fatal to the United States' claim – the claim fails because (1) any such indemnification prior to 2009 cannot be a FCA violation because it was not a "fixed" obligation within the meaning of the FCA and (2) the AC-1 does not and cannot allege that HUD's ability to request indemnification creates any Wells Fargo "obligation."

Prior to the 2009 FCA amendments (*i.e.*, the time period applicable to "a greater portion" of the AC-1 claims (Opp. at 36 n.14)), the law was clear that a reverse false claims violation could arise only where the obligation to pay was fixed.  31 U.S.C. § 3729(a)(7) (pre-2009).

---

[25]   Nor can the Court credit the Opposition assertion that it is relying on Wells Fargo's insurance claims.  (Opp. at 17).  The AC-1 never mentions these claims, let alone identifies language that could be deemed an expressly false certification (and the insurance claims, like the loan-level certifications, cannot be considered factually false under any definition).

[26]   31 U.S.C. § 3729(a)(7) (emphasis added).  Contrary to the United States' characterization (Opp. at 37), FHA regulations and the AC-1 itself establish that indemnification is not an obligation to pay money *to* the government. Indemnification does not involve a payment to the government where the mortgagee is the holder of the loan; rather, it is the absence of requesting a payment from the government if the loan defaults (which it may never do).  24 C.F.R. § 203.255(g)(5) ("mortgagee agrees to either abstain from filing an insurance claim, or reimburse FHA if a subsequent holder of the mortgage files an insurance claim and FHA suffers a financial loss"); *see also* AC-1 ¶ 43. Here, the United States alleges that Wells Fargo was the holder of record for the "vast majority" of the loans at issue (AC-1 ¶ 5).  Thus, indemnification means that Wells Fargo abstains from making an insurance claim.  Nothing – neither money nor property – is transmitted *to* the government.

Here, any obligation cannot be "specifically fixed to the amount of the FHA insurance claim," as the United States claims (Opp. at 38), for three reasons: (1) the amount of any potential, future claim is unknown at the time of the alleged false statement made to avoid indemnification; (2) the amount of any insurance claim does not necessarily equate to a "financial loss" to FHA, due to the inherent value of the property, title of which is often transferred to HUD-FHA; and (3) even where an indemnification agreement is in place, a claim for FHA insurance may be allowed because the indemnification agreement expired before any loan default.[27]   All of these factors negate the necessary pre-2009 reverse false claims element of a *fixed* obligation.

While the 2009 amendments altered the reverse false claims language slightly, they did not change the fundamental element of an *obligation* to pay the government.   31 U.S.C. § 3729(a)(1)(G) (2009); *see also* 31 U.S.C. § 3729(b)(3) ("[T]he term 'obligation' means an **established duty** …." (emphasis added)).   Notably, in the AC-1, the United States does not and cannot identify any actual obligation to pay the government that Wells Fargo avoided – fixed or not.   To the contrary, the AC-1 repeatedly admits the reality that indemnification is *not* automatic, but is contingent on a number of factors and is within HUD's discretion, such that indemnification does not occur on every self-reported loan.   (*See, e.g.*, AC-1 ¶¶ 4, 120, 135.)[28]

---

[27]   *See* 77 Fed. Reg. 3598, 3599–600 (Jan. 25, 2012) ("Indemnification for 5 years from the date of insurance endorsement is the current standard practice for indemnification.").

[28]   *See Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 738 (6th Cir. 1999) ("Contingent obligations – those that will arise only after the exercise of discretion by government actors – are not contemplated by the [FCA]."). Beyond the AC-1 admissions themselves, the Court can take notice of the fact that the FHA regulations recently were amended to require indemnification in certain circumstances, but only from "lender insurers." *See* 77 Fed. Reg. 3598, 3603 (Jan. 25, 2012) ("[L]enders with lender insurance authority will be subject to indemnification procedures and **will not be able to negotiate the settlement as is the current practice**." (emphasis added)).   There was no prior and is no current regulation mandating indemnification from Direct Endorsement Lenders ("DELs"), and the AC-1 only makes allegations with respect to the DEL program.  And even the new mandate regarding lender insurers is only triggered for "serious **and** material" violations, 24 C.F.R. § 203.255(g)(3) (emphasis added), presumably a different standard than an internal "material" finding at Wells Fargo or a "material violation" under the U.S. Release.

This contingent nature of the so-called obligation, apparent from the face of the AC-1, is a fatal pleading defect.

### C.   The AC-1 Has Not Pleaded the Requisite Causation Under the FCA

Wells Fargo seeks dismissal of the FCA claims because the AC-1 does not allege any proximate causation between the thousands of alleged FHA loan defaults (and resulting insurance claims) and the supposed deficiencies that Wells Fargo either failed to detect or to report.  (Memo at 31–33.)  In response, the United States asserts that it is relying on a "but for" causation theory and that the AC-1 adequately pleads both "but for" and "proximate" causation.  (Opp. at 33–34.)[29]  The United States' reliance on "but for" causation in this type of case is misplaced.  Indeed, the United States concedes that the law in this Circuit is "unsettled," and yet it wrongly insists that the *Cicero* "but for" standard is controlling as opposed to the *Hibbs* proximate causation approach adopted by the Third and Fifth Circuits in FCA cases involving FHA loans.  *See, e.g.*, *United States v. Miller*, 645 F.2d 473, 476 (5th Cir. 1981) ("In the context of a federal housing case, the United States must show that the false statements in the application [for mortgage insurance] were the cause of subsequent defaults.").

Moreover, the United States' description of causation standards is inaccurate.  For instance, the United States completely misstates a Third Circuit decision – far from equating the proximate cause and "but for" standards as the United States argues (Opp. at 34), that court was

---

[29]   The AC-1's conclusory assertion – that "Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments" – is not adequate, even for pleading purposes, because it is limited to ten specific loans.  (*See, e.g.*, AC-1 ¶¶ 60, 65, 70.)  The AC-1 makes no causation allegation whatsoever regarding the thousands of other loans for which it seeks to impose FCA liability.  Nor could it because the United States never identifies the alleged thousands of other loans at issue or the alleged deficiencies within those loans.

simply summarizing the two *different* standards.[30]   Likewise, the United States' attempt to rely on a recent decision within this District in a private breach of contract case involving a mortgage lender and insurer is misleading.  In fact, an earlier decision in that case, which was referenced in the decision quoted by the United States, makes clear that the causation analysis was dependent on the written contract at issue in that dispute.[31]

## V.   THE AC-1 FAILS TO STATE ANY FIRREA CLAIM

Wells Fargo's Motion shows how the United States has tried to manufacture FIRREA claims against Wells Fargo.  It is now clear that the United States has little relevant authority to support its FIRREA theories, and this Court should dismiss the AC-1 FIRREA cause of action (Sixth Claim) for failure to state a claim.

### A.   The FIRREA Claim Based on 18 U.S.C. § 1005 Fails

Wells Fargo's Motion shows that 18 U.S.C. § 1005 cannot be a FIRREA predicate offense against Wells Fargo because it applies only to individuals.  (Memo at 36–37.)  Indeed, numerous courts have interpreted the various paragraphs of § 1005 – all of which begin "Whoever …" – as being limited to claims against individuals.  *See United States v. Barel*, 939 F.2d 26 (3d Cir. 1991); *United States v. Ortiz*, 906 F. Supp. 140 (E.D.N.Y. 1995); *United States v. Edwards*, 566 F. Supp. 1219 (D. Conn. 1983).  The United States' sole response is to argue that the fourth paragraph of § 1005 must be treated differently because it was added at a later time.  But no law or statutory construction principle supports the United States' position.  To the

---

[30]   *See United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 417 (3d Cir. 1999).  Moreover, comparison of an FCA mortgage insurance case to an FCA grant case – as in *Cantekin* – is misleading because most FCA "grant" cases are based on a "fraud in the inducement" theory, which has not been (and cannot properly be) alleged here.

[31]   *See Assured Guaranty Mun. Corp. v. Flagstar Bank,* No. 11 Civ. 2375 (JSR), 2013 WL 440114, at *8 (S.D.N.Y. Feb. 6, 2013) ("Moreover, given the Court's prior ruling that 'the causation that must here be shown is that the alleged breaches caused plaintiff to incur an increased risk of loss,' Mem. at 12, ECF No. 100 (Sept. 25, 2012) ….").  The *Assured Guaranty* breach of contract causation analysis has no bearing on the AC-1's FCA theories.

contrary, the fact that Congress added this subsection to the preexisting paragraphs of § 1005, with knowledge of the case law (*e.g.*, *Edwards*) interpreting the same language as applying only to individuals, evidences a legislative intent that it be interpreted the same.[32]   Indeed, another court in this district analyzed and applied this same history and ruled that the fourth paragraph of § 1005 applies only to bank insiders, notwithstanding the fact that the fourth paragraph was added well after the first three paragraphs.  *See United States v. Rubin/Chambers, Dunhill Ins. Serv.*, 798 F. Supp. 2d 517, 525–27 (S.D.N.Y. 2011).  Wells Fargo obviously is not "an insider to its own fraudulent scheme" as the United States suggests, nor is there any allegation in the AC-1 that would support such a claim.  Indeed, an "insider," by definition, is "[o]ne who takes part in the control of a corporation, such as an officer or director."  Black's Law Dictionary (9th ed. 2009).  This FIRREA claim fails as a matter of law.

### B.   The FIRREA Claim Based on 18 U.S.C. § 1014 Fails

In response to Wells Fargo's argument that the AC-1 does not particularize any false statement that falls within the scope of 18 U.S.C. § 1014, the United States points to AC-1 "statements" post-2008 (Opp. at 54–55), none of which could possibly establish a § 1014 violation or meet Rule 9(b).  As the United States admits, the only conduct at issue after 2005 pertains to the alleged "self-reporting" violations (*see* AC-1 ¶¶ 2, 4), but the "statements" referenced by the United States are individual "claims for insurance payments" by Wells Fargo, which have nothing to do with self-reporting.  Neither the AC-1 nor the Opposition identifies any false statement associated with any claim for insurance proceeds, let alone one that is pleaded with the requisite particularity.  And, the annual certifications themselves, which the United

---

[32]   *See Comm'r v. Lundy*, 516 U. S. 235, 250 (1996) ("The interrelationship and close proximity of these provisions of the statute 'presents a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.'" (quoting *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990))).

States also references as "statements" for § 1014 purposes (Opp. at 55), are barred by the U.S.

Release.  As such, this FIRREA theory fails.

### C.    The AC-1's "Affect Yourself" FIRREA Theory Fails

The United States concedes that its FIRREA claims based on violations of 18 U.S.C.

§§ 1001, 1341, and 1343 cannot succeed unless this Court rules, as a matter of law, that the

"affected" financial institution is Wells Fargo itself.  Yet, the United States has not cited a single

case that supports this "affect yourself" theory of liability.  Rather, the United States' cases (*see,*

*e.g.*, Opp. at 56 n.26, 58 n.27) stand for the unremarkable proposition that third parties, not a

financial institution itself, can be subject to an extended limitations period or enhanced

sentencing.  Moreover, each of these cases supports a finding that Congress did not intend for

financial institutions to be liable for "affecting themselves," but, rather, that FIRREA was

enacted to *protect* financial institutions and the public from both outsiders and insiders.[33]   In

short, there is no support for the notion that Wells Fargo can "affect" itself, and this Court should

not be the first to adopt, over two decades after the statute was enacted, such a stretched and

novel theory of FIRREA liability.

Even if this Court were to entertain the "affect yourself" theory, the AC-1 does not

adequately plead an effect.  While the United States suggests that "indemnifications" should

satisfy the "effect" test (Opp. at 62), the AC-1 never identifies a single indemnification.  Nor can

the United States craft an "effect" by citation to an unrelated private civil litigation settlement

---

[33]    Wells Fargo has not "cherry-pick[ed]" FIRREA's legislative history (Opp. at 59).  Rather, Wells Fargo relies on the legislative history for § 1833a and the intended purpose of § 1833a(c)(2).  (Memo at 41–44.)  It is the United States that simply ignores the pertinent parts of the legislative history cited by Wells Fargo and misleadingly refers to general purposes of FIRREA as if § 1833a were the only mechanism through which those purposes could be accomplished.  (Opp. at 48–50.)  Moreover, the United States' focus on legislative history using the phrase "involving financial institutions" (Opp. at 59) only undercuts its argument, as the drafters of FIRREA explicitly used this phrase in stating that the Justice Department was to employ § 1833a to pursue "the prosecution of individuals who have acted illegally against financial institutions."  H.R. Rep. No. 101-54, pt. 1, at 311 (1989).  The United States also fails to address the legislative history demonstrating that § 1833a(c)(2) was modeled on the bank fraud statute at 18 U.S.C. § 1344, which criminalizes actions that "defraud" a financial institution (*see* Memo at 43).

(Opp. at 63–64). Unlike the cases cited by the United States, where the effect was tied to a settlement involving the same transaction at issue in the criminal case, *see, e.g.*, *United States v. Ghavami*, No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *7–8 (S.D.N.Y. July 13, 2012), the allegations in the settlement cited in the AC-1 (*see* AC-1 ¶ 172) are unrelated to the AC-1 allegations, and did not even involve FHA loans. Moreover, as established in *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, a settlement which "does not contain an express admission of guilt" and "features language disclaiming any factual admissions … is not direct evidence of an effect on a financial institution." 831 F. Supp. 2d 779, 784 (S.D.N.Y. 2011) (internal quotations omitted). The United States' attempt to create a FIRREA "effect" in this manner, much less through the filing of this very action, fails in every way.

## VI.    THE AC-1 FAILS TO STATE ANY COMMON LAW CLAIMS

The United States does nothing to overcome the statute of limitations and Rule 9(b) deficiencies with respect to the AC-1's common law claims (Seventh–Eleventh Claims). Moreover, with respect to the fiduciary duty count (Seventh Claim), the AC-1 cites no authority in attaching a "fiduciary" label to Wells Fargo,[34] and this Court should reject these hollow claims, particularly since (1) a court may not assume a fiduciary duty from a "repose of trust," *Sinclair v. Donovan*, Nos. 1:11–CV–00010, 1:11–CV–00079, 2011 WL 5326093, at *10 (S.D. Ohio 2011), and (2) HUD regulations and handbooks flatly contradict the AC-1's bare assertion that Wells Fargo was a fiduciary (*see* Memo at 48 (describing HUD's pre-endorsement review prerogatives)). Finally, there is no merit to the United States' assertion (Opp. at 67) that the Mortgage Insurance Certificate is not an express contract that precludes the AC-1's unjust

---

[34]   *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (holding that a complaint must plead facts "plausibly suggesting (not merely consistent with)" each element of a cause of action). The administrative decisions cited by the United States (Opp. at 66) are not binding on this Court and only summarily mention fiduciary responsibilities or focus on inapposite aspects of the mortgagee role.

enrichment and payment by mistake causes of action (Tenth and Eleventh Claims).  In fact,
federal regulations state just the opposite: "From the date of the issuance of a Mortgage
Insurance Certificate … [t]he Commissioner and the mortgagee are thereafter bound by the
regulations in this subpart with the same force and to the same extent as if a separate contract had
been executed relating to the insured mortgage, including the provisions of the regulations in this
subpart and of the [National Housing] Act."  24 C.F.R. § 203.257; *see also Am. Home Mortg.
Servicing, Inc. v. Donovan*, No. 3:10-CV-1936-M, 2011 WL 2923978, at *1 (N.D. Tex. July 20,
2011).  Accordingly, these claims must be dismissed.  (*See* Memo at 48–49.)

## CONCLUSION

For all these reasons, Wells Fargo requests that the Court grant its Motion to Dismiss.

Dated:   New York, New York
          February 22, 2013

By:  ___*/s/ William F. Johnson*___

William F. Johnson
Douglas W. Baruch, *pro hac vice*
Jennifer M. Wollenberg, *pro hac vice*
FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000
william.johnson@friedfrank.com
douglas.baruch@friedfrank.com
jennifer.wollenberg@friedfrank.com

Michael J. Missal, *pro hac vice*
Amy Pritchard Williams, *pro hac vice*
K&L GATES LLP
1601 K Street NW
Washington, DC 20006-1600
(202) 778-9000
michael.missal@klgates.com
amy.williams@klgates.com

Attorneys for Defendant
    Wells Fargo Bank, N.A.