UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
:
UNITED STATES OF AMERICA,                          :
:
                                  Plaintiff,       :            12 Civ. 7527 (JMF)
:
                    -v-                            :            OPINION AND ORDER
:
WELLS FARGO BANK, N.A.,                            :
:
                                  Defendant.       :
:
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        The United States brings this civil fraud action against Defendant Wells Fargo Bank,

N.A. ("Wells Fargo" or the "Bank"), alleging that the Bank engaged in misconduct in originating

and underwriting government-insured home mortgage loans.  The Government seeks damages

and civil penalties, likely to total hundreds of millions of dollars, under the False Claims Act (the

"FCA"), 31 U.S.C. §§ 3729 *et seq.*; the Financial Institutions Reform, Recovery, and

Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a; and New York common law.  Wells

Fargo moves to dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the

Federal Rules of Civil Procedure, arguing that: (1) the Government released the claims at issue

pursuant to a consent judgment entered by the United States District Court for the District of

Columbia in a previous lawsuit; (2) many of the Government's FCA and common law claims are

time barred; (3) the Amended Complaint fails to satisfy the pleading requirements of Rule 9(b);

and (4) the Amended Complaint fails to state a claim upon which relief can be granted.[1]

---

[1]      Wells Fargo also asserts that, "for several of the years at issue," the relevant mortgage
loan business was conducted by Wells Fargo Home Mortgage, Inc., "a separate and distinct legal
entity."  (Wells Fargo Mem. 18).  At this stage of the litigation, however, there is no evidence to

For the most part, Wells Fargo's arguments are unavailing.  As an initial matter, the consent judgment does not bar any of the Government's claims.  Furthermore, the claims are pleaded with sufficient particularity to satisfy Rule 9(b).  In addition, the federal statutory claims are sufficient to allege a plausible basis for relief under Rule 12(b)(6).  And, on the current record, there is no basis to dismiss any of the statutory claims as untimely.  Therefore, all of the Government's federal statutory claims may proceed.  Many of the Government's common law claims, however, must be, and are, dismissed.  In particular, any tort claims that arose before June 25, 2009, are time barred.  Additionally, the Government's mistake of fact and unjust enrichment claims are dismissed in their entirety: Those arising before 2004 are untimely, and those arising thereafter are barred because the United States Department of Housing and Urban Development was aware of Wells Fargo's misconduct at the time.  Accordingly, as explained in more detail below, Wells Fargo's motion is DENIED as to the Government's federal statutory claims and GRANTED in part and DENIED in part with respect to the Government's common law claims. [2]

## BACKGROUND

Unless otherwise stated, the following facts are taken from the Amended Complaint (Docket No. 22) and are assumed, for purposes of this opinion, to be true.  *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

---

support this assertion.  The Amended Complaint, the truth of which the Court is required to assume for purposes of considering the Bank's motion to dismiss, alleges that Defendant Wells Fargo Bank, N.A. committed all of the alleged misconduct at issue.  If, after discovery, the evidence indicates that another entity was responsible for some or all of the loans at issue here, the Government may move for leave to amend its complaint to allege successor liability, if applicable, or Wells Fargo may move to dismiss the claims that do not pertain to it.

[2]     Following oral argument on this motion, the Government withdrew the Fifth Claim alleged in its Amended Complaint, a claim for relief based on "reverse false claims."  (Docket No. 35).  By memorandum endorsement, that claim was dismissed and is not at issue here.

**A.  The Direct Endorsement Lender Program**

The United States Department of Housing and Urban Development ("HUD"), through the Federal Housing Administration ("FHA"), insures approved lenders against losses on certain home mortgage loans.  (Am. Compl. ¶ 13).  If a homeowner whose mortgage is FHA-insured defaults, HUD will pay the lender the balance of the loan as well as assume ownership of and manage any foreclosed property.  (*Id.* ¶ 14).  By protecting lenders against mortgage defaults, FHA insurance encourages lenders to make home loans to creditworthy borrowers to whom the lenders might not otherwise offer a mortgage.  (*Id.*).

One program through which FHA insures home mortgages is the Direct Endorsement Lender program.  (*Id.* ¶ 15).  Direct Endorsement Lenders ("lenders") are authorized to evaluate the credit risk of potential borrowers, underwrite mortgage loans, and certify those loans for FHA mortgage insurance "without prior HUD review or approval."  (*Id.*).  In doing so, these lenders are required to comply with regulations — including those found in HUD Handbooks and Mortgagee Letters — governing, among other things, the origination and underwriting of individual loans; the hiring, training, and compensation of underwriters; the monitoring and reporting of the quality of loans originated; and the submission of FHA claims for defaulted loans.  (*Id.* ¶¶ 17-30, 37-43).  Each lender is required to make an annual certification of compliance with the program's requirements.  (*Id.* ¶ 37).

The claims at issue in this case arise from Wells Fargo's participation in the Direct Endorsement Lender program.

**1.  Issuance of Individual Mortgages**

HUD requires Direct Endorsement Lenders to conduct due diligence before issuing FHA-insured mortgages.  (*Id.* ¶¶ 19-20).  In particular, when issuing a loan, an underwriter must

"determin[e] a borrower's ability and willingness to repay a mortgage debt," and examine any "property offered as security for the loan to determine if it provides sufficient collateral." (*Id.* ¶ 19 (citing 24 C.F.R. §§ 203.5(d), (e)(3))). HUD provides specific requirements for how underwriters are to evaluate a borrower's credit risk and appraise mortgaged property. (Am. Compl. ¶¶ 21-23). These requirements specify, for example, the documents an underwriter must obtain from a potential borrower, the information the underwriter must request from the borrower, and the factors a lender is to consider in determining whether to issue a mortgage. (*Id.*). In making loan decisions, a Direct Endorsement Lender is required by law to "'exercise the same level of care which it would exercise in obtaining and verifying information for a loan'" that was not FHA-insured — that is, a loan where the lender was "'entirely dependent on the property as security to protect its investment.'" (*Id.* ¶ 19 (quoting 24 C.F.R. § 203.5(c))).

After each loan is issued, the lender must make several certifications regarding its compliance with HUD regulations. For example, if the loan was underwritten using an FHA-approved automated underwriting system, the lender must certify to "the integrity of the data" inputted into the system "to determine the quality of the loan," and it must certify "that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." (Am. Compl. ¶ 38 (internal quotation marks and brackets omitted)). If the loan was manually underwritten, the lender must certify that "the underwriter personally reviewed the appraisal report (if applicable), credit application, and all associated documents and has used due diligence in underwriting the mortgage." (*Id.* (internal quotation marks and brackets omitted)). In all cases, the underwriter must certify that he or she has "personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents." (*Id.*). The underwriter must also "make all certifications required for th[e] mortgage as set forth in

HUD Handbook 4000.4." (*Id.* ¶ 39 (internal quotation marks omitted)).  And the lender must certify that the mortgage "complies with HUD rules and is eligible for HUD mortgage insurance under the Direct Endorsement program." (*Id.* ¶ 38 (internal quotation marks omitted)).

If HUD discovers that a loan endorsed for FHA insurance is, in fact, ineligible to be insured, "HUD seeks indemnification from the Direct Endorsement Lender that certified the loan via an indemnification agreement whereby the lender agrees to indemnify HUD should claims for FHA insurance be submitted on that loan." (*Id.* ¶ 40).

## 2.  Quality Control and Reporting

In order to participate in the Direct Endorsement Lender program, lenders must implement a quality control system that is independent of the lender's loan origination and servicing departments.  (*Id.* ¶ 24).   HUD's quality control requirements mandate that, among other things, lenders review a random sample of loans each month to ensure they were underwritten in accordance with HUD requirements, and that they review all early payment defaults — that is, loans that default within the first six payments.  HUD Handbook 4060.1 REV-2, ¶ 7-6.  (*See also* Am. Compl. ¶ 24).

HUD provides a rating system by which lenders may evaluate the loans they review.  (*Id.* ¶ 26).  Loans with only minor or no violations of HUD's origination and servicing guidelines are rated low risk; those with violations, but none that is "material to creditworthiness, collateral security or insurability of the loan," are considered acceptable; mortgages with "significant unresolved questions or missing documentation" are labeled a "moderate risk to the mortgagee and FHA"; and mortgages that contain "material violations of FHA or mortgagee requirements . . . represent an unacceptable level of risk" and are labeled "material risk" loans.  HUD Handbook 4060.1 REV-2, ¶ 7-4.  (*See also* Am. Compl. ¶ 26).  Lenders are required to report to

FHA in writing any "material risk" mortgages they identify.  HUD Handbook 4060.1 REV-2, ¶ 7-4.  HUD also requires that lenders report any "'[s]erious deficiencies, patterns of non-compliance, or fraud'" they discover "within 60 days."  (Am. Compl. ¶ 28 (quoting HUD Handbook 4060.1 REV-1, CHG-1, ¶ 6-13)).  In addition to reporting these violations to HUD, quality control review findings must also be reported to lenders' "'senior management,'" which is required to "'take prompt action to deal appropriately'" with the problems.  (*Id.* ¶ 30 (quoting HUD Handbook 4060.1 REV-2, ¶ 7-3(I))).

During the time period relevant to this case, Wells Fargo maintained a quality control program.  (*Id.* ¶¶ 31- 36).  Through this program, the Bank conducted "monthly reviews of a random sample of loans originated . . . within the prior 60 days," as well as "at least some portion of its [early payment defaults]."  (*Id.* ¶ 31).  In reviewing its loans, Wells Fargo largely adopted the rating system provided by the HUD Handbook.  (*Id.* ¶ 32).  Although not identical to that provided in the Handbook, Wells Fargo's definition of "material risk" loans "mirrored HUD's in substance, and made clear that a loan with that rating contained unacceptable risk and was ineligible for FHA insurance."  (*Id.*).  The findings of Wells Fargo's quality control reviews were reported monthly to the Bank's senior management.  (*Id.* ¶ 34).

**B.  Reckless Origination and Underwriting Allegations**

The Government alleges that between May 2001 and October 2005, "Wells Fargo engaged in a regular practice of reckless origination and underwriting of its [FHA-insured] loans and falsely certified to HUD that tens of thousands of those loans were eligible for FHA insurance."  (*Id.* ¶ 44).  In particular, the Government alleges that beginning in 2000, Wells Fargo significantly increased its origination of FHA-insured mortgages.  (*Id.* ¶ 46).  To do so, the Bank relied on inadequately trained employees (*id.* ¶¶ 46, 86); impermissibly paid its

underwriters a bonus based on the number of loans they approved (*id.* ¶ 47); "applied heavy pressure on loan officers and underwriters to originate, approve, and close loans" (*id.* ¶ 48); "required underwriters to make decisions on loans on extremely short turnaround times" (*id.*); and "employed lax and inconsistent underwriting standards and controls" (*id.*).

As a result, "the quality of the bank's [FHA-insured home mortgage] loans dropped precipitously." (*Id.* ¶ 50). Underwriters were certifying as eligible for FHA insurance loans they knew or should have known were not so eligible. (*Id.* ¶ 140). Between May 2001 and January 2003, an average of 32.9% — that is, nearly a third — of the randomly sampled loans the Bank reviewed every month evidenced material violations of HUD regulations. (*Id.* ¶ 54).[3] For several months during that time period, the material violation rate climbed to over forty percent. (*Id.*). Between February 2003 and October 2005, the monthly material violation rate of randomly reviewed loans averaged 16.4%. (*See id.* ¶ 89).

Wells Fargo's Quality Assurance department reported these findings to the Bank's senior management. (*Id.* ¶ 50). The department warned the Bank's management that "heavy volume, pressure to approve loans and meet acceptable turn[around] times[,] along with inexperienced staff are key contributing factors overall to the issues leading to material findings." (*Id.* ¶ 85). Yet the Bank did almost nothing. (*Id.* ¶¶ 55, 85). It did not change its focus on high volume loan origination or its tactics for generating such volume; it did not prepare a written action plan to address the loans with material violations; it did little to no follow-up on these loans; it did not report the loans to HUD; and it did not document any corrective action that was taken. (*Id.* ¶¶ 55, 84-86). Despite knowing that a substantial portion — in some months, nearly half — of its loans issued between 2001 and 2005 evidenced material violations of HUD regulations, Wells

---

[3]     This calculation excludes the months of September 2001, September 2002, and October 2002, for which data are not available.

Fargo nevertheless "certified its entire portfolio of retail FHA loans for insurance, and thereby falsely certified that thousands of retail FHA loans were eligible for insurance when they were not." (*Id.* ¶ 140; *see id.* ¶¶ 54, 84, 89).

Wells Fargo sold some of these FHA-insured loans to third parties "knowing" that those third parties would submit claims to HUD if the loans defaulted. (*Id.* ¶¶ 82, 117). But "for the vast majority of its retail FHA loans originated in this period," the Bank "remained the holder of record," and thus "was paid on claims for FHA insurance when those loans defaulted." (*Id.* ¶ 82; *see id.* ¶ 117).

## C. Allegations Regarding Wells Fargo's Failure To Self-Report Material Violations

HUD requires — and throughout the time period relevant to this lawsuit, required — Direct Endorsement Lenders to report to the agency any loans the lenders identify as materially violating FHA regulations. (*Id.* ¶ 121).[4]  Wells Fargo was aware of this requirement and affirmed to HUD that it would comply. (*Id.* ¶¶ 122, 126).  Between January 2002 and December 2010, the Bank identified 6,558 loans as materially violating HUD requirements. (*Id.* ¶ 132). Nevertheless, until October 2005, Wells Fargo did not report a single loan (*id.* ¶ 127), and between October 2005 and December 2010, the Bank reported only 238 loans (*id.* ¶ 132). Despite HUD requirements to the contrary, Wells Fargo thus failed to report 6,320 "material risk" loans to the agency. (*Id.*).  An internal memo suggests that it did so, in part, to avoid having to indemnify HUD for these loans. (*Id.* ¶ 130).

Of the 6,320 loans Wells Fargo failed to report, 1,443 defaulted. (*Id.* ¶ 135).  Although a small fraction of these loans were sold to third parties, Wells Fargo was the holder of record for,

---

[4]     The precise formulation of this requirement changed during the relevant time period, but in all versions, it required the reporting of material violations to HUD. (Am. Compl. ¶ 121 (citing HUD Handbook 4060.1 REV-1, ¶ 6-1(H) (1993); HUD Handbook 4060.1 REV-1, CHG-1, ¶ 6-3(J), 6-13 (2003); HUD Handbook 4060.1 REV-2, ¶¶ 7-3(J), 7-4(D) (2006))).

and submitted claims for FHA insurance on, 97% of them.  (*Id.*).  The Government provides, as exhibits to its Amended Complaint, lists of the 6,320 "material risk" loans it alleges Wells Fargo failed to report; the 1,406 loans that defaulted and for which Wells Fargo submitted a claim for FHA insurance; and the 37 defaulted loans for which third parties submitted claims for FHA insurance.  (*Id.* Exs. A-C).

## D.  Relief Sought

The Government alleges that, as a result of Wells Fargo's reckless origination and underwriting, as well as the Bank's failure to report to HUD loans it identified as materially violating FHA regulations, Wells Fargo submitted claims for FHA insurance on thousands of defaulted mortgage loans that Wells Fargo knew, or should have known, were ineligible for such insurance.  (*E.g.*, *id.* ¶¶ 140, 147, 152, 159).  The Government seeks treble its damages and civil penalties pursuant to the FCA, civil penalties under FIRREA, and compensatory damages for its common law claims.  (*Id.* ¶¶ 144, 149, 156, 162, 167, 183, 190, 196, 199, 204, a-g).  The specific amount of damages is to be determined at trial, but would presumably total hundreds of millions of dollars.  (*See id.* ¶¶ 3, 5, 83, 119, 137).

## DISCUSSION

Wells Fargo moves to dismiss the Amended Complaint on four grounds.  First, it contends that the Government released the claims at issue here pursuant to a consent judgment entered in the United States District Court for the District of Columbia in a previous lawsuit.  Second, the Bank asserts that many of the Government's FCA and common law claims are time barred.  Third, Wells Fargo argues that the Amended Complaint fails to satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  And fourth, it

contends that the Amended Complaint fails to state a claim upon which relief can be granted

pursuant to Rule 12(b)(6).  The Court will address each argument in turn.

## A.  The Consent Judgment

Wells Fargo argues first that the Government released the claims at issue here pursuant to

a consent judgment entered on April 4, 2012, in the United States District Court for the District

of Columbia.  In that case, the Department of Justice ("DOJ"), forty-nine state attorneys general,

and the attorney general for the District of Columbia sued several banks including Wells Fargo,

alleging misconduct related to, among other things, the origination and servicing of FHA-insured

mortgage loans.  *See United States v. Bank of America Corp.*, No. 12-361 (RMC).  As part of a

settlement agreement, the Government and Wells Fargo agreed to the entry of a consent

judgment, under which the United States released Wells Fargo from any civil claims under

FIRREA or the FCA "where the sole basis for such claim or claims is that [Wells Fargo] . . .

submitted to HUD-FHA . . . a false or fraudulent annual certification that the mortgagee had

conformed to all HUD-FHA regulations necessary to maintain its HUD-FHA approval."

(Baruch Decl Ex. D, at F-17 (internal quotation marks and alteration omitted)).[5]

---

[5]      The release further provided:

> For avoidance of doubt, this Paragraph means that the United States is barred
> from asserting that a false annual certification renders [Wells Fargo] . . . liable
> under the False Claims Act and the other laws cited above for loans endorsed by
> [Wells Fargo] . . . for FHA insurance during the period of time applicable to the
> annual certification without regard to whether any such loans contain material
> violations of HUD-FHA requirements, or that a false individual loan certification
> that "this mortgage is eligible for HUD mortgage insurance under the Direct
> Endorsement program" renders [Wells Fargo] . . . liable under the False Claims
> Act for any individual loan that does not contain a material violation of HUD-
> FHA requirements.

(Baruch Decl Ex. D, at F-17, F-18).

When the Government filed the present lawsuit, Wells Fargo sought an order from the

D.C. District Court enjoining this suit as prohibited by the terms of the release.  That Court

denied Wells Fargo's motion and rendered an interpretation of the consent judgment, *see United

States v. Bank of America*, No. 12-361 (RMC), 2013 WL 504156 (D.D.C. Feb 12, 2013), an

interpretation the parties agree is binding in this case.  (*See* Oral Arg. Tr. 3, 10, Apr. 17, 2013

(Docket No. 36)).  The consent judgment, that Court held, is "clear and unambiguous."  *Bank of

America*, 2013 WL 504156, at *7.  "[W]ith regard to liability based on false certifications," the

United States released:

> (1) Claims under FIRREA, FCA, and the Program Fraud Civil Remedies Act
> where the "sole basis" for such claims is that Wells Fargo submitted a false or
> fraudulent annual certification — without regard to whether any such loan
> contains a material violation of HUD-FHA requirements; and
>
> (2) Claims under FCA based on a false individual loan certification where the
> individual loan did not contain a material violation of HUD-FHA
> requirements.

*Id.* at *9.  The Court clarified that while the Government released Wells Fargo from claims

based solely on the annual certifications themselves, it did not release claims based on the

underlying conduct that is the subject of such certifications.  *See id.*  Having so construed the

consent decree, the D.C. Court left it to this Court to interpret the Amended Complaint in this

case and to decide whether the Government's claims here are barred by the consent judgment.

Given the D.C. Court's construction of the consent decree, this Court easily concludes

that the release does not bar the claims at issue here.  The Amended Complaint's allegations do

not rely *solely* on the annual certifications.  Indeed, the annual certifications are largely irrelevant

to the Government's claims.  The claims in the Amended Complaint are primarily based on:

Wells Fargo's practices targeted at increasing loan origination, resulting in loans that the

Government alleges Wells Fargo knew or should have known materially violated HUD

11

regulations; the individual loan certifications the Government alleges Wells Fargo — because of its reckless encouragement of loan origination — knew or should have known were false; Wells Fargo's failure to report to HUD loans it knew to be materially in violation of HUD's regulations; and its subsequent submission of claims for defaulted loans.  It is true that some of the *conduct* upon which the Government's claims are based is conduct that underlies the annual certifications.  But the D.C. Court explicitly held that claims based on such conduct were not released by the consent judgment.  Accordingly, this lawsuit is not barred by the release.

**B.  Timeliness**

Next, Wells Fargo contends that many of the Government's FCA and state common law claims are untimely.  The Bank is correct with respect to many of the Government's common law claims, but there is no basis — at this stage of the case — to dismiss the Government's FCA claims as time barred.   As relevant here, FCA claims may be brought within three years of the date that DOJ learned of the relevant facts underlying the claims, so long as they are brought within ten years of the date of the violation.  Furthermore, the Wartime Suspension of Limitations Act (the "WSLA"), 18 U.S.C. § 3287, which was amended in 2008, tolled the statute of limitations for any claims that were still live at the time of the amendment.  The Government alleges that DOJ did not learn of the facts at issue here until 2011.  Assuming this allegation to be true — as the Court must — all of the Government's FCA claims were live as of 2008, were tolled by the WSLA at that point, and thus are timely now.

By contrast, the Government's common law tort claims are subject to a three year statute of limitations, and its quasi-contract claims are subject to a six year statute of limitations.  The parties entered a tolling agreement that permits the Government to bring in this action any claims that were timely as of June 25, 2012.  There is no other basis, however, to find that the statutes of

limitations with respect to these common law claims was tolled.  Accordingly, only those tort claims arising on or after June 25, 2009, and those quasi-contract claims arising on or after June 25, 2006, are timely.

### 1.  The FCA Claims

The Court will begin its analysis with the FCA claims.  Title 31, United States Code, Section 3731(b) provides that a claim under the FCA "may not be brought":

> (1)  more than 6 years after the date on which the violation . . .  is committed, or
>
> (2)  more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
>
> whichever occurs last.

Citing Section 3731(b)(1), Wells Fargo argues that any FCA claims that accrued prior to June 25, 2006 — that is, six years before the parties' tolling agreement — are time barred.  The Government counters that its FCA claims are timely for two reasons:  First, the Government argues, the FCA itself, in Section 3731(b)(2), extends the statute of limitations for claims where, as here, the Attorney General, or his designee within DOJ, is not, and has no reason to be, aware of the facts underlying those claims.  Second, it contends that, pursuant to the WSLA, the statute of limitations was tolled for all FCA claims when Congress authorized the use of military force against those responsible for the September 11, 2001 terrorist attacks, *see* Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), and in Iraq in 2002, *see* Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107–243, 116 Stat. 1498.  (Gov't Mem. 46-48 (Docket No. 30); Oral Arg. Tr. 39).  Because the United States is still technically at war for purposes of the WSLA, the Government argues, the limitation periods remain tolled.  (Gov't Mem. 48).  The Court will address each argument in turn.

### a.   The Statute of Limitations Under the FCA

With respect to its first argument, the Government contends that the Attorney General, or his designee within DOJ, is "the official of the United States charged with responsibility to act" on FCA claims.  (Gov't Mem. 40-42).  The Amended Complaint alleges that DOJ was unaware of "the facts material to its claims against Wells Fargo" until "2011, the year in which the United States Attorney's Office for the Southern District of New York . . . commenced its investigation."  (Am. Compl. ¶ 118).  Therefore, the Government argues, pursuant to Section 3731(b)(2), its FCA claims were timely so long as they were brought within three years of the time the investigation began and within ten years of the parties' tolling agreement.  (Gov't Mem. 40).

Wells Fargo, however, insists that the HUD Inspector General — who conducted an audit of Wells Fargo's FHA mortgage loan origination practices in July of 2004 (Baruch Decl. Ex. F) — "certainly" has responsibility to act in the face of  mortgage fraud.  (Wells Fargo Mem. 15 (Docket No. 27)).  Therefore, Wells Fargo argues, the Government was required to bring its FCA claims by July 2007 — three years after the Inspector General became aware of Wells Fargo's purported misconduct  — or six years after the claims arose, whichever is later.  (Wells Fargo Mem. 13).

Section 3731(b)(2) was adapted from Title 28, United States Code, Section 2416(c), which provides that the statute of limitations generally applicable to claims brought by the United States shall exclude any time during which "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances."  28 U.S.C. § 2416(c); *see* 132 Cong. Rec. 20,536 (1986) (statement of Sen. Charles Grassley) (stating that the FCA tolling provision "is adopted

directly" from 28 U.S.C. § 2416(c)).  Because the FCA has its own statute of limitations, it is not

subject to the statute of limitations generally applicable to Government claims or the provisions,

including Section 2416, tolling that statute of limitations.  *See* 28 U.S.C. § 2415 (stating that the

statute of limitations provided therein applies to claims of the United States "except as otherwise

provided by Congress").  Therefore, Congress amended the FCA to provide for similar tolling.

*See, e.g.*, *False Claims Act Amendments: Hearings Before the Subcomm. on Admin. Law and

Governmental Relations of the H. Comm. on the Judiciary*, 99th Cong. 159 (1986) (statement of

Rep. Willard).

Courts have repeatedly held that Section 2416(c) applies to officials other than those at

DOJ.  *See, e.g.*, *United States v. Bollinger Shipyards, Inc.*, No. 12-920, 2013 WL 393037, at *14

(E.D. La. Jan. 30, 2013); *United States ex rel. Wilkins v. North Am. Constr. Corp.*, No. Civ. A.

H-95-5614, 2001 WL 34109383, at *4 (S.D. Tex. Sept. 26, 2001); *United States v. Stella Perez*,

956 F. Supp. 1046, 1058 (D.P.R. 1997).  It does not necessarily follow, however, that Section

3731(b)(2), the FCA tolling provision, applies as broadly.  Section 2416(c), after all, extends to

*all* government claims (unless otherwise specified by Congress), including claims that may be

brought by agencies other than DOJ.  *See Bollinger Shipyards,* 2013 WL 393037, at *13

(collecting cases).  By contrast, the only official authorized to bring an FCA claim is the

Attorney General (or his designee within DOJ).  *See* 31 U.S.C. § 3730; 28 C.F.R. § 0.45(d); *see

also Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 547 (Fed. Cir. 1988) ("[T]he

Attorney General is specifically authorized to administer [FCA] claims for the government.  No

other agency is empowered to act under the statute."); *United States ex rel. Barajas v. Northrop

Corp.*, 65 F. Supp. 2d 1097, 1102 (C.D. Cal. 1999) (similar); *Ohio Hosp. Ass'n v. Shalala*, 978 F.

Supp. 735, 739 (N.D. Ohio 1997) (similar); *Jana, Inc. v. United States*, 34 Fed. Cl. 447, 451 n.6
(Fed. Cl. 1995) (similar).[6]

Indeed, although other agencies are permitted to settle certain claims, they are expressly
prohibited from compromising fraud claims. *See* 31 U.S.C. § 3711(b)(1).   Furthermore, while
Section 2416(c) provides for tolling until "*an* official . . . charged with the responsibility to act"
is apprised of the material facts, 28 U.S.C. § 2416(c) (emphasis added), Section 3731(b)(2)
applies where "*the* official of the United States charged with responsibility to act" is reasonably
unaware of the relevant facts, 31 U.S.C. § 3731(b)(2) (emphasis added).   On its face, then,
Section 3731(b)(2) contemplates only one relevant official.   The law is clear that that official is
the Attorney General.

The majority of other courts that have considered this issue have reached the same
conclusion.  *See, e.g.*, *United States v. Carell*, 681 F. Supp. 2d 874, 881 (M.D. Tenn. 2009);
*United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1009 (N.D. Ill. 2001); *Jana, Inc. v.
United States*, 34 Fed. Cl. 447, 451 n.6 (1995); *United States v. Incorporated Vill. of Island Park*,
791 F. Supp. 354, 363 (E.D.N.Y. 1992) ("*Island Park*").   For the contrary proposition, Wells
Fargo cites *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 777 F. Supp. 195
(N.D.N.Y. 1991), in which the district court held that senior army officials were officials

---

[6]     There is at least one case in which an FCA suit was brought by a federal corporation,
rather than by the Attorney General acting on behalf of the United States, *see Federal Crop Ins.
Corp. v. Hester*, 765 F.2d 723 (8th Cir. 1985), but there is no indication that the court in that case
ever considered whether the suit was proper under the FCA.   All the cases this Court has found
that have explicitly considered the issue of who may bring suit under the FCA have held that the
Attorney General acting on behalf of the United States is the only government official permitted
to do so.   *See, e.g.*, *United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1009 (N.D. Ill.
2001) (stating that *Hester* "does not undermine our construction of the statute" as delegating
responsibility for FCA enforcement solely to the Attorney General, and explaining that "[t]he
issue was not raised in *Hester*, and in any event there is nothing in the FCA that would preclude
the Attorney General, after learning of the material facts, from delegating to another government
agency the authority to bring a particular FCA claim").

"charged with responsibility to act" on claims that an army contractor had concealed a design defect in helicopters sold to the army in violation of the FCA.  (Wells Fargo Mem. 16 n.17).[7]  In that case, however, the relator argued that the statute of limitations ought to be tolled because the only official "charged with responsibility to act" on such claims was the contracting officer, and that officer was unaware of the fraud; the question of whether the Attorney General was the only official with responsibility to act was neither raised nor decided.  *Kreindler & Kreindler*, 777 F. Supp. at 204-05.  Additionally, although it did not specifically address the question at issue here, the Second Circuit reversed on appeal, holding both that the district court should not have reached the statute of limitations question at all and that its analysis on that issue was flawed.  *See United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1155-57 (2d Cir. 1993).  Because it did not consider the arguments raised here and because it was reversed by the Second Circuit, the decision in *Kreindler & Kreindler* "is of limited precedential value."  *Tech Refrigeration*, 143 F. Supp. 2d at 1010 n.3.

In sum, both the statutory text and the weight of authority support the conclusion that the only government "official . . . charged with responsibility to act" under the FCA is the Attorney General (or his designee within DOJ).  It follows that the Government's FCA claims are timely

---

[7]      At oral argument, Wells Fargo's counsel stated that *United States v. Kensington Hospital*, Civ. A. No. 90-5430, 1993 WL 21446 (E.D. Penn. Jan 14, 1993), also held that the Attorney General is not the only relevant official for purposes of the FCA's tolling provision.  (Oral Arg. Tr. 25).  That statement is incorrect.  First, although *Kensington Hospital* mentioned in passing the FCA statute of limitations, it focused its statute of limitations analysis on Section 2416(c), the statute of limitations generally applicable to claims brought by the Government.  *See id.* at *4-7.  And for good reason: The Government in that case limited its FCA claims to those that fell within the six-year statute of limitations provided in Section 3731(b)(1).  *See* 1993 WL 21446, at *14.  Accordingly, the Court did not consider whether the extended statute of limitations provided by Section 3731(b)(2) applied.   Furthermore, it is not at all clear from the opinion that DOJ was not informed of the relevant conduct.  *See, e.g.*, 1993 WL 21446, at *10 (stating that the report informing various Government officials of the defendant's misconduct was presented to a "Special Agent of the Federal Bureau of Investigation," which is a part of DOJ).

so long as they are: (1) filed within either six years of the underlying violation or three years of the date DOJ knew or reasonably should have known of the facts material to the claim, whichever is later; and (2) filed no later than ten years from the date on which the underlying violation was committed.  The Government alleges that DOJ was unaware of the material facts underlying this action until 2011.  Given the purported widespread dissemination of the 2004 HUD audit of Wells Fargo and its subsequent report to Congress, Wells Fargo contends that the facts underlying this action "'reasonably should have been known' to the Justice Department" in 2004, even if DOJ did not have actual knowledge.  (Wells Fargo Mem. 15-16 (quoting 31 U.S.C. § 3731(b)(2)).   But the extent of the audit's dissemination and, thus, the question of whether DOJ knew or should have known of its findings is a question of fact that is not properly resolved at this stage.  *See, e.g.*, *United States v. BNP Paribas SA*, 884 F. Supp. 2d 589, 600 (S.D. Tex. 2012) (holding that where the complaint alleges some basis for tolling, whether the material facts were known or should have been known by the responsible officials is a question of fact).  Therefore, for purposes of this motion, the Court must assume the Government's allegation regarding DOJ's knowledge to be true.  Based on this allegation, any FCA claims filed by 2014 — that is, three years from the date DOJ allegedly became aware of the material facts at issue here — are timely so long as they are also filed within ten years of the date of the underlying violation.

 As noted above, the parties entered a tolling agreement that permits the Government to bring any claims that were timely as of June 25, 2012.  (Wells Fargo Mem. 13 n.11)  On the current record, then, any claims based on FCA violations arising after June 25, 2002 would

appear to be timely.  By contrast, any claims based on violations before that date would seem to be untimely, unless there was some basis to toll the statute of limitations.[8]

### b.  The WSLA

That brings the Court to the WSLA.  To the extent relevant here, the WSLA suspends the statute of limitations for offenses involving fraud against the United States when the country is at war or Congress has enacted a specific authorization for the use of the Armed Forces.  *See* 18 U.S.C. § 3287.  The Government argues that even if some of its FCA claims arose prior to June 25, 2002, they are nevertheless timely because the WSLA tolled the statute of limitations for claims that were live as of October 14, 2008, the date upon which the WSLA was amended to make clear that the Act applied to congressional authorizations for the use of force.   (*See* Gov't Mem. 46-48).  The Court agrees.  Because, as explained above, there is no reason at this stage to believe that the Attorney General knew or should have known of the facts at issue here until 2011, pursuant to Section 3731(b)(2), any claims that arose within ten years of October 14, 2008 — that is, all of the Government's claims — were presumably live as of that date and thus tolled by WSLA.

Prior to 2008, the WSLA provided as follows:

When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation, or other termination or

---

[8]      It is not actually clear whether any of the Government's claims arose before June 25, 2002.  Although the Government alleges misconduct beginning in May 2001 (Am. Compl. ¶ 44), the statute of limitations period on FCA claims "begins to run on the date the claim [for payment from the Government] is made, or, if the claim is paid, on the date of payment."  *Kreindler & Kreindler*, 985 F.2d at 1157 (internal quotation marks omitted).  The Amended Complaint does not state when the first allegedly fraudulent claims for FHA insurance were filed or paid.

> settlement, of any contract, subcontract, or purchase order which is connected
> with or related to the prosecution of the war, or with any disposition of
> termination inventory by any war contractor or Government agency, shall be
> suspended until three years after the termination of hostilities as proclaimed by
> the President or by a concurrent resolution of Congress.

18 U.S.C. § 3287 (2006).  On October 14, 2008, Congress amended the Act, expanding its

application to cover periods "[w]hen the United States is at war *or* Congress has enacted a

specific authorization for the use of the Armed Forces."  18 U.S.C. § 3287 (2011) (emphasis

added).  Additionally, the amended statute suspends the relevant statutes of limitations "until 5

years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice

to Congress, or by a concurrent resolution of Congress."  *Id.*[9]

In light of the 2008 amendment, there is no dispute that the WSLA is now in effect as to

offenses "involving fraud or attempted fraud against the United States or any agency thereof."

After all, on September 18, 2001, Congress authorized the use of military force "against those

responsible for" for the September 11, 2001 terrorist attacks, *see* Authorization for Use of

Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001); and on October 16, 2002, Congress

authorized the use of military force in Iraq, *see* Authorization for Use of Military Force Against

Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498.  Additionally, there has been

neither a Presidential proclamation, with notice to Congress, nor a congressional resolution

suspending hostilities.  Nevertheless, Wells Fargo argues that the WSLA should not be applied to

the Government's claims in this case for four reasons: (1) because the 2008 amendment may not

---

[9]     According to the Senate Report accompanying the bill, Congress amended the WSLA for
three reasons: (1) to harmonize it with the general criminal statute of limitations, which had been
extended from three years to five years; (2) to "make[ ] clear . . . ., so courts, prosecutors, and
litigants c[ould] be sure when the statute of limitations starts to run," that only "an official act of
the President with notice to Congress, or a concurrent resolution of Congress" would end the
tolling of the statute of limitations period under the WSLA; and (3) to "clarif[y] that for purposes
of" the WSLA, "the term 'war' shall include Congressional authorizations for the use of military
force pursuant to the War Powers resolution."  S. Rep. 110-431, at 5 (2008).

be "retroactive[]"; (2) because the claims do not "involv[e] fraud" within the meaning of the WSLA; (3) because the WSLA applies only to criminal offenses, not civil claims; and (4) because the Act does not extend to claims that are unrelated to wartime contracting.  (*See* Reply 8-9 (Docket No. 31); Oral Arg. Tr. 17-24).  These arguments are unpersuasive.

First, Wells Fargo suggests that "it is by no means clear" that the 2008 amendment "can be applied retroactively."  (Reply 9).  "[W]here, as here," however,  a "new rule" does not "alter[] substantive rights," but rather "announces a period of limitations, the conduct to which it refers is the plaintiff's conduct relating to the filing of the claim and not the defendant's conduct giving rise to the claim."  *Walsche v. First Investors Corp.*, 981 F.2d 649, 654 (2d Cir. 1992).  Therefore, "applying a new or amended statute of limitations to . . . a cause of action filed after its enactment, but arising out of events that predate its enactment, generally is not a retroactive application of the statute."  *Vernon v. Cassadaga Valley Cent. Sch. Dist*., 49 F.3d 886, 889 (2d Cir. 1995).  The applicable statute of limitations governing a lawsuit is thus that which is in effect at the time the lawsuit is filed.  *See id.*

As Wells Fargo conceded at oral argument (Oral Arg. Tr. 15), the 2008 WSLA amendment therefore applies to any claims for which the statute of limitations had not yet run at the time of its passage.  *See BNP Paribas SA*, 884 F. Supp. 2d at 607-8; *see also United States v. Kozeny*, 541 F.3d 166, 172 (2d Cir. 2008) ("[A] district court can suspend the running of a statute of limitations . . .  only if the limitations period has not yet expired." (internal quotation marks and brackets omitted)).  Here, the earliest fraudulent conduct alleged by the Government occurred in 2001.  As explained above, therefore, absent reason to revisit the issue following discovery, under Section 3731(b)(2), the earliest claim the Government could bring was live until 2011.   All of the FCA claims were thus live on October 14, 2008, when the WSLA was

amended.[10]  It follows that, if those claims otherwise fall within the ambit of WSLA, then the

statute of limitations on those claims has been suspended by that Act, and the claims are

therefore timely.

Second, Wells Fargo argues that the offenses alleged by the Government do not

"involve[e] fraud or attempted fraud against the United States" within the meaning of the

WSLA.  (Reply 9; Oral Arg. Tr. 19-20).  Although its plain text suggests that the Act applies to

all frauds, the Supreme Court has held otherwise.  *See Bridges v. United States*, 346 U.S. 209

(1953).  Under *Bridges*, the WSLA only applies to offenses: (1) of "a pecuniary nature or of a

nature concerning property," *id.* at 216; (2) "in which defrauding or attempting to defraud the

United States is an essential ingredient of the offense charged," *id.* at 221 (internal emphasis

omitted).  The fraud at issue here — the submission to HUD of false claims for payment — is

certainly of a pecuniary nature.  Wells Fargo, however, argues that "defrauding or attempting to

defraud the United States" is not an "essential ingredient" of some of the Government's FCA

claims — in particular, those based on allegations that Wells Fargo encouraged the reckless

origination of loans without regard to HUD regulations, knowing that such conduct would lead

---

[10]      As noted, before the 2008 amendment, the WSLA applied only when the United States
was "at war."  Courts have disagreed about whether the conflicts in Afghanistan and Iraq put the
United States "at war" within the meaning of the Act given the absence of a congressional
declaration of war pursuant to Article I, Section 8, Clause 11 of the United States Constitution.
*Compare, e.g.*, *United States v. Shelton*, 816 F.Supp. 1132, 1135 (W.D.Tex.1993) (holding that
"[t]he recent conflict with Iraq did not constitute a 'war' as that term is used in the" WSLA),
*with U.S. ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 178-79 (4th Cir. 2013) (holding that
the WSLA "does not require a formal declaration of war" and that "the United States was 'at
war' in Iraq from the date of the [Authorization for the Use of Military Force] issued by
Congress on October 11, 2002"), *and United States v. Prosperi*, 573 F. Supp. 2d 436, 455 (D.
Mass. 2008) (same).  In light of the Court's holding that the Government's FCA claims were
presumptively live when WSLA was amended, it need not decide here whether the United States
was at war for purposes of the pre-amendment WSLA.

to the submission of loans to FHA that did not qualify for FHA insurance.  (Oral Arg. Tr. 19-20).[11]

This argument is foreclosed by the Supreme Court's decision in *United States v. Grainger*, 346 U.S. 235 (1953), which held that an FCA violation constitutes fraud within the meaning of the WSLA.  *Id.* at 243.  In arguing otherwise, Wells Fargo contends that the *mens rea* requirement for FCA claims is now broader than it was when *Grainger* was decided.  (Oral Arg. Tr. 19-20).  At the time *Grainger* was decided, the FCA prohibited only those claims that were submitted "'*knowing* such claim to be false, fictitious, or fraudulent.'"  *Grainger*, 346 U.S. at 241 (quoting 18 U.S.C. § 287 (1952)) (emphasis added).  Such claims, the *Grainger* Court reasoned, "involv[e] the element of deceit that is the earmark of fraud."  *Id.* at 243.  The current version of the FCA also provides that a defendant who submits a false claim must do so "knowingly" to incur liability.  31 U.S.C. § 3729(a)(1).  But whereas the version of the Act at issue in *Grainger* did not provide a statutory definition of the term knowingly, the FCA as currently enacted defines knowing and knowingly to include not only "actual knowledge" of fraud, but also "deliberate ignorance" and "reckless disregard of the truth or falsity of the information."  False Claims Amendments Act of 1986, Pub. L. No. 99-562, 100 Stat. 3153.

Citing this change, Wells Fargo argues that false statements made in reckless disregard of the truth do not constitute "fraud against the United States" as defined by *Bridges*.  (Reply 9).  But the Bank does not cite — and the Court has not found — any authority that would support drawing a distinction between false statements made in reckless disregard for the truth and false statements made with actual knowledge of their falsity.  *Grainger* itself did not make any such

---

[11]     By contrast, Wells Fargo concedes that the Government's other FCA claims — based on allegations that, in order to secure payment from the United States for defaulted loans, Wells Fargo knowingly failed to report loans that materially violated the conditions for insuring such loans — constitute fraud within the meaning of the WSLA.  (Oral Arg. Tr. 21).

distinction. *See Grainger*, 346 U.S. at 242-43 (holding that the "making of claims upon the Government for payments induced by knowingly false representations . . . . involv[es] the element of deceit that is the earmark of fraud" without specifying a particular definition of knowingly). And courts have repeatedly defined fraud to include not only false representations made with "knowledge of the falsity," but also those made with "a reckless disregard for the truth." *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987); *see, e.g.*, *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001); *see also Grainger*, 346 U.S. at 244 ("The combination of either falsity, fiction or fraud with the claim is enough."). Notably, Wells Fargo itself states that the claims against it "sound in fraud." (Wells Fargo Mem. 17). The Government's FCA claims thus constitute fraud within the meaning of the WSLA.

Third, Wells Fargo contends that the WSLA applies only to *criminal* offenses. (Reply 8-9). As originally promulgated, the WSLA did indeed apply only to crimes. Specifically, it suspended the statutes of limitations for any "offenses involving the defrauding or attempts to defraud the United States . . . *now indictable* under any existing statutes." *Dugan & McNamara, Inc. v. United States*, 127 F. Supp. 801, 802 (Ct. Cl. 1955) (internal quotation marks omitted) (emphasis added); *see Halliburton*, 710 F.3d at 179. In 1944, however, the "indictable under any existing statutes" language was removed. *See Halliburton*, 710 F.3d at 179. As currently enacted, then, the statute applies to "*any* offense . . . involving fraud or attempted fraud against the United States." 18 U.S.C. § 3287 (emphasis added). As the Fourth Circuit recently held, this change indicates that Congress intended to broaden the statute's application to civil, as well as criminal, offenses. *See Halliburton*, 710 F.3d at 179-80; *see also United States v. Wiesner*, 216 F.2d 739, 741 (2d Cir. 1954) (holding in the context of a different statute that "any offense

24

which by act of Congress is prohibited in the interest of the public policy of the United States,

although not . . . punishable by criminal prosecution, but only by suit for penalty, is . . . an

offense against the United States" (internal quotation marks omitted)).  With the exception of a

1952 Northern District of Alabama case, all courts that have considered the issue have agreed

with the Fourth Circuit and concluded that the WSLA now applies to civil claims.  *See, e.g.*,

*Halliburton*, 710 F.3d at 180 (collecting cases); *United States v. Stryker Corp.*, Civ. No. 11-0041,

2013 WL 2666346, at *15 (W.D. Mo. June 12, 2013); *BNP Paribas SA*, 884 F. Supp. 2d at 604;

*United States v. Kolsky*, 137 F. Supp. 359, 361 (E.D. Pa. 1955); *Dugan & McNamara*, 127 F.

Supp. at 802.  This Court agrees with the weight of authority: The WSLA applies to both civil

and criminal claims.

       Finally, Wells Fargo suggests that, even if the WSLA applies in the civil context to

claims of the sort at issue here, it should not apply "to matters involving domestic mortgage loan

practices, having nothing to do with wartime contracting."  (Reply 9).  At oral argument, the

Bank went even further, suggesting that the actual text of the WSLA might limit the statute to

offenses related to the war.  (Oral Arg. Tr. 22-23).  Not so.  By its plain terms, the WSLA applies

to three kinds of offenses: (1) fraud against the United States; (2) offenses related to "any real or

personal property of the United States"; and (3) offenses "committed in connection with . . . any

contract, subcontract, or purchase order which is connected with or related to the prosecution of

the war or directly connected with or related to the authorized use of the Armed Forces, or with

any disposition of termination inventory by any war contractor or Government agency."  18

U.S.C. § 3287.  Wells Fargo suggests that the phrase "which is connected with or related to the

prosecution of the war" limits not just the third category of offenses to which WSLA applies, but

also the two preceding categories.  (Oral Arg. Tr. 23).  Such an interpretation, however, would

violate "the grammatical rule of the last antecedent," *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (internal quotation marks omitted), pursuant to which "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows," *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 133 (2013) (internal quotation marks omitted).

There is no basis to disregard that rule here.  Among other things, applying the WSLA to all frauds against the United States, including those unrelated to the war, accords with the purpose of the Act.  The WSLA serves not only to allow the Government to combat fraud related to wartime procurement programs, but also "to give the government sufficient time to investigate and prosecute pecuniary frauds" of any kind "committed while the nation [is] distracted by the demands of war."  *Prosperi*, 573 F. Supp. 2d at 449; *see United States v. Smith,* 342 U.S. 225, 228 (1952) (explaining that one purpose of WSLA "is that offenses occurring prior to the termination of hostilities shall not be allowed legally to be forgotten in the rush of the war activities").  Courts, including the Supreme Court in *Grainger*, have routinely applied the WSLA to fraud having nothing to do directly with the prosecution of war or the military.  *See, e.g.*, *Grainger*, 346 U.S. at 237-38; *Stryker Corp.*, 2013 WL 2666346, at *15; *BNP Paribas SA*, 884 F. Supp. 2d at 593.  In short, "it makes no difference that the fraud in this case [was] . . . unrelated to the Iraqi or Afghani conflicts.  In the few cases since *Grainger* in which the government has successfully invoked the Suspension Act, the absence of a connection between the fraud and wartime procurement has played no part."  *Prosperi*, 573 F. Supp. 2d at 442.

In sum, the WSLA applies to the FCA claims in this case.  Accordingly, any claims that were live as of October 14, 2008, when the WSLA was amended to apply to congressional authorizations for the use of military force, are timely.  Given the Court's holding above that the Government can, in the absence of contrary evidence developed during discovery, rely on the

ten-year statute of limitations for FCA claims set forth in Section 3731(b)(2), it follows that there is no basis, at this stage of the litigation, to dismiss any of the FCA claims as untimely.[12]

### 2.   The Common Law Claims

By contrast, many of the Government's common law claims are time barred.  The Government alleges tort claims (breach of fiduciary duty, negligence, and gross negligence) as well as quasi-contract claims (unjust enrichment and mistake of fact).  As the Government concedes, the WSLA does not apply to these claims (nor, of course, do the statute of limitations provisions of the FCA).  (*See* Oral Arg. Tr. 33).  Instead, the statute of limitations for the Government's tort claims is three years, and the statute of limitations for its quasi-contract claims is six years.  *See* 28 U.S.C. § 2415.  Thus, any of the Government's breach of fiduciary duty, gross negligence, or negligence claims that arose prior to June 25, 2009 (three years before the tolling agreement) and any of its unjust enrichment or mistake of fact claims that arose prior to June 25, 2006 (six years before the tolling agreement) would appear to be time barred.

In arguing otherwise, the Government relies on Title 28, United States Code, Section 2416(c), which, as noted above, exempts from the statute of limitations for claims brought by the Government "all periods during which . . . facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances."  (Gov't Mem. 64-65 n.34).  Based on this provision, the

---

[12]      Even assuming Wells Fargo can demonstrate after discovery that DOJ was or reasonably should have been aware of the facts underlying this action after the publication of the HUD Inspector General's report in 2004, most of the Government's claims would still be timely. Pursuant to the FCA statute of limitations found in Section 3731(b)(1), any FCA claims that arose on or after October 14, 2002 would have been live when WSLA was amended.  The applicable statutes of limitations for those claims would therefore have been suspended by the Act, and they would be timely now.

Government contends, the common law claims are timely "for the same reasons set forth with respect to the FCA claims."  (*Id.*).

This argument does not survive scrutiny.  As explained above, while the only relevant government official for purposes of the FCA's tolling provision is the Attorney General, any number of officials may constitute "an official of the United States charged with the responsibility to act" within the meaning of Section 2416(c).  As relevant here, the HUD Inspector General is plainly one such official.  *See, e.g.*, 5 U.S.C. app. 3 § 4 (charging "each Inspector General" with, among other things, "preventing and detecting fraud and abuse" and aiding in the "identification and prosecution of participants in such fraud and abuse"); *Island Park*, 791 F. Supp. at 372 ("As a general proposition, the responsible official would be the official who is also responsible for the activity out of which the action arose." (internal quotation marks omitted)).

Additionally, the 2004 audit report produced by the HUD Inspector General is plainly sufficient to demonstrate that the relevant facts underlying this action were known to him by 2004.[13]  Among other things, the HUD Inspector General examined seventy-four defaulted loans originated by Wells Fargo, and found that the Bank "did not adhere to HUD requirements and prudent lending practices when processing 61 of the 74 loans."  (Baruch Decl. Ex. F, at iii).  In particular, the Inspector General found that the vast majority of the examined loans

---

[13]     The Court considers the HUD audit report, which is cited in the Amended Complaint (Am. Compl. ¶ 123) and available on HUD's website (*see* Wells Fargo Mem. 14 n.13 (noting that the report is available at http://archives.hud.gov/offices/oig/reports/files/ig471003.pdf)), solely for the fact that it was issued and that the statements therein were made by the agency, not for the truth of the information it contains.  *See Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005) ("In determining the adequacy of the complaint, the court may consider any written instrument . . . incorporated in the complaint by reference."); *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411 (S.D.N.Y. 2011) ("[I]t is well-established that courts may take judicial notice of publicly available documents on a motion to dismiss.").

> contained at least one of the following deficiencies: unsupported assets, unsupported income, inadequate qualifying ratios, inadequate documentation, unallowable fees charged to the borrowers, derogatory credit information, underreported liabilities, potential fraud indicators, and improper approval method followed when using an automated underwriting system. . . . The deficiencies occurred because Wells Fargo's management did not take appropriate action to ensure that staff adhered to HUD/FHA requirements when originating FHA loans.

(*Id.*).  In other, words, the audit discovered precisely the sort of misconduct alleged in this lawsuit.  At a minimum, therefore, the HUD Inspector General was privy to "sufficient critical facts to cause a reasonable person to investigate" the possibility of bringing common law claims. *United States ex rel. Frascella v. Oracle Corp.*, 751 F. Supp. 2d 842, 852 (E.D. Va. 2010) (internal quotation marks omitted).

In short, Section 2416(c) provides no support for the Government's arguments with respect to the timeliness of its common law claims.  Accordingly, any and all of its tort claims that arose prior to June 25, 2009, and any and all of its quasi-contract claims that arose prior to June 25, 2006, are untimely and dismissed.

## C.  Rule 9(b)

Next, Wells Fargo argues that the Government's fraud claims should be dismissed for failure to satisfy the requirements of Rule 9(b).[14]  That Rule provides that a party alleging fraud "must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Scienter (or knowledge), however, "may be alleged generally."  *Id.*  "The purpose of Rule 9(b)'s specificity requirement is to provide the defendant with fair notice of a plaintiff's claim

---

[14]     There is no dispute that Rule 9(b) applies to the Government's fraud claims.  (Wells Fargo Mem. 17; Gov't Mem. 18).  *See also Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995) (holding that Rule 9(b) applies to FCA claims); *United States v. Bank of New York Mellon*, — F. Supp. 2d —, 2013 WL 1749418, at *7-9 (S.D.N.Y. Apr. 24, 2013) (applying Rule 9(b) to a complaint alleging FIRREA violations based on fraudulent conduct); *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 108 (S.D.N.Y. 2009) (applying Rule 9(b) where to a common law claim "based on fraud").

and adequate information to frame a response." *U.S. ex rel. Tiesinga v. Dianon Sys., Inc.*, 231 F.R.D. 122, 123 (D. Conn. 2005); *see Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

Generally, to satisfy Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170. Whether a complaint complies with the Rule, however, depends "upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004) (internal quotation marks omitted). In particular, "where the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct." *Id.*; *see United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 509-10 (6th Cir. 2007); *State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*, 589 F. Supp. 2d 221, 237 (E.D.N.Y. 2008); *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 326 (S.D.N.Y. 2004); *Cardiac Devices*, 221 F.R.D. at 333 (collecting cases); *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 47 (D. Mass. 2001).

Applying these standards here, the allegations in the Amended Complaint are sufficient to satisfy Rule 9(b). The Government in this case alleges that Wells Fargo engaged in two schemes involving thousands of false or fraudulent claims over a period of almost ten years: (1) "Wells Fargo's reckless underwriting and certification of loans for FHA insurance from May 2001 through October 2005"; and (2) "the bank's knowing failure to report to HUD as required

FHA loans with material underwriting violations from 2002 through 2010." (Gov't Mem. 19; *see* Am. Compl. ¶¶ 45, 82, 147, 170). In these circumstances, it would be impractical, if not impossible, to require that the Government plead the details of each and every false claim.

Instead, the Government may plead each scheme "with particularity, and provide[ ] examples of specific false claims submitted to the government pursuant to that scheme." *Bledsoe*, 501 F.3d at 510; *see also, e.g.*, *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (rejecting the argument that "the district judge had to address each of the 1,812 claim forms" at issue and holding that "[s]tatistical analysis should suffice"); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013) (holding that the plaintiff could use statistical sampling to prove liability). Such examples, however, "will support more generalized allegations of fraud only to the extent that [they] are representative samples of the broader class of claims." *Bledsoe*, 501 F.3d at 510. If the examples are sufficiently representative, "the defendant will, in all likelihood, be able to infer with reasonable accuracy the precise claims at issue by examining the . . . representative samples, thereby striking an appropriate balance between affording the defendant the protections that Rule 9(b) was intended to provide and allowing [plaintiffs] to pursue complex and far-reaching fraudulent schemes without being subjected to onerous pleading requirements." *Id.* at 511.

The Government's allegations satisfy these standards. With respect to the reckless origination scheme, the Government specifically alleges the practices by which Wells Fargo sought to increase its loan originations without regard to whether the practices or the loans themselves complied with HUD regulations (Am. Compl. ¶¶ 44-49, 85-86); the resulting increase in loans that evidenced material violations of these regulations (*id.* ¶¶ 50, 52-54, 84, 87-89); Wells Fargo's decision to continue its loan origination practices, despite knowledge of these

violations (*id.* ¶¶ 44-47, 51, 84-89); and its motive for doing so (*id.* ¶¶ 3, 5, 45, 82, 117). Additionally, the Government provides ten examples of insurance claims, identified by FHA case number, paid by HUD on loans the Government alleges Wells Fargo falsely certified as eligible for FHA insurance as a result of this scheme.  (Am. Comp. ¶¶ 57-81, 91-115).

These examples, drawn from throughout the time period the Government alleges the reckless origination scheme occurred, appear sufficient "in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme, . . . such that a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims."  *Bledsoe*, 501 F.3d at 511.  Combined with the allegations setting forth in detail the reckless origination scheme, they are, therefore, sufficient to satisfy Rule 9(b).  *See, e.g.*, *State Farm*, 589 F. Supp. 2d at 237-38 (holding that a complaint that described in detail the fraudulent scheme alleged and provided examples of "many specific claims that plaintiff allege[d] were fraudulent" satisfied rule 9(b)); *Carey v. Berisford Metals Corp.*, 90 Civ. 1045 (JMC), 1991 WL 44843, at *5 (S.D.N.Y. Mar. 28, 1991) (holding that where a fraudulent scheme is pleaded with sufficient particularity to "give [the defendant] fair notice of the claim asserted," the pleading of "a few examples" of the allegedly false or fraudulent claims submitted as a result of that scheme is sufficient); *see also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) ("A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.").[15]

---

[15]    Wells Fargo argues that the examples the Government provides are particularly insufficient to support the Government's FIRREA claim that is premised on the Bank's violation of Title 18, United States Code, Section 1014.  (Wells Fargo Mem. 37-38).  That statute prohibits

The allegations regarding the second scheme — the Bank's alleged failure between 2002 and 2010 to report loans with material underwriting violations to HUD — even more clearly satisfy Rule 9(b).  The Government has pleaded with particularity HUD's quality control and self-reporting requirements (Am. Compl. ¶¶ 24-30); Wells Fargo's process for reviewing loans (*id.* ¶¶ 31-36); and its deliberate failure to report those loans that evidenced a material violation of HUD regulations (*id.* ¶¶ 51, 55, 84, 122-130, 132).   In addition, the Government has provided not merely a representative sample, but rather a list of *all* false claims, identified by loan number, alleged to have been submitted as a result of this scheme.  (*Id.* Exs. B, C).  These allegations plainly satisfy Rule 9(b).  *See, e.g.*, *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 372-73 (E.D.N.Y. 2012) (holding that where plaintiff "explain[ed] in detail the contours of the fraudulent scheme it allege[d]" and provided  "a series of charts that include each of the charges submitted by the defendants that it believe[d] were fraudulent," plaintiff's complaint satisfied Rule 9(b)); *Beth Israel Medical Center v. Smith*, 576 F. Supp. 1061, 1070 (S.D.N.Y. 1983) (holding that a complaint "specif[ying] the nature and operation of" an allegedly fraudulent scheme and the "exact dates and amounts of many of the alleged payments" satisfied Rule 9(b)).

"knowingly mak[ing] any false statement or report . . . for the purpose of influencing in any way the action of the Federal Housing Administration."  Because that provision applies only to false statements made after July 30, 2008, the parties agree that Wells Fargo may only be held liable for FIRREA violations based on that provision for conduct after that date.  (Am. Compl. ¶ 169 n.4; Wells Fargo Mem. 37; Gov't Mem. 54).  Wells Fargo contends that the Amended Complaint "never identifies any alleged false statement or report made" after July 30, 2008, and therefore this claim does not satisfy the pleading requirements of Rule 9(b).  (Wells Fargo Mem. 37).  Although a plaintiff may not save allegations that do not comply with Rule 9(b) simply by placing them alongside allegations that do, where allegations are related to a scheme of fraudulent conduct, Rule 9(b) should only be "construed as narrowly as is necessary to protect the policies promoted by" that Rule.  *Bledsoe*, 501 F.3d at 509.  Here, despite the fact that the Government has not pleaded a specific example of a false statement made by Wells Fargo after 2008, it has identified the categories of statements upon which its claims rely and provided pre-2008 examples of these statements.  Given that the Government's FIRREA claim based on alleged violations of Section 1014 relies on essentially the same conduct as its other allegations, that claim survives as well.

Wells Fargo's counterarguments are unavailing.  First, Wells Fargo suggests that in order to meet the requirements of Rule 9(b), the Government must identify, among other things, each loan for which a false or fraudulent claim for payment was allegedly submitted, the relevant material violation of HUD-FHA requirements contained in the loan, and the Wells Fargo staff member who submitted or certified the loan.  (Wells Fargo Mem. 21-22; Reply 11).  But, as explained above, given the breadth and length of the schemes alleged in the Amended Complaint, the Government need not plead the details of every false or fraudulent claim Wells Fargo allegedly submitted.  Instead, it need only plead the schemes with particularity and provide representative examples of claims submitted as a result.  It has done so.  The contention that the Government must identify the particular employee responsible for submitting or certifying each loan is also incorrect.  Where a plaintiff "has alleged that [a] corporation has committed . . . fraudulent acts, it is the identity of the corporation, not the identity of the natural person, that the [plaintiff] must necessarily plead with particularity."  *Bledsoe*, 501 F.3d at 506; *see United States v. Huron Consulting Grp., Inc.*, 09 Civ. 1800 (JSR), 2011 WL 253259, at *2 & n.3 (S.D.N.Y. Jan. 24, 2011) (citing *Bledsoe* and denying a motion to dismiss a complaint, even though the plaintiff did not plead the identity of specific employees of the defendant corporation).[16]

Next, citing Black's Law Dictionary, the Bank contends that the reckless underwriting and origination scheme cannot be considered a "scheme" at all, because a scheme is an "artful plot," intentionally planned, and cannot be undertaken recklessly.  (Reply 10).  This argument is

---

[16]    Furthermore, at least with respect to the self-reporting scheme, the Government has, effectively, provided Wells Fargo with the names of the employees responsible for the alleged false claims.  Because the Government provided the Bank with the loan numbers of each claim it alleges was fraudulently submitted as a result of the scheme, the Bank should be able to identify the employees that worked on each loan.  (*See* Oral Arg. Tr. 54).  The Bank can obviously determine the names of the employees that worked on the ten loans cited as examples of the reckless origination scheme as well.  (*See id.*).

little more than sophistry.  The Government does allege that Wells Fargo *intentionally* increased

its volume of loan origination, in part through conduct that violated HUD regulations, recklessly

disregarding the consequences — a substantial quantity of loans that contained material

violations of HUD regulations and therefore were ineligible for FHA insurance.  (Am. Compl.

¶¶ 3, 44-55, 84-88, 117).  In other words, the United States alleges that Wells Fargo *knew*,

through monthly reports, that it was originating loans that materially violated HUD requirements

and intentionally disregarded these reports, continuing to emphasize loan volume over quality

and to submit to HUD claims for reimbursement on loans it knew or should have known were

ineligible for FHA insurance.  (*Id.*).  In short, there is no doubt that, if the Government's

allegations are true, Wells Fargo's misconduct was intentional.[17]

    *United States ex rel Cericola v. Fed. Nat'l Mortg. Assoc.*, 529 F. Supp. 2d 1139 (C.D.

Cal. 2007), which Wells Fargo cites in support of its arguments (Wells Fargo Mem. 23-24), does

not call for a different result.  In that case, the plaintiff-relator alleged that the Federal National

Mortgage Association ("Fannie Mae") submitted thousands of claims for HUD insurance to the

Government, knowing that the loans for which the claims were submitted were ineligible for

such insurance.  *See id.* at 1143.  The only examples of allegedly false claims provided in the

---

[17]    Wells Fargo also contends that the Government should not be permitted to "hide behind the relaxed pleading standard courts sometimes apply to *qui tam* relators who rely on inferences rather than facts."  (Wells Fargo Mem. 23 (internal quotation marks omitted)).  *See United States ex rel. Grubbs v. Kannegati*, 565 F.3d 180, 190 (5th Cir. 2009) (holding that, where the relevant facts are within the defendant's exclusive control, plaintiffs may plead allegations on inference and belief or plead a fraudulent scheme with particularity while alleging only a "strong inference" — and not the particular details — of an actual false claim); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974) ("[T]he rule relating to information and belief may be relaxed as to matters peculiarly within the opposing party's knowledge.").  Wells Fargo is correct:  Because the Government is empowered to investigate allegations of fraud before bringing suit and had access to all of the relevant facts before filing its complaint, it may not be allowed to rely on information and belief.  It has not done so.  For the reasons explained above, the Amended Complaint satisfies the requirements of Rule 9(b) as traditionally applied.

complaint, however, were for loans for which the plaintiff explicitly stated that she was *not* seeking recovery. *See id.* at 1143-44. The complaint provided no examples of false claims for which the plaintiff sought recovery. *See id.* at 1144. The complaint at issue in *Cericola*, then, alleged a fraudulent scheme, but it did not provide any specific examples of false claims submitted as a result of that scheme. That is not the case here.

For similar reasons, *United States v. Countrywide Fin. Corp.*, — F. Supp. 2d —, 2013 WL 4437232 (S.D.N.Y. Aug. 16, 2013), is also inapposite. In that case, the Government brought FCA claims against Bank of America alleging that the bank had engaged in fraud and made false representations in connection with the sale of loans to Fannie Mae and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The Government's complaint alleged with sufficient particularity a fraudulent scheme as well as seven representative examples of loans that were defective as a result of that scheme. *See id.* at *6. The problem, however, was that Bank of America had not issued the loans the Government alleged were fraudulent. *See id.* at *9. Instead, it had acquired the company that issued the loans. *See id.* There were no allegations that the fraudulent scheme continued after the acquisition, and the Government failed to plead the details of any allegedly fraudulent loans submitted after the acquisition. *See id.* Accordingly, the Court held that the Government's amended complaint "include[d] no particular and reliable indicia that might permit an inference that loans tainted" by the allegedly fraudulent scheme "were sold to Fannie Mae and Freddie Mac" during the relevant time period. *Id.* (internal quotation marks omitted). By contrast, the Amended Complaint in this case indisputably alleges that Wells Fargo itself originated the loans at issue. (*See, e.g.*, Am. Compl. ¶¶ 2, 4, 44). *Countrywide*, therefore, has no bearing on this case.

Thus, with respect to both the reckless origination and the failure to self-report schemes, the Amended Complaint alleges the circumstances constituting fraud with sufficient particularity to satisfy Rule 9(b).  Wells Fargo, however, contends that even if the Government has sufficiently alleged the fraud itself, it has failed to allege scienter with the requisite particularity. (Wells Fargo Mem. 22).  Under Rule 9(b), "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent."  *Acito v. IMCERA Grp., Inc.* 47 F.3d 47, 52 (2d Cir. 1995).  This inference "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.*  Here, the Government has done both.   The Government alleges that Wells Fargo submitted claims to HUD for insurance on defaulted loans it *knew* contained material violations of HUD requirements, and withheld information about these violations in order to gain payment from HUD and avoid having to indemnify the agency.  (Am. Compl. ¶¶ 152-154, 160).  In addition, the Government alleges that Wells Fargo's practices aimed at increasing its loan origination evidenced at the very least recklessness and possibly conscious misbehavior.  (*Id.* ¶¶ 140-42, 147).  These allegations are sufficient to "give rise to a strong inference of fraudulent intent."[18]  The Government's Amended Complaint therefore satisfies Rule 9(b).

---

[18]     In its discussion of scienter Wells Fargo repeats its contention, discussed above, that in order to satisfy Rule 9(b), the Government must allege that "[e]ach mortgage loan origination certification" was "signed by an identified person who knew that it was false at the time of the certification."  (Wells Fargo Mem. 22 (internal emphasis omitted)).  As explained above, however, this is not the case.  Because the Government alleges that Wells Fargo has committed fraudulent acts, it is the Bank's intent, not that of the Bank's employees, that must be pleaded with sufficient particularity to satisfy Rule 9(b).  *See Bledsoe*, 501 F.3d at 506; *Huron Consulting Grp., Inc.*, 2011 WL 253259, at *2; *In re Leslie Fay Cos., Inc. Sec. Litig.*, No. 92 Civ. 8036 (WCC), 1993 WL 438927, at *3 (S.D.N.Y. Oct. 27, 1993) ("In cases where it is undisputed that fraud occurred within a corporation, we have held that the facts that show which corporate officials knew of the fraud . . . need not be alleged in the complaint.").

**D.  Rule 12(b)(6)**

Finally, Wells Fargo argues that most of the Government's claims should be dismissed, pursuant to Rule 12(b)(6), for failure to state a claim upon which relief can be granted.  (Wells Fargo Mem. 24, 35, 46).  First, the Bank argues that the Government's FCA claims fail because none of the regulations with which the Government alleges Wells Fargo falsely certified compliance are, according to Wells Fargo, conditions of receiving payment on FHA insurance claims.  Furthermore, Wells Fargo contends that even if the Government has adequately alleged that the Bank submitted false or fraudulent claims, it has not sufficiently pleaded that such claims caused the Government's damages in the form of FHA insurance payments on defaulted loans.  As explained below, the Court rejects both of these arguments.  The Government has sufficiently pleaded that Wells Fargo falsely certified compliance with FHA regulations upon which payment was conditioned and that the Bank fraudulently induced the Government to insure loans it otherwise would not have.  In addition, it has adequately pleaded that this misconduct caused the FHA to pay insurance claims it otherwise would not have.

Next, Wells Fargo contends that most of the Government's FIRREA claims should be dismissed because the statute does not prohibit the kind of misconduct the Government alleges.  In particular, Wells Fargo argues that Title 18, United States Code, Section 1005, upon which the Government bases one of its FIRREA claims, prohibits only fraud committed by bank insiders, not that committed by a bank itself.  And Title 12, United States Code, Section 1833a(c)(2), which prohibits certain false statements and fraud that "affect[ ] a federally insured financial institution,"  the Bank contends, cannot be applied to the conduct alleged here because the statute does not contemplate liability where the affected financial institution and the institution alleged

to have perpetuated the fraud are the same entity.  Both of these arguments fail.  For the reasons articulated below, a plain reading of the text of FIRREA makes clear that the provisions the Government alleges Wells Fargo has violated do indeed prohibit the alleged misconduct.

Finally, Wells Fargo argues that the Government's common law claims fail as a matter of law.  The Government's breach of fiduciary duty claim, the Bank contends, must fail because there was no fiduciary duty between Wells Fargo and HUD.  But whether such a duty existed is a question of fact.  Therefore, the breach of fiduciary duty claim cannot be dismissed at this stage of the litigation.  By contrast, the Government's quasi-contract claims, for unjust enrichment and mistake of fact, are dismissed, because the HUD Inspector General was aware of the facts underlying the claims at issue when HUD paid the relevant FHA insurance claims.

### 1. The Standard of Review

To survive a Rule 12(b)(6) motion, a plaintiff must generally plead sufficient facts "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a probability requirement, but it" does require "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).  A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.   If the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Id.* at 570.  The Government's FCA, FIRREA, and common law tort claims satisfy these standards.  Its common law quasi-contract claims do not.

## 2.   The FCA Claims

Wells Fargo argues, first, that the Government has failed to state an FCA claim because none of the false or fraudulent claims alleged in the Amended Complaint is cognizable under the FCA, and because the Government has not sufficiently alleged that any false or fraudulent claim caused the Government's loss.  Neither argument is availing.

### a.   False or Fraudulent Claims

As relevant here, the FCA imposes liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim" to the Government or "knowingly makes, uses, or causes to be made or used, a false record or statement material" to such a claim.  31 U.S.C. § 3729(a)(1) (2006); 31 U.S.C. § 3729 (a)(1)(A); *id.*. § 3729(a)(1)(B).[19]  The FCA is broad; it "was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government."  *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).  Indeed, the Supreme Court has "consistently refused to accept a rigid, restrictive reading" of the Act.  *Id.*  Thus, "an improper claim" is any claim "aimed at extracting money the government otherwise would not have paid."  *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001).

More specifically, two theories of FCA liability are relevant here: false certifications and

---

[19]   In 2009, Congress passed the Fraud Enforcement and Recovery Act ("FERA"), which amended and renumbered the relevant provisions of the FCA.  *See* Pub.L. No. 111-21, 123 Stat. 1617 (2009).  The amendments are not relevant to the disputed issues in this motion.  For clarity's sake, however, the Court notes for false claims submitted prior to the passage of FERA, the provisions governing the FCA claims at issue in this case are the pre-amendment 31 U.S.C. § 3729(a)(1) (2006), providing liability for the submission of false claims, and current 31 U.S.C. § 3729(a)(1)(B), imposing liability for false statements.  *See U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010), *rev'd and remanded on other grounds*, 131 S. Ct. 1885 (2011) (explaining that the 2009 amendments to the false statements provision of the FCA are applicable to any claim pending on or after June 7, 2008, but that the amendments to the false claims provision are not retroactive).  For false claims allegedly submitted after the passage of FERA, the current provisions of the FCA, 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B), apply to both false claims and false statements.  References to the pre-amendment version of the FCA herein are indicated by the inclusion of a date in the citation.

fraudulent inducement.  Under the former — which is the principal focus of the parties in their

briefing— there are three kinds of false certifications that can lead to liability under the Act.  The

most straightforward is a certification that is *factually* false, "which involves an incorrect

description of goods or services provided or a request for reimbursement for goods or services

never provided."  *Mikes*, 274 F.3d at 697.  In addition, however, the FCA also prohibits

certifications that are *legally* false — that is, false representations of compliance with a federal

statute, regulation, or contractual term.  *See id.* at 696.  Legally false certifications may, in turn,

be *express*, or they may be *implied* by submission of the claim itself.  *See id.* at 698-99

(explaining that "[a]n expressly false claim is, as the term suggests, a claim that falsely certifies

compliance with a particular statute, regulation or contractual term," whereas "[a]n implied false

certification claim is based on the notion that the act of submitting a claim for reimbursement

itself implies compliance with governing federal rules that are a precondition to payment").  A

legally false claim — express or implicit — is only actionable under the FCA "where a party

certifies compliance with a statute or regulation as a condition to governmental payment."

*Mikes*, 274 F.3d at 697.[20]  "Conditions of payment are those which, if the government knew they

were not being followed, might cause it to actually refuse payment."  *United States ex rel.*

*Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008).[21]

---

[20]     The Government argues that this requirement applies only to implied false certifications.
(Gov't Mem. 29).  That is not the case.  *See Mikes*, 274 F.3d at 697.

[21]     Wells Fargo argues that, under Second Circuit precedent, in order to incur liability for an
implied false certification, the underlying regulation must expressly state that payment depends
upon compliance.  (Wells Fargo Mem. 26-27).  The Court of Appeals did hold in the healthcare
context that "implied false certification is appropriately applied only when the underlying statute
or regulation upon which the plaintiff relies expressly states the provider must comply in order to
be paid."  *Mikes*, 274 F.3d at 700 (emphasis omitted).  At least one court in this district, however,
has held that this holding does not apply outside that context.  *See United States ex rel. Feldman
v. City of New York*, 808 F. Supp. 2d 641, 653 (S.D.N.Y. 2011) ("[T]he Second Circuit restricted
its holding to FCA claims brought against a medical provider. . . .  It is clear, therefore, that

The second theory of liability — fraudulent inducement — stems from *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542-43 (1943), in which the Supreme Court considered whether otherwise valid claims submitted pursuant to contracts defendants obtained through impermissible collusive bidding were fraudulent within the meaning of the FCA.  The Court held that because the contracts were "induced by the [defendants'] frauds," claims for payment based on those contracts were also fraudulent.  *Id.* at 542-43.  "The government's money," the Court explained, "would never have been" paid to the defendants "had its agents known the bids were collusive."  *Id.* at 543.  In other words, the defendants' "fraud did not spend itself with the execution of the contract. . . .  The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal — payment of government money to persons who had caused it to be defrauded."  *Id.* at 543-44.  Based on this reasoning, courts have repeatedly held that the "use of fraudulent information to induce the Government to provide a loan guarantee" or other contract "constitutes a false claim under the FCA."  *United States v. Eghbal*, 548 F.3d 1281, 1283 (9th Cir. 2008); *see, e.g.*, *United States ex rel. Longhi v. Lithium Power Techs.*, 575 F.3d 458, 467-68 (5th Cir. 2009); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787 (4th Cir. 1999); *United States v. Veneziale*, 268 F.2d 504, 505 (3d Cir. 1959); *see also United States ex rel. Feldman v. Van Gorp*, 697 F.3d 78, 91 (2d Cir. 2012) (explaining the fraudulent inducement theory of FCA liability); S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986

---

*Mikes* does not directly control this case so far as the theory of implied false certification is concerned." (internal quotation marks omitted)); *see also United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1177 (9th Cir. 2006) ("[T]he *Mikes* court was dealing with the Medicare context, to which the court specifically confined its reasoning.").  The Court need not decide whether the *Mikes* limitation of the implied certification theory applies outside the healthcare context.  As explained below, the Government has alleged sufficient facts to make plausible a claim that Wells Fargo falsely certified compliance with HUD regulations, upon which payment was explicitly conditioned.

U.S.C.C.A.N. 5266, 5274 ("[E]ach and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim."). Indeed, in *Eghbal*, the Ninth Circuit held that where HUD is fraudulently induced to insure a mortgage that does not qualify for HUD insurance, otherwise valid claims submitted on that loan when it defaults constitute false claims under the FCA. *See* 548 F.3d at 1282-83.

The Government has adequately alleged liability under both theories. Turning first to the reckless underwriting and origination scheme, those claims can be understood as alleging that Wells Fargo fraudulently induced HUD to insure loans that were ineligible for such insurance. It did so, the Government alleges, by certifying that the mortgages met certain requirements for FHA insurance that they did not, in fact, meet. For example, Wells Fargo applied for — and received — HUD insurance on mortgages for which the Bank failed to verify and document the borrower's investment in the property; failed to verify and document the borrower's income; or failed to verify and analyze the borrower's payment history of housing obligations and obtain written explanations of derogatory credit history. (Am. Compl. ¶¶ 59, 93, 98). These failures rendered the loans ineligible for HUD mortgage insurance, and yet Wells Fargo — with knowledge or in reckless disregard of their ineligibility — certified the loans' eligibility. (*Id.* ¶¶ 140-42, 147). The Bank then submitted claims to HUD for those that defaulted or sold the loans to other entities that did so. If the Government's allegations are true, these claims, based on loan guarantees "induced by the [Bank's] fraud[ ]," constitute false claims under the FCA. *Hess*, 317 U.S. at 543-44; *see Eghbal*, 548 F.3d at 1282-83.

43

Alternatively, the reckless underwriting and origination claim may also be understood as a legally false certification claim.[22]   HUD regulations explicitly establish certain conditions that must be satisfied in order for a loan to be eligible for FHA insurance — that is, in order for a lender to be paid by HUD when the loan defaults.  *See, e.g.*, HUD Handbook 4150.2 (valuation and appraisal requirements); HUD Handbook 4155.1 (borrower eligibility requirements); 24 C.F.R. § 203.255 (providing that before endorsing a mortgage for insurance, the Secretary will review the application to ensure, among other things, that the lender has certified that "the proposed mortgage complies with HUD underwriting requirements").  For each mortgage it submitted for insurance, the Bank was required to certify that the loan met these conditions. (*See, e.g.* HUD/VA Addendum to Uniform Residential Loan Application, Baruch Decl. (Docket No. 28) Ex. B).  The Government alleges that these certifications were, in many instances, knowingly false.  These allegations are sufficient to state a claim under the legally false certification theory.  *See, e.g.*, *Kirk*, 601 F.3d at 114; *Feldman*, 808 F. Supp. 2d at 654.

Wells Fargo's arguments to the contrary are premised on a misunderstanding of the Government's claim.  In the Bank's view, the Government's claim is that implied in the individual loan applications are certifications of company-wide compliance with the quality control and self-reporting requirements for participation in the Direct Endorsement Lender program.  (*See* Wells Fargo Mem. 25-29).  Even if false, the Bank contends, such implied

---

[22]     The Government contends that the individual loan certifications were factually false. (*See* Gov't Mem. 28).  Because Wells Fargo failed to comply with HUD regulations designed to minimize the risk of default, the Government argues, the Bank's certifications to the contrary amounted to a certification that the loans were of higher quality than they actually were, which in the Government's view, is a claim of factual falsehood.  (*See id.*).  The Government's allegations, however, are better understood as a claim of legal falsehood: The Bank did not attest to the quality of its mortgages *per se*.  Instead, it falsely certified compliance with regulations with which it did not in fact comply.  Although such false certifications do, indeed, decrease the quality of the loan, to understand them as factually false would conflate the two categories and transform all claims of legal falsehood in this context into factually false certification claims.

certifications cannot be the basis for FCA liability because they are merely conditions of *participation* in the Direct Endorsement Lender program, not conditions of *payment* of individual claims.  (*Id.*).  *See Mikes*, 274 F.3d at 701-702 (distinguishing between false certifications of compliance with conditions of payment, which may form the basis of an FCA claim, and false certifications of compliance with programmatic conditions of participation, which, at least in certain circumstances, may not).  But the Government does not contend that the individual loan certifications implied anything about company-wide compliance with quality control, self-reporting, or any other conditions of participation in the Direct Endorsement Lender program.  Instead, the Government alleges that Wells Fargo originated loans that did not meet the requirements upon which FHA insurance — and thus FHA insurance payments — are conditioned, but nevertheless submitted certifications to HUD stating that they did.  If true, such conduct constitutes a legally false certification cognizable under the FCA.

The Government's second set of allegations — that Wells Fargo knowingly failed to report to HUD as required FHA loans with material underwriting violations — state a claim based on the implied legal certification theory of FCA liability.  After all, implicit in the submission of a claim for payment on a defaulted loan is a certification that the loan complies with the core eligibility requirements of HUD insurance.  *See Feldman*, 808 F. Supp. 2d at 652 (explaining that implicit in the submission of a claim for payment is "compliance with certain core, specific legal requirements").  By definition, material violations are violations of HUD requirements, "which, if the government knew they were not being followed, might cause it to actually refuse payment."  *Conner*, 543 F.3d at 1220.  Wells Fargo rated as containing "material" risks those loans that "contain[ed] significant deviations from the specific loan program parameters under which [they were] originated, making the loan ineligible for sale to [an]

45

investor or resulting in potential repurchase or indemnification." (Am. Compl. ¶ 32; *see also id.* ¶ 33). HUD defines "Material Risk" loans as those that contain "'material violations of FHA or mortgagee requirements and represent an unacceptable level of risk.'" (Am. Compl. ¶ 27 (quoting HUD Handbook 4060.1 REV-2, ¶ 7-4(D)). That the absence of material violations was an explicit condition of payment is made clear by regulation and by statute. Such loans must be reported to HUD, s*ee, e.g.*, HUD Handbook 4060.1 REV-2, ¶ 7-4, and the agency may seek indemnification, *see, e.g.*, 12 U.S.C. § 1715z-21(c)(1) — that is, HUD may refuse to pay claims — on defaulted loans that materially violate the agency's requirements.[23] Furthermore, as explained above, many, if not all, of the requirements Wells Fargo allegedly violated are themselves explicit conditions of eligibility for FHA insurance, and thus of payment.

### b. Causation

Wells Fargo's second argument with respect to the FCA claims — that the Government has not sufficiently alleged that any false or fraudulent claim caused the Government's loss — is even more easily rejected. Courts disagree about the proper standard governing causation in FCA cases. While the Seventh Circuit has held that the Government need only demonstrate that it "would not have guaranteed the loan 'but for' the false statement" at issue, *see United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992), the Third and Fifth Circuits have held that "the United States must demonstrate that the events which caused the defaults were related to the false statements in the applications," *United States v. Miller*, 645 F.2d 473, 475-76 (5th Cir. Unit A May 1981); *accord United States v. Hibbs*, 568 F.2d 347, 350-51 (3d Cir. 1977). The Second Circuit has not yet addressed the issue.

---

[23]   There is no relevant difference between the possibility that HUD may require a lender to indemnify a claim and the possibility that HUD may refuse to pay the claim. Wells Fargo does not argue otherwise.

At this stage, this Court need not determine which standard should govern here, because the Government has sufficiently alleged causation under either test. The Government alleges that Wells Fargo's false statements that it complied with HUD regulations induced the Government to insure loans it otherwise would not insure — that is, that HUD would not have guaranteed the loan but for the Bank's misstatements. (*See* Am. Compl. ¶¶ 147, 153). The Government has also satisfied the more stringent causation requirements of the Third and Fifth Circuits. The regulations the Government argues Wells Fargo violated are those meant to ensure that borrowers are able to afford their homes; failure to uphold these regulations "could very well be the major factor for subsequent defaults," and thus satisfy the requirement that "the defaults were related to the false statements in the application." *Miller*, 645 F.2d at 476 (holding that the causation requirement was satisfied where the Government alleged that an application for FHA insurance contained false statements about, for example, the creditworthiness, net worth or debts of borrowers).

### 3. FIRREA

The Court turns next to Wells Fargo's arguments about the Government's FIRREA claims. Congress enacted FIRREA in response to the savings and loan crisis of the 1980s. *See Bank of New York Mellon*, 2013 WL 1749418, at *9. Among other things, FIRREA enhanced civil and criminal penalties for bank fraud. *See, e.g.*, FIRREA, Pub. L. No. 101-73, §§ 951, 961 (1989). Particularly relevant here, the Act imposes civil penalties for the violation of certain specified criminal statutes. *See* 18 U.S.C. § 1833a(c). The Government alleges that Wells Fargo violated five of these predicate statutes. It claims that the Bank violated Title 18, United States Code, Section 1005, which prohibits, in relevant part, profiting from an act of a financial institution with the intent to defraud the Government; Sections 1001, 1341, and 1343, which

prohibit making false statements to the government or committing mail or wire fraud, for which

FIRREA imposes civil liability if such statement or fraud affects a federally insured financial

institution; and Section 1014, which prohibits "knowingly mak[ing] any false statement or report

. . . for the purpose of influencing in any way the action of the Federal Housing Administration."

*See id.* § 1833a(c)(1)-(2) (imposing civil penalties for violation of these criminal statutes).  Wells

Fargo argues that all but the last claim are insufficient under Rule 12(b)(6).  (Wells Fargo Mem.

35-45).[24]

### c.  Title 18, United States Code, Section 1005

First, the Government claims that Wells Fargo violated the fourth paragraph of Title 18,

United States Code, Section 1005.  Section 1005 provides in full as follows:

> Whoever, being an officer, director, agent or employee of any Federal Reserve
> bank, member bank, depository institution holding company, national bank,
> insured bank, branch or agency of a foreign bank, or organization operating under
> section 25 or section 25(a) of the Federal Reserve Act, without authority from the
> directors of such bank, branch, agency, or organization or company, issues or puts
> in circulation any notes of such bank, branch, agency, or organization or
> company; or

---

[24]     Wells Fargo contends that the Section 1014 claim is insufficient under Rule 9(b).  As
explained above in footnote 15, this argument is without merit.

Whoever, without such authority, makes, draws, issues, puts forth, or assigns any certificate of deposit, draft, order, bill of exchange, acceptance, note, debenture, bond, or other obligation, or mortgage, judgment or decree; or

Whoever makes any false entry in any book, report, or statement of such bank, company, branch, agency, or organization with intent to injure or defraud such bank, company, branch, agency, or organization, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System; or

*Whoever with intent to defraud the United States or any agency thereof, or any financial institution referred to in this section, participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution —*

Shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1005 (emphasis added).

Notably, only the first paragraph of the Section expressly limits liability to officers, directors, agents, or employees — that is, insiders — of a bank.  Nevertheless, some — although not all — courts to consider the question have extended that limitation to paragraphs two and three of the Section.  *See, e.g.*, *United States v. Barel*, 939 F.2d 26, 39 (3d Cir. 1991); *United States v. Ortiz*, 906 F. Supp. 140, 144-46 & n.2 (E.D.N.Y. 1995); *United States v. Edwards*, 566 F. Supp. 1219, 1220 (D. Conn. 1983).  *But see United States v. Edick*, 432 F.2d 350, 352-53 (4th Cir. 1970) (declining to extend the limitation of paragraph one to paragraph three).  Wells Fargo argues that the same limitation should be read into paragraph four, and therefore the Bank itself cannot be held liable for violating Section 1005.  (Wells Fargo Mem. 36)  Only a few courts have addressed the issue of whether liability under paragraph four of Section 1005 is limited to bank insiders, and those courts are divided on the issue.  *Compare United States v. Van Brocklin*,

115 F.3d 587, 597 (8th Cir. 1997) (holding that paragraph four is not limited to bank insiders),

*and United States v. Christensen*, 344 F. Supp. 2d 1294, 1296-97 (D. Utah 2004) (same), *with*

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 798 F. Supp. 2d 517, 528 (S.D.N.Y. 2011)

("*Rubin*") (extending the limitation of paragraph one to paragraph four).

 This Court agrees with the Government that paragraph four of Section 1005 is not limited

to bank insiders.  It nearly goes without saying that, "when [a] statute's language is plain, the

sole function of the courts — at least where the disposition required by the text is not absurd —

is to enforce it according to its terms."  *Hartford Underwriters Ins. Co. v. Union Planters Bank,*

*N.A.*, 530 U.S. 1, 6 (2000) (internal quotation marks omitted).  In deviating from this principle

with respect to paragraphs two and three of Section 1005, courts have relied on the legislative

history of those paragraphs.  Specifically, before 1948, "[t]he substantive conduct proscribed by

[those] paragraphs was contained . . . in a single paragraph that began with language limiting the

provision expressly to any [bank] officer, director, agent, or employee."  *Rubin*, 798 F. Supp. 2d

at 525 (internal quotation marks omitted).   When Congress revised the criminal code in 1948, it

"divided the single paragraph into three separate paragraphs, after which the limiting language

appeared in Paragraph One only."  *Id.*  There was no other indication, however, that Congress

intended to limit the restriction to paragraph one.  In fact, a note accompanying the revision

stated that, with a few exceptions not relevant here, "no changes of meaning or substance were"

intended.  *Id.* (internal quotation marks omitted).  In light of this unique history, courts have

reasoned that "this is one of those 'rare cases [where] the literal application of a statute will

produce a result demonstrably at odds with the intentions of its drafters, and those intentions

must be controlling.'"  *Barel*, 939 F.2d at 39 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458

U.S. 564, 571 (1982)).

The fourth paragraph of Section 1005, however, was enacted nearly fifty years later, in 1989, as part of FIRREA.  *See* Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub. L. No. 101-73, § 961(d)(3), 103 Stat. 183, 499 (1989).  In adding paragraph four to the Section, Congress gave no indication that the word "whoever" should be limited to bank insiders.  Moreover, Congress used the word "whoever" in several other provisions of FIRREA, and there is no dispute that, in those provisions at least, the word is not limited to bank insiders. *See, e.g.*, 18 U.S.C. §§ 1007, 1344; *see also* 1 U.S.C. § 1 (defining the word "whoever," when used in the United States Code, to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); *United States v. A & P Trucking Co.*, 358 U.S. 121, 123 n.2 (1958) (explaining that the word "'whoever' is to be liberally interpreted").  Finally, Congress made clear elsewhere in FIRREA that it knew how to limit liability to bank insiders when it wanted to do so.  *See, e.g.*, 18 U.S.C. § 1510 ("Whoever, *being an officer of a financial institution*, with the intent to obstruct a judicial proceeding, directly or indirectly notifies any other person about the existence or contents of a subpoena for records of that financial institution, or information that has been furnished to the grand jury in response to that subpoena, shall be fined under this title or imprisoned not more than 5 years, or both." (emphasis added)).

In declining to interpret paragraph four by its terms, the *Rubin* Court relied in part on the legislative history of FIRREA, citing a statement in the Committee Report that "one of the 'primary purposes of [FIRREA was to] . . . enhance the regulatory enforcement powers of the depository institution regulatory agencies to protect against fraud, waste and *insider abuse*.'" 798 F. Supp. 2d at 526-27 (quoting H.R. Rep. 101-54(I), at 307-08 (1989)) (emphasis in original).  As the *Rubin* Court itself acknowledged, however, this legislative history is

ambiguous at best.  *See id.* at 527 (acknowledging that paragraph four "might just as easily have been designed to address fraud and waste, more generally, as to address the more limited field of illicit bank transactions conducted by bank insiders"); *see also Van Brocklin*, 115 F.3d at 597 ("FIRREA's legislative history notes the addition of paragraph four, but in no way indicates that liability under that provision is limited to bank insiders." (citing H.R. Rep. No. 101-54(I), at 399-400, 472-73)).  The *Rubin* Court also relied in part on Congress's decision to place paragraph four within Section 1005.  *See* 798 F. Supp. 2d at 527.  Once again, however, *Rubin* itself acknowledged that that placement was ambiguous, as "Congress may or may not have been aware of the unique history of § 1005 . . . and the divergent construction assigned to it by the few courts to have considered it."  *Id.*  Further, not every court to consider the issue had held that paragraphs two and three of the Section applied only to bank insiders.  *See Edick*, 432 F.2d at 352-53.  Given that lack of judicial consensus, it cannot be presumed that Congress implicitly adopted any judicial interpretation of Section 1005 when enacting FIRREA.  *See, e.g.*, *Nike, Inc. v. Top Brand Co. Ltd.*, No. 00 Civ.8179 (KMW) (RLE), 2005 WL 1654859, at *10 n.9 (S.D.N.Y. July 13, 2005) (declining to presume that Congress's inclusion, without alteration, of certain language in a statute incorporated prior judicial interpretations of that language where "there was no clear judicial consensus for Congress to incorporate").

In light of this ambiguity, whatever the merits of limiting paragraphs two and three of Section 1005 to bank insiders (a question this Court need not decide), there is no basis to deviate from the plain language of paragraph four by limiting it in a similar manner.  That is, paragraph four plainly does not present the "rare" or "exceptional" case in which "literal application of a statute will produce a result *demonstrably* at odds with the intentions of its drafters" or "thwart the *obvious* purpose of the statute."  *Griffin*, 458 U.S. at 571 (emphasis added) (internal

quotation marks omitted).  Accordingly, the question is not whether "importing into Paragraph Four the scope restriction that [some courts] found to exist in Paragraphs Two and Three is . . . unreasonable," *Rubin*, 798 F. Supp. 2d at 527, but rather whether it is required by the text of the statute.  It is not.  Thus, the Court holds that the fourth paragraph of Section 1005 is not limited to bank insiders.  Instead, *any* person or entity that, "with intent to defraud" the Government or a financial institution, "participates or shares in or receives" funds derived from an act of a financial institution, may be convicted under that paragraph.  *See Van Brocklin*, 115 F.3d at 596-97.  It follows that the United States may proceed with its FIRREA claim based on Section 1005.

### d.  Title 18, United States Code, Sections 1001, 1341, and 1343

Next, Wells Fargo seeks to dismiss the Government's FIRREA claims to the extent they are predicated on violations of Title 18, United States Code, Sections 1001, 1341, or 1343, statutes prohibiting false statements to the Government and mail and wire fraud.  FIRREA imposes civil liability on "whoever" violates these provisions, where such conduct "affect[s] a federally insured financial institution."  12 U.S.C. § 1833a(c)(2).  Wells Fargo argues that the Government's claims under these provisions fail because the only financial institution the Government has alleged was affected is Wells Fargo itself.  (Wells Fargo Mem. 38-39).  Such self-affecting misconduct, Wells Fargo contends, is not contemplated by the statute.  (*Id.* at 39).

Since oral argument in this case, two other courts in this District have considered, and rejected, precisely the same argument.  *See Bank of New York Mellon*, 2013 WL 1749418, at *11; *Countrywide Fin. Corp.*, 2013 WL 4437232, at *5.  Indeed, one of these courts went so far as to say that the argument "merits little discussion."  *Bank of New York Mellon*, 2013 WL 1749418, at *11.  This Court agrees.  Wells Fargo's proffered interpretation is unsupported by the text of the statute, which does not exempt from the relevant affected financial institutions

those that perpetrate fraud affecting themselves.  *See Countrywide Fin. Corp.*, 2013 WL
4437232, at *5 (holding that "the plain language of [S]ection 1833a(c)(2) . . . is as unambiguous
as it is dispositive"  that a financial institution may violate FIRREA through conduct that affects
itself).  Moreover, in the context of another FIRREA provision that contains virtually identical
language — namely, Section 961(l), which extends the statute of limitations for mail and wire
fraud "if the offense affects a financial institution," 18 U.S.C. § 3293(2) — courts have
repeatedly rejected Wells Fargo's interpretation in favor of a plain-text reading.  *See, e.g.*, *United
States v. Serpico*, 320 F.3d 691, 695 (7th Cir. 2003); *United States v. Ghavami*, 10 Cr.1217
(KMW), 2012 WL 2878126, at *5 (S.D.N.Y. July 13, 2012) (collecting cases).

Wells Fargo correctly notes that in each of the cases addressing Section 961(l), the
affected financial institution — although a participant in the alleged fraud — was not the
defendant.  (The financial institutions had generally either pleaded guilty or entered into civil
settlements).  That distinction, however, does not alter the analysis.  The question considered by
the courts in these cases was whether a financial institution, through its own misconduct, can
affect itself within the meaning of FIRREA.  Courts have repeatedly held that it can.  There is no
reason to deviate from that interpretation here.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90,
101 (2003) (explaining that where the same term is used in two different provisions of the same
statute, it is "logical to assume that the [same] term . . . would carry the same meaning with
respect to both provisions").  This Court therefore joins the two other courts to have considered
the issue in holding that an institution that participates in a fraud may also be affected by it
within the meaning of Title 12, United States Code, Section 1833a(c)(2).  *See Bank of New York
Mellon*, 2013 WL 1749418, at *11; *Countrywide Fin. Corp.*, 2013 WL 4437232, at *5.

As Wells Fargo concedes (*see* Oral Arg. Tr. 80-81), Courts have repeatedly held that in order to allege such an effect, the Government need not allege actual harm, but only facts that would demonstrate that the bank suffered an increased risk of loss due to its conduct. *See, e.g.*, *United States v. Serpico*, 320 F.3d 691, 694-95 (7th Cir. 2003); *United States v. Mullins*, 613 F.3d 1273, 1278-79 (10th Cir. 2010); *Bank of New York Mellon*, 2013 WL 1749418, at *11-12; *Ghavami*, 2012 WL 2878126, at *5.[25] Here, the Amended Complaint alleges at least two ways in which Wells Fargo's misconduct has not only increased the Bank's risk of harm, but already caused the Bank to suffer harm. First, the Government alleges that Wells Fargo's fraudulent underwriting practices led to the Bank's issuing loans that materially violated HUD regulations, loans that because of these violations had a higher risk of default. (*See, e.g.*, Am. Compl. ¶ 171). As a result, Wells Fargo has had to indemnify HUD for hundreds of loans it would not otherwise have to indemnify, and faces the prospect of further indemnifications. (*Id.*). *Cf. Serpico*, 320 F.3d at 695 (holding that a bank's exposure to the risks of loans it would not otherwise have issued absent a fraudulent scheme constitutes an effect on a financial institution within the meaning of FIRREA). Second, the Government alleges that Wells Fargo's misconduct has exposed the bank to considerable legal liability and, indeed, has already caused the Bank significant legal expenditures. (Am. Compl. ¶¶ 171-74). In particular, the Government alleges that Wells Fargo faces "treble damages and civil penalties under the False Claims Act" and FIRREA (*id.* ¶¶ 171, 174); and that its "fraudulent practices . . . have caused the bank to become a defendant in other lawsuits, and already have resulted in Wells Fargo paying out settlements."

---

[25] Some courts have suggested that the relevant effect on a financial institution need not be negative at all, but rather any impact — positive or negative — may constitute an effect within the meaning of FIRREA. *See, e.g.*, *Bank of New York Mellon*, 2013 WL 1749418, at * 11. Because the Government has alleged sufficiently that Wells Fargo's conduct negatively affected it, the Court need not address this interpretation.

(*Id.* ¶ 172). "Courts regularly have concluded that a fraud affects an institution by embroiling it in costly litigation, whether because the fraud causes actual losses to the institution through settlements and attorney's fees or because it exposes the institution to realistic potential legal liability." *Bank of New York Mellon*, 2013 WL 1749418, at *12 (collecting cases).[26] Accordingly, the Government's allegations are sufficient to state a claim.

### 4.    Common Law Claims

Finally, Wells Fargo argues that the Government's breach of fiduciary duty, unjust enrichment, and mistake of fact claims are insufficient under Rule 12(b)(6).[27]  With respect to

---

[26]    Wells Fargo complains that allowing the Government to allege that this lawsuit is itself an effect cognizable under FIRREA would allow the Government "to manufacture [an] 'effect' — and therefore [a] FIRREA violation — simply by bringing suit against a federally insured financial institution." (Wells Fargo Mem. 45).  This argument misunderstands the effect alleged in the Amended Complaint.  The negative effect the Government alleges is not this lawsuit *per se*, but rather Wells Fargo's exposure to potential legal liability more generally.  (Am. Compl. ¶ 171).  This effect is cognizable under FIRREA.  *See Bank of New York Mellon*, 2013 WL 1749418, at *12.  Furthermore, even if potential legal liability was not a cognizable effect under FIRREA, the Government has, as noted above, alleged other negative effects.

[27]    Wells Fargo argues that the Government's common law claims should be dismissed for several other reasons as well.  In particular, the Bank contends that the statute of limitations has expired on many of the claims; that the claims do not satisfy Rule 9(b); that the Government has failed to adequately plead causation; and that, to the extent the Government alleges claims for "future losses," such claims are "no more than an impermissible attempt to seek future indemnification." (Wells Fargo Mem. 46-47).  Each of these arguments is cursory, offering little factual or legal analysis.  Nevertheless, the Court has considered them.  With respect to the first two arguments, as explained above, many of the Government's common law claims are untimely, but the claims are sufficient to satisfy the requirements of Rule 9(b).  As to the third argument, for the same reasons the Government has adequately pleaded causation under the FCA, causation is also adequately pleaded for the common law claims.

Wells Fargo's final argument is less than clear.  The argument appears to be that the Government's allegations with respect to FHA claims for loans that have not yet defaulted are not ripe.  But "under general principles of tort law, a cause of action accrues when conduct that invades the rights of another has caused injury.  When the injury occurs, the injured party has the right to bring suit for all of the damages, past, present and future, caused by the defendant's acts." *Davis v. Blige*, 505 F.3d 90, 103 (2d Cir. 2007) (brackets and internal quotation marks omitted); *see also Sea Tow Servs. Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349, 357 (E.D.N.Y. 2007) ("Under New York law,  . . . a breach of contract case is ripe immediately upon the alleged breach, even where damages remain uncertain.") (internal brackets and quotation marks

the first, Wells Fargo contends that the Government cannot state a claim for breach of fiduciary duty because there was no fiduciary relationship between the Bank and HUD.   (Wells Fargo Mem. 47-48).   To state a claim for breach of fiduciary duty, a plaintiff "must allege (1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach."  *Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 258 (S.D.N.Y. 2009) (internal quotation marks omitted).[28]  "A fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another."  *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*, 376 F. Supp. 2d 385, 413-14 (S.D.N.Y. 2005) (internal quotation marks omitted). As "the existence of a fiduciary relationship normally depends on the facts of a particular relationship, a claim alleging such a relationship is generally not dismissed for failure to state a claim."  *Ho Myung Moolsan Co.*, 665 F. Supp. 2d at 258 (internal quotation marks omitted).

---

omitted).  The injury alleged by the Government does not rest upon "nebulous future events . . . contingent in nature."  *In re Drexel Burnham Lambert Grp. Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993).  Instead, the Government alleges (and Wells Fargo disputes) that, between 2001 and 2010, the Bank submitted false claims to HUD in violation of several common law principles. This is a concrete dispute fit for judicial review.  *See id.*  The fact that the Government's damages "have not yet been fixed does not negate the very real rights and liabilities associated with [its] underlying claims."  *Greenlight Reinsurance, Ltd. v. Appalachian Underwriters, Inc.*, No. 12 Civ. 8544 (JPO), 2013 WL 3835341, at *9 (S.D.N.Y. July 25, 2013).

[28]    It is unclear which state's law applies to the Government's common law claims.  In its memorandum of law, the Government relies on New York state law when discussing the common law claims.  (*See* Gov't Mem. 64-67).  Wells Fargo cites New York state law, as well as the law of Iowa, where it is headquartered, and Minnesota, where the Bank asserts it "has significant operations."  (Wells Fargo Mem. 47).  The parties have not identified, and the Court has not found, any conflict between the laws of these states relevant to the disputes at issue here. Therefore, the Court need not determine which body of law applies at this time.  *See, e.g.*, *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (noting that a court does "not have occasion to embark on a choice-of-law analysis in the absence of an 'actual conflict' between the applicable rules of [the] relevant jurisdictions").

Applying these standards here, there is no basis to dismiss the Government's claims.  To be sure, the Government's allegation that the "Direct Endorsement Lender program empowered Wells Fargo to obligate HUD to insure mortgages it issued" (Am. Compl. ¶ 176), is, as the Bank points out (Wells Fargo Mem. 48), somewhat overstated.  After all, a lender submits to HUD applications for insurance to be reviewed and approved by the agency.  *See* 24 C.F.R. § 203.255. Upon receipt of an application for insurance, HUD reviews the application to determine, among other things, that the mortgage is executed on the correct form; that all of the requisite documents were submitted; and that the lender made all the necessary certifications.  *See* 24 C.F.R. § 203.255(c).  Only once this pre-endorsement review is complete does HUD certify a mortgage for insurance.

Nevertheless, under the Direct Endorsement program, HUD "does not review applications for mortgage insurance before the mortgage is executed."  24 C.F.R. § 203.5(a). Nor does it ensure that the borrower meets the requirements for the issuance of a mortgage. Instead, it is the lender that evaluates a potential borrower's ability to satisfy the obligations of a mortgage, *see id* § 203.5(d), and the lender that "determines that the proposed mortgage is eligible for insurance under the applicable program regulations," *id.* § 203.5(a).  Furthermore, although HUD reviews insurance applications to ensure that a Direct Endorsement Lender has made all the necessary certifications, it does not necessarily review the accuracy of these certifications; it depends upon the lender "to supply true, accurate, and complete information." *In re Flagship Mortg. Servs.*, HUDALJ 90-154-MR, 1991 WL 11668525, at *6 (H.U.D.A.L.J. Jan. 16, 1991).  HUD's dependence on its Direct Endorsement Lenders suggests that the relationship between HUD and these lenders may be fiduciary.  *See, e.g.*, *id.*; *In re Samuel T. Isaac & Assoc., Inc.*, 1983 WL 13321, at *22 (H.U.D.B.C.A. Nov. 10, 1983); *see also In re*

*O'Keefe*, 46 So. 3d 1240, 1242 (La. 2010) (characterizing "a direct endorsement lender" as having a "fiduciary duty" to HUD).  At a minimum, it is plausible that such a relationship existed, which is all that is needed to survive a Rule 12(b)(6) motion.

The Government's unjust enrichment and mistake of fact claims are a different story. Under New York law, "the voluntary payment doctrine precludes a party from recovering voluntary payments 'made with full knowledge of the facts' if the party's ignorance of its contractual rights and obligations resulted from a 'lack of diligence.'"  *United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 657 (S.D.N.Y. 2011) (quoting *Spagnola v. Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2009)).  As discussed above, HUD was on notice of the facts underlying the Government's claims here no later than 2004, when its Inspector General issued an audit report of Wells Fargo detailing the same kind of misconduct as that alleged in this lawsuit.[29]  Therefore, any payments made after that report were made with knowledge of that misconduct and cannot form the basis of an unjust enrichment or mistake of fact claim. Because, for the reasons explained above, any claims based on payments made before the HUD report are time barred, the Government's unjust enrichment and mistake of fact claims are all dismissed.

## CONCLUSION

For the reasons stated above, there is no basis to dismiss any of the Government's federal statutory claims.  Wells Fargo's motion to dismiss is therefore DENIED as to these claims.  Any

---

[29]   The Government disputes that the audit report was sufficient to put it on notice of the misconduct alleged in the Amended Complaint, but it does not contest the proposition that if the report was indeed sufficient to put the Government on notice, the quasi-contract common law claims must be dismissed.  (Gov't Mem. 67).  It has therefore waived any argument to the contrary.  *See, e.g.*, *First Capital Asset Mgmt. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392-93 & n.116 (S.D.N.Y. 2002) (holding that an issue plaintiffs failed to raise in their memorandum of law was considered waived).

tort claims arising before June 25, 2009, however, are untimely and therefore dismissed.  In addition, the Government's mistake of fact and unjust enrichment claims are dismissed in their entirety.  Wells Fargo's motion is therefore GRANTED as to these claims.

The Clerk of Court is directed to terminate the motion (Docket No. 26).  In addition, the Clerk of Court is directed to terminate Wells Fargo's previous motion to dismiss (Docket No. 14) as moot.

SO ORDERED.

Dated: September 24, 2013
      New York, New York

                                                    JESSE M. FURMAN
                                   United States District Judge