PREET BHARARA
United States Attorney for the
Southern District of New York
BY:    JEFFREY S. OESTERICHER
         SARAH J. NORTH
         REBECCA S. TINIO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone No. (212) 637-2800
Facsimile No. (212) 637-2730
Jeffrey.Oestericher@usdoj.gov
Sarah.North@usdoj.gov
Rebecca.Tinio@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

       Plaintiff,

        -against-

WELLS FARGO BANK, N.A. and
KURT LOFRANO,

       Defendants.

12 Civ. 7527 (JMF)(JCF)

**SECOND AMENDED COMPLAINT OF THE**
**UNITED STATES OF AMERICA**

**Jury Trial Demanded**

      The United States of America (the "United States" or the "Government"), by its attorney,

Preet Bharara, United States Attorney for the Southern District of New York, brings this

complaint against Wells Fargo Bank, N.A. ("Wells Fargo"), and Wells Fargo executive Kurt

Lofrano ("Lofrano") (collectively, "Defendants"), alleging as follows:

**INTRODUCTION**

      1.     This is a civil fraud action by the United States to recover treble damages and

civil penalties under the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.*, civil penalties

under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"),

12 U.S.C. § 1833a, and common-law damages arising from fraud on the United States Department of Housing and Urban Development ("HUD") in connection with Wells Fargo's residential mortgage lending business.

2.      As set forth more fully below, Wells Fargo, the largest HUD-approved Federal Housing Administration ("FHA") residential mortgage lender, engaged in a regular practice of reckless origination and underwriting of its retail FHA loans over the course of more than four years, from May 2001 through October 2005, all the while knowing that it would not be responsible when the materially deficient loans went into default.  Rather, as explained below, under FHA's Direct Endorsement program, HUD insured the loans that Wells Fargo was originating.  During this four and a half year period, Wells Fargo certified to HUD that over 100,000 retail FHA loans met HUD's requirements for proper origination and underwriting, and therefore were eligible for FHA insurance, when the bank knew that a very substantial percentage of those loans – nearly half of the loans in certain months – had not been properly underwritten, contained unacceptable risk, and were ineligible for FHA insurance.

3.      Moreover, the extremely poor quality of Wells Fargo's loans was a function of management's nearly singular focus on increasing the volume of FHA originations (and the bank's profits), rather than on the quality of the loans being originated.  Management's actions included hiring temporary staff to churn out and approve an ever-increasing quantity of FHA loans, failing to provide its inexperienced staff with proper training, paying improper bonuses to its underwriters to incentivize them to approve as many FHA loans as possible, and applying pressure on loan officers and underwriters to originate and approve more and more FHA loans as quickly as possible.  As a consequence of Wells Fargo's misconduct, FHA paid hundreds of

millions of dollars in insurance claims on defaulted loans that the bank had falsely certified met HUD's requirements, and thousands of Americans lost their homes through mortgage foreclosures across the country.   Furthermore, Wells Fargo actually received hundreds of millions of dollars in FHA payments on those false claims, as the bank not only falsely certified those mortgages for government insurance, but also remained the holder of record for the vast majority of those mortgages, such that it submitted the claims and received the insurance payments for nearly all of the loans that defaulted.   Accordingly, the Government seeks recovery for its loss on these materially deficient mortgage loans that Wells Fargo recklessly underwrote and falsely certified were eligible for FHA insurance.

4.      In addition, from January 2002 through December 2010, Defendants purposely violated HUD reporting requirements and kept its materially deficient loans a secret.   Defendants were well aware that HUD regulations required it to perform monthly reviews of its FHA loan portfolio and to self-report to HUD any loan that was affected by fraud or other serious violations.   This reporting requirement permits HUD to investigate the bad loans and request reimbursement or indemnification, as appropriate.   But, although the bank generally performed the monthly loan reviews and internally identified over 6,000 materially deficient loans during this period, including over 3,000 loans that had gone into default within the first six months after origination (known as "Early Payment Defaults" or "EPDs"), Defendants chose not to comply with the bank's self-reporting obligation to HUD.

5.      Prior to October 2005, Wells Fargo, the largest originator of FHA loans in America, did not self-report a single bad loan to HUD.   Instead, Lofrano – who was in charge of quality control at Wells Fargo, including self-reporting materially defective loans to HUD – and

others at Wells Fargo concealed the bank's bad loans and shoddy underwriting to protect its enormous profits from the FHA program. And when HUD inquired about Wells Fargo's self-reporting practices in 2005, the bank attempted to cover up its misdeeds by falsely suggesting to HUD that the bank had in fact been reporting bad loans. Thereafter, the bank's self-reporting was woefully and purposefully inadequate, all in an effort to avoid indemnification claims from HUD and pushback from wholesale brokers whose materially defective loans would be reported to HUD. All told, from January 1, 2002 through December 31, 2010, Wells Fargo internally identified 6,558 loans that it was required to self-report, including 3,142 Early Payment Defaults, but self-reported only 238 loans. As a consequence of Defendants' intentional failure to self-report these ineligible loans to HUD, FHA was required to pay hundreds of millions of dollars in insurance claims when the loans defaulted, with additional losses expected in the future. Moreover, for the vast majority of these loans, Wells Fargo remained the holder of the mortgage notes and received the FHA insurance payments on those claims.

## JURISDICTION AND VENUE

6.  This Court has jurisdiction pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. § 1331.

7.  Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1), (b)(3), and (c) because the defendant can be found and transacts business in this judicial district.

## PARTIES

8.  Plaintiff is the United States of America.

9.  Defendant Wells Fargo Bank, N.A. is a national bank and federally insured financial institution with its principal place of business in California. Wells Fargo Bank, N.A. is

4

the parent company of Wells Fargo Home Mortgage, a mortgage lender headquartered in Des Moines, Iowa, with branches and offices in all 50 states.

10.     Throughout the relevant period, Defendant Kurt Lofrano was responsible for quality control at Wells Fargo's Home Mortgage division and held the position of Vice President of Decision Quality Management, or a substantially similar position.  Upon information and belief, he resides in Minnesota.

## CIVIL STATUTES TO COMBAT MORTGAGE FRAUD

11.     The False Claims Act provides liability for any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B).  The False Claims Act further provides that any person who violates the Act: "is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

12.     Congress enacted FIRREA in 1989 to reform the federal banking system.  Toward that end, FIRREA authorizes civil enforcement of enumerated criminal predicate offenses—as established by a preponderance of the evidence—that involve financial institutions and certain government agencies. *See* 12 U.S.C. § 1833a(e).  Several of the predicate offenses that can form the basis of liability under FIRREA are relevant here:   First, 18 U.S.C. § 1014 prohibits "knowingly mak[ing] any false statement or report, or willfully overvalu[ing] any land, property, or security, for the purpose of influencing in any way the action of [FHA]." *Id*.   The

Government asserts that cause of action for false statements or reports that Wells Fargo made after July 30, 2008, to influence the actions of FHA.  Second, 18 U.S.C. § 1005 prohibits anyone who, with "intent to defraud the United States or any agency thereof, or any financial institution referred to in this section, participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution."  Third, 18 U.S.C. §§ 1341, 1343 prohibit using the mails or wires, respectively, for the purpose of executing a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  Fourth, 18 U.S.C. § 1001 prohibits any person from, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . mak[ing] any materially false, fictitious, or fraudulent statement or representation."

13.     FIRREA provides that the United States may recover civil penalties of up to $1.1 million per violation, or, for a continuing violation, up to $1.1 million per day or $5.5 million, whichever is less.  12 U.S.C. § 1833a(b)(1)-(2); 28 C.F.R. § 85.3(a)(6), (7).  The statute further provides that the penalty can exceed these limits to permit the United States to recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.  18 U.S.C. § 1833a(b)(3).

## FACTUAL BACKGROUND

## I.   THE FHA MORTGAGE INSURANCE PROGRAM

### A.   Background

14.   FHA, a part of HUD, is the largest mortgage insurer in the world, insuring approximately one third of all new residential mortgages in the United States.  Pursuant to the National Housing Act of 1934, FHA offers various mortgage insurance programs.  Through these programs, FHA insures approved lenders ("mortgagees") against losses on mortgage loans made to buyers of single-family housing.  The programs help low-income and moderate-income families become homeowners by lowering some of the costs of their mortgage loans.  FHA mortgage insurance encourages lenders to make loans to creditworthy borrowers who nevertheless might not meet conventional underwriting requirements.

15.   Under HUD's mortgage insurance programs, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property.  HUD also incurs expenses in managing and marketing the foreclosed-upon property until it is resold.  By protecting lenders against defaults on mortgages, FHA mortgage insurance encourages lenders to make loans to millions of creditworthy Americans who might not otherwise satisfy conventional underwriting criteria.  FHA mortgage insurance also makes mortgage loans valuable in the secondary markets, as FHA loans are expected to have met HUD requirements and because they are secured by the full faith and credit of the United States.

16.   HUD's Direct Endorsement Lending program is one of the FHA-insured mortgage programs.  A Direct Endorsement Lender is authorized to underwrite mortgage loans,

decide whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA mortgage insurance without prior HUD review or approval.  To qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD requirements (*e.g.*, income, credit history, valuation of property, etc.).

17.     HUD relies on the expertise and knowledge of Direct Endorsement Lenders in providing FHA insurance and relies on their decisions.  A Direct Endorsement Lender is therefore obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in dealings with HUD.  The duty of good faith also requires a Direct Endorsement Lender to make full and fair disclosures to HUD of all material facts and to take on the affirmative duty of employing reasonable care to avoid misleading HUD in all circumstances.

**B.     Underwriting and Due Diligence Requirements**

18.     A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. The underwriter must "evaluate [each] mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).  In addition, the underwriter must "have [each] property appraised in accordance with [the] standards and requirements" prescribed by HUD. 24 C.F.R. § 203.5(e).

19.     Mortgagees must employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud; in addition, underwriting decisions must be performed with due diligence in a prudent manner.  HUD Handbook 4000.4 REV-1, ¶ 2-4(C)(5);

*see also* HUD Handbook 4155.2 ¶ 2.A.4.b.   The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters.   HUD Handbook 4060.1 REV-2, ¶ 2-9(A).

20.     HUD relies on Direct Endorsement Lenders to conduct due diligence on Direct Endorsement loans.   The purposes of due diligence include (1) determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties, *see* 24 C.F.R. § 203.5(d), and (2) examining a property offered as security for the loan to determine if it provides sufficient collateral, *see* 24 C.F.R. § 203.5(e)(3).   Due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.   In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment."   24 C.F.R. § 203.5(c).

21.     HUD has set specific rules for due diligence predicated on sound underwriting principles.   In particular, HUD requires Direct Endorsement Lenders to be familiar with, and to comply with, governing HUD Handbooks and Mortgagee Letters, which provide detailed processing instructions to Direct Endorsement Lenders.   These materials specify the minimum due diligence with which Direct Endorsement Lenders must comply.

22.     With respect to ensuring that borrowers have sufficient credit, a Direct Endorsement Lender must comply with governing HUD Handbooks, such as HUD Handbook 4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans), to evaluate a borrower's credit.   The rules set forth in HUD Handbook 4155.1 exist to

ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt. HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

23.     To properly evaluate a borrower's credit history, a Direct Endorsement Lender must, at a minimum, obtain and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or interested parties; inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts and recent credit inquiries; establish income stability and make income projections; obtain explanations for gaps in employment, when required; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and consider and document any compensating factors permitting deviations from those fixed ratios.

24.     With respect to appraising the mortgaged property (*i.e.*, collateral for the loan), a Direct Endorsement Lender must ensure that an appraisal and its related documentation satisfy the requirements in governing HUD Handbooks, such as HUD Handbook 4150.2 (Valuation Analysis for Single Family One- to Four-Unit Dwellings). The rules set forth in HUD Handbook 4150.2 exist to ensure that a Direct Endorsement Lender obtains an accurate appraisal that properly determines the value of the property for HUD's mortgage insurance purposes.

**C.     Quality Control Requirements and Wells Fargo Quality Control**

25.     Furthermore, to maintain HUD-FHA approval, a Direct Endorsement Lender must implement and maintain a quality control program. HUD requires the quality control department to be independent of mortgage origination and servicing functions. *See* HUD

Handbook 4060.1 REV-1, ¶ 6-3(B); HUD Handbook 4060.1 REV-2, ¶ 7-3(B); HUD Handbook 4700.2 REV-1, ¶ 6-1(A).   To comply with HUD's quality control requirements, a lender's quality control program must (among other things): (a) review a prescribed sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (b) conduct a full review of "all loans going into default within the first six payments," which HUD defines as "early payment defaults."   HUD Handbook 4060.1 REV-1, ¶¶ 6-6(C), 6-6(D); HUD Handbook 4060.1 REV-2, ¶¶ 7-6(C), 7-6(D); HUD Handbook 4700.2 REV-1, ¶¶ 6-1(B), 6-1(D).

26.     In conducting a quality control review of a loan file, the lender must, among other things, review and confirm specific items of information.   For instance, "[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written re-verification.   Examples of items that must be reverified include, but are not limited to, the mortgagor's employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds."   HUD Handbook 4060.1 REV-2, ¶ 7-6(E)(2).   Further, "[a]ny discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed."   *Id.*; *see also* HUD Handbook 4060.1 REV-1, ¶ 6-6(E)(2); HUD Handbook 4700.2 REV-1, ¶ 6-3(A)(2).

27.     The HUD Handbook lays out a rating system for the quality control reviews, in which the lender implements a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review.   The system should enable a mortgagee to compare one month's sample to previous samples so the mortgagee may conduct trend analysis."   HUD Handbook 4060.1 REV-2, ¶ 7-4; *see also* HUD Handbook 4060.1 REV-1, ¶ 6-

11

4.  The ratings provided for this purpose are "Low", *i.e.,* no or minor violations, "Acceptable," *i.e.,* issues identified were not material to insurability of the loan, "Moderate," *i.e.,* significant unresolved questions or missing documentation created a moderate risk to the mortgagee and FHA, and "Material," *i.e.* issues identified were material violations of FHA or mortgagee requirements and represent an unacceptable level of risk, such that the loans must be reported to HUD.  HUD Handbook 4060.1 REV-1, ¶ 6-4; HUD Handbook 4060.1 REV-2, ¶ 7-4.

28.  Specifically, the HUD Handbook defines "Material Risk" loans as follows:

> The issues identified during the review were material violations of FHA or mortgagee requirements and represent an unacceptable level of risk.  For example, a significant miscalculation of the insurable mortgage amount or the applicant[']s capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud.  Mortgagees must report these loans, in writing, to the Quality Assurance Division in the FHA Home Ownership Center having jurisdiction.

HUD Handbook 4060.1 REV-2, ¶ 7-4(D); *see also* HUD Handbook 4060.1 REV-1, ¶ 6-4(D).

29.  Under HUD's rules, a lender must report to HUD (along with the supporting documentation) "[s]erious deficiencies, patterns of non-compliance, or fraud uncovered by mortgagees" during the "normal course of business and by quality control staff during reviews/audits of FHA loans" within 60 days of the initial discovery.  HUD Handbook 4060.1 REV-1, CHG-1, ¶¶ 6-13, 6-3(J); *see also* HUD Handbook 4060.1 REV-2, ¶ 7-3(J) (requiring Direct Endorsement Lenders to "immediately" report findings of "fraud or other serious violations" affecting an FHA loan); HUD Handbook 4060.1 REV-2, ¶ 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.").[1]  Upon

---

[1] Prior to November 2003, lenders were required to self-report to HUD loans affected by "significant discrepancies," such as "any violation of law or regulation, false statements or

making such findings, the lender must also expand the scope of the quality control review both by increasing the number of files reviewed and conducting a more in-depth review of the selected files.

30.     Until 2005, HUD's rules instructed Direct Endorsement Lenders to make the required self-reports of loans with serious deficiencies, patterns of noncompliance, or fraud in writing to HUD through the Quality Assurance Division of the HUD Homeownership Centers ("HOCs") having jurisdiction.  In May 2005, HUD issued Mortgagee Letter 2005-26, which notified lenders that going forward they would have to participate in mandatory electronic reporting through HUD's online Neighborhood Watch system.  That new method became mandatory at the end of November 2005, and required mortgagees "to report serious deficiencies, patterns of noncompliance, or suspected fraud, to HUD in a uniform, automated fashion" and in lieu of written reports to the various individual HOCs.

31.     In addition to reporting loans affected by fraud or other serious violations to HUD, the lender is required to take corrective action in response to its findings.  In particular, quality control review findings must "be reported to the mortgagee's senior management within one month of completion of the initial report" and "[m]anagement must take prompt action to deal appropriately with any material findings.  The final report or an addendum must identify the actions being taken, the timetable for their completion, and any planned follow-up activities." HUD Handbook 4060.1 REV-2, ¶ 7-3(I); *see also* HUD Handbook 4060.1 REV-1, ¶ 6-3(I); HUD Handbook 4700.2 REV-1, ¶ 6-1(F).   Appropriate action by management includes

---

program abuses by the mortgagee, its employees, or any other party to the transaction."  HUD Handbook 4060.1 REV-1, ¶ 6-1(H).

following up with underwriters responsible for material findings to ensure that they are properly trained and diligently reviewing each file before endorsing it for FHA mortgage insurance.

32.     Wells Fargo's home mortgage division's quality control function included both the Fraud Risk Management ("FRM") and Quality Assurance ("QA") departments.  The QA department's procedures included the following with respect to FHA-insured loans:  monthly reviews of a random sample of loans originated and sponsored within the prior 60 days, reviews of at least some portion of its EPDs, and preparation and circulation of internal reports of the reviews' findings.  The FRM department also reviewed loans referred to it as potentially involving fraud or misrepresentation.  The FRM department had several sources for these referrals, including the QA department, its branches, and the bank's fraud reporting hotline.

33.     In evaluating the loans it reviewed, Wells Fargo tracked HUD Handbook terminology, rating its findings regarding the risks of the loans as either "Material," "Moderate," or "Acceptable."  Wells Fargo's definition for the "Material" rating mirrored HUD's in substance, and made clear that a loan with that rating contained unacceptable risk and was ineligible for FHA insurance.  Specifically, Wells Fargo's defined the "Material" rating in October 2002 as follows:

> The loan contains significant deviations from the specific loan program parameters under which it was originated, making the loan ineligible for sale to the investor or resulting in potential repurchase or indemnification. [And/or] The loan contains significant risk factors affecting the underwriting decision and/or contains misrepresentation, which may render the loan non-investment quality.

34.     Wells Fargo's May 2004 Quality Control Plan for FHA loans, which was provided to HUD, similarly defined "Material risk" rated loans as follows:

> The loan contains significant deviations from the specific loan program parameters under which it was originated or significant risk factors affecting the underwriting decision and/or contains misrepresentation, making the loan ineligible for sale to the investor or resulting in potential repurchase or indemnification.

That Plan also included examples drawn directly from the HUD Handbook's definition of "Material risk" loans, stating: "Examples of material risks include the applicant's capacity to repay the mortgage, failure to underwrite an assumption or protect abandoned property from damage, or fraud."

35.     Both the QA and FRM departments made monthly reports to senior management, including to the Wells Fargo Quality Control ("QC") Committee.  Lofrano was the head of the QC Committee and received the monthly QA and FRM departments' reports.  Wells Fargo's QA department provided written reports, summarizing its findings resulting from QA's reviews of statistically random monthly samples of loans, as well as loans that were categorized as EPDs. Among other information, those QA reports summarized the percentage of loans reviewed in various categories and lines of business that contained "Material" risk ratings.

36.     Where FRM received a referral and conducted an initial review of a loan, if the loan file indicated there may have been origination and underwriting violations, FRM performed a "deep dive" review.  In this "deep dive," the FRM reviewers sought to verify the employment and income, whether "middle men" were being used for purchases, the validity of appraisals, and other items.  On the retail side of home mortgage, according to a former Wells Fargo FRM manager, these reviews exposed a "dirty underbelly of bad loan officers."

37.     The FRM reports that were made to the QC Committee (headed by Lofrano) provided information regarding loans whose underwriting showed serious violations, including

15

loans reviewed in its "deep dive."  Loans reported by FRM to the QC Committee included loan files containing misrepresentations of assets, credit, and income, as well as appraisal fraud. According to a former manager in the FRM department, FRM understood that the QC Committee, and particularly Lofrano, then determined what information would be reported to HUD and that the QC Committee, at Lofrano's direction, would make those reports.

**D.    Direct Endorsement Lender Certifications**

38.    Every Direct Endorsement Lender must make an annual certification of compliance with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan.   The annual certification states, in sum or substance:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies.  I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

Absent a truthful annual certification, a lender is not entitled to maintain its direct endorsement lender status and is not entitled to endorse loans for FHA insurance.  Further, the certification states, "I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law."

39.    Wells Fargo submitted an annual certification to HUD in every year that it has been a member of the Direct Endorsement Lender program.  That certification was executed by

Lofrano as "Vice President," for the year 2004 and the years 2009 through 2012, and by his direct subordinate for the years 2005 through 2008.

40.     In addition to the annual certification requirement, after each mortgage closing, the Direct Endorsement Lender must certify that the lender conducted due diligence and/or ensured data integrity such that the endorsed mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program."   Form HUD-92900-A. For each loan that was underwritten with an automated underwriting system approved by FHA, the lender must additionally certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)."   *Id.*   For each loan that required manual underwriting, the lender must additionally certify that the underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage."   *Id.*

41.     Whether a loan is approved through automated or manual underwriting, the underwriter additionally must certify:   "I, the undersigned, as authorized representative of mortgagee at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4."   *Id.*   If the loan does not meet the requirements of HUD Handbook 4000.4, then it is not eligible for FHA insurance and cannot be certified for endorsement.   Both the annual certification form and the individual loan certification forms are submitted to HUD electronically.

17

**E.     HUD's Procedure for Submission and Payment of FHA Claims**

42.     HUD relies on each individual loan certification to endorse the loan and provide the lender with an FHA mortgage insurance certificate.  Once a loan is endorsed for insurance, the loan receives a unique FHA case number.  In the event that HUD later discovers that a loan was endorsed despite being ineligible for the FHA program, HUD seeks indemnification from the Direct Endorsement Lender that certified the loan via an indemnification agreement whereby the lender agrees to indemnify HUD should claims for FHA insurance be submitted on that loan.

43.     Whenever an FHA loan defaults and an insurance claim is submitted for processing through HUD's electronic claim system, the claim must include the FHA case number as well as the FHA mortgagee identifying number of the lender inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.  If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim.

44.     After a claim is submitted, HUD's electronic system will automatically conduct a series of edits to ensure data validity, date consistency and that reasonable and valid amounts are requested for reimbursement, including that the FHA insurance for the case number provided is in Active status and there are no other impediments (such as a no-pay flag or indemnification agreement) to paying the claim.  After a claim has passed all the electronic edits in the claim processing system, the claim is approved for payment and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of record.

45.     However, where a lender and HUD have entered into an indemnification agreement with respect to a particular loan, and an insurance claim is submitted with respect to

18

that loan, if the holder of record to which claim proceeds would be disbursed is also the indemnifying lender, the electronic claim system will not process payment of the claim. But, if the holder of record is not the lender that indemnified HUD for the loan, HUD will disburse payment to the holder of record and then issue a billing letter to the indemnifying lender to recoup HUD's losses.

II. **WELLS FARGO SUBMITTED THOUSANDS OF FALSE INDIVIDUAL LOAN CERTIFICATIONS TO HUD IN CONNECTION WITH FHA LOANS THAT THE BANK ORIGINATED FROM MAY 2001 THROUGH OCTOBER 2005**

46. From May 2001 through October 2005, Wells Fargo engaged in a regular practice of reckless origination and underwriting of its retail FHA loans and falsely certified to HUD that tens of thousands of those loans were eligible for FHA insurance. During this time period, the quality of Wells Fargo's retail FHA loans was extremely poor. This was a function of the bank's concerted effort to vastly increase its FHA loan volume by hiring temporary staff to underwrite loans, failing to give the staff proper training, paying incentive bonuses to underwriters based on the number of loans that they approved, and pressuring loan officers and underwriters to originate and approve as many FHA loans as possible as quickly as possible. Not surprisingly, this increase in loan volume came at the expense of loan quality.

47. From May 2001 through October 2005, Wells Fargo's management was aware that a substantial percentage of its retail FHA loan portfolio – nearly 50% in certain months – did not comply with HUD requirements, contained an unacceptable level of risk, and therefore was ineligible for HUD insurance. But management failed to take effective action to address the seriously deficient loan originations and underwriting. Instead, Wells Fargo reaped all the profits by certifying falsely that its entire portfolio of retail FHA loans met HUD requirements

19

and was eligible for insurance.  And to avoid any indemnification claims from FHA, Wells Fargo concealed the fact that it was having very serious loan quality problems from HUD and failed to self-report, as required, any of the bad loans.   As a result of Wells Fargo's false loan certifications, FHA paid insurance claims on thousands of defaulted mortgage loans that Wells Fargo knew, or should have known, did not meet HUD's requirements and were ineligible for FHA insurance.  FHA's payments on more than 94% of those claims were made directly to Wells Fargo, as holder of the mortgage notes on those loans.

**A.      Wells Fargo's Widespread Loan Quality Problems, Reckless Underwriting, and False Loan Certifications:  May 2001 through January 2003**

48.      The underlying causes of Wells Fargo's very serious loan quality problems and reckless underwriting are multifold.  In or around the middle of 2000, Wells Fargo significantly increased its FHA loan originations.  From January 1, 2001 through December 31, 2002, Wells Fargo originated or sponsored approximately 225,000 FHA loans.  To facilitate this substantial increase in FHA originations, Wells Fargo expanded its staff, including hiring temporary underwriters to review FHA loans.  Many of these employees were not adequately trained with respect to the requirements of the FHA program.  Indeed, Wells Fargo's senior management was aware that these employees had not received the in-depth training necessary to properly underwrite these loans and adhere to FHA's submission requirements.

49.      To compound matters, Wells Fargo paid its underwriters a bonus (in addition to their salaries) based on the number of loans approved, rather than the number of loans reviewed.  This improper *de facto* commission incentivized the underwriters to approve as many FHA loans as possible, regardless of the risk of default or the loan's eligibility for FHA insurance.  Worse

yet, the incentive was tied to the total number of loans approved at a particular underwriting site, thereby fostering a group dynamic whereby individual underwriters felt pressure from their peers at the site to approve loans.

50.    Apart from the incentive system, management applied heavy pressure on loan officers and underwriters to originate, approve, and close loans.   And management required underwriters to make decisions on loans on extremely short turnaround times and employed lax and inconsistent underwriting standards and controls.

51.    The extraordinarily heavy volume of FHA loans also overwhelmed Wells Fargo's FHA underwriters and further contributed to the extremely poor loan quality.   This heavy volume was particularly problematic given the underwriting staff's general lack of experience.

52.    As a result of this multitude of factors, the quality of the bank's retail FHA loans dropped precipitously beginning in the summer of 2000.   This huge decline in loan quality was detected contemporaneously by Wells Fargo's Quality Assurance division and was directly reported to senior management.   For example, QA's report for loans originated in December 2000 advised that 26% of the retail FHA loans that were randomly sampled contained a material violation of HUD's requirements.   In other words, based on Wells Fargo's sampling, greater than one out of every four retail FHA loan that the bank originated in December 2000 and certified to HUD for FHA insurance bore unacceptable risk and did not meet HUD's requirements.   The report for December 2000 originations was consistent with prior monthly QA reports from the summer and fall of 2000 showing material violation rates in randomly sampled retail FHA loans of between about 15% to 20%.

53.     Despite these troubling findings, Wells Fargo's management failed to take action to address these issues.  No written action plans were prepared for loans with material violations.  Corrective action for such loans was not formally tracked.  There was little to no follow-up on the material violations.  And the bank failed to self-report any of these loans with serious deficiencies to HUD.  Instead, Wells Fargo continued on the same path, originating tens of thousands of FHA loans with the same reckless underwriting, and certifying its entire portfolio of FHA loans for insurance.

54.     As a result of management's inaction, the material violation rate worsened significantly beginning in May 2001, and escalated tremendously throughout 2002.  Based on Wells Fargo's own QA findings, during the 21 months from May 2001 through January 2003, the material violation rate for randomly reviewed FHA loans exceeded 25% in 18 of those months.  That means that at least one out of every four retail FHA loan that Wells Fargo certified to HUD for FHA insurance during those months did not qualify, and the bank knew it.

55.     Even worse, during a seven-month stretch from April 2002 through October 2002, the material violation rate never dipped below 42%, and reached as high as 48%.  That means that during those months nearly one out of every two retail FHA loan that Wells Fargo certified to HUD did not qualify for insurance, and the bank knew it.  This was an extraordinary departure from Wells Fargo's internal benchmark for material violations, which was set at 5%.  And QA's material violation rate for FHA loans that went into early payment default was even higher, averaging 66% in 2002, and hitting an astronomical high of nearly 90% in one of those months.

56.     Wells Fargo QA's month-by-month findings for its random reviews specific to the retail FHA business for this period are as follows:[2]

| LOAN FUNDING MONTH | MATERIAL VIOLATION | MODERATE VIOLATION | TOTAL |
|---|---|---|---|
| May 2001 | 19.9% | N/A | N/A |
| June 2001 | 30.2% | N/A | N/A |
| July 2001 | 36.5% | N/A | N/A |
| August 2001 | 26.5% | N/A | N/A |
| September 2001 | NOT AVAILABLE | N/A | N/A |
| October 2001 | 30.5% | N/A | N/A |
| November 2001 | 28.9% | N/A | N/A |
| December 2001 | 21.8% | N/A | N/A |
| January 2002 | 30.5% | N/A | N/A |
| February 2002 | 21.6% | 24.4% | 46.0% |
| March 2002 | 35.7% | 29.1% | 64.8% |
| April 2002 | 48.0% | 28.6% | 76.6% |
| May 2002 | 46.2% | 28.8% | 75.0% |
| June 2002 | 46.6% | 36.2% | 82.8% |
| July 2002 | 42.6% | 40.3% | 82.9% |
| August 2002 | 43.6% | 32.6% | 76.2% |
| September 2002 | NO | TESTING | PERFORMED |
| October 2002 | NO | TESTING | PERFORMED |
| November 2002 | 28.5% | 38.9% | 67.4% |
| December 2002 | 27.5% | 47.1% | 74.6% |
| January 2003 | 27.5% | 49.0% | 76.5% |

57.     Month after month, Wells Fargo QA reported the extraordinarily severe and worsening loan quality problems to the bank's senior management, yet no effective action was

---

[2] Information regarding Wells Fargo QA's review of September 2001 FHA originations is not available.  Information is not provided for September and October 2002, because Wells Fargo did not conduct random sample reviews of FHA loans for those months.

taken.  Again, no written action plans were prepared to address loans with material violations.  There was little to no follow-up on the material violations.  Corrective action was not formally tracked.  And the bank did not self-report a single loan to HUD.

58.    The examples set forth below represent a tiny sample of the total number of mortgages for which Wells Fargo submitted false certifications in this period.

**1.    The Marsh Salt Property in Texas**

59.    FHA case number 492-6423217 relates to a property on Marsh Salt Court, in Springtown, TX (the "Marsh Salt Property").  Wells Fargo underwrote the mortgage for the Marsh Salt Property, reviewed and approved it for FHA insurance, and certified that a Direct Endorsement ("DE") underwriter had conducted the required due diligence on the loan application and that the loan was eligible for HUD mortgage insurance.  The mortgage closed on or about July 1, 2002.

60.    Contrary to Wells Fargo's certification, Wells Fargo did not comply with HUD rules in reviewing and approving this loan for FHA insurance, and did not exercise due diligence in underwriting the mortgage.  Instead, Wells Fargo violated multiple HUD rules, including HUD Handbook 4155.1 ¶¶ 2-10, 2-3, 3-1 and Mortgagee Letter 2001-01.

61.    Wells Fargo's violation of HUD Handbook 4155.1 ¶ 2-10 is illustrative of the multiple rules that Wells Fargo violated in approving the Marsh Salt Property.  HUD underwriting guidelines state that all funds for the borrower's investment in the property must be verified.  HUD Handbook 4155.1 ¶ 2-10.  Contrary to this clear requirement, Wells Fargo failed to verify and document the borrower's purported investment in the Marsh Salt Property; indeed, the documents in the Marsh Salt Property mortgage application reveal that the borrower had

24

documented assets of thousands of dollars less than the amount the borrower was purportedly investing in the property. In violating HUD Handbook 4155.1 ¶ 2-10, Wells Fargo endorsed the Marsh Salt Property for FHA insurance without proof of the borrower's contribution to the purported investment.

62.     Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

63.     Within three months after closing, this mortgage went into default. As a result, HUD paid Wells Fargo, as holder of the mortgage note, an FHA insurance claim of $120,751.83, including costs.

**2.   The Albert Drive Property in New Jersey**

64.     FHA case number 352-4722386 relates to a property on Albert Drive in Old Bridge Township, NJ (the "Albert Drive Property"). Wells Fargo underwrote the mortgage for the Albert Drive Property, reviewed and approved it for FHA insurance, and certified that a DE underwriter had conducted the required due diligence on the loan application and that the loan was eligible for HUD mortgage insurance. The mortgage closed on or about September 27, 2002.

65.     Contrary to Wells Fargo's certification, Wells Fargo did not comply with HUD rules in reviewing and approving this loan for FHA insurance, and did not exercise due diligence in underwriting the mortgage. Instead, Wells Fargo violated multiple HUD rules, including HUD Handbook 4155.1 ¶¶ 2-3, 2-12, and 2-13, HUD Handbook 4000.4 ¶ 2-4(c)(5), and Mortgagee Letter 1992-5.

66.     Wells Fargo's violation of HUD Handbook 4155.1 ¶¶ 2-12 and 2-13 is illustrative of the multiple rules that Wells Fargo violated in approving the Albert Drive Property.  HUD underwriting guidelines state that lenders cannot exceed HUD's established debt-to-income ratio benchmarks unless significant compensating factors are present.  At the time this loan closed, the total-fixed-payment-to-effective-income ratio ("TPI" ratio) limit was 41%.  HUD Handbook 4155.1 ¶¶ 2-12 and 2-13.  Contrary to this clear requirement, Wells Fargo failed to document adequate compensating factors even though the borrower's TPI ratio exceeded the 41% limit.  In violating HUD Handbook 4155.1 ¶¶ 2-12 and 2-13, Wells Fargo endorsed the Albert Drive Property for FHA insurance without sufficiently analyzing the borrower's ability to support the monthly mortgage payments.

67.     Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that borrower would make mortgage payments.

68.     Soon after closing, this mortgage went into default.  As a result, HUD paid Wells Fargo, as holder of the mortgage note, an FHA insurance claim of $251,783.42, including costs.

**3.  The North Main Street Property in Indiana**

69.     FHA case number 151-6793642 relates to a property on North Main Street in Laketon, IN (the "North Main Street Property").   Wells Fargo, using an FHA-approved Automated Underwriting System ("AUS"), underwrote the mortgage for the North Main Street Property, reviewed and approved it for FHA insurance, and certified to the integrity of the data supplied and that the mortgage qualified for HUD mortgage insurance.  The mortgage closed on or about August 9, 2002.

70.     Because the soundness of the AUS's evaluation is dependent on the accuracy and reliability of the data submitted by the mortgagee, a mortgagee may only enter into the AUS such income, asset, debt, and credit information that meets FHA's applicable eligibility rules and documentation requirements, including those set forth in HUD Handbook 4155.1, Mortgagee Letters, the FHA TOTAL Mortgage Scorecard User Guide, and the AUS certificate.

71.     Contrary to Wells Fargo's certification, the data Wells Fargo entered into the AUS lacked integrity and the mortgage loan failed to meet FHA's eligibility and documentation requirements.  Despite clear requirements, Wells Fargo entered income data variables into the AUS that overstated the borrower's income and lacked integrity.  In failing to enter accurate and verified information into AUS, Wells Fargo submitted a loan for FHA endorsement that was supported by data lacking integrity.

72.     Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

73.     Within seven months after closing, this mortgage went into default.  As a result, HUD paid Wells Fargo, as holder of the mortgage note, an FHA insurance claim of $62,226.16, including costs.

### 4.  The Coriander Lane Property in Kentucky

74.     FHA case number 201-2966012 relates to a property on Coriander Lane in Lexington, KY (the "Coriander Lane Property").  Wells Fargo, using an FHA-approved AUS, underwrote the mortgage for the Coriander Lane Property, reviewed and approved it for FHA

insurance, and certified to the integrity of the data supplied and that the mortgage qualified for HUD mortgage insurance.  The mortgage closed on or about May 31, 2001.

75.     Because the soundness of the AUS's evaluation is dependent on the accuracy and reliability of the data submitted by the mortgagee, a mortgagee may only enter into the AUS such income, asset, debt, and credit information that meets FHA's applicable eligibility rules and documentation requirements, including those set forth in HUD Handbook 4155.1, Mortgagee Letters, the FHA TOTAL Mortgage Scorecard User Guide, and the AUS certificate.

76.     Contrary to Wells Fargo's certification, the data Wells Fargo entered into the AUS lacked integrity and the mortgage loan failed to meet FHA's eligibility and documentation requirements.  Despite clear requirements, Wells Fargo entered credit and debt variables that were stale and lacked integrity.  In failing to enter timely and verified information into AUS, Wells Fargo submitted a loan for FHA endorsement that was supported by data lacking integrity.

77.     Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

78.     Soon after closing, this mortgage went into default.  As a result, HUD paid Wells Fargo, as holder of the mortgage note, an FHA insurance claim of $111,879.30, including costs.

**5. The Courville Street Property in Michigan**

79.     FHA case number 261-8163025 relates to a property on Courville Street in Detroit, MI (the "Courville Street Property").  Wells Fargo underwrote the mortgage for the Courville Street Property, reviewed and approved it for FHA insurance, and certified that a DE

underwriter had conducted the required due diligence on the loan application and that the loan was eligible for HUD mortgage insurance.  The mortgage closed on or about July 17, 2002.

80.     Contrary to Wells Fargo's certification, Wells Fargo did not comply with HUD rules in reviewing and approving this loan for FHA insurance, and did not exercise due diligence in underwriting the mortgage.  Instead, Wells Fargo violated multiple HUD rules, including HUD Handbook 4155.1 ¶¶ 2-3, 2-10, 2-12, 2-13, and 3-1, and Mortgagee Letter 2001-01.

81.     Wells Fargo's violation of HUD Handbook 4155.1 ¶¶ 2-12 and 2-13 is illustrative of the multiple rules that Wells Fargo violated in approving the Courville Street Property.  HUD underwriting guidelines state that lenders cannot exceed HUD's established debt-to-income ratio benchmarks unless significant compensating factors are present.  At the time this loan closed, the TPI ratio limit was 41%.  HUD Handbook 4155.1 ¶¶ 2-12 and 2-13.  Contrary to this clear requirement, Wells Fargo failed to document any compensating factors whatsoever even though the borrowers TPI ratio exceeded the 41% limit.  In violating HUD Handbook 4155.1 ¶¶ 2-12 and 2-13, Wells Fargo endorsed the Courville Street Property for FHA insurance without sufficiently analyzing the borrower's ability to support the monthly mortgage payments.

82.     Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

83.     Soon after closing, this mortgage went into default.  As a result, HUD paid Wells Fargo, as holder of the mortgage note, an FHA insurance claim of $142,123.04, including costs.

*       *       *       *       *

29

84.     In short, from May 2001 through January 2003, Wells Fargo engaged in reckless loan origination and underwriting and falsely certified tens of thousands of retail FHA loans for FHA insurance when the bank knew, or should have known, that the loans contained unacceptable risk and did not qualify for insurance.  Wells Fargo sold many of its retail FHA loans to third parties knowing that the third parties would submit claims for FHA insurance in the event that the loans defaulted.  However, Wells Fargo remained the holder of record for the vast majority of its retail FHA loans originated in this period, and indeed was the holder of record for 6,271 of the 6,740 claims for FHA insurance submitted for those loans.  Accordingly, Wells Fargo was paid on claims for FHA insurance when those loans defaulted.

85.     As a result of Wells Fargo's false certifications, the United States has suffered hundreds of millions of dollars in damages for the insurance claims FHA has paid on defaulted mortgage loans that were not eligible for FHA insurance.

**B.     Wells Fargo's Widespread Loan Quality Problems, Reckless Underwriting, and False Loan Certifications:  February 2003 through October 2005**

86.     Although Wells Fargo purported to make some efforts to improve loan quality in 2002, management's focus remained on maintaining and even expanding loan volume, and the bank's reckless underwriting and serious loan quality problems persisted from February 2003 through October 2005.  During this period, Wells Fargo continued to certify its entire portfolio of retail FHA loans for insurance even though the bank knew that a substantial percentage of those loans did not meet HUD requirements.  And, as before, Wells Fargo failed to self-report a single bad loan to HUD and did not otherwise inform HUD of the loan quality problems that it was experiencing.

87.     As shown by Wells Fargo's internal QA reports from February 2003 through October 2005, month after month QA reported to management about the significant problems it was finding with respect to the bank's retail FHA loans.  Despite these reports, and QA's increasingly specific direction to management about the very serious underwriting problems, no effective action was taken.  For example, in July 2003, QA candidly advised that one of the "overall root cause[s]" for the exceedingly high material violation rates in underwriting across all business lines was "[v]olume, pressure to approve loans, and the experience levels."  QA was even more explicit in its August 2003 report on the same issue: "heavy volume, pressure to approve loans and meet acceptable turn times along with inexperienced staff are key contributing factors overall to the issues leading to material findings."  But management did not change course.

88.     Instead of limiting its FHA originations or training an appropriate underwriting staff to match the volume of loans the bank was originating, Wells Fargo slashed the number of its FHA underwriters from 919 to 401.  This smaller crew of underwriters remained inadequately trained, and the bank's improper bonus system for underwriters continued throughout this period.

89.     Consequently, Wells Fargo's QA reports show that the material violation rate for randomly sampled retail FHA loans remained very high, over 20% in many months.  At the same time, the moderate violation rate skyrocketed.  For a number of months during this period, the combined material and moderate violation rate exceeded 80% of the randomly sampled retail FHA loans, hitting a high of 87.2% in July 2003.  And for 18 consecutive months that combined rate hovered between 70% and 80% and never fell below 63%.  This astoundingly high violation rate – including the moderate violations – was a very serious problem because the "moderate"

risk rating classification encompassed underwriting violations that actually were material to whether the loans met HUD's requirements and were eligible for FHA insurance.   Indeed, QA noted that "[i]n many instances the only difference between a moderate or material rating are the loan characteristics.  Therefore, attention should be given to all deficiencies if improved quality is to be achieved and maintained."

90.     The "moderate" rated loans in this and prior periods included loan files that lacked support for critical borrower income and asset information, including missing or incomplete verifications of employment, missing income, asset, and debt documentation, incorrect calculations of income, and social security number discrepancies.  For example, one QA report in this period identified "moderate" and "material" violations as follows:  "Critical documentation needed for either loan decisioning or program requirements are missing … Examples noted were employment gaps, discrepancies on pay-stubs for hours worked, ytd earnings that don't coincide with current earnings, etc."  Failure by the bank's underwriters to resolve any of these discrepancies evidences a lack of due diligence in underwriting the loan for FHA insurance.

91.     Wells Fargo QA's month-by-month findings for its random reviews of the bank's distributed retail FHA business in this period are as follows:

| LOAN FUNDING MONTH | MATERIAL VIOLATION | MODERATE VIOLATION | TOTAL |
|---|---|---|---|
| February 2003 | 21.1% | N/A | N/A |
| March 2003 | 22.4% | N/A | N/A |
| April 2003 | 19.3% | N/A | N/A |
| May 2003 | 19.6% | N/A | N/A |
| June 2003 | 24.6% | 56.5% | 80.1% |
| July 2003 | 17.2% | 60.0% | 77.2% |

| LOAN FUNDING MONTH | MATERIAL VIOLATION | MODERATE VIOLATION | TOTAL |
|---|---|---|---|
| August 2003 | 14.9% | 58.9% | 73.8% |
| September 2003 | 20.4% | 52.6% | 73.0% |
| October 2003 | 27.0% | 53.3% | 80.3% |
| November 2003 | 18.5% | 58.5% | 77.0% |
| December 2003 | 21.7% | 46.1% | 67.8% |
| January 2004 | 14.2% | 56.6% | 70.8% |
| February 2004 | 13.0% | 62.0% | 75.0% |
| March 2004 | 21.0% | 62.9% | 83.9% |
| April 2004 | 15.8% | 47.4% | 63.2% |
| May 2004 | 14.9% | 62.4% | 77.3% |
| June 2004 | 26.2% | 48.6% | 74.8% |
| July 2004 | 21.3% | 52.1% | 73.4% |
| August 2004 | 25.3% | 47.3% | 72.6% |
| September 2004 | 16.1% | 53.8% | 69.9% |
| October 2004 | 8.5% | 55.3% | 63.8% |
| November 2004 | 20.9% | 44.0% | 64.9% |
| December 2004 | 16.7% | 36.7% | 53.4% |
| January 2005 | 12.8% | 36.2% | 49.0% |
| February 2005 | 6.5% | 57.0% | 63.5% |
| March 2005 | 5.0% | 44.0% | 49.0% |
| April 2005 | 9.8% | 46.1% | 55.9% |
| May 2005 | 6.2% | 45.4% | 51.6% |
| June 2005 | 11.7% | 36.9% | 48.6% |
| July 2005 | 15.8% | 31.7% | 47.5% |
| August 2005 | 10.1% | 36.4% | 46.5% |
| September 2005 | 12.3% | 41.5% | 53.8% |
| October 2005 | 9.1% | 31.8% | 40.9% |

92.    The examples set forth below represent a tiny sample of the total number of mortgages for which Wells Fargo submitted false certifications in this period.

### 1.  The Palmer Court Property in Minnesota

93.     FHA case number 271-9084779 relates to a property on Palmer Court in Lindstrom, MN (the "Palmer Court Property"). Wells Fargo underwrote the mortgage for the Palmer Court Property, reviewed and approved it for FHA insurance, and certified that a DE underwriter had conducted the required due diligence on the loan application and that the loan was eligible for HUD mortgage insurance. The mortgage closed on or about May 14, 2004.

94.     Contrary to Wells Fargo's certification, Wells Fargo did not comply with HUD rules in reviewing and approving this loan for FHA insurance, and did not exercise due diligence in underwriting the mortgage. Instead, Wells Fargo violated multiple HUD rules, including HUD Handbook 4155.1 ¶¶ 2-3, 2-6, 2-7, and 3-1, and Mortgagee Letter 2001-01.

95.     Wells Fargo's violation of HUD Handbook 4155.1 ¶ 3-1 is illustrative of the multiple rules that Wells Fargo violated in approving the Palmer Court Property. HUD underwriting guidelines state that to verify and document a borrower's income, the lender must obtain a Verification of Employment and the borrower's most recent pay stubs. HUD Handbook 4155.1 ¶ 3-1. Contrary to this clear requirement, Wells Fargo failed to obtain the borrower's most recent pay stubs that could corroborate the information on the verification of employment and would allow the lender to accurately calculate and adequately document the amount of income received by the borrower. In violating HUD Handbook 4155.1 ¶ 3-1, Wells Fargo endorsed the Palmer Court Property for FHA insurance without adequate proof of the borrower's employment or income.

96.     Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

97.     Soon after closing, this mortgage went into default.  As a result, HUD paid Wells Fargo, as holder of the mortgage note, an FHA insurance claim of $42,632.61, including costs.

### 2.  The King Blvd. Property in New Jersey

98.     FHA case number 352-4948464 relates to a property on Martin Luther King Blvd. in Newark, NJ (the "King Blvd. Property").  Wells Fargo underwrote the mortgage for the King Blvd. Property, reviewed and approved it for FHA insurance, and certified that a DE underwriter had conducted the required due diligence on the loan application and that the loan was eligible for HUD mortgage insurance.  The mortgage closed on or about July 23, 2003.

99.     Contrary to Wells Fargo's certification, Wells Fargo did not comply with HUD rules in reviewing and approving this loan for FHA insurance, and did not exercise due diligence in underwriting the mortgage.  Instead, Wells Fargo violated multiple HUD rules, including HUD Handbook 4155.1 ¶¶ 2-3 and 3-1, HUD Handbook 4000.4 ¶ 2-4(c)(5), and Mortgagee Letters 1992-5 and 2001-01.

100.    Wells Fargo's violation of HUD Handbook 4155.1 ¶ 2-3 is illustrative of the multiple rules that Wells Fargo violated in approving the King Blvd. Property.   HUD underwriting guidelines state that lenders must analyze a mortgage applicant's credit and determine the creditworthiness of the applicant.  Specifically, lenders must verify and analyze the borrower's payment history of housing obligations, and obtain written explanations from the borrower of past derogatory credit.  HUD Handbook 4155.1 ¶ 2-3.  Contrary to this clear requirement, Wells Fargo failed to verify the borrower's history of housing obligations or obtain explanations from the borrower for past derogatory credit.  In violating HUD Handbook 4155.1 ¶

2-3, Wells Fargo endorsed the King Blvd. Property for FHA insurance without sufficiently analyzing the borrower's creditworthiness.

101.    Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

102.    Within nine months of closing, this mortgage went into default. As a result, HUD paid Wells Fargo, as holder of the mortgage note, an FHA insurance claim of $228,580.31, including costs.

### 3. The 240th Street Property in Washington

103.    FHA case number 561-7803393 relates to a property on 240th Street in Spanaway, WA (the "240th Street Property"). Wells Fargo, using an FHA-approved AUS, underwrote the mortgage for the 240th Street Property, reviewed and approved it for FHA insurance, and certified to the integrity of the data supplied and that the mortgage qualified for HUD mortgage insurance. The mortgage closed on or about June 30, 2003.

104.    Because the soundness of the AUS's evaluation is dependent on the accuracy and reliability of the data submitted by the mortgagee, a mortgagee may only enter into the AUS such income, asset, debt, and credit information that meets FHA's applicable eligibility rules and documentation requirements, including those set forth in HUD Handbook 4155.1, Mortgagee Letters, the FHA TOTAL Mortgage Scorecard User Guide, and the AUS certificate.

105.    Contrary to Wells Fargo's certification, the data Wells Fargo entered into the AUS lacked integrity and the mortgage loan failed to meet FHA's eligibility and documentation requirements.    Despite clear requirements, Wells Fargo failed to obtain the required

36

documentation to verify the borrower's income and misrepresented the borrower's eligibility for the amount of insurance for which the loan was submitted. In failing to accurately and reliably verify information submitted into AUS, Wells Fargo submitted a loan for FHA endorsement that was ineligible for FHA insurance, and was supported by data lacking integrity.

106.    Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

107.    Within five months after closing, this mortgage went into default. As a result, HUD paid Wells Fargo, as holder of the mortgage note, an FHA insurance claim of $179,558.03, including costs.

### 4.   The West Summit Property in Missouri

108.    FHA case number 291-3292799 relates to a property on West Summit in Seymour, Missouri (the "West Summit Property"). Wells Fargo underwrote the mortgage for the West Summit Property, reviewed and approved it for FHA insurance, and certified that a DE underwriter had conducted the required due diligence on the loan application and that the loan was eligible for HUD mortgage insurance. The mortgage closed on or about July 29, 2004.

109.    Contrary to Wells Fargo's certification, Wells Fargo did not comply with HUD rules in reviewing and approving this loan for FHA insurance, and did not exercise due diligence in underwriting the mortgage. Instead, Wells Fargo violated multiple HUD rules, including HUD Handbook 4155.1 ¶¶ 2-3, 2-11, 2-12, and 2-13, HUD Handbook 4000.4 ¶ 2-4(c)(5), and Mortgagee Letter 1992-5.

110.   Wells Fargo's violation of HUD Handbook 4000.4 ¶ 2-4(c)(5) and Mortgagee Letter 1992-5 is illustrative of the multiple rules that Wells Fargo violated in approving the West Summit Property.   HUD underwriting guidelines state that lenders must be aware of warnings signs of fraud and irregularity and examine all irregularities presented in the mortgage application.  HUD Handbook 4000.4 ¶ 2-4(c)(5) and Mortgagee Letter 1992-5.   Contrary to this rule, Wells Fargo failed to reconcile conflicting information concerning the borrower's rental and residence history.   In violating this requirement, Wells Fargo endorsed the West Summit Property for FHA insurance without sufficiently resolving discrepancies and analyzing the borrower's history of paying housing obligations.

111.   Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

112.   Soon after closing, this mortgage went into default.  As a result, HUD paid Wells Fargo, as holder of the mortgage note, an FHA insurance claim of $56,604.91, including costs.

**5.  The Brentwood Drive Property in Kentucky**

113.   FHA case number 202-0208757 relates to a property on Brentwood Drive in Dry Ridge, KY (the "Brentwood Drive Property").   Wells Fargo, using an FHA-approved AUS, underwrote the mortgage for the Brentwood Drive Property, reviewed and approved it for FHA insurance, and certified to the integrity of the data supplied and that the mortgage qualified for HUD mortgage insurance.  The mortgage closed on or about December 12, 2003.

114.   Because the soundness of the AUS's evaluation is dependent on the accuracy and reliability of the data submitted by the mortgagee, a mortgagee may only enter into the AUS

such income, asset, debt, and credit information that meets FHA's applicable eligibility rules and documentation requirements, including those set forth in HUD Handbook 4155.1, Mortgagee Letters, the FHA TOTAL Mortgage Scorecard User Guide, and the AUS certificate.

115.    Contrary to Wells Fargo's certification, the data Wells Fargo entered into the AUS lacked integrity and the mortgage loan failed to meet FHA's eligibility and documentation requirements.  Despite clear requirements, Wells Fargo entered asset and debt data variables into the AUS that understated the borrower's monthly debt obligations and overstated the borrower's assets.  In failing to enter accurate and verified information into AUS, Wells Fargo submitted a loan for FHA endorsement that was supported by data lacking integrity.

116.    Wells Fargo's false certification on this loan was material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

117.    Soon after closing, this mortgage went into default.  As a result, HUD paid Wells Fargo, as holder of the mortgage note, an FHA insurance claim of $123,224.54, including costs.

\*       \*       \*       \*       \*

118.    Moreover, Wells Fargo management knew, or should have known, that certain of its branches and underwriters were originating and approving loans of astoundingly poor quality. For instance, Wells Fargo's Baton Rouge, Louisiana Branch – whose FHA status was not terminated until 2009 – originated a total of 1,519 FHA loans, 771 of which went into default, for a default rate of 51%.  And the EPD rate for that branch was an incredible 12%.  Wells Fargo also allowed underwriters with default rates of over 30% to continue to underwrite FHA loans, and even employed underwriters with FHA default rates of greater than 60%.

39

119.    As shown, from February 2003 through October 2005, Wells Fargo falsely certified that tens of thousands of distributed retail FHA loans met HUD's requirements and were eligible for FHA insurance when the bank knew, or should have known, that the loans did not qualify for insurance.  Wells Fargo sold many of its distributed retail FHA loans to third parties knowing that the third parties would submit claims for FHA insurance in the event that the loans defaulted.  However, Wells Fargo remained the holder of record for the vast majority of its distributed retail FHA loans, and indeed was the holder of record for 6,588 of the 6,920 claims for FHA insurance submitted for those loans.  Accordingly, Wells Fargo submitted and was paid on claims for FHA insurance when those loans defaulted.

120.    The United States Department of Justice learned the facts material to its claims against Wells Fargo related to the bank's reckless underwriting during the period May 2001 through October 2005 no earlier than 2011, the year in which the United States Attorney's Office for the Southern District of New York ("USAO SDNY") commenced its investigation resulting in this action.

121.    The United States is owed hundreds of millions of dollars in damages for the insurance claims it paid on defaulted mortgage loans that Wells Fargo falsely certified were eligible for FHA insurance.

## III.    DEFENDANTS KNOWINGLY FAILED TO REPORT OVER 6,000 BAD LOANS TO HUD FROM JANUARY 2002 THROUGH DECEMBER 2010, RESULTING IN HUNDREDS OF MILLIONS OF DOLLARS OF LOSSES TO FHA

122.    As discussed above, HUD required Direct Endorsement Lenders to perform post-closing reviews of the FHA loans they originated and to report to HUD loans that had an unacceptable risk.  This requirement provided HUD with an opportunity to investigate the loans

and request reimbursement or indemnification, as appropriate. Defendants, however, decided unilaterally that the bank did not have to comply with this requirement.

123.    Prior to 2003, the self-reporting regulation required lenders to report loans that contained "significant discrepancies," such as "any violation of law or regulation, false statements or program abuses . . ." HUD Handbook 4060.1 REV-1, ¶ 6-1(H) (1993). In 2003, the requirement was amended to require reporting of "serious deficiencies, patterns of noncompliance or fraud," HUD Handbook 4060.1 REV-1, CHG-1, ¶ 6-13 (2003), and lenders were instructed that loans identified as having material violations by the bank's quality control had to be reported, *id.* ¶ 6-3(J). And in 2006, the requirement was restated to require reporting of "[f]indings of fraud or other serious violations," to include any material violations found by quality control. HUD Handbook 4060.1 REV-2, ¶¶ 7-3(J), 7-4(D) (2006).

124.    Wells Fargo's internal memoranda make clear that Lofrano and other executives at the bank were aware of HUD's requirement to report in writing loans affected by fraud and other serious violations, and that the bank consciously flouted this obligation. Wells Fargo's Quality Control plan, which was provided to HUD in or about May 2004, declared that the bank would report to HUD "when fraud or other serious violations of FHA requirements are identified (whether during the normal course of business or by Quality Control staff during reviews/audits of FHA loans)." Similarly, a Wells Fargo internal memorandum dated August 4, 2005 confirmed that Lofrano and other executives at the bank knew that "HUD has always requested significant findings or fraud on FHA loans be reported to HUD."

125.    Behind closed doors, however, Lofrano and others at Wells Fargo decided to disregard the self-reporting requirement entirely. They did so by simply ignoring the bank's

41

self-reporting obligations prior to 2004, and then redefining the reporting requirement so narrowly as to obliterate it.  Indeed, despite the fact that Lofrano had been in charge of quality control at Wells Fargo's home mortgage division for years, received regular reports from QA and FRM regarding FHA loans containing material underwriting violations, misrepresentations, and outright fraud, and personally certified or had a direct subordinate certify on behalf of Wells Fargo that the bank was in compliance with HUD requirements, including self-reporting requirements, Lofrano and others at Wells Fargo only began to consider complying with the self-reporting requirements at or about the time of a HUD-Office of the Inspector General ("HUD-OIG") audit in 2004.  An April 8, 2004 memorandum entitled "HUD QC Plan Meeting Action Items" states that Lofrano "will organize a working group to address reporting to HUD.  Some of the items in the scope of this group are: fraud, significant credit risks, significant servicing risks, EPD issues, non-owner occupied issues, fair lending issues."

126.    But no self-reporting occurred.   Rather, in August 2004, under Lofrano's leadership, the working group agreed not to follow the HUD reporting requirements and not to report loans to HUD that Wells Fargo had internally identified as containing material violations of HUD requirements.  In an August 13, 2004 memorandum to Lofrano, among others, bearing the subject line "Reporting Process to HUD," the author recounts issues discussed in the recent working group call, which included "[d]efin[ing] the process of what and how we report fraud and deficiencies as HUD requires."  The author goes on to explain that during the call, in which Lofrano participated as the group's leader, the QC working group discussed that "[Wells Fargo Home Mortgage] is required to report violations and deficiencies that are identified.  Fraud or other serious deficiencies must be reported to Director of HUD … within 60 days of initial

42

discovery.  It was agreed that loans reviewed and rated material through the Quality Assurance process would not necessarily meet that definition."

127.    Later, Lofrano and his Quality Control working group further unilaterally narrowed the bank's reporting obligations.  In April 2005, Wells Fargo's FRM Director emailed Lofrano and others, laying out numerous HUD reporting requirements – including the requirement that "[s]erious deficiencies, patterns of non-compliance, or fraud uncovered by mortgagees, must be reported in writing (along with supporting documentation)" – and requested specific guidance on reporting broker fraud.  Lofrano replied to the email, stating that he and two others previously had reviewed HUD's requirements and "determined 'serious deficiencies' did not include material findings and unallowable fees, but that systemic fraud issues need to be reported to HUD . . . One-off borrower fraud generally would not be reported, but LO, broker, appraiser, realtor fraud would be."  However, Defendants did not even comply with their own unilaterally narrowed formulation of Wells Fargo's reporting obligation, and the bank continued not to self-report any loans. This, despite the fact that Lofrano's email to the FRM Director ended by quoting a key reporting section of the 2004 FHA Quality Control plan that Wells Fargo had submitted to HUD, which represented that "When fraud or other serious violations of FHA requirements are identified (whether during the normal course of business or by Quality Control staff during reviews/audits of FHA loans), [Wells Fargo Home Mortgage] will notify HUD in writing of such fraud or violations within 60 days of the initial discovery, and it will include supporting documentation."

128.    Indeed, months later, the QC working group was still artificially narrowing the bank's reporting obligations, while reporting nothing.  In August 2005, Lofrano's working group

sent a memorandum to Wells Fargo Senior Management that "proposed changes regarding the reporting of serious deficiencies to HUD on FHA originated and serviced loans," in response to concerns HUD raised in a May 2005 review about "the lack of reporting of deficiencies to HUD." Those proposed changes included reporting to HUD "material findings in which one or more of the parties involved in the transaction may have potentially 'misrepresented' some information in the loan file, such as social security number, income, appraisal data, etc." as well as any "suspected fraud" identified by the FRM department. The working group put off the subject of reporting "serious deficiencies," for "other areas of the company," stating that "[a] process will be developed . . . to report other 'serious deficiencies' to HUD . . . Serious deficiencies will be defined and documented for all areas, but will be based on 'misrepresentation' issues."

129.    Shortly thereafter, in response to findings from a May 2005 HUD review that questioned whether Wells Fargo was complying with its self-reporting obligations, the bank went into full double-speak mode and presented to HUD a fanciful – and plainly false – tale regarding its self-reporting practices. Wells Fargo's explanation was flatly inconsistent with its internal documents and purposely concealed that Lofrano and others at Wells Fargo had failed to comply with HUD's reporting requirements.

130.    Specifically, in a January 18, 2006 letter to HUD, the Division Presidents of Wells Fargo Home Mortgage acknowledged that "HUD requires that 'serious deficiencies, patterns of non-compliance, or fraud uncovered by mortgagees must be report[ed] in writing,'" and then represented falsely that "[p]rocedures are, and have been, in place to report appropriate items to the HUD Homeownership Centers." The Division Presidents then described these

supposed procedures, which they claimed included "obtaining input from various groups including Quality Assurance, Fraud Risk management, Legal Servicing, etc.," and assured HUD that "[r]egular meetings are held to discuss what files should be reported." They explained the bank's prior self-reporting policy as follows: "[h]istorically Wells Fargo interpreted HUD's [self-reporting] requirement . . . to mean that reporting was required on incidents that involve several files or patterns of fraud or non compliance . . . ." Based on this interpretation, the Division Presidents continued, "Wells Fargo did not report *every* incident of fraud or non compliance that involved a single instance or file, but rather focused on reporting larger global fraud issues which involved numerous parties and files." (emphasis added). They assured HUD, however, that the bank had now "broadened its reporting requirements to meet the guidance provided" in HUD's May 27, 2005 Mortgagee Letter.

131.    Defendants' abject failure to report a single individual loan prior to October 2005 puts the lie to those representations and makes clear that Defendants had no intention to comply with the self-reporting requirement prior to HUD's inquiry.

132.    Following HUD's inquiry, Wells Fargo began to self-report loans in October 2005, but even then Defendants failed to adhere to Well Fargo's own self-reporting policy and, more importantly, knowingly failed to comply with HUD's self-reporting regulations. Indeed, from October 2005 through December 2010, the bank's self-reporting was cursory at best. During that more than five-year period, Wells Fargo, the largest originator and sponsor of FHA home mortgages for much, if not all, of this period, self-reported fewer than 250 loans.

133.    Wells Fargo's woefully inadequate reporting thereafter was the product of regular monthly meetings of Lofrano's QC working group. Those meetings began in October 2005 and

were attended by numerous high-level Wells Fargo employees, including Lofrano. At these meetings, the attendees conducted only bare reviews of a handful of loans and, accordingly, reported to HUD only a tiny number of loans. For example, at the October 2005 meeting, seven loans were discussed but only three were reported. There was no November 2005 meeting. In December 2005 and January 2006, four loans were discussed in each month. Then, in February 2006 – the month after Wells Fargo laid out its purported, historic review and reporting process in its January 18, 2006 letter and told HUD that "Wells Fargo takes its reporting requirements very seriously" – Lofrano's working group discussed one loan and reported none. Among the loans discussed and not reported at these QC working group meetings were loans the group suspected involved fraud.

134.    Defendants' motive for not self-reporting loans to HUD is made clear in the bank's internal documents. In the August 4, 2005 inter-office memorandum to "Senior Management" discussed above, which upon information and belief was prepared by the working group led by Lofrano, the Wells Fargo "HUD Deficiency Reporting Cross Functional Team" listed the following two concerns about starting to self-report: First, Lofrano's team highlighted that "[b]y self reporting all significant audit results and suspected fraud to HUD on FHA originations, [Wells Fargo Home Mortgage] has potentially given HUD a list of loans which could result in indemnification from HUD." In other words, the bank's bottom line would be hurt by complete self-reporting. The August 4, 2005 memorandum further stated that "[t]his is however, similar to our current self reporting requirements with" Fannie Mae and Freddie Mac. Second, Lofrano's team underscored that "[Wells Fargo Home Mortgage] will be reporting audit findings for wholesale brokers. This could cause client issues or concerns, depending upon

direction other lenders take." Again, Defendants' overriding concern rested with losing some wholesale FHA business, thereby affecting its profits.

135. It was not until June 2011, shortly after this Office served Wells Fargo with a subpoena, that the bank began self-reporting a more significant quantity of loans, and, on information and belief, retroactively reported loans back to the beginning of 2011.

136. Defendants' complete failure to self-report bad loans prior to October 2005, and woefully inadequate reporting thereafter, stands in stark contrast to the findings of Wells Fargo's QA reviews. From January 2002 through December 2010, Wells Fargo reported 238 loans to HUD. In contrast, during that same time, Wells Fargo QA identified 6,558 loans as having a material violation. Of those, 2,628 were identified through randomly sampled QA reviews, 3,142 from mandated EPD reviews, and an additional 788 through targeted reviews. As head of Wells Fargo QC, Lofrano received those reports from the QA and FRM departments. Defendants then failed to report 6,320 of these "material" risk loans to HUD. (Attached as Exhibit A to the Amended Complaint is a list of the 6,320 FHA loans that Wells Fargo failed to self-report.) Those loans alone resulted in FHA's payment of nearly $190 million in FHA benefits on defaulted mortgage loans.

137. Moreover, on information and belief, the 6,558 "material" risk-rated loans that QA identified do not constitute the universe of bad loans that Wells Fargo was aware of and failed to self-report. For example, the 6,558 loans do not include any loans that Fraud Risk Management determined during this period were affected by fraud or other serious violations and that were reported to Lofrano and his QC committee. Accordingly, there are additional loans

47

containing material violations that Defendants should have self-reported to HUD and that almost certainly resulted in insurance claims that FHA was required to satisfy.

138.   Further, Wells Fargo QA failed to review all early payment defaults as required under the HUD Handbook.  That is because, according to QA, the loan file often "was not available for review."  On average, approximately 20% of the FHA EPDs were not reviewed each month by QA.  For example, in its July 2002 report, QA reported that there were 36 FHA EPDs but QA reviewed only 24.  The next month there were 29 FHA EPDs and QA reviewed 20.  The following month there were 41 EPDs and QA reviewed 30.

139.   This failure is particularly problematic because a loan that is 60 days in default within the first six months after origination has an increased likelihood of fraud or other serious violations.  As a result of QA's failure to review all EPDs, Wells Fargo never identified additional loans that contained unacceptable risk and never self-reported these loans to HUD.  As a consequence, HUD never had the opportunity to investigate these loans or request reimbursement or indemnification, and FHA was required to pay insurance claims on these loans when they defaulted.  Of the 6,320 "material" risk-rated loans that Wells Fargo failed to self-report, 1,443 of those loans defaulted and resulted in claims being submitted for FHA insurance.  Wells Fargo remained the holder of record on 97% of the 1,443 loans, and received more than $185 million in FHA insurance payments in connection with claims submitted for those loans.  (Attached as Exhibit B is a list of the 1,406 "material" risk-rated loans that Wells Fargo did not self-report, and for which a claim was submitted and Wells Fargo was paid as holder of record.  Attached as Exhibit C is a list of the 37 "material" risk-rated loans that Wells Fargo did not self-report, and for which claims were submitted and paid to another entity as holder of record.)

48

140.    The United States Department of Justice learned the facts material to its claims against Defendants related to Wells Fargo's failure to self-report "material" risk-rated FHA loans to HUD no earlier than 2011, the year in which the USAO SDNY commenced its investigation resulting in this action.

141.    Accordingly, Defendants' failure to self-report over 6,000 FHA loans that did not meet HUD requirements, and failure to review all EPDs, caused FHA to pay hundreds of millions of dollars in insurance claims for loans that were not eligible for insurance.

## FIRST CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))
### Presenting or Causing False Claims to Be Presented (Reckless Underwriting)
### As to Defendant Wells Fargo

142.    The Government incorporates by reference paragraphs 1 through 141 as if fully set forth in this paragraph.

143.    The Governments seeks relief against Wells Fargo under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

144.    As set forth above, from May 2001 through October 2005, Wells Fargo engaged in a regular practice of reckless origination and underwriting of its retail FHA loans.  During that time, Wells Fargo's senior management was aware of the very serious loan quality problems that the bank was experiencing with respect to its retail FHA loans.  Similarly, Wells Fargo's underwriters knew, or should have known, that a substantial portion of the bank's retail FHA loans during this time period did not meet the FHA loan program parameters, contained

unacceptable risk, and were ineligible for FHA insurance. Nonetheless, Wells Fargo certified its entire portfolio of retail FHA loans for insurance, and thereby falsely certified that thousands of retail FHA loans were eligible for insurance when they were not.

145.   Wells Fargo knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, caused false or fraudulent claims for FHA insurance to be presented to an officer or employee of the United States Government. Wells Fargo did so by, inter alia, submitting false loan-level certifications for retail FHA loans to HUD in order to get FHA to endorse these mortgages that did not meet HUD requirements and contained unacceptable risk for FHA insurance, and then selling the mortgage loans to third parties whom Wells Fargo knew would submit insurance claims in the event the mortgage loans defaulted.

146.   Wells Fargo knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented to an officer or employee of the Government false or fraudulent claims for payment when it submitted claims for FHA insurance for defaulted loans that Wells Fargo falsely certified were eligible for FHA insurance.

147.   A truthful individual loan certification for FHA endorsement is a condition of payment of FHA insurance on that loan. HUD paid insurance claims, and incurred losses, on these retail FHA loans that Wells Fargo falsely certified were eligible for HUD insurance.

148.   By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## SECOND CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729(a)(2) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B))
### Use of False Statements in Support of False Claims (Reckless Underwriting)
### As to Defendant Wells Fargo

149.   The Government incorporates by reference paragraphs 1 through 141 as if fully set forth in this paragraph.

150.   The Government seeks relief against Wells Fargo under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(2) (2006), and, as amended, Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

151.   As set forth above, from May 2001 through October 2005, Wells Fargo knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims with respect to the thousands of FHA loans that Wells Fargo falsely certified were eligible for FHA insurance.  Specifically, during this period, Wells Fargo knowingly submitted thousands of false individual retail FHA loan certifications to HUD representing, inter alia, that each loan was eligible for HUD mortgage insurance under the Direct Endorsement program. Wells Fargo submitted the false loan certifications to induce FHA to endorse the mortgages for insurance and to get HUD to pay false insurance claims when the mortgages defaulted.   In addition, Wells Fargo submitted and caused to be submitted false records and statements to HUD in connection with claims that were submitted for FHA insurance for defaulted loans that Wells Fargo had falsely certified were eligible for FHA insurance.

152.   A truthful individual loan certification for FHA endorsement is a condition of payment of FHA insurance on that loan.   HUD paid insurance claims, and incurred losses, on these retail FHA loans that Wells Fargo falsely certified were eligible for HUD insurance.

153.   By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## THIRD CLAIM

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))**
**Presenting or Causing False Claims to Be Presented (Self-Reporting)**
**As to Defendants Wells Fargo and Lofrano**

154.   The Government incorporates by reference paragraphs 1 through 141 as if fully set forth in this paragraph.

155.   The Governments seeks relief against defendants Wells Fargo and Lofrano under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

156.   As set forth above, from January 2002 through December 2010, Defendants intentionally failed to self-report to HUD, as required, at least 6,320 FHA loans that it knew failed to meet the FHA loan program parameters, contained an unacceptable level of risk, and were not eligible for HUD insurance.   (Attached as Exhibit A to the Amended Complaint is a list of the 6,320 FHA loans that Wells Fargo failed to self-report.)   Defendants' failure to self-report these loans evidences their intent to knowingly present or cause to be presented false or fraudulent claims for FHA insurance.   Moreover, with knowledge that those loans were

ineligible for HUD insurance, Wells Fargo submitted the claims or caused the claims to be submitted for, and was paid FHA insurance on, nearly all of those loans for which claims were submitted. (Attached as Exhibit B to the Amended Complaint is a list of those 1,406 loans which Wells Fargo failed to self-report and for which it was paid as the holder of record, after FHA claims were submitted.) With knowledge that those loans were ineligible for HUD insurance, Wells Fargo sold some of the loans to third parties knowing that the third parties would submit claims for insurance in the event these defective loans defaulted. (Attached as Exhibit C to the Amended Complaint is a list of those 37 loans which Wells Fargo failed to self-report and for which a third party was paid as the holder of record, after FHA claims were submitted.) Both with respect to the loans that Wells Fargo retained and those the bank sold, Lofrano knew that the loans were ineligible for HUD insurance and that Wells Fargo, or third parties to whom Wells Fargo would sell the loans, would submit claims for FHA insurance in the event that the defective loans defaulted. Lofrano thereby caused the submission of false claims for FHA insurance on those loans, and the resulting payment of FHA claims by HUD.

157.   Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, caused to be presented to an officer or employee of the Government, false and fraudulent claims for payment or approval. Wells Fargo submitted false loan-level certifications to HUD to induce FHA to endorse these mortgages for FHA insurance, and Defendants failed to self-report these mortgages that they knew failed to meet the FHA loan program parameters, contained an unacceptable level of risk, and were not eligible for HUD insurance. Defendants did so knowing that third parties to whom Wells Fargo had sold these

FHA loans or who were servicing these FHA loans would submit false claims for insurance when the loans defaulted.

158.    Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented or caused to be presented to an officer or employee of the Government, false and fraudulent claims for payment when Defendants submitted or caused claims for FHA insurance to be submitted in connection with these defaulted loans that the bank and Lofrano knew failed to meet the FHA loan program parameters, contained an unacceptable level of risk, had not been self-reported to HUD, and were not eligible for HUD insurance.

159.    A truthful individual loan certification for FHA endorsement is a condition of payment of FHA insurance on that loan.  HUD paid insurance claims, and incurred losses, on these loans that Wells Fargo wrongfully failed to self-report to HUD.

160.    By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## FOURTH CLAIM

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(2) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B))**
**Use of False Statements in Support of False Claims (Self-Reporting)**
**As to Defendants Wells Fargo and Lofrano**

161.    The Government incorporates by reference paragraphs 1 through 141 as if fully set forth in this paragraph.

162.    The Government seeks relief against defendants Wells Fargo and Lofrano under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(2) (2006), and, as amended, Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

163.    As set forth above, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims for FHA insurance with respect to at least the 6,320 loans that Defendants knew failed to meet the FHA loan program parameters, contained an unacceptable level of risk, and were not eligible for HUD insurance.

164.    Between January 2002 and December 2010, Defendants made numerous false statements and used numerous false records to get false claims for FHA insurance paid by HUD. The false statements and false records that Wells Fargo and Lofrano made and/or used include, but are not limited to:  (1) Wells Fargo's May 2004 Quality Control Plan submitted to HUD which falsely represented that Wells Fargo's policy and practice was to self-report loans as required, (2) Wells Fargo's annual certifications from 2002 through 2010 submitted to HUD, including the certifications from 2004 through 2010 in which Lofrano, individually and on behalf of the bank, certified, or caused a direct subordinate to certify, inter alia, that Wells Fargo conformed to all regulations necessary to maintain its HUD-FHA approval, (3) Wells Fargo's January 18, 2006 letter to HUD falsely stating that the bank had been self-reporting loans, (4) Wells Fargo's self-reports of loans to HUD from January 2002 through December 2010, which knowingly omitted at least 6,320 seriously deficient loans, and (5) Wells Fargo's loan level certifications for the 6,320 loans which Defendants knew were false after the QA review was performed on these loans and which were used to get false or fraudulent claims for FHA

insurance paid for these loans.  In addition, Defendants submitted and caused to be submitted false records and statements to HUD in connection with claims that were submitted for FHA insurance for defaulted loans that Wells Fargo had falsely certified were eligible for FHA insurance.

165.   A truthful individual loan certification for FHA endorsement is a condition of payment of FHA insurance on that loan.  HUD paid insurance claims, and incurred losses, relating to these FHA mortgages that Wells Fargo falsely certified were eligible for HUD insurance and failed to self-report as required.

166.   By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## FIFTH CLAIM

### Violations of FIRREA
### (12 U.S.C. § 1833a)
### False Certifications and Statements to HUD
### As to Defendant Wells Fargo

167.   The Government incorporates by reference paragraphs 1 through 141 as if fully set forth in this paragraph.

168.   By virtue of the acts described above, and for the purpose of inducing HUD to endorse loans for FHA insurance, Wells Fargo knowingly made, used, or caused to be made or used, false individual loan certifications stating that loans were eligible for FHA insurance and that Wells Fargo had complied with other requirements including maintenance of data integrity and/or due diligence, and further submitted and caused to be submitted false claims in order to

receive insurance payments to which it was not entitled.  Wells Fargo submitted and caused to be submitted such false certifications and false claims to HUD using the mails and/or the wires in violation of 18 U.S.C. §§ 1001, 1005,[3] 1014, 1341, and 1343.  Further, as part of Wells Fargo's scheme to avoid informing HUD of the loan quality problems that the bank was experiencing and to avoid requests by HUD for indemnification on individual loans, the bank knowingly made numerous material fraudulent representations to HUD about its self-reporting practices using the mails and/or the wires in violation of 18 U.S.C. §§ 1001, 1005, 1014,[4] 1341, and 1343, including, but not limited to:  (1) Wells Fargo's May 2004 Quality Control Plan submitted to HUD which falsely represented that Wells Fargo's policy and practice was to self-report loans as required, (2) Wells Fargo's January 18, 2006 letter to HUD falsely stating that the bank had been self-reporting loans, (3) Wells Fargo's electronic submission of self-reported loans to HUD from October 2005 through December 2010, which knowingly omitted at least 6,320 seriously deficient loans, and (4) Wells Fargo's electronic submission of claims for payment, from 2002 through the present, on loans it knew were ineligible for FHA insurance.   These misrepresentations and omissions were material to HUD's decision to insure the loans and pay the insurance claims on defaulted loans.

169.   Wells Fargo made these statements to HUD with respect to the loans that it recklessly originated and underwrote between May 2001 and October 2005, and with respect to the loans that Wells Fargo failed to self-report between January 2002 and December 2010, with

---

[3] Wells Fargo's violations of the fourth paragraph of 18 U.S.C. § 1005 provide the basis for the United States' allegation of FIRREA violations based upon that predicate statute.

[4] With respect to Wells Fargo's violations of 18 U.S.C. § 1014, the Government only asserts claims based upon false statements and records made after July 30, 2008.

the intent to defraud or deceive HUD into endorsing loans that were ineligible for FHA insurance, and to defraud or deceive FHA into paying insurance claims for loans that were not eligible for insurance.  In connection with this scheme, as holder of record on a significant majority of those loans, Wells Fargo knowingly and intentionally submitted or caused to be submitted FHA insurance claims on thousands of ineligible loans and, as a result, received hundreds of millions of dollars in FHA insurance payments to which it was not entitled.  In addition, in connection with this scheme, Wells Fargo sold some of those loans that were ineligible for FHA insurance to third parties who submitted claims when the loans defaulted, thereby causing FHA to suffer additional losses.

170.   Wells Fargo is a federally insured financial institution.  Its fraudulent conduct has affected the bank by exposing it to actual losses and increased risk of loss.  Specifically, Wells Fargo has been required to indemnify HUD for specific loans that the bank falsely certified were eligible for FHA insurance and already has entered into hundreds of indemnification agreements for loans it originated and certified for FHA endorsement between May 2001 and October 2005. Wells Fargo's poor underwriting and loan administration practices, including quality control, risked the safety and security of federally insured bank deposits, exposing the bank to substantial losses.  In addition, by engaging in this widespread misconduct, Wells Fargo has exposed itself to substantial civil liability, including potential treble damages and civil penalties under the False Claims Act.

171.   Moreover, Wells Fargo's fraudulent practices that underlie this action also have caused the bank to become a defendant in other lawsuits, and already have resulted in Wells Fargo paying out settlements.  For example, according to Wells Fargo & Company's Year 2011

10-K, in *In Re Wells Fargo Mortgage Backed Certificates Litig.*, 09 Civ. 1376 (SI) (N.D.Cal.), class action plaintiffs asserted claims against Wells Fargo Bank, N.A., among others, alleging that certificate offering documents contained false statements of material fact, or omitted material facts necessary to make the registration statements and accompanying prospectuses not misleading. Similar to this action, the misrepresentations alleged in the *Wells Fargo Mortgage Backed Certificates Litigation* included that Wells Fargo Bank failed to disclose that it: "(i) systematically did not follow its stated underwriting standards and that the underwriting standards actually utilized failed to conform to Wells Fargo Bank's underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in order to generate increased loan volume; and (iii) that "credit risk" and "quality control" were materially disregarded in favor of generating sufficient loan volume as alleged herein and as set forth below." Amended Cmplt., ¶ 66, *In re Wells Fargo Mortgage Backed Certificates Litig.*, 09 Civ. 1376 (SI) (N.D.Cal.). The plaintiff alleged that "Wells Fargo Bank originated as many mortgage loans as possible without regard to the ability of the borrower to repay such mortgages." *Id.* § 67.

172.    The parties agreed to settle the case on May 27, 2011, for $125 million, with Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) opting out of the settlement.

173.    Accordingly, Wells Fargo is liable to HUD for civil penalties as authorized under 12 U.S.C. § 1833a, in the amount of up to the greater of (i) $1 million per violation, (ii) the amount of loss to the United States, or (iii) the amount of gain to Wells Fargo.

## SIXTH CLAIM

### Violations of FIRREA
### (12 U.S.C. § 1833a)
### False Certifications and Statements to HUD
### As to Defendant Lofrano

174.    The Government incorporates by reference paragraphs 1 through 141 as if fully set forth in this paragraph.

175.    By virtue of the acts described above, and as part of Defendants' scheme to avoid informing HUD of the loan quality problems that the bank was experiencing, to avoid requests by HUD for indemnification on individual loans, and to receive payments of FHA insurance for loans that Wells Fargo had identified as being materially defective and not eligible for FHA insurance, Lofrano knowingly made, used, and/or caused to be made or used numerous material fraudulent representations to HUD about the eligibility of Wells Fargo loans for FHA insurance and Wells Fargo's self-reporting practices, and thus executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1001, 1006, 1014,[5] 1341, and 1343.  Specifically, Lofrano knowingly and intentionally directed and/or participated in the bank's practice of not reporting to HUD, as required, thousands of materially defective FHA loans.  In addition, Lofrano knowingly and intentionally directed and/or participated in the creation of Wells Fargo's self-reporting policy, which he knew violated HUD's self-reporting requirements, concealed the bank's policy of non-reporting, and made and/or caused false statements to be made to HUD, including but not limited to personally certifying falsely that Wells Fargo was in compliance with "all HUD-FHA regulations necessary to maintain its HUD-

---

[5] With respect to Lofrano's violations of 18 U.S.C. § 1014, the Government only asserts claims based upon false statements and records made after July 30, 2008.

FHA approval" when he knew that was not the case. Lofrano committed these acts knowing that, in the event that the materially defective loans went into default, claims would be submitted to HUD for FHA insurance and HUD would reimburse the holder of the mortgage, which in most instances was Wells Fargo, as a result of the false certification that the loan was eligible for FHA insurance.

176.     Lofrano made, used, or caused to be made or used the following false statements in connection with the above-described fraudulent scheme, including but not limited to:  (1) Wells Fargo's annual certifications from 2004 through 2010 submitted to HUD in which Lofrano, individually and on behalf of the bank, certified, or caused a direct subordinate to certify, inter alia, that Wells Fargo conformed to all regulations necessary to maintain its HUD-FHA approval, (2) Wells Fargo's individual loan certifications for the 6,320 loans which Lofrano knew were false after the QA review was performed on these loans and which were used to get false or fraudulent claims for FHA insurance paid for these loans, (3) Wells Fargo's May 2004 Quality Control Plan submitted to HUD which falsely represented that Wells Fargo's policy and practice was to self-report loans as required, (4) Wells Fargo's January 18, 2006 letter to HUD falsely stating that the bank had been self-reporting loans, (5) Wells Fargo's submission of self-reported loans to HUD from October 2005 through December 2010, which knowingly omitted at least 6,320 seriously deficient loans, and (6) Wells Fargo's electronic submission of claims for payment, from 2002 through the present, on loans Lofrano knew were ineligible for FHA insurance.  These misrepresentations and omissions were material to HUD's decision to insure the loans and pay the insurance claims on defaulted loans.

177.    Lofrano made or caused these statements to be made to HUD with respect to the loans that he and Wells Fargo failed to self-report between January 2002 and December 2010, with the intent to defraud or deceive HUD into endorsing loans that were ineligible for FHA insurance, and to defraud or deceive FHA into paying insurance claims for loans that were not eligible for insurance.  In connection with this scheme, as holder of record on a significant majority of those loans, Wells Fargo, through Lofrano among others, knowingly and intentionally submitted or caused to be submitted FHA insurance claims on thousands of ineligible loans and, as a result, received hundreds of millions of dollars in FHA insurance payments to which it was not entitled.  In addition, in connection with this scheme, Wells Fargo sold some of those loans that were ineligible for FHA insurance to third parties who submitted claims when the loans defaulted, thereby causing FHA to suffer additional losses.

178.    Wells Fargo is a federally insured financial institution.  Lofrano's fraudulent conduct has affected the bank by exposing it to actual losses and increased risk of loss.  The scheme carried out by Lofrano, of concealing from HUD the existence of thousands of materially defective loans that were ineligible for FHA insurance and, more generally, the bank's significant loan quality control problems, has risked the safety and security of federally insured bank deposits, exposing Wells Fargo to substantial losses.  In addition, by engaging in this misconduct, Lofrano has exposed Wells Fargo to substantial civil liability, including potential treble damages and civil penalties under the False Claims Act.

179.    Moreover, Lofrano's fraudulent practices that underlie this action also have caused the bank to become a defendant in other lawsuits, and already have resulted in Wells Fargo paying out settlements.  For example, according to Wells Fargo & Company's Year 2011

10-K, in *In Re Wells Fargo Mortgage Backed Certificates Litig.*, 09 Civ. 1376 (SI) (N.D.Cal.), class action plaintiffs asserted claims against Wells Fargo Bank, N.A., among others, alleging that certificate offering documents contained false statements of material fact, or omitted material facts necessary to make the registration statements and accompanying prospectuses not misleading. Similar to this action, the misrepresentations alleged in the *Wells Fargo Mortgage Backed Certificates Litigation* included that Wells Fargo Bank failed to disclose that it: "(i) systematically did not follow its stated underwriting standards and that the underwriting standards actually utilized failed to conform to Wells Fargo Bank's underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in order to generate increased loan volume; and (iii) that "credit risk" and "quality control" were materially disregarded in favor of generating sufficient loan volume as alleged herein and as set forth below." Amended Cmplt., ¶ 66, *In re Wells Fargo Mortgage Backed Certificates Litig.*, 09 Civ. 1376 (SI) (N.D.Cal.). The plaintiff alleged that "Wells Fargo Bank originated as many mortgage loans as possible without regard to the ability of the borrower to repay such mortgages." *Id.* § 67.

180.    The parties agreed to settle the case on May 27, 2011, for $125 million, with Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) opting out of the settlement.

181.    Accordingly, Lofrano is liable to HUD for civil penalties as authorized under 12 U.S.C. § 1833a, in the amount of up to the greater of (i) $1.1 million per violation, (ii) the amount of loss to the United States, or (iii) the amount of gain to Lofrano.

## SEVENTH CLAIM

### Breach of Fiduciary Duty
### As to Defendant Wells Fargo

182.   The Government incorporates by reference paragraphs 1 through 141 as if fully set forth in this paragraph.

183.   HUD and Wells Fargo have a special relationship of trust and confidence by virtue of Wells Fargo's participation in the Direct Endorsement Lender program.   The Direct Endorsement Lender program empowered Wells Fargo to obligate HUD to insure mortgages it issued without any independent HUD review.   Wells Fargo is therefore in a position of advantage or superiority in relation to HUD and is a fiduciary to HUD.

184.   As a fiduciary, Wells Fargo had a duty to act for, and give advice to, the Government for the benefit of the Government as to whether mortgages should be insured by FHA under the direct endorsement lender program.

185.   As a fiduciary, Wells Fargo had an obligation to act in the utmost good faith, candor, honesty, integrity, fairness, undivided loyalty, and fidelity in its dealings with the Government.

186.   As a fiduciary, Wells Fargo had a duty to exercise sound judgment, prudence, and due diligence on behalf of HUD in endorsing mortgages for FHA insurance.

187.   As a fiduciary, Wells Fargo had a duty to refrain from taking advantage of HUD by the slightest misrepresentation, to make full and fair disclosures to HUD of all material facts, and to take on the affirmative duty of employing reasonable care to avoid misleading the Government in all circumstances.

188.   As set forth above, Wells Fargo breached its fiduciary duty to HUD.

189.   As a result of Wells Fargo's breach of the fiduciary duty, HUD has paid insurance claims and incurred losses, and will pay additional insurance claims in the future, relating to FHA-insured mortgages certified by Wells Fargo.  HUD has paid a significant amount of those insurance claims directly to Wells Fargo.

190.   By virtue of the above, the Government is entitled to compensatory damages for these past and future losses for breach of fiduciary duty claims which accrued on or after June 25, 2009, in an amount to be determined at trial.

## EIGHTH CLAIM

### Gross Negligence
### As to Defendant Wells Fargo

191.   The Government incorporates by reference paragraphs 1 through 141 as if fully set forth in this paragraph.

192.   Wells Fargo owed the Government a duty of reasonable care and a duty to conduct due diligence.

193.   As set forth above, Wells Fargo breached its duties to the Government.

194.   As set forth above, Wells Fargo recklessly disregarded its duties to the Government.

195.   As a result of the gross negligence of Wells Fargo, the Government has paid insurance claims, and incurred losses, relating to FHA-insured mortgages Wells Fargo endorsed. The Government has paid a significant amount of those insurance claims directly to Wells Fargo.

196.    As a result of the gross negligence of Wells Fargo, the Government will pay future insurance claims, and incur future losses, relating to FHA-insured mortgages Wells Fargo endorsed.

197.    By virtue of the above, the Government is entitled to compensatory and punitive damages for gross negligence claims which accrued on or after June 25, 2009, in an amount to be determined at trial.

## NINTH CLAIM

### Negligence
### As to Defendant Wells Fargo

198.    The Government incorporates by reference paragraphs 1 through 141 as if fully set forth in this paragraph.

199.    Wells Fargo owed the Government a duty of reasonable care and a duty to conduct due diligence.

200.    As set forth above, Wells Fargo breached its duties to the Government.

201.    As a result of Wells Fargo's breaches of its duty, the Government has paid insurance claims, and incurred losses, relating to FHA-insured mortgages endorsed by Wells Fargo.  The Government has paid a significant amount of those insurance claims directly to Wells Fargo.

202.    As a result of the negligence of Wells Fargo, the Government will pay future insurance claims, and incur future losses, relating to FHA-insured mortgages endorsed by Wells Fargo.

203.    By virtue of the above, the Government is entitled to compensatory damages for negligence claims which accrued on or after June 25, 2009, in an amount to be determined at trial.

WHEREFORE, the Government respectfully requests that judgment be entered in its favor, as follows:

a.  On Counts One and Two (False Claims Act), judgment for the Government against Wells Fargo, treble the Government's damages, and civil penalties for the maximum amount allowed by law;

b.  On Counts Three and Four (False Claims Act), judgment for the Government against Wells Fargo and Lofrano, jointly and severally, treble the Government's damages, and civil penalties for the maximum amount allowed by law;

c.  On Count Five (FIRREA), judgment for the Government against Wells Fargo and civil penalties up to the maximum amount authorized under 12 U.S.C. § 1833a;

d.  On Count Six (FIRREA), judgment for the Government against Lofrano and civil penalties up to the maximum amount authorized under 12 U.S.C. § 1833a;

e.  On Count Seven (Breach of Fiduciary Duty), judgment for the Government against Wells Fargo and compensatory damages making the Government whole for past and future losses;

f.  On Count Eight (Gross Negligence), judgment for the Government against Wells Fargo and compensatory damages making the Government whole for past and future losses;

g.  On Count Nine (Negligence), judgment for the Government against Wells Fargo and compensatory damages making the Government whole for past and future losses;

h.  For an award of costs pursuant to 31 U.S.C. § 3729(a); and

i.  For an award of any such further relief as is proper.

Dated:  New York, New York
        January 10, 2014

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

By:    _____
       JEFFREY S. OESTERICHER
       SARAH J. NORTH
       REBECCA S. TINIO
       Assistant United States Attorneys
       86 Chambers Street, Third Floor
       New York, New York 10007
       Telephone No. (212) 637-2800
       Facsimile No. (212) 637-2730
       Jeffrey.Oestericher@usdoj.gov
       Sarah.North@usdoj.gov
       Rebecca.Tinio@usdoj.gov